J. Kent Rutledge, #5-1392
Corinne E. Rutledge, #5-2480
Peter F. Howard, #7-5325
LATHROP & RUTLEDGE, P.C.
1920 Thomes Ave., Suite 500
P.O. Box 4068
Cheyenne, WY 82003-4068

Marc R. Brosseau
Chad M. Lieberman
Brosseau Bartlett Seserman, LLC
6455 South Yosemite Street, Suite 750
Greenwood Village, CO 80111

Colin P. Smith
Robert E. Tonn
Holland & Knight
131 South Dearborn Street, Suite 3000
Chicago, IL 60603

*Attorneys for Defendant Bridgestone Americas Tire Operations, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| BRIAN KEHLER, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 15-CV-127-J |
| ) | |
| BRIDGESTONE AMERICAS TIRE ) | |
| OPERATIONS, LLC; COMMERCIAL TIRE, ) | |
| INC. AND JOHN DOE CORPORATIONS 103, ) | |
| ) | |
| **Defendants.** ) | |

**BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC'S
MOTION TO LIMIT EXPERT TESTIMONY OF DENNIS CARLSON AND
FOR RULE 104(a) HEARING**

Defendant Bridgestone Americas Tires Operations, LLC ("BATO"), moves the Court to exclude certain opinions of Plaintiff's tire expert, Dennis Carlson, pursuant to the standards established by *Daubert* and Federal Rule of Evidence 702.

BATO does not request the wholesale exclusion of Carlson as a witness, nor does it address all of his questionable opinions in this motion. Instead, this motion addresses only specific

opinions that are grounded in untested and unreliable methodologies that find no general acceptance in the tire science community.  Specifically, BATO requests an order prohibiting Carlson from rendering opinions:

1. Regarding alleged defects with the steel belt joints in the subject tire;

2. Regarding claimed adhesion defects evidenced by "liner pattern" marks; and

3. Regarding claimed deficiencies in Bridgestone Americas' warnings.

These opinions are unreliable, unsupported by valid methodology, and must be excluded. The simple facts are that Carlson cannot identify any legitimate foundation for these opinions, nor can he describe a logical or accepted process by which he arrived at them.  The opinions are untested, without peer support, and ultimately based only in Carlson's subjective beliefs.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    CERTIFICATE OF CONFERRAL

Counsel for BATO has conferred both orally and via email with counsel for Plaintiff regarding this motion.  Both the telephone conversation and the emails took place on August 30, 2016.  BATO made reasonable good faith efforts to resolve the dispute.  Per those conversations, the Plaintiff's counsel has advised that the Plaintiff opposes this motion in all respects.

### II.   PLAINTIFF'S TIRE EXPERT DENNIS CARLSON

This motion focuses on the foundation for and the methodology by which Carlson's opinions were formed.  His qualifications are not directly in issue.  But Carlson's background is relevant to evaluating the context in which his proposed trial testimony has been developed.  *See, e.g., Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994).  The facts show that the opinions at issue are not legitimate expert work product, but are instead only result-oriented advocacy.

Carlson was the tire expert whose exclusion was affirmed by the United States Supreme

2

#47766288_v1

Court in the *Kumho Tire Co. v. Carmichael* case. 526 U.S. 137 (1999). Beyond the *Kumho Tire* decision, Carlson is no stranger to court rulings limiting or criticizing his testimony as is illustrated in the collection of orders and opinions attached as Exhibit 1. *See Moore v. The Goodyear Tire & Rubber Co.*, 2011 U.S. Dist. LEXIS 59403 (N.D. Tex. Jun. 2, 2011) (Court finds, "A less scientific approach to arriving at a design defect opinion would be hard to imagine" in excluding Carlson's tire defect opinion); *Siegel v. Sears, Roebuck & Co.*, No. 98-6097-CIV-UUB (S.D. Fla. Mar. 5, 1999) (Court finds Carlson's manufacturing defect theory unsupported his opinions "scant, highly speculative, and ultimately unconvincing"); *Carver v. Uniroyal, Inc.,* (unpublished), (Cal. Ct. App. Nov. 15, 1999) (Court finds "little basis" for Carlson to opinions).

Moreover, as other orders and opinions in Exhibit 1 demonstrate, various courts have also questioned Carlson's litigation tactics. One court sanctioned Carlson, noting that his testimony was "inherently suspect" and "not credible," with "heavy reliance upon . . . hedging, 'weasel-worded' responses." *Griego v. Michelin*, No. CV 496-87, at 65, (S.D. Ga. Dec. 10, 1998). Another court required him to be redeposed, due to his evasive and unresponsive testimony. *Carr v. Cooper Tire & Rubber Co.*, No. 02-0151-CV, (25th Jud. Dist. Tex. July 6, 2004). Yet another sanctioned him for his repeated misuse of protected materials. *Nevil v. Ford Motor Co.*, 1999 WL 1338625 (S.D. Ga. 1999).

Carlson can only be characterized as a professional witness who makes his living criticizing tire manufacturers. Carlson has not been an employee of any tire company since 1987, when he left Michelin Americas and his supervisor negatively reviewed his performance and deemed him ineligible for rehire consideration. (*See* Exh. 2, Carlson deposition, pp. 27-28). Not long thereafter, Carlson made an express decision to focus his consulting career on testifying against tire manufacturing companies. (*Id*., pp. 29-32). He admits that for the past twenty-nine years, 100% of his consulting work has been spent serving as an expert in litigation-related matters, and in those

3

#47766288_v1

matters he works for plaintiffs more than 90% of the time.  (*Id*., p. 41).

## III.  THE DAUBERT ISSUES

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), emphasized that Federal Rule of Evidence 702 requires trial courts to serve as evidentiary "gatekeepers" who must conscientiously screen expert testimony for relevance and reliability.  This requires that the court ensure that such testimony constitutes "good science," (*id.,* p. 593), and that expert findings are sufficiently "derived by the scientific method" or otherwise "supported by appropriate validation."  (*Id*., p. 590).

There is no question that the dictates of *Daubert* apply strongly and directly to the opinions at issue.  In the subsequent *Kumho Tire* decision, focusing on the opinions of Mr. Carlson, the Court abolished the distinction between scientific and technical evidence previously recognized by some courts and held that the opinions of a tire expert merited Rule 702 scrutiny.  Mr. Carlson claims to follow the scientific method in his tire analysis activities.  (*See* Exh. 2, Carlson Deposition, p. 22).  The opinions at issue purport to address a cause and effect relationship between certain physical or mechanical conditions and the failure of the tire. Such relationships must depend upon scientific principles and methodology that can be tested and which, if valid and reliable, can be peer reviewed and gain acceptance in a relevant scientific or technical community.  Absent such testing and acceptance, the opinions must be viewed as scientifically unsound and unreliable.

In assessing the validity of an expert theory or technique, the Supreme Court in *Daubert* and *Kumho Tire* set forth a non-exclusive four factor test to be used in evaluating the admissibility of expert testimony: "(1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and a known rate of error; [and] (4) whether the theory has been accepted in the scientific community." *Truck Ins. Exch. v. MagneTek, Inc.*, 360

4

F.3d 1206, 1210 (10th Cir. 2004) (citing *Daubert*, 509 U.S. at 590). The simple fact is that when measured against these factors, or any other indicia of reliability, the Carlson opinions addressed here do not pass muster.

### A. The Opinions at Issue

#### 1. Carlson's Belt Joint Defect Opinion

Carlson holds the opinion that a joint or splice in one of the tire's four steel belts is overlapped and contains an offset, which he refers to as a "dog-ear." Carlson opines that this splice caused the initiation of a separation in the tire. Yet, Carlson concedes that the separation initiated at a place in the tire nowhere near the splice at issue. The splice that Carlson is critical of is in the number one belt (the belt farthest from the tire's tread), also known as the transition belt, which is generally known as a "non-working belt" as it is under the least stress of any of the three belts. (*See* Exh. 2, p. 153). Carlson admits that the separation did not occur at the number one belt. (*Id.*, p. 156). Rather, he opines that the separation initiated at a different level in the tire, between the number two and three belts, and at a location nearly 90 degrees around the tire from the offset. (*Id.*, pp. 152-58). In other words, the separation was one quarter of the way around the tire and in a different layer than the allegedly improper splice. There is simply no scientific support or validation for Carlson's opinion that an overlapped or dog-eared splice, especially one so far removed from the point of initiation of a separation, could possibly be causative.

Carlson's belt joint opinion is supported by none of the *Daubert* indicia of reliability. Carlson acknowledges that he has never personally conducted any testing of the effect of belt joints in the allegedly defective condition he identifies. (*Id.*, p. 173). He is also not aware of testing done by anyone else that would support his opinion. (*Id.*, p. 174). Carlson could not identify a single peer-reviewed paper that supports his opinion that such a belt splice can cause a tread belt separation. (*Id.*, p. 173). Indeed, the only published testing that Carlson is aware of is actually

5

contrary to his opinion. (*Id*., pp. 175-77).

And when asked to identify the community of experts who generally accept his belt joint opinion, Carlson simply identified one individual who, like him, makes his living testifying against tire companies. (*Id*., pp. 174-75). He was forced to admit:

> Q. Can you identify any community of tire scientists or tire engineers that has ever indicated its general acceptance of the concept that splice conditions like this in the nonworking transition belt can cause a separation in the working belts 2 and 3?
>
> A. No, I can't say that.

(*Id*., p. 173).

Carlson's belt joint opinion does not pass the reliability and validity tests of Rule 702 and *Daubert* and it must be excluded.

### 2. Carlson's "Liner Pattern" Adhesion Defect Opinion

Carlson includes among his defect contentions a manufacturing defect claim that the tire exhibited poor adhesion. His methodology behind that conclusion involves his subjective observation of what he calls "liner pattern" marks in the steel belt rubber. Carlson's methodology for identifying this alleged "defect" is unrecognized by the scientific community and entirely without support. Carlson could not identify any scientific testing that supports his conclusion:

> Q. Have you ever specifically tested tires with and without what you call liner pattern markings to determine the effect of that condition on tire durability?
>
> A. No.
>
> Q. Can you point me to anyone who's tested that kind of condition in tires with and without those markings and determined that that condition did, in fact, have an adverse effect on tire durability?
>
> A. No.

(*Id*., p. 158).

When pressed at his deposition, Carlson initially claimed that such testing was referenced

#47766288_v1

in his report, however, he was ultimately forced to acknowledge that the only document he is aware of on this subject that comes close to supporting his opinion is actually an expert report written by another plaintiff's tire expert in a different case. (*Id*., pp. 158-59). Clearly this not the type of scientific validation contemplated by *Daubert* and its progeny. Moreover, Carlson acknowledges being aware that there is a body of testing and published studies that contradicts his liner patter opinion and indicates these conditions have no impact on tire durability. (*Id*., pp. 160-62).

Finally, in a last ditch attempt to salvage his liner patter opinion, Carlson claimed to find support in phantom testing that he could not produce or even discuss:

> Q. I want to know if you can point me to testing, Mr. Carlson. It's real simple.
>
> A. Oh, okay. Well, I have some testing coming, but I don't have it in a report yet.
>
> Q. And you don't have it in your references you brought with you here today, right?
>
> A. Right.
>
> Q. And what testing do you have coming that you can't disclose?
>
> A. Well, there's a guy that's done some testing, and I have to find out whether it's protected right now.
>
> Q. All right. So my question is, right now, can you point me to any testing that proves that this condition has an adverse effect on tire durability?
>
> A. No . . . .

(*Id*., pp. 159-60).[1]

When asked about published literature that supported his liner pattern opinion, Carlson could identify only one paper for such a proposition. However, even there Carlson's support

---

[1] Carlson's reliance on undisclosed and allegedly undisclosable protected materials is one of his common litigation tactics. Such phantom support cannot withstand *Daubert* scrutiny, and the Court also should prohibit Carlson from

7

#47766288_v1

disappears. The paper in question was written by a tire expert named Marvin Bozarth. However, Bozarth has become aware of Carlson's reliance upon his work and has offered stark criticisms of Carlson for such reliance, describing it as "completely wrong." (*Id*., pp. 163-64). Carlson admits to being fully aware of these criticisms:

> Q. And you know Mr. Bozarth has actually testified under oath in a case that you were in that you have misused and misinterpreted his work, correct?
>
> A. Yes.

(*Id*.).

When pressed for additional support, Carlson identified a book published by Tom Giapponi. (*Id*., pp. 164-67). However, Carlson has testified that he does not find the Giapponi book to be authoritative on a number of topics, and "disagree[s] dramatically" with much of the book, so he picks and chooses the portions he accepts as reliable. (*Id*., pp. 164-65). This is true even with respect to Giapponi's liner pattern work, which Carlson finds to be only partially valid:

> Q. So - - my point is, Mr. Carlson, is, you don't even agree with him on this whole issue of liner pattern?
>
> A. Yes.
>
>    * * *
>
> Q. So you think he's wrong, and you disagree with him?
>
> A. That part of it, yes.

(*Id*., pp. 165-66).

Carlson cannot identify any tire science or tire engineering body that has ever indicated its general acceptance of the proposition that what he calls liner patter marks can have a negative impact on tire durability. (*Id*., at p. 167). Carlson's liner pattern opinion is simply his own *ipse*

---

attempting to make such references during the trial of this case.

#47766288_v1

*dixit*, generated for purposes of his litigation consulting business.[2]

The admitted evidentiary weaknesses and large analytical gap in Carlson's liner pattern opinion require its exclusion. *See McDowell v. Brown*, 392 F.3d 1283, 1298-1299 (11th Cir. 2004).

### 3. Carlson's Speed Restriction Warning Opinion

In the final area addressed by this motion, Carlson purports to render opinions critical of BATO's warnings with regard to the speed restriction or speed rating of the subject tire. All truck tires have speed restrictions, which is the maximum speed at which the tire is supposed to be operated. The subject Bridgestone R283 tire was restricted to 75 mph, which is the highest rating for any truck tire appropriate for the Freightliner tractor involved in this case. Yet, there is ample evidence that Brian Kehler routinely operated the tractor at speeds far in excess of 75 mph, at times even exceeding 90 mph. According to BATO's tire expert Joseph Grant, damage caused by excessive speed was one of the primary causes of failure of the subject tire.

Carlson is critical of BATO's communication of information regarding the speed restriction, believing that additional warnings should have been printed on the side of the tire[3], in addition to BATO's printed warranty brochure and other industry literature. Yet Carlson admits that he has testified that he is not a warnings expert (*Id*., p. 220). He further concedes that he has no experience writing or evaluating warnings. (*Id*., pp. 219-20):

> Q.   Now, you've testified you're not an expert in warning effectiveness, correct?

---

[2] The *Daubert* case law disdains methodologies generated and employed in litigation. *See, e.g., Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (noting that the conclusions reached independent of litigation provide "important, objective proof that the research comports with good science"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (on remand), *cited in* Fed. R. Evid. 702, advisory committee's notes (finding that "one significant fact [to be considered] is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted *independent of the litigation*, or whether they have developed their opinions expressly for purposes of testifying") (emphasis added).

[3] While Carlson is critical of BATO for not imprinting the sidewall of the subject tire with some unspecified warning language, he admits that during the time he worked in the tire industry, his employer Michelin did not imprint truck tires with speed ratings. (Exh. 2, pp. 221-22).

#47766288_v1

> A.   Yes.
>
> Q.   You've also testified you're not an expert in the things that - - about warnings that may or may not change people's behavior, correct?
>
> A.   Well, I generally don't do that.
>
>    \* \* \*
>
> Q.   Have you ever done anything to test the effectiveness of any warning?
>
> A.   No, I don't have to.
>
> Q.   Do you have any data here in your file today that in any way suggests that an English language warning of any kind would change anyone's behavior?
>
> A.   No, that's not my job.

(*Id.*, pp. 226-27).

Even if we are to set aside Carlson's complete lack of any identifiable methodology, the insurmountable analytical gap in Carlson's warning opinion is the fact that Plaintiff Brian Kehler has admitted that he never read ***any*** information contained on the sidewall of the subject tire.  (*See* Exh. 3, Kehler Deposition, pp. 235-38).  In other words, no warning that BATO might have chosen to include on the tire would have prevented this accident because it too would not have been read.

Faced with this undeniable reality, Carlson simply responded, "I don't think it could have hurt."  (Exh. 2, pp. 222-23).  We are just asked to take Carlson's word for it.  This is not proper expert opinion testimony.

### B.   The Unreliability of the Opinions at Issue

Whether expert opinion testimony is supported by an adequate basis and is admissible is a matter of law to be determined by the trial judge.  *Truck Ins. Exch.*, 360 F.3d at 1210.  When faced with a proffer of expert testimony, the district court must determine at the outset whether the reasoning or methodology underlying the testimony satisfies the *Daubert* test and is thus

"scientifically sound" and "based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* (citing *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

The first issue to be resolved in determining the admissibility of expert testimony is whether the proffered testimony is "scientific knowledge." *Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592)). This task requires that the trial court consider whether the testimony has been subjected to the appropriate methodology, as opposed to mere subjective belief or unsupported speculation. *Goebel*, 215 F.3d at 1087 (citing *Daubert*, 509 U.S. at 592). Thus, the court must satisfy itself that the expert's reasoning and methodology is both "scientifically valid and applicable to a particular set of facts":

> [T]o be reliable under *Daubert*, an expert's scientific testimony must be . . . "ground[ed] in the methods and procedures of science" based on actual knowledge, *not "subjective belief or unsupported speculation."* In other words, "an inference or assertion must . . . be supported by appropriate validation – i.e., 'good grounds' based on what is known."

*Dodge v. Cotter Corp.* 328 F.3d 1212, 1221-22 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590). "[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." *Mitchell*, 165 F.3d at 782 (quoting *In re Paoli R.R. Yard PCB Lit*, 35 F.3d 717, 745 (3rd Cir. 1994)).

A leading decision of the Tenth Circuit notes that the purpose of the *Daubert* inquiry is always "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Dodge*, 328 F.3d at 1223 (quoting *Kumho Tire*, 526 U.S. at 152). In performing its evaluation, the district court generally should focus on the expert's methodology; however, the expert's ultimate conclusions are not immune from scrutiny, either. *Dodge*, 328 F.3d at 1222. "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the Court explained in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is

11

connected to existing data only by the *ipse dixit* of the expert." *Id.*; *see also Dodge*, 328 F.3d at 1223 (recognizing that the *ipse dixit* of the expert is insufficient foundation for an admissible opinion).

Other courts have likewise recognized that expert conclusions are not to be accepted simply because "an expert says it is so." *See, e.g., Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987). When the expert "br[ings] to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment. *Viterbo*, 826 F.2d at 421. The *Viterbo* Court affirmed summary judgment and the exclusion of expert testimony that was unreliable, holding that "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Id.* at 422; *see also Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992) (holding evidence legally insufficient when no understandable scientific basis was stated).

The Tenth Circuit has also found such unsupported opinions and conclusions to be inadmissible under *Daubert*. For example, in *Mitchell* the court found that the experts' opinions at issue were inadmissible under *Daubert* for several reasons, including that they had not been published and subjected to peer review, had not been tested, and had not been generally accepted in the scientific community. *Mitchell*, 165 F.3d at 783-84 (holding that experts who render opinions "prior to performing the necessary validating tests may properly be viewed . . . as lacking the objectivity that is the hallmark of the scientific method"). In terms of reliability and methodology, Carlson's opinions here are on all fours with the opinions excluded in *Mitchell*. *Id.* at 783.

Similarly, in *Truck Insurance Exchange* the court held that the "analytical gaps in the experts' opinions [were] too broad for their testimony to endure under the strictures of *Daubert* and Rule 702" where the theory at issue had not been sufficiently tested, the rate of error was unknown, and questions had been raised about theory's acceptance in the relevant scientific community. *Truck Ins. Exch.*, 360 F.3d at 1213-14 (quoting *Mitchell*, 165 F.3d at 783); *see also Black v. M & W*

12

*Gear Co.*, 269 F.3d 1220, 1237 (10th Cir. 2001) (expert's untested theory properly excluded under *Daubert*).

Carlson's opinions here are of exactly the type condemned by the Supreme Court in *Kumho Tire*. Carlson's methods and resulting conclusions here, like those he espoused in *Kumho Tire*, are standardless and subjective. *See Kumho Tire*, 526 U.S. at 154–57. As in *Kumho Tire*, there is no validation of Carlson's approach or indication that it is generally accepted by the community of tire experts. *Id.* at 157.

The speculative and unsupported opinions that Carlson attempts to offer in this litigation suffer from the same shortcomings as those stricken above. The opinions are untested, without peer support among any recognized community of tire experts, and contradicted by other available evidence which Carlson either ignored or failed to consider. Moreover, the opinions lack a legitimate foundation and Carlson is unable to describe any logical process by which he arrived at them. In short, the opinions lack any of the validation mandated by *Daubert* and, thus, they contribute "nothing to a legally sufficient evidentiary basis." *See J.B. Hunt Transp. Inc. v. General Motors Corp*, 243 F.3d 441, 444 (8th Cir. 2001).

## IV.     RULE 104(a) HEARING

BATO believes that the evidence set forth in this memorandum and exhibits overwhelmingly supports excluding the challenged Carlson opinions. However, should the Court have any doubt that the unreliability and inadequacy of the opinions at issue is fully demonstrated herein, BATO requests that the Court conduct a hearing pursuant to Federal Rule of Civil Procedure 104(a) to inquire further into the specific opinions at issue here. While the decision to conduct a Rule 104(a) hearing lies within the discretion of the trial court, *Kumho Tire* counsels that a hearing is appropriate in "more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire*, 526 U.S. at 152.

Dated this 2nd day of September, 2016.

                Defendant Bridgestone Americas Tire Operations, LLC

                By:  /s/ Robert E. Tonn_____
                     Colin P. Smith
                     Robert E. Tonn
                     HOLLAND & KNIGHT, LLP
                     131 S. Dearborn Street, 30th Floor
                     Chicago, IL  60603
                     colin.smith@hklaw.com
                     robert.tonn@hklaw.com

# CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing was served via CM/ECF on this 2nd day of September, 2016 upon the following parties:

Diana Rhodes
Traci Rivinus
The Rhodes Law Firm
2015 Warren Ave.
Cheyenne, WY 82001
Phone:  (307) 634-4444
Fax:  (307) 222-0280
Email: diana@drhodeslaw.com
   traci@drhodeslaw.com

Richard Friedman
Sean Gamble
Friedman/Rubin
51 University Street, Suite 201
Seattle, WA  98101
Phone:  (206) 501-4446
Fax:  (206) 623-0794
Email: rfriedman@friedmanrubin.com
   sgamble@friedmanrubin.com

*Attorneys for Plaintiff*

Monty Barnett
Grant Curry
White & Steele, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO  80202
Phone:  (303) 296-2828
Fax:  (303) 296-3131
Email: mbarnett@wsteele.com
   gcurry@wsteele.com

*Attorneys for Defendant Commercial Tire, Inc.*

/s/ Robert E. Tonn_____

#47766288_v1