EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



LINDSAY MOORE, INDIVIDUALLY        §
AND AS INDEPENDENT EXECUTRIX       §
OF THE ESTATE OF ZACHARY RAY       §
MOORE, ET AL.,                     §
                                   §
          Plaintiffs,              §
                                   §
VS.                                §   NO. 4:10-CV-372-A
                                   §
THE GOODYEAR TIRE & RUBBER         §
COMPANY,                           §
                                   §
          Defendant.               §

MEMORANDUM OPINION
and
ORDER

Before the court for decision is the motion for partial
summary judgment filed by defendant, The Goodyear Tire & Rubber
Company, ("Goodyear") on March 23, 2011.  After having considered
such motion, the response of plaintiffs thereto, Goodyear's
reply, the other items that have been filed in the above-
captioned action, and pertinent legal authorities, the court has
concluded that such motion should be granted in part and denied
in part.

I.

## Nature of the Action

By this action, plaintiffs, H. R. Moore, Jr., Trena Moore, and Lindsay Moore, individually and as independent executrix of the estate of Zachary Ray Moore, who are the survivors and the personal representative of the estate of Zachary Ray Moore ("Zachary"), sued Goodyear to recover damages allegedly resulting from the failure of a tire on a vehicle Zachary was operating that led to Zachary's loss of control of the vehicle, causing his death. Plaintiffs alleged that the tire was originally designed, manufactured, and placed into the stream of commerce by Goodyear several years prior to the accident. Causes of action are alleged by plaintiffs against Goodyear based on manufacturing, marketing, and design defect, breach of warranty, and negligence theories.

II.

## The Grounds of the Motion

Goodyear asserts in its motion that:

1.   There is no evidence to support Plaintiffs' claim
     for malice and exemplary damages;

2.   There is no evidence that Zachary Ray Moore
     experienced conscious pain and suffering;

3.    There is no evidence that the absence of a nylon
      overlay is a design defect.

Mot. at 2.  Goodyear seeks summary adjudications in its favor on

plaintiffs' claims that Goodyear was guilty of malice and is

subject to an award of exemplary damages in favor of plaintiffs;

that Zachary experienced conscious pain and suffering for which

the personal representative of his estate is entitled to make a

recovery from Goodyear; and, that the failure of Goodyear to

design the tire in question with a nylon overlay was a causative

design defect.[1]

III.

Analysis

A.    The Ground of the Motion as to Plaintiffs' Claim that
      Goodyear Was Guilty of Malice for Which Exemplary
      Damages Should be Awarded

Plaintiffs do not provide a response to the first ground of

Goodyear's motion other than to state that plaintiffs do not

oppose Goodyear's motion for summary judgment on punitive

damages.  Br. in Supp. of Resp. at 1 n.1 & 5.  The court takes

this concession, combined with plaintiffs' failure to make

---

[1]The "nylon overlay" design defect theory was not specifically alleged in plaintiffs' pleading, but
became a part of plaintiffs' claims through a witness hired by plaintiffs as an expert by the name of
Dennis Carlson, who opined for plaintiffs that absence of a nylon overlay in the design of the tire was a
causative design defect. Resp., App. at 20-23.

3

further response on the subject, to be a concession that the
first ground of Goodyear's motion should be granted.  Therefore,
the court is granting Goodyear's motion as to malice and
exemplary damages by ruling that plaintiffs' claims that Goodyear
was guilty of malice and that plaintiffs should recover exemplary
damages from Goodyear are without merit and no longer will be
issues in this case.

B.    The Conscious Pain and Suffering Ground of the Motion

       The second ground of the motion is based on Texas case law[2]
that only pain and suffering that is consciously experienced is
compensable.  See Casas v. Paradez, 267 S.W.3d 170, 185 (Tex.
App.--San Antonio 2008, pet. denied); Southern Pac. Transp. Co.
v. Luna, 730 S.W.2d 36, 38 (Tex. App.--Corpus Christi 1987, no
writ); Russell v. Ramirez, 949 S.W.2d 480, 491 (Tex. App.--
Houston [14th Dist.] 1997, no writ); Canales v. Bank of Cal., 316
S.W.2d 314, 317-18 (Tex. Civ. App.--Eastland 1958, writ ref'd
n.r.e.).  While the court's decision on this ground is a close
call, the court has decided to deny the motion as to this ground
on the assumption that the matter can be dealt with in the
court's charge to the jury if there is no trial evidence that

_____

       [2]The occurrence in question happened in Texas, with the consequence that Texas substantive law
governs.

4

Zachary had any conscious pain or suffering.  The court is
inclined to agree with plaintiffs that even if there is no
evidence of physical pain and suffering, there undoubtedly will
be circumstantial evidence that would support an award of mental
anguish damages for whatever mental turmoil Zachary might have
experienced from the time he lost control of the vehicle until it
crashed.

C.   The "Nylon Overlay" Design Defect Theory

     The only evidence adduced by plaintiffs in support of their
theory that absence of a nylon overlay in the design of the tire
in question was a causative design defect are the opinions
advanced by Dennis Carlson ("Carlson"), an engineer who
plaintiffs have retained as an expert in this action.  Carlson's
opinions favorable to plaintiffs on this subject are found in his
declaration, which is under tab D of plaintiffs' appendix to
their brief in response to the motion.  Br. in Supp. of Resp.,
App. at 20-23, ¶¶ 15-25.  The parties seem to be in agreement
that the merit of this third ground of the motion depends on the
validity of Carlson's opinions.  If plaintiffs are to satisfy
their summary judgment burden, they must do so through the
evidence provided by Carlson.

In deciding whether Carlson's opinions constitute probative summary judgment evidence that would raise a genuine issue of fact that absence of a nylon overlay was a causative design defect, the court has given significant attention to the Supreme Court decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999),[3] which put meat on the bones of Rule 702 of the Federal Rules of Evidence.[4]   While the substantive law of Texas is applicable to this case, the Federal Rules of Evidence control the admission of expert testimony.   <u>Mathis v. Exxon Corp.</u>, 302 F.3d 448, 459 (5th Cir. 2002).   "The admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment."   <u>First United Fin. Corp. v. U.S.F. & G. Co.</u>, 96 F.3d 135, 136-37 (5th Cir. 1996).

---

[3]In a sense, <u>Kumho</u> is particularly pertinent since Carlson was the witness whose opinion was at issue. In <u>Kumho</u>, the Court gave the following explanation of the issue confronting it: "The question was not the reliability of Carlson's methodology in general, but rather whether he could reliably determine the cause of failure of <u>the particular tire at issue</u>." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 139 (1999).

[4]The text of Rule 702 of the Federal Rules of Evidence is as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

All expert testimony is filtered through Rule 702. <u>Mathis</u>, 302 F.3d at 459. Whether a person is qualified to testify as an expert is a question of law. <u>Id.</u> "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." <u>Id.</u> at 459-60. When <u>Daubert</u> and <u>Kumho</u> are taken into account, "the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." <u>Moore v. Ashland Chem. Inc.</u>, 151 F.3d 269, 276 (5th Cir. 1998). That "requires some objective, independent validation of the expert's methodology." <u>Id.</u> at 276. "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." <u>Id.</u> In the final analysis, the court is tasked in determining admissibility of expert opinion testimony with an evaluation of whether the relevance and reliability requirements of Rule 702, <u>Daubert</u>, and <u>Kumho</u> have been satisfied.

In the instant action, so far as the court can tell the only thing in the record bearing on whether absence of a nylon overlay in the tire was causative is Carlson's own <u>ipse dixit</u> that it was. Resp., App. at 22-23, ¶¶ 23 & 25. There is no summary judgment evidence that would provide the element of reliability

to Carlson's bare conclusions that "the absence of a nylon overlay was a producing cause of the tread separation in the accident that occurred on May 28, 2009, and the loss of control of the vehicle in question resulting in the accident," and his opinion that "based upon reasonable engineering probability, that this design defect (the absence of a nylon overlay) was a producing cause of the accident that resulted in the death of Zachary Moore on May 28, 2009." Id. at 23.

Moreover, Carlson admitted in his deposition that absence of such a nylon overlay is not a design defect per se, and that there have been many successful tires that have not had the overlays.  Mot., App. at 130.  Carlson made a similar admission when giving his deposition in a case pending in the United States District Court for the District of Connecticut in March 2006. Mot., App. at 146 (dep. pp. 143-44).  The court notes that in that testimony Carlson said that "if you do have a separation, it will certainly stop it from growing and delay it a great number of miles." Id. (dep. p. 144).  There is no indication that Carlson has done, or is acquainted with, any testing to evaluate how much delay, if any, might be expected with or without a nylon overlay.  In March 2010 Carlson testified in a deposition he gave in a case pending in a Florida state court that he does not know

8

of any manufacturer in this country that uses the nylon overlay in medium truck tires.  Mot. to Exclude Test. of Carlson, App. at 78.

The explanations Carlson gave for his opinions that the absence of a nylon overlay caused the tire to be defective and to fail do not include anything that would cause the court to believe that his opinions are reliable in a <u>Daubert</u> or <u>Kumho</u> sense.  His mere assurances that absence of a nylon overlay was a causative design defect is not enough.  Plaintiffs have failed to persuade the court that Carlson's opinions are based on sound science having some objective, independent validation in an acceptable methodology.  The bases for his opinion on this subject are summed up in five paragraphs of his declaration, as follows:

> 15. Nylon overlays, or cap plies, were first incorporated in a Pirelli tire used as original equipment on a Fiat 2.4L Dino in the late 1960s.  They quickly became ubiquitous on performance vehicles, European vehicles and non U.S. tires.  They have been used by nearly every manufacturer on nearly every type of tire.  Today, they are used on approximately 50% of U.S. light truck tires, almost all non U.S. passenger and light truck tires and, tellingly, on all run flat tires.  There have been several medium truck tires including a Goodyear tire which use either nylon or steel to reinforce the shoulders.  Goodyear has used this construction in a European heavy truck tire for many years.

16. There is ample evidence that nylon overlays prevent tread-belt separations. Firestone proposed nylon overlay versions of its ATX and Wilderness AT tires to prevent separations shortly before the tires were first recalled in 2000. During the recalls and subsequent litigation, Firestone produced a list of hundreds of its tire designs that used nylon overlays, many of which were not high speed or heavy tread and belt tires (Exhibit 2).

17. Goodyear used nylon overlays to control its tread-belt separation problem that surfaced in 1995 in its light truck tires. That same year, a Goodyear design for a medium truck tire with a nylon overlay was patented which plainly states:

> This invention relates to a pneumatic truck tire having belt-edge reinforcement which prevents belt-edge separation..." (Exhibit 3).

In an earlier patent by Goodyear, its design includes a "pair of nylon overlays ... for reinforcement and to prevent tread separation" (Exhibit 4). Several Goodyear engineers have testified as to the effectiveness of nylon overlays in preventing tread separations (Exhibit 5).

18. Nylon overlays reduce the centrifugal forces on the tread-belt package where separations form. This stress occurs every time a tire is used. Centrifugal forces increase with speed and heavier belt packages, thus they are frequently used in higher speed tires and those with heavier belt packages such as light truck and traction tires. Every tire experiences centrifugal forces so nylon overlays benefit separation resistance in all tires.

19. It is my opinion that the subject tire was defective in design because Goodyear failed to design adequate separation countermeasures in this area by failing to use the technologically feasible, reasonable and economically feasible component known as nylon overlays. The subject tire was designed and

10

manufactured and placed into the stream of commerce by
Goodyear in the second week of January 2002.  As set
forth above, the nylon overlays were both
technologically feasible, reasonable and economically
feasible well before January 2002.  As set forth above,
Goodyear also used nylon overlays on tires before
January 2002 to prevent tread separations.

Resp., App. at 20-21.

Boiled down to their essentials, the bases for Carlson's

design defect theory are that since the 1960s certain tire

manufacturers, including Goodyear, have designed a nylon overlay

in certain types of tires they manufactured for certain classes

of vehicles, that their reason for doing so was to reduce the

frequency of tread separations on those types of tires used on

those types of vehicles.  He opines that, therefore, the design

of the subject tire was defective because Goodyear failed to

include in it a nylon overlay.  A less scientific approach to

arriving at a design defect opinion would be hard to imagine.

Kumho is not the only tire-failure case in which an "expert"

opinion of Carlson has been found wanting.  In Prapha-Phatana v.

Cooper Tire & Rubber Co., No. 03-1089-PHX-ROX, 2006 WL 2683629,

*4 (D. Ariz. Sept. 19, 2006), the court, in rejecting a "nylon

overlay" contention, noted that the contention was not supported

by expert testimony.  The expert was Carlson.  The Prapha-Phatana

court noted that in his deposition Carlson "stated that the

absence of a nylon overlay is not necessarily a defect and that 90% of comparable tires do not have a nylon overlay." <u>Id.</u>  In his deposition in the instant case, Carlson acknowledged that there was no methodology that would support his nylon overlay opinion.  Mot, App. at 137.

Carlson's opinions are not supported by any references to scientifically reliable peer review literature, test results, or research.  The court has not been provided information that would cause the court to believe that the opinions of Carlson, and the methods he used in arriving at those opinions, find general acceptance in the relevant scientific-technical community.

Plaintiffs simply have failed to provide the court probative evidence that Carlson's nylon overlay design defect theory is relevant to this particular case or is reliable.  Therefore, the court is ruling that plaintiffs shall not offer evidence from Carlson in support of such a theory, and that plaintiffs' claim of a causative design defect because of absence of a nylon overlay is without merit.

IV.

ORDER

For the reasons given above,

The court ORDERS that plaintiffs' claims that Goodyear was guilty of malice and that plaintiffs are entitled to recover exemplary damages from Goodyear are without merit, and shall no longer be pursued in this action.

The court further ORDERS that defendant's motion as to the conscious pain and suffering issue be, and is hereby, denied.

The court further ORDERS that plaintiffs' claims that the tire in question had a design defect because of absence of a nylon overlay in the design and that the absence of such an overlay caused the accident in question are without merit, and that such claims shall no longer be pursued in this action.

SIGNED June ___2___, 2011.

JOHN McBRYDE
United States District Judge

13

CAUSE NO.  245369-C

| | | |
|---|---|---|
| GEORGE BRINGHURST AND DONNA BRINGHURST, | § § § | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | § § § | |
| VS. | § § | BELL COUNTY, TEXAS |
| LEMANS CORP., D/B/A PARTS UNLIMITED; PIRELLI TIRE, L.L.C.; PIRELLI PNEUS LTDA, | § § § § § | |
| DEFENDANTS. | § | 169TH JUDICIAL DISTRICT |

## ORDER ON PIRELLI TIRE LLC'S MOTION TO
## EXCLUDE CERTAIN EXPERT TESTIMONY OF DENNIS CARLSON

Oct. 25, 2013

On this day came on to be considered Defendant Pirelli Tire LLC's Motion to Exclude Certain Expert Testimony of Dennis Carlson to which LeMans Corporation d/b/a Parts Unlimited has joined, and the Court, being apprised of the arguments of all sides, finds that the Motion should be GRANTED.

It is therefore ORDERED, ADJUDGED and DECREED that Pirelli Tire LLC's Motion to Exclude Certain Expert Testimony of Dennis Carlson to which LeMans Corporation d/b/a Parts Unlimited has joined is GRANTED, and Dennis Carlson's tire defect and accident causation and injury causation opinions which are set forth in Pirelli Tire LLC's Motion to Exclude Certain Expert Testimony of Dennis Carlson are hereby excluded.

SIGNED this **27** day of _____**Oct.**_____, 2013

_____
JUDGE PRESIDING

1

FILED ___ LODGED
RECEIVED ___ COPY

MAY 01 1996

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ E  DEPUTY

FILED ___ LODGED
RECEIVED ___ COPY

MAY 07 1996

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8   YOUNG JA MUN and SUN SAENG MUN,        )
    wife and husband,                      )      No. CIV 94-1817 PHX ROS
9                                          )
                      Plaintiffs,          )
10                                         )
    vs.                                    )      JUDGMENT
11                                         )
    THE UNIROYAL GOODRICH TIRE            )
12  COMPANY, a Delaware corporation;       )
    THE UNIROYAL GOODRICH TIRE            )
13  COMPANY, a New York partnership; et al.,)
                                           )
14                    Defendants.          )
                                           )
15

16        Plaintiffs and defendants Uniroyal Goodrich Tire Company, Inc., a Corporation; The B.F.

17  Goodrich Company; and The Uniroyal Goodrich Tire Company, a Partnership, have presented the

18  court with a stipulation that based upon the Motion for Summary Judgment Concerning Product

19  Defect and Expert Exclusion, along with the Motion *in Limine* on the same issue, plaintiffs cannot

20  proceed in good faith upon the facts in this case and the presently existing state of the law against

21  the above named defendants only.

22        Now, Therefore it is hereby Ordered, Adjudged and Decreed that defendants Uniroyal

23  Goodrich Tire Company, Inc., a Corporation; The B.F. Goodrich Company; and The Uniroyal

24  Goodrich Tire Company, a Partnership, only, are hereby granted judgment as a matter of law and

25  summary judgment since there is no triable issue of fact in dispute establishing that the product in

26  this case, manufactured by The Uniroyal Goodrich Tire Company, a Partnership, was defective.

1   when it was manufactured and when it left the manufacturer's hands. Further, plaintiffs' expert,

2   Dennis Carlson, is excluded as an expert witness from this case on the basis that he is unqualified

3   and not capable of rendering opinions based on scientific methodology. *Daubert v. Merrell-Dow*

4   *Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). The other pending motions between

5   plaintiffs and the defendants receiving judgment herein are deemed moot and withdrawn upon

6   notice. Each party to the stipulation shall bear its own costs and attorneys' fees.

7           DATED this __2__ day of __May__, 1996.

8

9

10                          The Honorable Roslyn O. Silver
                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

- 2 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 98-6097-CIV-UUB

KAREN SIEGEL,

    Plaintiff,

v.

SEARS, ROEBUCK AND CO.,

    Defendant.



## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

THIS CAUSE came to be heard before the Court, sitting as the trier of fact, beginning February 22, 1999, concluding March 1, 1999. Upon consideration the Court makes the following findings:

## FINDINGS OF FACT

1.   On November 9, 1996, the Plaintiff, Karen Siegel, was operating her father's vehicle, a 1984 Thunderbird, on I-95 in Broward County, Florida, when a serious accident occurred which resulted in significant permanent injuries to her.

2.   The accident was proximately caused by the failure of the left rear tire of the vehicle that the Plaintiff was driving. In the accident, the Plaintiff lost control of the vehicle, struck a barrier wall, the vehicle rolled over and skidded to rest on the vehicle's roof.

3.   The defendant Sears Roebuck and Company, (hereinafter referred to as "Sears") was the seller of the left rear tire. That tire had been purchased by Harry Siegel, Karen Siegel's father, at Sears in May, 1989, together with three other tires. These tires were Michelin

Roadhandler steel belted radial tires, size P205/75R14, which were manufactured by Michelin Tire Manufacturing Company of Canada, Ltd. in the tenth week of 1989. The tires carried a 50,000 mile tread life warranty.

4.   In April, 1996, one of these tires, specifically the tire then mounted as the right front tire,  failed.  As a result of the failure, Mr. Siegel took his vehicle to Sears for service where, unknown to him at the time, Sears replaced the failed  tire with a different type of tire.  There is no evidence that the  the mounting of  a different type of tire contributed to the accident or damaged the tire that failed in the accident.  Also, as part of Sears' service at that time, Sears rotated the tires so that the left front tire became the left rear tire that failed in the accident involved in this case.

5.   Sears replaced the right front tire pursuant to the terms of a Road Hazard Service Agreement which Mr. Siegel  had purchased from Sears when he purchased the tires.  Sears would not have replaced the tire under the Road Hazard Warranty unless Mr. Siegel  had advised Sears that the tire failed as a result of an impact  with a road hazard.

6.   In April, 1996, when the right front tire was replaced, the Sears tire installer performed a systems check on the vehicle, including a visual inspection of all of the tires.  Sears' records for the above described inspection and service indicate no unusual wear in or damage to any of the tires.

7.   At the time of the accident the vehicle had approximately 26,000 miles on its odometer.  Also, at the time of the accident the left rear tire had undergone approximately 13,000 miles of use during its 7 ½ year life.  Except for the day of the accident and one occasion a few days earlier, the vehicle had been operated exclusively by Mr.  Siegel  for non-highway travel.

2

8.     The Plaintiff's evidence of a manufacturing defect consisted mainly of the expert opinion of Dennis Carlson.  According to Carlson, the tire failed because of insufficient adhesion of the tread belt components resulting in a tread separation.  Carlson further testified that the separation was  probably due to unspecified contamination that occurred in the part of the manufacturing process wherein rubber (skimstock) is applied to the radial wires to facilitate adhesion.

9.     Carlson's theory that contamination occurred in the manufacturing process, specifically when the rubber was applied to the radial wires, purported to be "non-scientific," that is, based purely upon his education, training and  experience in the tire industry and as a forensic expert who has had the opportunity to examine the carcasses of thousands of failed tires.  While his knowledge, training and experience  were sufficient to qualify him to state a "non-scientific" expert opinion,[1]  the Court was not persuaded that his contamination theory was credible.  Aside from the fact that his testimony was successfully impeached on several points, the sole objective evidence Carlson could point to that supported his theory was the presence of loose wires which extended about one  foot  from each end of the separation.  Carlson, however, was unable to state that he had ever seen a tire that failed while in road use due to contamination in the manufacturing process, or that he had ever seen a tire in road use that failed because the radial wires had become separated from the skimstock.   Moreover, Sears demonstrated through its expert, Thomas Dodson, that loose wires are consistent with impact damage, and the defense

_____

[1]  *See, Carmichael v. Samyang Tire Inc.*, 131 F.3d 1433 (11th Cir. 1997) *cert. granted*, 118 S.Ct. 2339 1998) (admissibility of tire expert's non-scientific testimony not governed by *Daubert v. Merrill Dow Pharm. Inc.*)

expert was able to identify several other manifestations of impact damage in addition to the loose wires which were apparent to him from his examination of the tire. While Carlson disagreed with the defense expert that impact with a road hazard caused the tire to fail, the sole basis for his disagreement was that, in his opinion, a tire that fails from impact will always fail within a few miles (e.g. 14 miles) of the impact and will always leave a mark. His opinion, at least insofar as he maintained that an impact failure will always occur within a few miles of the impact, was not supported by the literature published by the Rubber Manufacturer's Association which Carlson conceded was authoritative. Similarly, Carlson testified that tire separations which are not due to impact damage typically occur over a long period of time, yet his opinion was that the separation in this case occurred within the last 300 miles or so of driving; Carlson was unable to explain why the separation in this case occurred atypically.

10.    The Court has further considered whether the Plaintiff offered credible evidence that the tire was defectively manufactured, notwithstanding that the Court is not persuaded by Carlson's contamination theory. The Court finds, however, that without the contamination theory, the evidence is scant, highly speculative, and ultimately unconvincing that the tire separated as a result of a manufacturing defect. In this regard, Carlson conceded that numerous causes can account for a separation, but that the most common cause is abuse or misuse of the tire due to contact with a road hazard, overdeflection and the like.

11.    Carlson testified, and the Court accepts his testimony, that tires most often fail for reasons associated with abuse or misuse by the users of the vehicle on which they are mounted.

Based upon the findings stated above, the undersigned concludes as follows:

4

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and over the parties.

2. In *West v. Caterpillar Tractor Company, Inc.*, 336 So.2d 80 (Fla. 1976), the Florida Supreme Court adopted §402(A) of the ALI Restatement (Second) of the Law, Torts. In sum, §402(A) provides that one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property, is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold even if the seller has exercised all possible care in the preparation and care of the product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

3. A plaintiff may establish a *prima facie* case of manufacturing defect by either direct or circumstantial evidence. Additionally, when a product malfunctions during normal operation, a legal inference of product defectiveness can arise in appropriate circumstances. *See, Cassisi v. The Maytag Company*, 396 So.2d 1140 (Fla. 1st DCA 1981). In this case, however, the inference is inapplicable because, among other reasons, the subject tire has not been lost or destroyed and because tire failure is not of a kind that ordinarily occurs as a result of product defect. As Carlson testified, tread separations ordinarily occur as a result of impact damage. *See Cassisi*, 396 So.2d at 1152; *see also Goodyear Tire and Rubber Co. v. Hughes Supply, Inc.*, 358 So.2d 1339 (Fla. 1978)(*res ipsa loquitur* is inapplicable to tire blow out cases where the tire has been in use for some time since the facts surrounding a tire blow out incident are discoverable and not typically suggestive of manufacturing negligence).

5

4.   The Plaintiff was required to prove by a preponderance of the evidence that the tire was defective when sold due to a manufacturing defect.  After considering all of the evidence in the case, the Court concludes that the Plaintiff failed to satisfy her burden.  Accordingly, the Court finds for Defendant on Count I, the sole remaining count, of the Complaint[2]

DONE AND ORDERED in Chambers at Miami, Florida, this __5__ day of March, 1999.

URSULA UNGARO-BENAGES
UNITED STATES DISTRICT JUDGE

cc:    Counsel of Record

_____

[2] Because the Court has found for the Defendant, it is unnecessary for the Court to determine what degree of responsibility, if any, Plaintiff bears for the accident.

6

Fourth Appellate District, Division One, No. D028496
S084569

IN THE SUPREME COURT OF CALIFORNIA
EN BANC

ROBERT CARVER Et Al., Appellants

v.

UNIROYAL INCORPORATED, Appellant

TONY SELLERS, Respondent

SUPREME COURT
FILED

MAR 1 5 2000

Frederick K. Ohlrich Clerk

_____
DEPUTY

Appellant's petition for review DENIED.

Mosk, J., is of the opinion the petition should be granted.

George
_____
Chief Justice

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk

NOV 1 5 1999

| | |
|---|---|
| ROBERT CARVER et al., | D028496 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. N64081, N64378) |
| UNIROYAL, INC., | |
| Defendant and Appellant; | |
| TONY SELLERS, | |
| Defendant and Respondent. | |

Court of Appeal Fourth District

APPEALS from a judgment and post-judgment orders of the
Superior Court of San Diego County, Vincent P. DiFiglia, Judge.
Reversed.

Following a jury trial, Uniroyal, Inc. (Uniroyal) appeals a
judgment[1] entered on special verdicts in favor of Robert Carver,

---

[1]   Uniroyal filed a notice of appeal stating it is appealing
the judgment and the court's post-judgment orders awarding costs,
denying Uniroyal's motion for judgment notwithstanding the
verdict and denying Uniroyal's motion for an order preserving
evidence.  In an amended notice of appeal, Uniroyal stated it was

Jason Mondragon and John Johnstone (plaintiffs). Carver, Mondragon and Johnstone's son, Jeffrey, were riding in the rear of a truck owned and driven by Tony Sellers when Sellers lost control of the vehicle while driving on Interstate 5. Mondragon was injured, Carver was rendered quadraplegic, and Jeffrey Johnstone was killed in the accident. The jury found the accident was caused by a defect in the right rear tire manufactured by Uniroyal and found Uniroyal 100 percent at fault for the injuries and death.

Uniroyal contends the court erred in (1) barring comparative fault liability for riding without seat belts in the rear of a pick-up truck; (2) denying its motions in limine and requests for a foundational hearing relating to the qualifications of plaintiffs' experts and the admissibility of their opinions on manufacturing defects; (3) treating plaintiffs and Sellers as adverse parties and structuring the trial proceedings on that basis; and (4) denying Uniroyal's motion for new trial on the ground of the jury foreman's mental incompetence.

Plaintiffs appeal from the judgment and from the court's order granting Uniroyal's post-trial motion to tax Carver's cost

---

also appealing a stipulation and order for inclusion of costs and prejudgment interest in the previously entered judgment. Uniroyal's briefs do not specify errors in the court's post-trial orders; we deem points not raised abandoned. (*Cabrera v. Plager* (1987) 195 Cal.App.3d 606, 609, fn. 3; *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811.)

bill, contending that the court erred by (1) refusing to permit testimony on certain consequential damages; (2) denying Carver recovery of the cost of a discovery referee; (3) refusing arguments and an instruction on loss of enjoyment of life as a compensable item of general damages; (4) refusing instructions on design defect and consumer expectations; (5) admitting evidence of Carver's use of intoxicants; and (6) excluding evidence probative of Uniroyal's liability.

We conclude the court prejudicially erred in instructing the jury on contributory negligence. We further find the court abused its discretion in refusing to hold a hearing to consider the qualifications of plaintiffs' experts and basis for their opinions. Finally, we hold the court erred in treating plaintiffs and Sellers as adverse parties. Our disposition of Uniroyal's appeal renders moot plaintiffs' appeal of the post-judgment order taxing costs. Plaintiffs' conditional appeal of the judgment requests an advisory opinion that we shall not give. Accordingly, we reverse the judgment, vacate the costs award and dismiss plaintiffs' appeal.

FACTUAL AND PROCEDURAL BACKGROUND

On July 7, 1993, Jeffrey Johnstone and plaintiffs Carver and Mondragon were riding unrestrained in the camper shell-covered bed of Tony Sellers' 1982 Chevrolet pick-up truck on Interstate en route from San Diego to Tustin. The right rear tire sustained

3

a separation of tread and outer steel belt.  The tire did not lose air.  Sellers stepped down hard on his brake and the truck skidded, collided with the center median and flipped over.  The camper shell broke off on impact with the median.  Plaintiffs were thrown from the truck; Carver was rendered a quadriplegic, Johnstone was killed and Mondragon suffered injuries.

Sellers had purchased the truck approximately eight months earlier, on November 27, 1992, for use in his new business, primarily to transport workers.  At that time, the truck had 90,565 miles on it and a set of Uniroyal "Laredo LT" model steel-belted tires.  The truck's former owner purchased the tires in May 1985 when the truck had 64,612 miles on it.  The former owner installed the camper shell to store gear.  Plaintiffs' tire failure expert estimated the right rear tire, which was manufactured in 1984, had over 40,000 miles of use on it at the time of the accident.  Sellers never personally checked the tire pressure during the time he owned the vehicle.  In May 1992 Sellers purchased two new tires from Discount Tire.  According to a Discount Tire store manager, company policy would have required all four of Sellers' tires to be checked and the air put at the proper level before the vehicle left the shop.

Plaintiffs sued Uniroyal for personal injuries and wrongful death based on negligence and strict products liability and Sellers for negligence.  They contended the tire was defectively

4

manufactured because of insufficient curing or vulcanization[2]

that caused "poor rubber-to-metal bonding."[3]  Uniroyal maintained

that the tire had no manufacturing defect, but was run in

underinflated and overloaded conditions and sustained impact

damage that eventually caused the tread separation.  Uniroyal

also argued Sellers was negligent for exceeding the speed limit

and not providing the vehicle with proper seating and plaintiffs

were negligent for agreeing to ride in the rear of the truck.[4]

---

[2]    In the vulcanization process, a "raw" tire is placed in a
press that applies measured amounts of pressure and heat for a
specified length of time to produce a firmly cured tire.
Undercure occurs when the raw tire has not received the proper
temperature, time or pressure to trigger a particular chemical
reaction in the rubber.

[3]    The court observed that the plaintiffs' theory of the tire's
defect changed repeatedly over the course of the case.  The
parties later stipulated that plaintiffs' sole claim of defect in
the tire was undercure.  During presentation of Uniroyal's expert
Donald Avila, Carver's counsel responded to an objection by
stating:  "Mr. Carlson has testified, and I think Mr. Grogan will
testify that the exposed steel cords are essentially a function
of the belt and tread coming off.  They are exposed because the
rubber was scraped off.  They are exposed because there was a
poor interface, rubber-to-metal interface.  That is our theory of
the case.  [¶]  You've heard Dr. Kashar testify to that at
length.  You've heard Mr. Carlson testify on the poor rubber-to-
metal bonding.  The court keeps saying, 'Like it or not, that's
your theory.  You're stuck with it.'  [¶]  Let me pursue it."
The main theory advanced by plaintiffs was poor rubber-to-metal
bonding due to undercure.  Seller's expert, Grogan, testified it
was a combination of the open inner liner splice allowing in
moisture and the poor adhesion that led to the tread separation.

[4]    Uniroyal's answer contained affirmative defenses asserting
plaintiffs' comparative fault and assumption of the risk.  The
eleventh affirmative defense alleged that "plaintiff did not

5

However, the court admonished the jury that they were not to consider the absence of seat belts or fixed seats in the truck bed as a factor in plaintiffs' negligence.  It instructed the jury that, as a matter of law, contributory negligence could not be based upon the failure to wear a seat belt where none were provided.

The jury returned a special verdict.  It found Sellers negligent but determined his negligence was not the legal cause of plaintiffs' injuries.  It also found Uniroyal negligent and concluded its negligence was the legal cause of plaintiffs' injuries.  The jury found the tire had a manufacturing defect at the time it left Uniroyal's plant and that the defect caused the plaintiffs' injuries.  It concluded Uniroyal was 100 percent at fault for the injuries sustained by all three plaintiffs.  The court entered judgment against Uniroyal.

I.

*The Court Erred in Instructing the Jury on Comparative*

*Negligence*

Before trial, Carver moved in limine for an order excluding any evidence that he was not wearing a seatbelt or other safety

exercise due care, caution or circumspection, or any care, caution or circumspection, for his own safety . . . and voluntarily assumed the risk of injury attendant upon his conduct . . . ."  The fifteenth affirmative defense alleged that plaintiffs' own "acts, omissions, faults, negligence or culpable conduct" contributed to their injuries.

restraint at the time of the accident on the grounds, among others, that his failure to use unavailable seatbelts was irrelevant and Uniroyal could not prove with certainty the injuries he would have received had he worn a seatbelt. Later, Carver filed an additional brief arguing he could not be negligent as a matter of law for riding in the covered bed of a truck on the ground that he "had no duty to wear a seat belt because there was none available to him." On the same issue, Uniroyal filed a brief addressing the admissibility of certain Vehicle Code sections including the Motor Vehicle Safety Statute, Vehicle Code section 27315,[5] which imposes an obligation to use seat belts in certain types of vehicles. Uniroyal argued plaintiffs' violation of the section "underscored" their negligence.

The court granted plaintiffs' motion, ruling "as a matter of law, a plaintiff cannot be held comparatively negligent for riding in the back of a pick-up truck that was not equipped with bolted down seats and/or seatbelts." It found Sellers alone faced the potential liability for having plaintiffs ride in the bed of his pickup truck without providing restraints.

---

[5]    Vehicle Code section 27315 mandates the use of seat belts by persons over 16-years-old at all times while a passenger in a private passenger motor vehicle on a highway. (Veh. Code § 27315, subd. (e).) It requires that no driver of a private passenger vehicle operate a vehicle unless all passengers over

7

During jury selection, three prospective jurors were removed for cause after expressing opinions about riding in vehicles without seatbelts.  One juror said his motor home had seats with signs indicating they were not to be occupied while the vehicle was in motion; another felt Carver should be responsible for his actions in riding without seat belts; the third juror felt Carver "assumed some of the responsibility" in getting in the truck. That juror explained that he owned a truck with a camper shell and related that the camper shell came with literature stating it was not designed to carry people.

The court instructed the jury on contributory negligence as follows:

> "Contributory negligence, comparative fault, is
> negligence on the part of a plaintiff which,
> combining with the negligence of a defendant, or
> with a defect in a product, contributes as a cause
> in bringing about the injury.  [¶]  As a matter of
> law, contributory negligence cannot be based upon
> a failure to wear a seat belt where none are
> provided.  [¶]  In addition, you are instructed you
> cannot find contributory negligence on the part of
> plaintiff John McGarry. . . .  [¶]  However, one
> who is simply a passenger in a motor vehicle and
> has no right to the control, slash, or management
> of such vehicle nevertheless has the duty to
> exercise the same ordinary care for his own safety
> and protection as a person of ordinary prudence
> would take under the same circumstances.  [¶]  You
> must determine from all the evidence what conduct
> might reasonably have been expected of a person of
> ordinary prudence in the same circumstances.  [¶]
> As to the wrongful death cause of action in this

---

four years-old are properly restrained by a seatbelt.   (Veh.
Code, § 27315, subd. (d)(1).)

case, contributory negligence is negligence on the
part of a decedent which, combining with the
negligence of a defendant or with a defect with
the product, contributes as a cause in bringing
about death. . . .
"[¶]  In order to determine the proportionate
share of the total fault attributable to the
plaintiffs you will of necessity be required to
evaluate the combined negligence of the plaintiffs
and the negligence or defective product of the
defendants whose negligence or defective product
contributed as a cause to plaintiff[s'] injury.
[¶]  In comparing the fault of such persons you
should consider all the surrounding circumstances
as shown by the evidence. . . .[¶]  The
instructions relating to contributory negligence
apply only to plaintiffs Robert Carver; Jeffrey
Johnstone, through his heir, John Johnstone; and
Jason Mondragon."

At trial, Uniroyal was permitted to argue that the

plaintiffs were negligent in deciding to ride in the truck bed

and that the jury should consider the contributory negligence

instruction as to them on that basis.  Under the court's

instruction, however, it was not permitted to argue that

plaintiffs could be held contributorily negligent for riding in

the back of a truck not equipped with fixed seats and/or

seatbelts.[6]

---

[6]    Plaintiffs made a continuing objection and requested a
continuing limiting instruction "each time a reference is made to
seat belt or no seat belt, insofar as Mr. Carver is concerned,
insofar as it deals with a fixed seat or non-fixed seat, insofar
as his getting in the vehicle in the back or not getting in the
vehicle. . . ."  The court complied, stating "the jury will be
admonished that the evidence is to be considered for the limited
purpose of its applicability to Mr. Sellers."  During testimony
of Uniroyal's expert about the safety aspects of seat belts, the
court obliged plaintiffs' request for a limiting instruction,

Uniroyal contends the court erred in ruling that plaintiffs were not contributorily negligent as a matter of law for riding in the bed of a truck not equipped with seat belts.  It asserts plaintiffs' decision to ride unrestrained in the truck bed raised a substantial issue of contributory negligence that the jury should have considered.  It also contends the court's order exempting plaintiffs from contributory negligence under these circumstances contradicts the intent of mandatory seat belt usage under Vehicle Code section 27315.  Uniroyal maintains it was denied the right to a jury trial on a critical defense and that the error was reversible per se, requiring a new trial on all liability issues.

We conclude that the court's instruction on contributory negligence prejudicially confused and misled the jury.  The jury should have been permitted to consider the absence of seat belts in assessing plaintiffs' contributory negligence in choosing to ride in the truck bed.  As the court properly instructed, plaintiffs had a duty as passengers to exercise ordinary care for their own safety.  The California Supreme Court explained that duty in *Pobor v. Western Pacific Railroad Co.* (1961) 55 Cal.2d 314, 324: ". . . the passenger is bound to exercise ordinary care

---

advising the jury that "with respect to the issue of the use of seat belts, that issue, as you will be instructed later, . . . cannot be the basis of any contributory negligence on the part of the occupants of the vehicle.

for his own safety.  He may not shut his eyes to an obvious
danger . . . He is normally bound to protest against actual
negligence or recklessness of the driver, the extent of his duty
in this regard depending upon the particular circumstances of
each case and ordinarily being a question of fact for the jury."
(See also *Rodriquez v. Lompoc Truck Co.* (1964) 227 Cal.App.2d
769, 775.)

The court agreed that some danger was presented -- it
allowed the jury to consider whether plaintiffs were negligent in
choosing to ride in the back of Sellers' truck.  But we are
unable to distinguish the general danger of riding in a truck bed
from the risk of harm or injury posed by the absence of fixed
seats or restraints.

In *Twohig* v. *Briner* (1985) 168 Cal.App.3d 1102, this court
recognized as a matter of "common knowledge" that safety belts
are effective in reducing fatalities and minimizing injuries in
motor vehicle collisions.  (*Id.* at p. 1107.)  We noted that "an
available and visible seat belt provides a passenger with an
opportunity to mitigate damages by minimizing his or her exposure
to potential injury before an accident . . . ."  (*Id.* at p.
1109.)  We believe it equally clear that a passenger may minimize
exposure to potential injuries by declining to ride at highway
speed in a truck bed having no seat belts or any other
restraints.  Indeed, Carver testified that the day of the

11

accident, he did not want to go to work because he did not like
riding in the truck bed.  He was aware of an element of danger
riding in the back of a pickup truck, even with a camper shell
attached, due to the possibility of an accident.  He testified at
his deposition that he always wore seatbelts when they were
provided in vehicles and that he would not ride in the back of a
truck without a camper shell.

Under contributory negligence principles, the jury was
entitled to consider any circumstances tending to show whether
plaintiffs, as passengers, exercised care for their own
protection that a reasonable person would have exercised under
similar circumstances.  Such circumstances would include the fact
that Seller's truck bed lacked seat belts or other restraints and
safety devices and that plaintiffs chose to ride there despite
the obvious danger of riding in a vehicle without restraints of
any kind.  (See, e.g. *Reyes v. Kosha* (1998) 65 Cal.App.4th 451,
462 [". . . the fact that Reyes and Barcenas chose to live in the
camp despite the obvious danger of fire . . . goes to the
question of comparative fault, a question to be decided by the
trier of fact"]; *Von Beltz v. Stuntman* (1989) 207 Cal.App.3d
1467, 1483 [". . . plaintiff clearly was aware that the Aston-
Martin had no seat belts and had some knowledge that the stunts
in which she was about to engage were hazardous . . . [T]he
circumstances of the instant case presented a jury question of

12

whether plaintiff was contributorily negligent"]; *Rodriquez* v.

*Lompoc Truck Co., supra,* 227 Cal.App.2d at pp. 775-776

[plaintiffs' decision to ride in a car for 9 miles knowing the

right-rear tire to be flat was sufficient evidence to support

instructions on contributory negligence].)

We disagree with the holding of *Wineinger* v. *Bear Brand*

*Ranch* (1988) 204 Cal.App.3d 1003, criticized on other grounds in

*Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1107, relied upon by

plaintiffs, to the extent it suggests a contrary result. The

*Wineinger* court's cursory holding in that case was focused upon

proximate cause -- that the evidence did not support jury

consideration of contributory negligence based on a number of

circumstances including that the passenger had no control over

the removal of the top, seats or safety belts of a car. (*Id.* at

p. 1010-1011.) To the extent *Wineinger*'s holding is interpreted

to prevent juries from considering the potential danger assumed

by choosing to ride in the altered vehicle, we decline to follow

it. *Dutton* v. *City of Pacifica* (1995) 35 Cal.App.4th 1171,

another case upon which plaintiffs rely, is inapplicable because

it simply addresses a third party's duty of care to another not

to increase risk of injury. (*Dutton* v. *City of Pacifica, supra,*

35 Cal.App.4th at pp. 1174-1175 [rejecting a duty of care owed by

a police officer for injuries occurring in an truck accident

13

after the officer ordered people to get into the back of a truck and leave the scene].)

It follows that, in considering the totality of the circumstances to determine contributory negligence, the jury should also have been permitted to consider the existence of Vehicle Code section 27315, mandating passengers' use of seat belts in private vehicles. (*Housely* v. *Godinez* (1992) 4 Cal.App.4th 737.) "While subdivision (j) of section 27315 precludes defense arguments that a violation of the statute constitutes 'negligence as a matter of law or negligence per se,' nothing in the statute prohibits a jury from knowing and considering its very existence when determining the reasonableness of driving without a seat belt . . . [I]t was the Legislature's plain intent to allow section 27315 to play the traditional role of a statute in tort litigation, a factor to be considered by the jury in determining the reasonableness of the conduct in question." (*Id.* at pp. 744, 747.)

Plaintiffs counter that other statutes refute Uniroyal's claim that a jury should consider plaintiffs' fault for riding without restraints in the bed of Sellers' truck. They argue Vehicle Code section 27315 does not require truck bed riders to be restrained when it is read and reconciled with Vehicle Code

14

sections 21712, subdivision (c), 31400, and 23116.[7]  We disagree.
When we read those sections in conjunction with Vehicle Code
section 27315, we see nothing that contradicts that section's
clear mandate that passengers over the age of 16 wear a seat
belt.  As noted above (footnote 6, supra), Vehicle Code section
23116, subdivision (e) was not in effect at the time of the
accident.  Vehicle Code section 31400 requires that trucks
transporting workmen have seats securely fastened to the vehicle
(plainly requiring workers to be seated in those seats) but is
silent about seat belts.  Vehicle Code section 21712 arguably may

---

[7]   At the time of the accident, Vehicle Code section 23116,
subdivision (a) provided:  "No person driving a motortruck shall
transport any minor under the age of 12 years in the back of the
motortruck in a space intended for any load on the vehicle on a
highway unless the space is enclosed to a height of 46 inches
extending vertically from the floor, the vehicle has installed
means of preventing the minor from being discharged, or the minor
is secured to the vehicle in a manner which will prevent the
minor from being thrown, falling or jumping from the vehicle."
Effective January 1, 1994, the statute was amended to permit
passengers to ride in the back of a truck on a highway if either
secured by a restraint system or transported in an enclosed
camper or camper shell.  (Veh. Code, § 23116, subds. (b), (d);
Stats. 1993 ch. 895 (AB 153), § 1; Gov. Code, § 9600.)  Vehicle
Code section 31400 in part requires that "trucks used primarily
or regularly for the transportation of workmen shall be (a)
equipped with seats securely fastened to the vehicle.  (Veh.
Code, § 31400, subd. (a).)  Vehicle Code section 21712 prohibits
riding on any vehicle or portion of a vehicle that is not
designed or intended for the use of passengers, but exempts
employees engaged in the necessary discharge of his duty or
"persons riding completely within or upon vehicle bodies in space
intended for any load on the vehicle."  (Veh. Code, § 21712,
subds. (b), (c).)

allow persons to ride in the bed of a truck, but it does not
exempt those persons from wearing seat belts or other restraints.

In any event, we reject plaintiffs' suggestion that
compliance with the statutes they cite would exempt them from
application of contributory negligence.  In *Ramirez v. Plough,
Inc.* (1993) 6 Cal.4th 539, the California Supreme Court noted the
prevailing view of using statutory compliance as a defense to
tort liability:

> Where a statute, ordinance or regulation is found
> to define a standard of conduct for the purposes
> of negligence actions, ... the standard defined is
> normally a minimum standard, applicable to the
> ordinary situations contemplated by the
> legislation.  This legislative or administrative
> minimum does not prevent a finding that a
> reasonable [person] would have taken additional
> precautions where the situation is such as to call
> for them. (Rest.2d Torts, § 288C, com. a, p. 40;
> see also Elsworth v. Beech Aircraft Corp. (1984)
> 37 Cal.3d 540, 547 [208 Cal.Rptr. 874, 691 P.2d
> 630] [manufacturer's compliance with federal
> aircraft safety regulations does not preclude
> liability for defective design]; Buccery v.
> General Motors Corp. (1976) 60 Cal.App.3d 533,
> 540-541 [132 Cal.Rptr. 605] [compliance with
> federal motor vehicle safety standards does not
> preclude liability for defective design].)

(*Id.* at p. 548.)  Nevertheless, the court said "there is some
room in tort law for a defense of statutory compliance.  Where
the evidence shows no unusual circumstances, but only the
ordinary situation contemplated by the statute or administrative
rule, then 'the minimum standard prescribed by the legislation or
regulation may be accepted by the triers of fact, or by the court

16

as a matter of law, as sufficient for the occasion. . . .'
[Citations.]"  (*Ibid*, citing Rest.3d Torts, § 288C, com. a, p. 40
and *Arata* v. *Tonegato* (1957) 152 Cal.App.2d 837, 842-843 [jury
entitled to consider compliance with federal labeling
requirements for hair dye as factor in determining negligence].)
On the present record we cannot conclude as a matter of law that
plaintiffs complied with all applicable statutes.  We think it is
for the jury to consider these statutes and assess whether a
reasonable person would have taken additional precautions.

   Under the circumstances, we find the court erred when it
prohibited the jury from considering the absence of seat belts in
the truck bed in assessing contributory negligence.  Even though
the record shows Uniroyal was permitted to argue plaintiffs'
contributory negligence for riding in the bed of the truck, they
were precluded from arguing the specific factor that posed the
risk of harm: the absence of seat belts.  We conclude it is
probable the erroneous instruction confused and mislead the jury,
prejudicially affecting its verdict.  (*Soule* v. *General Motors
Corp.* (1994) 8 Cal.4th 548, 580; *Rutherford* v. *Owens-Illinois,
Inc.* (1997) 16 Cal.4th 953, 983 [instructional error in civil
cases requires reversal only where it seems probable that the
error prejudicially affected the verdict].)

   Under the *Rutherford* v. *Owens-Illinois, Inc.* standard, we
take into account "'(1) the state of the evidence, (2) the effect

17

of other instructions, (3) the effect of counsel's arguments, and
(4) any indications by the jury itself that it was misled.'
[Citation.]" (Rutherford v. Owens-Illinois, Inc., supra, 16
Cal.4th at p. 983; Soule v. General Motors Corp. (1994) 8 Cal.4th
548, 580-581.)  The determination of whether prejudice occurred
due to instructional error depends heavily on the nature of the
error, assessed in the context of the trial record, and it must
be probable rather than merely possible that the jury's verdict
was based on the incorrect instruction. (Soule, supra, at pp.
580-581 and fn. 11.)

The jury ultimately rejected any contributory negligence on
the part of plaintiffs, instead concluding plaintiffs' injuries
and death were 100 percent caused by Uniroyal.  Its general
finding that Sellers was negligent but not the cause of
plaintiffs' injuries does not, as plaintiffs suggest, preclude a
finding that plaintiffs were in some manner negligent.  Carver
was aware of the dangers of riding in the truck bed.  Uniroyal's
bio-mechanics expert testified that with proper restraints and a
designated seating position plaintiffs would have been protected
from their severe or fatal injury patterns.

In closing argument, Carver's counsel emphasized the court's
instruction: "And the judge is going to tell you an instruction
that you shouldn't and you can't find Mr. Carver guilty of
contributory negligence because he's in the back of a truck

18

without a seat belt." Rereading or emphasizing the language of
an incorrect instruction enhances the likelihood of prejudice.
(*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th
715, 772.) We do not believe the remaining instructions remedied
or lessened the effect of the incorrect instruction. While there
is no direct evidence of the jury's attitude about the
contributory negligence instruction, the record indicates they
were advised and admonished before and during the trial that they
could not base any contributory negligence on the plaintiffs with
respect to the use of seat belts. These repeated admonitions
underscore the prejudice suffered by Uniroyal. We therefore
reverse the judgment for retrial on all liability issues.
(*Hasson* v. *Ford Motor Company* (1977) 19 Cal.3d 530, 552-553,
overruled on other grounds in *Soule* v. *General Motors Corp.*,
*supra,* 8 Cal.4th at p. 580; *Curties* v. *Hill Top Developers* (1993)
14 Cal.App.4th 1651, 1656-1657.)

                              II.

                         *The Experts*

    Plaintiffs designated Robert Carlson, Jr. and Lawrence
Kashar and Sellers designated Richard Grogan as experts to give
opinions about the manufacturing defects and the cause of the
tire's failure. Carlson, a litigation consultant with a masters
degree in mechanical engineering and ten years of tire-related
experience at Michelin America's Research & Development

                              19

Corporation, testified in his deposition that the tire had a
manufacturing defect consisting of a defective inner liner that
allowed air and moisture to enter the structure of the tire,
causing it to weaken.  He identified evidence of "undercure" as a
"contributing factor."  Later in his deposition Carlson stated,
"The defect is undercure, and it manifests itself in the reduced
adherence in the . . . tread belts, and an inner liner crack.
That is the mechanism of the failure."  According to Carlson,
undercure meant that the tire was manufactured with lack of full
vulcanization, or chemical reaction, in the rubber.  Evidence of
undercure, according to Carlson, manifested itself in the yellow
appearance to the cable.  He also conducted a shore test on a
small piece of tread that he said "probably" indicated undercure.
He found the inner liner crack by inflating the tire to
approximately 5 pounds per square inch (psi) and placing soap on
the outside carcass of the tire directly opposite the inner liner
splice.  Carlson did no other testing on the tire.

Carlson has no degree in chemistry; his training in
chemistry is limited to high school and college classes and a
rubber technology course he attended while employed with
Michelin, of which one aspect was chemistry.  He testified he
never devised or evaluated tests to determine the correct
vulcanization of rubber products or tires, nor had he conducted
tests to evaluate a cure problem.  Carlson admitted his

20

professional experience in tire design at Michelin was limited to mechanical aspects of the tire: determining the shape and pressure profiles of the tire to achieve a desired performance. The curing process and related problems was handled by another group at Michelin.

Lawrence Kashar, a physical and mechanical metallurgist whose expertise includes the failure analysis of metals and alloys, testified in deposition that in his opinion, the existence of brass plating on the steel wires of the tire indicated that the "curing process did not proceed in the manner that was intended, and that good adhesion between the rubber and steel wires probably was not obtained." Kashar testified that the sources of his opinion were the deposition transcripts of Carlson and Uniroyal's experts Donald Avila and Gary Fowler; a paragraph from a metals handbook indicating that the steel cords in tires are brass plated; and plaintiff's counsel's comment to him that Grogan testified that during curing the brass is "consumed . . . in order to get a good bond between the steel and the rubber." Kashar admitted he had no background, training, or special experience in tire manufacturing or in physical testing and evaluation of materials specifically for inclusion in tires, nor was he ever involved in the design, specifications or criteria for steel cords in tires.

21

At the time of his deposition, Kashar had done no testing, review of scientific literature or independent investigation of his own and was unable to identify any physical law, chemical formula, or technical, scientific or industry literature supporting his theory. Following his first deposition, Kashar reviewed the literature and testified in a second deposition that the tire was defective due to poor bonding between the brass plating and the rubber. According to Kashar, the brass/rubber bond should be stronger than the rubber itself; if a proper bond was made, the rubber would tear and adhere to the wires if an attempt were made to separate the belts from the rubber. Kashar conceded the scientific literature contradicted Carlson and Grogan's theory that 100 percent of the brass coating is consumed during the vulcanization process in a properly cured tire, but said the literature did not cause him to change his ultimate opinion.

Sellers designated Grogan to testify about the cause of the tire's failure. Although Grogan was continuously employed by Dunlop Tire Company from 1947 to 1980, his direct experience with radial tires and steel/brass/rubber adhesion was for a six-month period in 1958 as a senior technical assistant and "compounder" in a team at Dunlop charged with getting the radial tire into production. Grogan's work on that project consisted of devising and conducting tests to determine the force required to separate

22

a rubber block from a steel cord. His education consists of a "national certificate" in applied physics from the Birmingham College of Advanced Technology, which he attended for a "brief period" while working for Dunlop. He is neither a chemist nor an engineer.

Grogan gave three reasons at his deposition why the tire failed. First, he testified it failed because of tread separation caused primarily by a bad inner liner joint which allowed air and moisture to enter the belt and rust the cords. Second, and to a "very much secondary" extent, the tire failed due to weak adhesion between the cords and surrounding rubber. Finally, he said there was porosity in the "skim stock"[8] due to undercure or "other factors." As to the theory of weak adhesion, Grogan stated "[t]he fact that you can see brass means that the adhesion hasn't formed properly;" there was no proper bond as opposed to insufficient vulcanization. He testified, based only upon his "[y]ears of experience in the industry," that brass is one hundred percent consumed in the vulcanization process if the process is correct. Grogan's explanation as to why clean brassy cords was always indicative of poor adhesion was based on the chemical reaction occurring between the rubber and metal:

> "[Grogan]: The purpose of the brass is to combine with the sulfur in the rubber compound to form a

---

[8]    The skim coat of a tire is the rubber layer coating both sides of the sheet of steel wires that form the belts.

23

> link between the rubber and the brass.  And the
> brass sticks to the steel, and the brass sticks to
> the rubber.  And so the brass has to enter into a
> chemical reaction with the rubber to get adhesion
> at all.  It can't just sit there for the ride.
> . . .
> "[Defense counsel]:  Well, what chemical formula
> or scientific principle do you rely on in support
> of that opinion?
> . . .
> "[Grogan]:  The copper and the brass is converted
> to copper sulfide, at least in part, but probably
> wholly.  And this forms the cross-link between the
> rubber and the metal."

Grogan later attempted to explain that his conclusion about

consumption of brass and inadequate vulcanization was not based

on the chemical reaction itself, but only on the fact that

visible brass appeared on the tire.  Grogan found the bad inner

liner splice by conducting a single air test on the tire

consisting of viewing bubbles after spraying soapy water on a

portion of the tire's inner liner.  He did not repeat the test

nor did he document his findings about the inner liner splice by

photograph or videotape.

Uniroyal moved in limine to exclude the opinions of Carlson

Kashar and Grogan relating to the cause of tire failure,

specifically their opinions that the manufacturing defect in the

tire was "undercure" or inadequate vulcanization.  Uniroyal

argued that Carlson and Grogan's opinions, based upon the theory

that a "brassy" appearance to the tire's steel belt wires proved

insufficient curing, failed to satisfy the foundational

24

requirements for scientific evidence mandated by *People* v. *Leahy*
(1994) 8 Cal.4th 587 (*Leahy*) and *Daubert* v. *Merrell Dow*
*Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*). It
maintained *Leahy* and *Daubert* envisioned the court as a gatekeeper
to assess the reliability of their methodologies. Uniroyal
further argued that neither Carlson's expertise or methodology
met the requirements for scientific reliability and knowledge
sufficient under Evidence Code sections 720 and 801.[9]   Uniroyal
challenged both Carlson and Grogan's qualifications to provide
their opinions under Evidence Code sections 720 and 801, arguing
they lacked the requisite knowledge, skill, experience, training
or education to offer admissible opinions on the issue of
undercure. Uniroyal moved to exclude Kashar's opinion regarding
brassiness of the steel cords as proof of defect on the ground it
was not based upon any specialized skill, experience or training

---

[9]     Evidence Code section 720, subdivision (a) provides: "A
person is qualified to testify as an expert if he has special
knowledge, skill, experience, training or education sufficient to
qualify him as an expert *on the subject to which his testimony
relates*. Against the objection of a party, such special
knowledge, skill, experience, training or education must be shown
before the witness may testify as an expert." (Emphasis added.)
    Evidence Code section 801 provides: "If a witness is
testifying as an expert, his testimony in the form of an opinion
is limited to such an opinion as is: [¶] ... [¶] (b) Based on
matter (including his special knowledge, skill, experience,
training, and education) perceived by or personally known to the
witness or made known to him at or before the hearing, whether or
not admissible, that is of a type that reasonably may be relied
upon by an expert in forming an opinion upon the subject to which

25

and was cumulative of Carlson and Grogan's testimony.  At a
pretrial hearing, it requested the court conduct a hearing under
Evidence Code section 402 to exercise that function before the
jury heard their testimony.

The court denied Uniroyal's in limine motions.  It
considered it improper to render an advance ruling on the
admissibility of Carlson and Grogan's testimony, concluding that
it would take these issues from the jury.[10]  The court also
denied Uniroyal's motion to exclude Dr. Kashar's testimony,
finding it was being asked to "judge the credibility of a witness

_____

his testimony relates, unless an expert is precluded by law from
using such matter as a basis for his opinion."

[10]    The court stated:  ". . . these motions are, in effect,
advance evidentiary ruling requests which are improper.  [¶]
Apparently, the big question here is – if I understand the moving
papers, is this existence of brassy wires being indicative of an
under cure, and still having in mind [Daubert and Leahy], I don't
see how I can determine as a matter of law at this time that that
testimony from either of those witnesses is excludable."  The
court sought input on the manner of making such an evaluation:
". . . in this situation I have got the notion of a 402 hearing,;
I've got an opportunity for a motion to strike, and, as already
has been indicated, jurors are really quite intelligent people,
and to rule and preclude testimony on this subject without
hearing it at all, as opposed to the excerpts from depositions
here and there that have been submitted, I think would be grossly
unfair, grossly unfair."
Finally, in response to Uniroyal's assertion that the court
could make its ruling on the papers, the court commented:  "It is
not the same as hearing the testimony from the witness, and
hearing both sides of the story, and enabling counsel to
establish the appropriate foundation for the testimony.  It
simply cannot be done . . . I think that I've got to give you an
opportunity to kind of -- to try your lawsuit.  So the motion to
exclude the testimony of Mr. Carlson and Grogan will be denied."

26

who has not even testified and determine that it is cumulative
based upon other witnesses who have not yet testified . . . ."
It took Uniroyal's request for a 402 hearing under consideration.

The case proceeded in separate liability and damages phases.
During the liability phase, the court denied Uniroyal's further
objection on *Kelly* grounds to Carlson's methodology and rejected
Uniroyal's renewed argument that Grogan's air test method was not
scientifically viable. It denied Uniroyal's renewed 402 motion
as to Kashar, finding sufficient foundation for Kashar's
testimony.

Carlson was permitted to testify that the nature of the
manufacturing defect causing the tire to fail was a "defective
tread belt adhesion system." He concluded that the presence of
bare and brassy cords over 40 percent of the tire's circumference
"shows that the tire did not have sufficient adhesion . . . it
means that the vulcanization process was not complete . . . ."
He explained: "In the curing process . . . copper combines with
sulfur in the rubber to form a copper sulfide, which is a black
compound. And when you take apart tires that are properly cured,
you see the silver wire. You don't see the copper-colored wire."
The court denied Uniroyal's motion to strike Carlson's testimony
at the close of the liability phase of trial.

Grogan testified at trial that a tire investigator who sees
"clean, brassy cords" on a failed tire "knows there has been no

27

bonding between the rubber and the cord -- steel cords, of course." Grogan said a clean, brassy appearance is "highly significant, because that tells me that there has been no adhesion there." According to Grogan, two manufacturing defects existed in the accident tire: improper adherence of the cord and the split in the inner liner. Based on his air test, he believed wet air permeated the tire causing rust and ultimately the tread separation. He explained that wet air entering the inner liner opening worked *in conjunction with* the weak bond to "push[] the tread off." The jury heard Kashar's testimony from his second deposition in which he conceded problems with Carlson and Grogan's testimony.

Uniroyal's tire failure expert Donald Avila testified the tire had been run in overloaded and underinflated conditions and had sustained continuous and severe impact damage causing it to eventually break apart. As to plaintiffs' theory that the tire left the manufacturing plant without adequate adhesion between the rubber and steel, Avila and another Uniroyal expert Jerry Leyden agreed that a tire with insufficient vulcanization would have failed much earlier in its life. Uniroyal's former director of development and testing, Charles Reynolds, also indicated that lack of adhesion between the steel and rubber "promote[s] very early tire failures." Even Sellers' expert Grogan admitted that

28

tire failure should occur early on, within six months to two years of its life.

Uniroyal contends the court committed reversible error by allowing evidence of plaintiff's "brassy wire theory" as conclusive proof of a defectively manufactured tire without conducting a preliminary *Kelly*[11] admissibility hearing. It argues the theory underlying plaintiffs' experts' opinions -- that 100 percent of the brass coating on the steel cords is consumed during vulcanization -- is a novel scientific "method of proof" (*Kelly, supra*, 17 Cal.3d at p. 30) subject to *Kelly's* three-prong inquiry. Uniroyal urges the defect theory is inadmissible because plaintiffs' did not and cannot demonstrate the reliability and general acceptance in the relevant scientific community of the fact that 100 percent of brass is consumed during the tire curing process, nor can plaintiffs show their experts were qualified to express opinions based upon the theory. Uniroyal further argues that even if the theory was admissible, neither it nor the other defect theories suggested by plaintiffs amount to substantial evidence of a manufacturing defect. According to Uniroyal, prejudice from the court's error results from the dominant role of the theory during trial.

_____

[11]    As did the California Supreme Court in *People* v. *Leahy* (1994) 8 Cal.4th 587, 604 and *People* v. *Venegas* (1998) 18 Cal.4th 47, 76, fn. 30), we refer to the formula as the *Kelly* test.

Plaintiffs on the other hand argue that *Kelly* is inapplicable because their experts' opinions do not rely upon a novel scientific technique, process or theory. They say their experts' testimony is based only upon the well-known chemical reaction that occurs between brass and rubber and a physical inspection similar to that used by other tire failure analysts. According to Plaintiffs, neither Carlson, Grogan nor Kashar rested their opinion on the theory that brass is supposed to be completely converted into copper sulfide in order to produce the desired rubber/steel bond. Plaintiffs compare their experts' opinions to medical opinions based upon deductions from physical symptoms; according to plaintiffs the real controversy was over the "inferences, if any, to be drawn from recognized facts."

The *Kelly* rule for admission of scientific evidence is applicable to "expert testimony which is based, in whole or in part, on a technique, process, or theory which is new to science, and even more so, the law." (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1156; *People* v. *Cegers* (1992) 7 Cal.App.4th 988, 997.) Application of *Kelly* is not limited to use of new machines or processes; it extends to novel scientific theories or principles. (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1156; *Metaleuca, Inc.* v. *Clark* (1998) 66 Cal.App.4th 1344, 1357 [*Kelly* test deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles];

30

*People v. Peneda* (1995) 32 Cal.App.4th 1022, 1030 [expert's approach did not involve a "novel scientific theory or technique"].)   "The *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas, supra,* 18 Cal.4th at p. 47.)

*Kelly* requires the proponent of a new scientific technique, process, or theory to establish three factors.  First, it must establish that the theory is "reliable" by showing that it has "'gained general acceptance in the particular field to which it belongs.'" (*Kelly, supra,* 17 Cal.3d at p. 30; *People v. Stoll, supra,* 49 Cal.3d at p. 1156; *People v. Venegas, supra,* 18 Cal.4th at p. 78.)  Second, it must show the witness testifying on general acceptance is properly qualified as an expert on the subject. (*Kelly, supra,* 17 Cal.3d at p. 30; *People v. Venegas, supra,* 18 Cal.4th at p. 78.)  Third, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. (*Ibid.*)  In performing a *Kelly* evaluation, the court's duty is not to decide whether the theory is "'reliable as a matter of "scientific fact," but simply whether it is generally accepted as reliable by the relevant scientific community.'" (*People v. Venegas, supra,* 18 Cal.4th at p. 85 quoting *People v. Shirley* (1982) 31 Cal.3d 18, 55.)

The testimony of the challenged experts is of a scientific nature.  Although one can arguably address the issue posed under *Kelly*, particularly under prongs two and three, we are not persuaded that the issue meets the threshold criteria for *Kelly*'s application, namely, that it is "new to science."  (*People* v. *Stoll*, *supra*, 49 Cal.3d at p. 1156.)  Accordingly, we believe it best to analyze Uniroyal's objections under the traditional tests under Evidence Code sections 720 and 801.

Uniroyal urges us to perform an independent review and reject the general scientific acceptance of plaintiffs' theory.  Because the court refused to conduct any hearing on the qualifications of plaintiffs' experts' and the bases of their theories, we are incapable of performing de novo review and believe it more appropriate, as did the California Supreme Court in *People* v. *Leahy*, *supra*, 8 Cal.4th 609-610, to remand the issue to the trial court for an appropriate hearing on retrial.  (See also *People* v. *Pizarro* (1992) 10 Cal.App.4th 57, 88-89.)

We do not fault the court for not granting Uniroyal's in limine motions based solely upon the experts' deposition testimony.  However, we are concerned by the court's failure to hold an Evidence Code section 402 hearing to determine whether Carlson, Grogan and Kashar were qualified as experts and to assess the basis for their opinions.  Uniroyal's motions in limine raised substantial concerns about the qualifications of

32

these witnesses and the foundation for their testimony sufficient to warrant such hearings.

"The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court.  [Citations.] . . . 'The competency of an expert "is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement." [Citation.]' [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.)  "On appeal, a trial court's decision to admit or not admit evidence, whether made in limine or following a hearing pursuant to Evidence Code section 402, is reviewed only for abuse of discretion.  [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 153, 197.)

Under Evidence Code sections 801 and 803,[12] the court had wide discretion to rule on foundational matters forming the basis of the expert's testimony.  Upon Uniroyal's motions it was *required* to consider whether Carlson, Grogan and Kashar were sufficiently competent and qualified to render their opinions. (See e.g. *Miller v. Los Angeles County Flood Control Dist* (1973) 8 Cal.3d 689, 700-703; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523; 1 Jefferson, Cal. Evidence Benchbook (3d

---

[12]   Evidence Code section 803 provides in part: "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion."

33

ed. 1998) § 29.24, p. 588 ["If there is a dispute about whether a witness is qualified as an expert witness to give opinion testimony, the judge must make a determination that the witness is so qualified before permitting him or her to testify"].)

Based on the record before us, we question whether Carlson, Grogan and Kashar were sufficiently qualified in experience, training or education to render opinions on chemical processes during the manufacturing of tires. "'"The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited."'" (*People* v. *Williams* (1989) 48 Cal.3d 1112, 1136 [police officer who had investigated 100 rape cases over 17 years was qualified to state it was not unusual for rapist to have no marks on his body, but was not qualified with psychiatric training and expertise to state that marks on the rapist is dependent on the victim's emotional makeup].)

As to Carlson and Grogan, it does not follow that their experience in the tire industry gives them the ability to give opinions on all aspects of tire manufacture or failure. (E.g. *People* v. *Davis* (1965) 62 Cal.2d 791, 801 [not all psychologists are competent to give an opinion on sanity].) Whether a person has sufficient expertise to testify as an expert in a particular

34

case "depends on the facts of that case, the questions propounded to the witness and his particular qualifications." (*Ibid.*)  In particular, we see little basis for Carlson and Grogan's qualifications to render conclusions about the chemical reaction during vulcanization or advance the proposition that brassy color *necessarily* indicates undercure.  Neither witness is a chemist. Neither gave details of any direct experience conducting studies or tests to evaluate insufficient vulcanization.  We do not accept the reasoning that visual examination of numerous failed tires provides sufficient knowledge to give opinions about the significance of brass colored cords.  Carlson in particular could not state how many light truck tires he had examined that experienced belt separation due to undercure or undervulcanization.  As for Kashar, plaintiff's metallurgist, he admitted he had no experience in the tire industry and was not an expert in evaluating rubber or polymers.

Uniroyal raised legitimate issues about the foundation for these experts' opinions.  Neither Carlson nor Grogan conducted any actual testing or chemical analysis of the steel cord in the failed tire to determine whether proper adhesion was obtained. As indicated, Kashar, who had the most relevant training and experience to review and interpret the scientific literature, eventually admitted that the premise underlying Carlson and Grogan's conclusions was contradicted by the scientific

35

literature existing on the very subject at issue: rubber-to-steel adhesion in steel-belted tires.[13]   At the time of Uniroyal's original in limine motion, Kashar's opinions, based on deposition testimony of other experts and matters admittedly outside his expertise, were merely cumulative.   (Evid. Code, § 352.)

Foundational problems with other aspects of Carlson and Grogan's testimony appeared during trial.   Grogan, for example, was permitted to testify that the presence of rust on the accident tire supported his opinion that the tire had a defective inner liner splice.   He testified, however, that the rust did not form until after the first 39,000 miles of use.   Grogan attempted to explain his theory by speculating about the use of dry air and wet air in inflating the tire:   "If this guy inflated his tire with dry air, 39,000 miles, then there would obviously be no rust.   But then he might come across a filling station or something where there was wet air, and then the whole process would start.   So it's perfectly possible to run this tire for quite a long distance without the rust appearing, and then suddenly you get wet air going through instead of dry air, and

---

[13]    See Van Ooij, "Fundamental Aspects of Rubber Adhesion to Brass-Plated Steel Tire Cords,"   52 *Rubber Chemistry and Technology* 605, 623, 625 (1979) [". . . .the adhesive reaction between rubber and steel cord, at least as far as initial adhesion is concerned, involves only a small fraction of the coating (i.e., the brass coating is not completely consumed during bonding). . . . . only a fraction of the brass coating is consumed under conditions of normal cure."]

literature existing on the very subject at issue: rubber-to-steel
adhesion in steel-belted tires.[13]   At the time of Uniroyal's
original in limine motion, Kashar's opinions, based on deposition
testimony of other experts and matters admittedly outside his
expertise, were merely cumulative.   (Evid. Code, § 352.)

Foundational problems with other aspects of Carlson and
Grogan's testimony appeared during trial.  Grogan, for example,
was permitted to testify that the presence of rust on the
accident tire supported his opinion that the tire had a defective
inner liner splice.  He testified, however, that the rust did not
form until after the first 39,000 miles of use.  Grogan attempted
to explain his theory by speculating about the use of dry air and
wet air in inflating the tire:  "If this guy inflated his tire
with dry air, 39,000 miles, then there would obviously be no
rust.  But then he might come across a filling station or
something where there was wet air, and then the whole process
would start.  So it's perfectly possible to run this tire for
quite a long distance without the rust appearing, and then
suddenly you get wet air going through instead of dry air, and

[13]   See Van Ooij, "Fundamental Aspects of Rubber Adhesion to
Brass-Plated Steel Tire Cords," 52 *Rubber Chemistry and
Technology* 605, 623, 625 (1979) [". . . .the adhesive reaction
between rubber and steel cord, at least as far as initial
adhesion is concerned, involves only a small fraction of the
coating (i.e., the brass coating is not completely consumed
during bonding). . . . . only a fraction of the brass coating is
consumed under conditions of normal cure."]

now it starts to rust, and now it starts to fail." Experts are given considerable leeway concerning the matters upon which they may rely, but they may not rely on speculation or conjecture. (*Korsak v. Atlas Hotels, Inc., supra*, 2 Cal.App.4th at p. 1526.)

Based on the inconsistencies, contradictions and weaknesses of the expert opinions, we conclude the court's failure to hold a 402 hearing was not harmless. Certainly, the admission of testimony by three separate experts that a manufacturing defect existed when the tire left the plant influenced the jury. The jury heard the experts testify conclusively that the accident tire left the plant with a manufacturing defect, evidenced mainly by the presence of yellow-colored wire on portions of one of the tread pieces.[14] This evidence was contrasted by testimony from Uniroyal's experts that the presence of brass wires was meaningless or proved good adhesion and that a tire with such a defect would not withstand over 40,000 miles of use. As indicated, even Sellers' expert Grogan admitted that if a tire is going to fail, it will do so within six months to two years of its life. The jury nevertheless rejected Uniroyal's expert's testimony.

---

[14]   We disagree with plaintiffs contention that expert Grogan provided independent evidence of a separate defect, namely, an open inner liner splice. As indicated above, Grogan testified that two defects -- poor adhesion and an open inner liner splice -- worked in conjunction with each other to cause the tread to separate from the belt.

37

Given an opportunity for a hearing on the issue of their qualifications and bases of their opinions, we cannot say plaintiffs or Sellers are incapable of showing adequate qualifications or foundation for their experts' testimony. Accordingly, on remand the court should hold a 402 hearing on the experts' qualifications and bases of their opinions.

III.

*Parties' Alignment*

Uniroyal contends the court erred by declining to treat Sellers as a party aligned with plaintiffs, and that Uniroyal was prejudiced by the court's allocation of peremptory challenges, orders regarding the presentation of testimony and sequence of closing arguments. Specifically, Uniroyal contends (1) it was given only eight peremptory challenges to the sixteen allocated to plaintiffs' and Sellers combined; (2) plaintiffs were unfairly permitted to call Sellers as an adverse witness under Evidence Code section 776; (3) Sellers was given independent time to cross-examine Uniroyal's witnesses; and (4) plaintiffs and Sellers unfairly obtained three closing arguments in rebuttal to Uniroyal's closing argument. Uniroyal argues that although the prejudice is "difficult to quantify," the errors were prejudicial. We believe the record shows plaintiffs and Sellers were largely if not completely united in interest against Uniroyal and based upon the pretrial contentions of the parties,

38

the court should have reallocated the peremptory challenges and readjusted the order of proof.  However, Uniroyal has not shown, and we cannot find, prejudice as a result of the court's ruling.

The court was required to determine the parties' respective interests in case issues and allot peremptory challenges in "the interests of justice" under Code of Civil Procedure section 231.[15]  That determination, involving the court's assessment of the issues in the case, the parties' focus on those issues at trial, and ultimate fairness in the trial proceedings, is one appropriate for review under an abuse of discretion standard. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065 [abuse of discretion standard applies to a broad range of decisions, including those relating to case management, pleadings, admission of evidence and dismissal].)

The court also has broad discretion to determine the order of witnesses and arguments under Code of Civil Procedure sections 607 and 320.  "When several defendants, each having separate defenses, appear by separate counsel, the court must determine

---

[15]   Code of Civil Procedure section 231, subdivision (c) provides:  "If there are more than two parties, the court shall, for the purpose of alloting peremptory challenges, divide the parties into two or more sides according to their respective interests in the issues.  Each side shall be entitled to eight peremptory challenges. . . . If there are more than two sides, the court shall grant such additional peremptory challenges to a side as the interests of justice may require; provided that the peremptory challenges of one side shall not exceed the aggregate number of peremptory challenges of all other sides.

their relative order of presentation.   (Code Civ. Proc., § 607,
subd. 8; see also Evid. Code, § 320.)   The reviewing court will
uphold such a determination unless abuse of discretion is clear
and a miscarriage of justice has resulted.   [Citation.]"
(*Diamond Springs Lime Co.* v. *American River Constructors* (1971)
16 Cal.App.3d 581, 602; *People v. Alvarez* (1996) 14 Cal.4th 155,
207 [trial court's ruling on order of proof is reviewed for abuse
of discretion].)

Despite Seller's counsel's representation that he was
"adverse to everybody," plaintiffs' arguments in support of
treating the case as having three "sides" should have compelled
the court, in the interests of justice, to treat the case as
having two basic sides.  Carver's counsel stated that, although
Sellers was technically a defendant, his liability was
"infinitesimal" as compared to Uniroyal's.   Those comments, as
well as plaintiffs' mild treatment of Sellers on the stand,
indicate that the overwhelming thrust of plaintiffs' case was to
prove Uniroyal's liability.   The court was appropriately
reluctant to treat the case as three-sided and itself believed
that the "[case] may well try as a two-party case. . . ."   It is
clear from the record that the sole basis of plaintiffs' and
Sellers' case was that the sole cause of the accident was a
defectively manufactured Uniroyal tire.

40

While we believe the court should have structured the case differently, Uniroyal has not shown it was prejudiced at trial by the court's rulings.  (*Reid v. Balter* (1993) 14 Cal.App.4th 1186, 1195.)  "When appeal is taken from a judgment and the appellant alleges the trial court made an erroneous pretrial ruling, it is not enough to show that the ruling was indeed erroneous.  In addition, the appellant must also 'show resulting prejudice, and the probability of a more favorable outcome, *at trial*.'" (*Ibid.*, [emphasis in original], quoting *Waller v̇. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)  For example, Uniroyal complains it was not provided with at least the same number of peremptory challenges as plaintiffs and Sellers, yet the record shows it did not use all eight of its challenges in excusing potential jurors.  It cannot argue that had it obtained more peremptory challenges, it would have used them.  Likewise, with regard to Uniroyal's inability to rebut Grogan's opinions about the defective inner liner splice, Uniroyal did present evidence of the lack of an opening in the splice through its own experts in its case in chief.  On Uniroyal's offer of proof, the court prohibited other testimony from Uniroyal's expert under Code of Civil Procedure 2034 on a ground unrelated to the order of proof, namely, the testimony (about a particular test conducted to determine whether the splice was open) was not covered in the

expert's deposition.  Uniroyal has not made a sufficient showing
of prejudice with regard to its remaining points.

IV.

*Right to a Competent Jury*

Because of the conclusions reached above, we see no need to
address Uniroyal's argument regarding deprivation of its right to
a competent jury.

V.

*Plaintiffs' Appeal*

Plaintiffs have appealed both the judgment and the court's
order granting Uniroyal's motion to tax costs in certain
respects.  They describe their appeal as addressing two
categories of issues: the first involving certain items of
damages and costs they should have recovered, the second
involving instructional and evidentiary issues.  Plaintiffs
assert we must address the first category of issues regardless of
the disposition of Uniroyal's appeal and may abandon the latter
category of issues in the event Uniroyal's appeal is
unsuccessful.  They are incorrect.

Because reversal of the judgment operates to vacate the
award of costs incident to that judgment, plaintiffs' appeal from
the order granting Uniroyal's motion to tax costs is moot and the
appeal must be dismissed.  (See e.g. *Muething v. Franchise Tax
Bd.* (1997) 52 Cal.App.4th 275; *Evans v. Southern Pacific*

42

*Transportation Co.* (1989) 213 Cal.App.3d 1378, 1388.)   We further dismiss the remainder of plaintiffs' appeal as to the underlying judgment.   The judgment was in plaintiffs' favor.   As a general rule plaintiffs cannot appeal a favorable judgment because they are not aggrieved.   (Code Civ. Proc. § 906; *In re Marriage of Brockman* (1987) 194 Cal.App.3d 1035, 1041-1042; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 188, p. 243.)   Apart from this ground, we have not found nor have plaintiffs cited authority for their unusual conditional appeal.   In any event, plaintiffs' appeal seeks advisory opinions on instructional and evidentiary matters that we cannot say are "necessary" to a final determination of the case upon retrial; we decline to give them. (Code Civ. Proc. § 43; *Neary v. Regents of University of California* (1992) 3 Cal.4th 273, 284.)

DISPOSITION

The judgment is reversed.  Uniroyal is to recover its costs
on appeal.  Plaintiffs' appeal is dismissed.

O'ROURKE,  J.

WE CONCUR:

HUFFMAN,  Acting  P.J.

McDONALD,  J.

44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED
U.S. DIST. COURT
SAVANNAH DIV.

DEC 10   9 39 AM '98

CLERK W. Williams
SO. DIST. OF GA.

THOMAS J. GRIEGO, TRAVIS M.      )
TOOKE, MR. and MRS. RICHARD S.   )
WHITE, Individually and as       )
natural parents of William R.    )
White, deceased, KIM VIGLIATURA, )
Individually and as widow of     )
John Francis Vigliatura, IV,     )
deceased, and MR. And MRS.       )
DOUGLAS BENDER, Individually     )       CONSOLIDATED
and as natural parents of        )       CV 496-87
Timothy Bender, deceased,        )
                                 )
        Plaintiffs,              )
                                 )
v.                               )
                                 )
FORD MOTOR COMPANY and MICHELIN  )
NORTH AMERICA, INC.,             )
                                 )
        Defendants.              )

ATTEST A TRUE COPY
Certified

Elizabeth P. Elam
Deputy Clerk

# O R D E R

In its 11/17/98 Sealed Order, the Court provided ten days for
any party with standing to object to the Order's unsealing.  Doc.
# 461 at 92-93.  Defendant Michelin North America, Inc. objects
only to the disclosure of the "adjustment data" rates contained on
page 78 of the Order.  Doc. # 466.  Accordingly, the Court is re-
issuing its 11/17/98 Order by attaching it to this Order and
amending "page 78" with [SEALED] designations over the adjustment
rates in question.

To spare needless consumption of public resources, the Clerk
shall serve the parties with only the instant Order and a copy of
the revised "page 78" from the attached, 11/17/98 Sealed Order, but

478

not the remainder.

SO ORDERED, this _10th_ day of December, 1998.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

THOMAS J. GRIEGO, TRAVIS M.          )
TOOKE, MR. and MRS. RICHARD S.       )
WHITE, Individually and as           )
natural parents of William R.        )
White, deceased, KIM VIGLIATURA,     )
Individually and as widow of         )
John Francis Vigliatura, IV,         )
deceased, and MR. And MRS.           )
DOUGLAS BENDER, Individually         )          CONSOLIDATED
and as natural parents of            )          CV 496-87
Timothy Bender, deceased,            )
                                     )          (SEALED ORDER)
      Plaintiffs,                    )
                                     )
v.                                   )
                                     )
FORD MOTOR COMPANY and MICHELIN      )
NORTH AMERICA, INC.,                 )
                                     )
      Defendants.                    )

S E A L E D   O R D E R

I.   BACKGROUND

In these consolidated products liability cases, three of the

plaintiffs (represented here by relatives) died and two were

severely injured when the van they were riding in suffered a tire

blow-out.   Their driver lost control, and the van, a Ford "E350

Super Club Wagon," rolled over and crashed.   Doc. # 16 (Amended

Complaint) ¶¶ 13-56; doc. # 15; # 68 at 6.

Plaintiffs thereafter filed this products liability action [1]

against Ford Motor Company (Ford) and various tire manufacturers.

_____

[1] The individual plaintiffs originally filed their own Amended Complaints prior to the cases
being consolidated. The Complaints filed by the other plaintiffs are all similar. See White, No.
CV496-115; Tooke, No. CV496-88; and Vigliatura, No. CV496-116.

14

alleging that the van's right rear tire "suddenly and without warning failed and malfunctioned, in that [it] completely separated and blew out." Doc. # 16 ¶ 17. They insist that negligence in the tire's design and manufacture proximately caused the accident and resulting damages. Id. ¶ 24. The tire manufacturer, they further contend, negligently failed to warn of the tire's dangerous propensities. Id. ¶ 25.

According to plaintiffs, Ford (a) was aware of the tire blow-out/van rollover problem prior to the accident, yet also negligently failed to warn plaintiffs, id. ¶¶ 21-32; (b) negligently designed and marketed "a vehicle which was subject to a severe and wholly unreasonable propensity to tip and overturn even in ... normal driving conditions and circumstances," id. ¶ 20; and (c) negligently failed to warn plaintiffs of the van's uncrashworthiness. Id. ¶¶ 43-44. Plaintiffs also pursue punitive damage claims against both Ford and the tire manufacturer. Id. ¶¶ 33-42, 45-56.

The tire in question is a Uniroyal Laredo DOT #BJORD JU064 LT 235/85/R16 M+S, Load Range E. Id. ¶ 14; doc. # 419, exh. D ¶ 4; # 258, exh. A ¶ 3. By way of an amendment, plaintiffs added as defendants Michelin North America, Inc. (Michelin), as well as several other tire companies, Doc. # 16 ¶ 14, but have since dismissed all tire makers except Michelin, Uniroyal's successor. Doc. ## 58, 64 (stipulation).

2

II.  <u>ANALYSIS</u>

A.  Slaying the Discovery Beast

Few cases in this Court's history have spawned as many discovery disputes as have erupted here.  <u>See</u> doc. # 334 at 24. The record, which consumes nearly seven feet of shelf space, includes numerous orders addressing highly contentious discovery motions.  Many of the motions, including those addressed here, claim discovery violations and ask the Court to unsheathe its "Samurai Sword."  <u>See</u> doc. # 178 at 33-34 (origin of this phrase); # 258 at 1; # 346 at 2.

Boiled down, the parties accuse each other of hiding information and lying about it.  Michelin, for example, has filed a sanctions and subpoena-enforcement motion aimed at plaintiffs' tire expert, Dennis Carlson.  It contends, <u>inter alia</u>, that he (1) twice appeared for his deposition without complying with Michelin's subpoena <u>duces tecum</u>; and (2) has deceived this Court about what became of subpoenaed documents and things that he now says he cannot find or discarded through "normal housekeeping."  <u>See</u> doc. # 253.

Plaintiffs, on the other hand, have moved to strike Michelin's Answer because, they insist, it has lied to this Court about the way it uses "tire adjustment" data (i.e., information it gleans from analyzing tires returned by dissatisfied customers).  <u>See</u>, <u>e.g.</u>, doc. # 318.  Michelin's motivation, the Court is to infer,

3

has been to keep plaintiffs from proving that Michelin may have self-acquired (from its "adjustment data" extraction and analysis) knowledge of tire defects which, if negligently or intentionally ignored, may support plaintiffs' design-defect, failure to warn and punitive damage claims. See doc. # 354; # 316 at 10.

Perhaps the best way to get a handle on this mess is to view the case through the prism of Michelin's summary judgment and *in limine* motions. The root of this entire controversy, after all, can be traced to the van's rear tire blow-out and the driver's subsequent loss of control. In a way which might impact Ford's liability, Michelin seeks to show that its tire was not defective, while plaintiffs contend otherwise. Examination of Michelin's motions, in turn, will highlight the information around which the discovery disputes revolve.

**B. Michelin's Summary Judgment Motion[2]**

No party disputes that, had the van's tire not suffered a tread separation, the accident would not have occurred and this case would not exist. See, e.g., doc. # 327 at 3-4. All agree that tread separations, however, can arise not just from a manufacturing defect, but also from non-defect causes (e.g., abuse,

---

[2] This Court applies the summary judgment principles explained in Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742-43 (11th Cir. 1996) and Cohen v. United American Bank of Cent. Fla., 83 F.3d 1347, 1349 (11th Cir. 1996). Under Local Rule 56.1 and Dunlap v. Transamerica Occidental Life Ins. Co., 858 F.2d 629, 632 (11th Cir. 1988), all unopposed fact statements supported by the evidentiary materials of record are deemed admitted.

4

underinflation, overinflation, road hazards, etc.). See doc. # 327
at 4; 11/17/97 Carlson dep. at 186-91; doc. # 398, exh. I at 62 ¶
116. Whether the tire was defectively designed, manufactured and
marketed, and whether such negligence proximately caused the
plaintiffs' damages, form the core issues reached by Michelin's
summary judgment motion.

Because an action in products liability may proceed on one or
a combination of theories of negligence, strict liability, or
breach of warranty, Powell v. Harsco Corp., 209 Ga. App. 348, 349
(1993); Freeman v. United Cities Propane Gas of Georgia, Inc., 807
F.Supp. 1533, 1542 (M.D.Ga. 1992), those issues face analysis under
the strict liability rubric, and from that Ford's liability
ultimately must be sifted.[3] See Lindsey v. Navistar Inter. Transp.
Corp., 150 F.3d 1307, 1317 (11th Cir. 1998) ("under Georgia law
there may be more than one proximate cause of an injury"); Timmons
v. Ford Motor Co., 982 F.Supp. 1475, 1480 (S.D.Ga. 1997) (but only
if the original negligent actor reasonably could have anticipated
or foreseen the intervening act and its consequences).

"The paramount purpose of strict liability is the protection
of otherwise defenseless victims of manufacturing defects and the

---

[3] In doc. # 288, Ford moves for partial summary judgment against plaintiffs' "core allegation
that [their] Ford E-350 Super Club Van was unstable." Doc. # 289 (brief) at 12 (seeking summary
judgment against Counts I, II, III, V and VI of the Complaint). In doc. # 422, it moves for summary
judgment against plaintiffs on their punitive damages claim. See also doc. # 434 at 3-4. And, in doc.
## 290, 390, and 428 - 433, it chips away at plaintiffs' case through a series in *in limine* motions.
The Court will reach these motions in a separate opinion.

spreading throughout society of the cost of compensating them."
Farmex Inc. v. Wainwright, 269 Ga. 548, 550 (1998) (internal quotes
& cite omitted).   A "product that is not merchantable and
reasonably suited to the use intended is defective."   Zeigler v.
CloWhite Co., ___ Ga. App. ___, 1998 WL 634891 at *1 (9/16/98)
(quotes and cite omitted).

     "A defect can exist in product design, in faulty construction,
in the instructions, in the form and content of warnings, or in the
failure to warn."   Lamb by Shepard v. Sears, Roebuck & Co., 1 F.3d
1184, 1187 (11th Cir. 1993).   Here plaintiffs allege, inter alia,
negligent manufacturing -- that the subject tire suffered from a
bonding flaw (i.e., insufficient adhesion of metal wires within the
tire to its rubber and other components).

     On defective-design based, strict liability claims, plaintiffs
may prevail by showing that a reasonable manufacturer would have
employed an available and superior design.   While plaintiffs need
not advance an alternative design to prevail on this theory, it is
a factor that may be considered.   Timmons, 982 F.Supp. at 1479.
Here the plaintiffs' expert contends that the subject tire should
have been designed and produced with a protective "zero cap ply."
11/17/97 Carlson dep. at 292-93, 294-95; see also doc. # 130 at
115-16.   This feature would have retarded the tread separation
which caused the tire to blow out.   Id.   On "alternative-design"
theories   courts   apply   "a   risk-utility   analysis   ...   [which]

6

essentially requires the court to balance the risks inherent in a product design against the utility of the product so designed." Lindsey, 150 F.3d at 1313; Zeigler, 1998 WL 634891 at *2.

Even where defective design (or some other strict liability basis) is shown, "a plaintiff must show that the proximate cause of the injury was a defect which existed at the time the product was sold." Carmical v. Bell Helicopter Textron, Inc., 117 F.3d 490, 494 (11th Cir. 1997); Timmons, 982 F.Supp. at 1480. "The law does not require, however, that a manufacturer produce or sell only the safest products it is capable of making." Vax v. Albany Lawn & Garden Center, 209 Ga. App. 371, 371 (1993) (the absence of a deadman control does not make a lawnmower defective); id. at 372 (noting that the absence of the device was not concealed). It is in this light that the Court now turns to examine plaintiffs' evidence.

### 1.   Plaintiffs' Evidence

Michelin[4] manufactured the "Laredo" tire in 2/94 at its Fort Wayne, Indiana plant. Doc. # 311 ¶ 1; 11/17/97 Carlson dep. at 323; doc. # 130 at 108, 122; # 334 at 39; # 374, exh. A ¶ 9. It had 62,000 miles of wear on it when the accident occurred. Doc. # 311 ¶ 2; 11/17/97 Carlson dep. at 209 ("it's about two-thirds

---

[4] For convenience, the Court will dispense with identifying Michelin's predecessors and, for the purpose of this Order, will simply label Michelin as the tire's manufacturer. See doc. # 346 at 11 ("a ... Michelin entity acquired control of the Uniroyal Goodrich tire operations in 1990, four years before the subject tire was manufactured").

worn"). Michelin complied with government safety regulations, doc. # 311 ¶ 3, specifically "Safety Standard 119," id.; doc. # 310 at 3-4; see 47 C.F.R. § 571.119.S1 (1997) ("This standard establishes performance and marking requirements for tires for use on ... trucks"); § 571.119.S2 ("The purpose is to provide safe operational performance levels for [truck] tires ... and to place sufficient information on the tires to permit their proper selection and use"), though plaintiffs insist that Standard 119 "addresses only endurance testing of tires." Doc. # 316 at 10 (emphasis original).[5]

Plaintiffs trace the tire's alleged manufacturing defect back to its composition and curing process. Their recitation relies on much in the way of technical description. According to one of Michelin's experts, Richard J. Harrison,

> [a] steel-belted radial tire is composed of several layers, each with a specific and different function. The outermost layer is the tread, which is bonded to the undertread. The undertread rests on top of the cords, which covers the carcass, which is pressurized during use.

Doc. # 284, exh. A ¶ 2.

So, beneath the outer layer (the tread) and beneath the next layer (the undertread) is the "carcass" -- also known as the

---

[5] Even were it an all-encompassing standard, however, it would not automatically insulate a tire manufacturer from liability. See Doyle v. Volkswagenwerk, 267 Ga. 574, 577 (1997) (Under the risk-utility test for Georgia products liability cases, compliance with federal standards or regulations is only a factor for the jury to consider in deciding question of reasonableness, that is, whether the product design selected was a reasonable one from among feasible choices of which the manufacturer was aware or should have been aware).

8

"common green -- which is the "underlying part of the tire, including the steel belt assembly." Doc. # 130 at 93. That assembly is comprised of

> two steel belts [which] are strands of brass-coated steel fibers, held together by a multi-ingredient, rubber like material called the "steel belt skim coat." The skim coat compound bonds the surrounding natural rubber and synthetic polymers to the brass coating and holds the flexible steel wires in place.

Doc. # 284, exh. A ¶ 2.

The bonding of metal to rubber requires a proper application of "skim coat" compounds. Doc. # 317, exh. B at 2. Improper mixture or application of those compounds (e.g., if moisture seeps into the "curing" process) can result in a tire prone to tread separation. Doc. # 130 at 88-89, 106. "If there are problems in the manufacturing process with the manufacturer or with the plant, ... those problems ... can or may appear across the broad spectrum of tires made in the plant...." Id. at 91.

Plaintiffs contend that one "defect" causing tread separation can be traced to improper compound application in the rubber-to-steel bonding process. Id. at 88-91. Harrison further detailed this bonding process:

> At its most basic level, tire manufacture consists of the initial assembly of the various tire layers and other components into what is known as a "green tire."[6]

---

[6] "Green tires," also known as "common green" tires, are

those which are identical in design except for the moldings on the tire tread and sidewalls. Among other things, "common green" tires share the same manufacturing specifications, size, load range, speed rating (if any), width, aspect ratio, skim coat, tread and undertread compound, bead and intended application.

Doc. # 284, exh. C ¶ 5; see also doc. # 258, exh. A ¶ 5. "Common green" tires for the subject tire

9

> The "green tire" is then heat-and-pressure-treated or
> "vulcanized," a process which bonds the various tire
> components and chemically increases the strength and
> resilience of the tire.  Vulcanization is also known as
> "curing."

Doc. # 284, exh. A ¶ 4 (footnote added).

The problem tire manufacturers confront, Harrison points out, is that "[s]teel does not bond to natural or synthetic rubber." Id. ¶ 5.  So, they must coat the steel belt wires with brass plating to facilitate the necessary bonding.  Id.; see also doc. # 130 at 80 ("copper or brass compound").  This occurs during vulcanization, during which high temperatures and pressures are applied for predetermined times.  Doc. # 284, exh. A ¶ 6; # 327 exh. A ¶¶ 4-7.  "In addition to 'curing' the rubber, this process causes covalent bonding between the surface molecules of the brass plating and the steel belt skim coat."  Id.; see also doc. # 130 at 80.  Although moisture can disrupt this process, Harrison maintains that it is usually eliminated by the high temperatures and pressures of vulcanization.  Doc. # 284, exh. A ¶ 7.

Plaintiff's expert (Carlson) concluded that the subject tire "failed by a tread and outer belt separation."  Doc. # 317, exh. C ¶ 12; see also doc. # 317, exh. B at 1.  He found that the

> tire had been in very good pre-accident condition.  There
> were no signs of an abusive condition which would have
> adversely affected the tire's durability.  The tire tread
> was found to be worn to the second half of its life.  The
> wear pattern was flat and even.

Doc. # 317, exh. B at 2.

---

included seven "private label" brands (e.g., Sears).  Doc. # 258, exh. A ¶ 6.  Tires (like the subject tire) bearing the "Laredo" or even "LT 235" designation are not necessarily "common green" tires. Id. ¶¶ 9-13.

However, "[t]he wires of the cable were brassy or yellow colored." Id. Therein, Carlson, concluded, lies the defect: "During manufacture, the steel wires are coated with an extremely thin layer of brass to improve adhesion to the rubber. When the green tire is vulcanized, the copper in the brass combines with the sulphur in the rubber to form copper sulfide[,] which is black." Id.

So if a tread-separated (e.g., blown-out) tire's metal strands are yellow or "bright brassy," Carlson concludes, the bonding (vulcanization) process was not properly done: "The yellow cable indicates that the bonding process was not complete. This indicates that the components of the steel belt system had insufficient adhesion and this resulted in a premature failure." Id. Improper mixing, or overaging, or contamination of the "skim stock materials" used to bond the rubber to the metal can also cause tread separations. 11/17/97 Carlson dep. at 286-89; 1/30/98 Carlson dep. at 57-58.

In contrast, if the subject tire had been properly "cured" (vulcanized), there will generally be little or no "brassy" or "yellow" metal strands visible to the human eye:

> When the green tire is vulcanized, the copper in the brass combines with the sulfur in the rubber to form copper sulfide[,] which is black. [Hence, the presence of] yellow cable indicates that the bonding process was not complete. This indicates that the components of the steel belt system had insufficient adhesion and this resulted in a premature failure.

Doc. # 317, exh. B at 2.

That, in turn, would explain the rapid tread separation (i.e.,

11

the blow-out) that occurred in this case.  Id.;[1] see also 11/17/97 Carlson dep. at 255 ("Brassy and yellow mean the same thing").

Michelin strenuously challenges Carlson's opinion, and on this one point pivots much of its summary judgment and *in limine* motions.  Plaintiffs have engaged in much research and discovery to support it.  They refer this Court to other sources behind the theory.  According to Rex Grogan, a former Dunlop Tire Company analyst,

> [p]erhaps the most temperamental process in the tire industry is that of making metal stick to rubber.  The most usual method employed is to plate the metal with brass and apply a rubber compound containing a high level of sulphur.  Many of the commonly used compounding ingredients can weaken the rubber-metal bond and so great care has to be taken during manufacture that there is no intermixing of compounds.
>
> *        *        *        *
>
> During the vulcanization process, the brass plating fuses with the sulphur in the rubber, forming copper sulphide.  It follows from this that a properly formed rubber-metal bond will convert the brass to black copper sulphide and leave <u>no trace of brassiness</u>.  The investigator seeing areas of brightly shiny brass plating

---

[1]  Carlson has also acknowledged that the subject tire suffered a "chunk out" ("a piece of the tread that has come off from the belt," 1/30/98 Carlson dep. at 66), and a "sidewall split." Id. at 83. However, he opines that neither "had anything to do with why the tire failed...." Id. at 83; see also id. at 90.

Harrison disagrees, and believes that the subject tire's blow-out was caused by the "chunk-out," which, in turn, was caused by a road hazard well before the accident. 12/3/97 Harrison dep. (doc. # 260) at 73-74 ("[t]he tire had suffered an impact and the sidewall had weakened it.... it was caused by a blunt object"). "The impact weakened the adhesive bond between the sidewall rubber and the polyester skim coat." Id. at 79. This, in turn, caused the tire's two steel belts in the area beneath the "chunk-out" to corrode, weakening the tire. Id. at 79-80. Harrison thus disputes that the problem is traceable to moisture in the manufacturing process. Id. at 82. He reasons that, had there been moisture in the manufacturing of the tire, it would have manifested in a 360-degree rust pattern, not the spot pattern found in this case. Id. at 84, 95.

12

> gleaming at him from the belt area of a failed tire will
> have no difficulty in deciding that there was a
> deficiency in the bonding process.

Doc. # 317, exh. D at 10 ("Chapter 10 Adhesion Defects") (emphasis

added); see also 11/17/97 Carlson dep. at 256-57; 1/30/98 Carlson

dep. exh. 7 at 2.

This analysis, plaintiffs point out, is similar to a National

Transportation Safety Board (NTSB) accident investigator's 1987

findings on what plaintiffs contend to be a similar tire failure:

> One of the major problems in the manufacturing of
> steel belted tires is getting rubber to stick to metal.
> The usual method is to plate the metal with brass and
> apply a rubber compound containing a high level of
> sulphur. A problem with this is that brass plating will
> oxidize very fast and the resulting layers of oxide can
> prevent satisfactory adhesion.
>
> During the vulcanization process, the brass plating
> fuses with the sulphur in the rubber, forming copper
> sulphide. A properly formed rubber-metal bond will
> convert the brass to black copper sulphide _and leave no_
> _trace of brassiness_.

Doc. # 317, exh. E at 7 (emphasis added); 1/30/98 Carlson dep. exh.

18 at 4.

Here the issue subdivides. On this point the parties agree

that it is normal for _some_ brassiness to remain. This impeaches

the Grogan and NTSB "_no_ trace of brassiness" conclusions. Still,

Michelin dismisses Carlson's overall theory as unsupported by basic

science. And like the flat-earth theory, it contends that a flawed

assertion does not become less flawed merely by repeating it. Doc.

# 327 at 19-30. For that matter, Michelin's expert (Harrison)

13

points out that

> [a] detachment between a tire's two steel belts does not, in itself, imply there is a manufacturing or design defect. Belt detachments have many causes unrelated to manufacturing and design, including tire misuse and abuse, overdeflection caused by underinflation and/or overloading, road hazards, various poor maintenance practices, high speed operation, corrosion, and tire wear. All steel-belted radial tires can experience a belt separation. It is impossible to design a practical tire that is impervious to belt separations.

Doc. # 284, exh. A ¶ 8; see also 11/17/97 Carlson dep. at 322.

In reply, plaintiffs point to Harrison's written response to the NTSB investigator. Doc. # 338, exh. B (bates # 1029). In it he disputed that the subject tire there failed due to improper adhesion. Instead, he insisted, the "adhesive bonding system between the steel belts was degraded by extended service in an overloaded condition." Id. The investigator therefore was wrong, Harrison concluded, because a failure of the nature described by the NTSB would have occurred earlier in the tire's life, and the tire exhibited no bonding defect symptoms: "The surface of the steel belt would be totally devoid of rubber and a *shiny brass* color [would then be] evident around the total circumference." Id.[8] (emphasis added).

Plaintiffs also point to, *inter alia,* the 1996 fact witness testimony (from another case) of Uniroyal ex-employee William

_____

[8] Plaintiffs have not addressed the fact that this is not necessarily contrary to Michelin's position. The subject tire in this case failed late in its life, and no one has claimed that its "steel belt [was] totally devoid of rubber...."

14

Hudson, who supervised failed-tire analyses:

> Q. [Plaintiff's counsel]: [Let's] talk about a condition
> known as brassiness of the steel cords.  In your
> experience as a supervisor of failed tire analysis, did
> you ever come across tires that demonstrated the
> brassiness of the steel cords?
>
> A.  As -- I think I know what you're talking about.
>
> Q. * * * * Did you have occasion when writing your
> adjustment forms, when filling them out, to note tires in
> which you observed brassiness of the steel cords?
>
> A.  Yes, sir.  In analyzing the tire, if the tire
> separated between the belts and the tire cord would show
> brassiness, we would call it bright yellow.
>
> Q. And when you were instructed on how to perform your
> duties in failed tire analysis, sir, what were you told
> about the significance of having bright yellow wires or
> bright yellow steel cords?
>
> *    *    *    *
>
> A.  I was taught that if I saw bright yellow, that means
> there was lack of adhesion between the wire cord and the
> rubber that surrounds the wire.
>
> *    *    *    *
>
> Q. In examining the tires during your tire failure
> analysis, sir, was there a condition code that related to
> bright yellow cords?
>
> A.  It fell under the condition of belt separation.

Doc. # 347, exh. A at 145-46.

At the very least, plaintiffs contend, this exchange shows
that there exists an issue of a fact on causation, negligent
manufacture/design, strict liability, failure to warn, and punitive
damages.  Doc. # 316 at 6-7, 16.  Carlson, they point out,
qualifies as an expert witness and his opinions are admissible

under the criteria set forth in Carmichael v. Samyang Tire, Inc., 131 F.3d 1433, 1436-37 (11th Cir. 1997) (expert testimony which may implicate scientific principles but nevertheless is based only on an expert's experience and observations need not be subjected to the judicial scrutiny required by Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)), cert. granted, Kumho Tire Co. v. Carmichael, 118 S.Ct. 2339 (1998); see also Deere v. Goodyear Tire and Rubber Co., 175 F.R.D. 157, 163-64 (N.D.N.Y. 1997).

On the risk/utility analysis that plaintiffs must employ to advance their negligent-design based, strict liability claim, see Lindsey, 150 F.3d at 1313-14, Carlson points to a "better" design. The tire in question, he opines, should have had a "cap ply," which is a nylon belt running circumferentially between the steel belt assembly and the undertread. 11/17/97 Carlson dep. at 292-93. The nylon belt -- also referenced as a "0° belt," "degree textile cap ply" or "zero degree nylon belt" -- would mitigate the tread separating effect resulting from the defective bonding. Id. at 294-95; see also doc. # 130 at 115-16.

Carlson proposed this design change "somewhere around" 1980, while employed (from 1977-87) by Michelin North America Research and Development Corporation (MARC). 11/17/97 Carlson dep. at 298-99; see also doc. # 258 at 2 (MARC is an independent entity that tests and designs tires for Michelin); id. at 5; id., exh. B ¶ 7; doc. # 330 at 2. However, he did not begin to testify about this design defect theory until approximately 1995. 11/17/97 Carlson dep. at 306. The technological development for using nylon caps, he explained, had not sufficiently progressed until 1995, id. at 307-08, though plaintiffs point out that a patent for it was issued

16

to a Uniroyal engineer in 1974. Doc. # 317, exh. I; exh. G at 73-83; # 316 at 8; Doc. # 452, exh. 1. For that reason, Carlson does not feel that any tires Michelin made during his 1977-87 MARC employment were defective on this particular ground. 11/17/97 Carlson dep. at 308.

Plaintiffs also illuminate the 2/18/98 deposition testimony of Dwight Black, a former long-term Uniroyal Goodrich employee, who similarly testified that "insulation strips," inserted along the edges of radial belts, would "help minimize ... incipient separations along the edge of the belt by putting a little more rubber at that location." Doc. # 317, exh. G at 82.

In a 1993 deposition in another case concerning a Uniroyal LT 235/85R16 Load Range E light truck tire, doc. # 317, exh. H at 9, Black stated that "the primary reason for light truck [tire adjustments, which are refunds or exchanges issued to customers who bring back tires to dealers,]' is [tread] separations." Id. at

---

[9] In contrast, a member of Michelin's Product Safety Group (T.J. West) explains that a

tire adjustment is an honored warranty claim. As with any retail product, a certain number of tires sold are returned by dissatisfied customers to the tire dealer. Because the tire industry is enormously competitive, Michelin uses its adjustment program in part to promote customer satisfaction and goodwill by accepting and adjusting returned tires for reasons wholly independent of a determination that the tire was manufactured or designed defectively.

Doc. # 284, exh. B ¶ 5.

On these returns, West maintains, Michelin "does not conduct forensic investigation that would be necessary to determine what ... caused the condition observed. [Instead,] Michelin [merely] notes on the adjustment claim form the condition of the tire when it was adjusted, and generally discards the tire after its inspection." Id. Hence, Michelin does not use the opportunity to determine "what, if anything could or would have prevented the tire condition from occurring." Id. Nor does it "attempt to determine whether the tire's manufacture caused the condition noted." Id.; see also doc. # 327, exh. C ¶ 5; 11/17/97 Carlson dep. at 186 (Q. "[A]djustment data doesn't tell you the

17

82 (footnote added).

In his 1998 deposition, Black acknowledged his earlier testimony (from a previous case) that "utilizing nylon overlays or cap plies.... [was] not particularly costly [to do]...." Doc. # 317, exh. G. at 84-85. While Black left Uniroyal in 1991, doc. # 317, exh. G at 92-93, he stated that he would be surprised if the same (i.e., nominal extra cost of adding a zero ply cap) would be different in 1998. Id. at 85; see also doc. # 459 (internal company debate on removing nylon cap from tire lines that, "from a technical standpoint," do not need it -- versus the "marketing benefit" of including it, marketed as a "durashield" feature).

Michelin's expert (Harrison) agrees that

> [a] "zero degree textile cap ply" or "zero degree nylon belt" refers to an extra textile belt placed between the steel belt assembly and the tire undertread. A "zero degree" belt refers to one in which the belt plies are aligned with the tire circumstantially.

Doc. # 284, exh. A ¶ 9.

However, he points out, the subject tire "was not rated as a high speed tire," id. ¶ 10, and in his experience over 90% "of all non-speed rated passenger and light truck tires do not feature a zero degree textile cap ply." Id. ¶ 11. In "non-high-speed-rated tires such as the subject tire," he opines, the nylon cap is unnecessary "in light of technological advances." Id. It would "not necessarily prevent steel belt detachments caused by inadequate adhesion between the steel belt skim coat and the steel belt wires because it would have no effect on the covalent bonding between those components." Id.

---

cause of a separation, does it? It simply tells you that there was a separation? A. Generally, yes")

18

Carlson insists that the cap ply in fact would delay (by encapsulating and thus holding together separating steel belts) the tread-separation process. "[B]y retarding incipient separations until tread life is exhausted," plaintiffs emphasize, "[cap plies] can effectively eliminate such separations simply because tires 'wear out' and are replaced before they fail." Doc. # 316 at 8 (emphasis original). For that matter, Carlson makes no distinction between speed and non-speed rated tires. 11/17/97 Carlson dep. at 306-07.

Yet, Harrison insists, the cap ply "would add additional weight and mass to the tire, thereby increasing the potential for increased stress and heat during operational use, both of which decreases a tire's operational lifespan and increase the potential for tire failure. In [Harrison's] opinion, for the subject tire, the alleged benefits of this extra belt are minimal and do not outweigh its potential detriments." Doc. # 284, exh. A. ¶ 12. He also points out that, due to design modifications made since the 1980s, the subject tire "is not substantially similar in design to the Uniroyal Laredo tires made in the 1980s." Id. ¶ 13. He thus adverts to the "sufficient similarity" doctrine[10] in contending that

---

[10] "This doctrine applies to protect parties against the admission of unfairly prejudicial evidence, evidence which, because it is not substantially similar to the accident or incident at issue, is apt to confuse or mislead the jury." Heath v. Suzuki Motor Corp., 126 F.3d 1391, 1396 (11th Cir. 1997)) (quotes, cite and footnote omitted). While federal law governs evidentiary admissibility issues, id. at 1396, City of Tuscaloosa v. Harcros Chemicals, Inc., ___ F.3d ___, 1998 WL 740059 at * 4 (11th Cir. 10/23/98), Georgia cases are generally in accord. See Barger v. Garden Way, Inc., 231 Ga.App. 723, 744 (1998); Rose v. Figgie Intern., Inc., 229 Ga.App. 848, 850 (1997) (Evidence that manufacturer knew from complaints of similar incidents that the probable consequence of a certain defect would be to inflict injury is relevant to the question of malice or wanton misconduct, for purposes of punitive damages claim in products liability action).

However, Heath illuminates an important distinction. Heath appealed a jury verdict for

19

design analyses for dissimilar tires should not be considered here.

2.  **Plaintiffs' Design Defect Claim**

The Court will reach the easier issue first.  Michelin is
entitled to summary judgment on plaintiffs' alternative-design
based, strict liability theory.  Carlson conceded that his "better
design" opinion is premised upon zero cap ply technological
improvements not realized until approximately 1995, *after* the
subject tire was manufactured.  *Cf. Deere*, 175 F.R.D. at 161-62
(rejecting design defect claim because, *inter alia*, proposed
superior design ideas were "still undeveloped") (applying similar
N.Y. law).  Nor have plaintiffs shown, under the risk/utility test,
that such alternative design was available but unreasonably
bypassed in 1994.  Hence, it is not necessary to address Michelin's
"substantial similarity" argument, nor reach its

---

Suzuki, contending that the district court improperly allowed Suzuki to introduce evidence of other
rollover incidents involving *dis*similar vehicles.  Affirming the verdict, the Eleventh Circuit
acknowledged that Suzuki's evidence of rollover incidents involving dissimilar vehicles was not
substantially similar to the incident at issue.  But, the court concluded, the "substantial similarity"
doctrine was simply not applicable.  Typically, evidence of other incidents is offered to prove notice,
the nature or magnitude of the danger involved, a party's ability to correct a defect, causation, the
standard of care, or other similar issues.  When offered for these purposes, the extrinsic incident must
be substantially similar to the incident at issue.  *Id.* at 1396-97.

But Suzuki did not offer the evidence to reenact the accident at issue.  Rather, it used it in
an attempt to demonstrate how rollovers occur.  "The introduction into evidence of these three
dissimilar incidents for the purposes of illustrating the physical principles behind rollover accidents
was not unduly confusing to the jury or prejudicial to the plaintiff."  *Id.* at 1396.  Plaintiffs do not
invoke *Heath's* dissimilarity exception here, so they must meet fairly rigorous requirements for
admission.  See *Johnson v. Ford Motor Co.*, 988 F.2d 573, 579 (5th Cir. 1993) (When evidence of
other accidents or occurrences is offered for any purpose other than to show notice, the proponent
must show that the facts and circumstances of other accidents are "closely similar" to the facts and
circumstances at issue); *id.* at 580 (even when such evidence is offered solely to show notice, the
proponent must establish "reasonable similarity"); *id.* at 579 (Hence, summaries of other accidents,
claims, lawsuits and complaints amount "to nothing more than a summary of allegations by others
which constitute hearsay").

*in limine* motion (doc. # 326) to the extent it goes to Carlson's "zero cap" ply theory.

### 3. Plaintiffs' Negligent Manufacturing Claim

On plaintiffs' negligent manufacturing claim Michelin insists that, even under Carmichael, Carlson is not qualified to opine in support of it. See doc. ## 327 at 9-32. Like this case, Carmichael also involved a products liability action against a tire manufacturer: See Carmichael v. Samyang Tires, Inc., 923 F.Supp. 1514, 1516 (S.D.Ala. 1996) ("Carmichael I"). The plaintiffs -- passengers in a minivan which overturned after its right rear tire blew out -- also asserted that a tire defect caused the crash and their resulting injuries. Id. at 1516, 1519. And, as in this case, Carlson testified as their only expert witness. Id. at 1518. He opined that the "Samyang" tire failed

> because of poor or insufficient adhesion between the rubber, steel, and nylon components of the tire. This insufficient adhesion, in turn, caused the tire components to separate from each other, resulting in the flapping of the tread and the sudden, catastrophic loss of air pressure in the tire.

Id. at 1519 (cite omitted).

Carlson detected no signs of abuse (a cause of tread separation), so, by the process of elimination, he concluded that "there is nothing else but a manufacturing defect." Id. at 1519. However, Carlson had not examined the subject tire until the morning of his deposition. Id. "His analysis was limited to a visual inspection of the tire, though he conceded that such actions as cutting the tire would reveal additional pertinent information." Id. The district court also noted that Carlson had failed to identify any affirmative evidence of a defect, id., then held his

21

testimony inadmissible under Daubert.  Id. at 1519-22.

Before the district court the Carmichael plaintiffs
unsuccessfully argued that Daubert did not apply because Carlson
advanced only "technical" and not "scientific" evidence.  Id. at
1521-22.  It may be true, the district court reasoned, "that
Carlson's testimony does not concern a scientific concept *per se*;
however, it certainly is testimony about an application of
scientific concepts involved in physics, chemistry and mechanical
engineering."  Id. at 1522.  Hence, the court concluded, Daubert
applied and Carlson's testimony had to be excluded because it
failed to meet the Daubert factors.  Id.

Reversing, the Eleventh Circuit concluded that Carlson's tire-
failure testimony was not "scientific" and thus was not subject to
the Daubert factors for determining the admissibility of scientific
expert testimony.   131 F.3d at 1436-37 ("Carmichael II").
Carlson's opinion, after all, was not based on any scientific
theory of physics or chemistry, but on his experience in analyzing
failed tires:

> Although Samyang is no doubt correct that the laws of
> physics and chemistry are *implicated* in the failure of
> the ... tire, Carlson makes no pretense of basing his
> opinion on any scientific theory of physics or chemistry.
> Instead, Carlson rests his opinion on his experience in
> analyzing failed tires.... Like a beekeeper who claims
> to have learned through years of observation that his
> charges always take flight into the wind, Carlson
> maintains that his experience in analyzing tires have
> taught him that "bead grooves" or "sidewall
> deterioration" indicate as to the cause of a tire's
> failure."

131 F.3d at 1436 ("Indeed, Carlson asserts no knowledge of the
physics or chemistry that might explain why the ... tire failed")
(emphasis added).  The Eleventh Circuit warned that if, on remand,

22

Carlson or the plaintiffs' counsel "were to assert _or imply_ a 'scientific' basis for Carlson's testimony at trial," the district court would be free to apply "appropriate remedial measures." 131 F.3d at 1436 n. 7 (emphasis added).

District courts therefore must determine if expert testimony is sufficiently scientific in order to require a Daubert analysis in the first place. Id. at 1435-37; see also Voohries-Larson v. Cessna Aircraft Co., 177 F.R.D. 462, 471-72 (D.Ariz. 1998); 29 WRIGHT & MILLER: FEDERAL PRAC. & PROC. § 6266 (Scientific Evidence). Nevertheless, even nonscientific expert testimony must still meet F.R.Evid. 702's reliability requirements, and that decision falls within the district court's discretion. Carmichael II, 131 F.3d at 1436 ("Non-scientific experts" must be "sufficiently reliable and relevant to assist a jury"). And, of course, "Carlson's testimony is subject to exclusion under [F.R.Evid.] 403 if its probative value is substantially outweighed by its likely prejudicial effect." Id.

An obvious corollary arises from Carmichael II: by not subjecting "merely technical" or "experience-based" testimony to Daubert's reliability analysis, expert opinions with a basis in scientific methodology could be "massaged" and thus masqueraded as "technical" or "experience-based only" in order to evade Daubert screening. Courts therefore must inquire: just when does "experience-based" opinion testimony become (directly or, as the Carmichael II court recognized, by implication) "scientific" enough to warrant Daubert-level screening? Perhaps this is what caught the Supreme Court's eye. See 67 U.S.L.W. 3040 (7/21/98) (Carmichael II's "Question presented"). It has been answered in

23

the proposed revision to Rule 702.[11]

Daubert or not, all expert witness opinions must be supported by a competent evidentiary foundation, see, e.g., Moisenko v. Volkswagen AG, ___ F.Supp.2d ___, 1998 WL 681543 at *2 (W.D. Mich. 9/28/98), and courts can review them under F.R.Civ.P. 56(e). See Schubert v. Nissan Motor Corp. U.S.A, 148 F.3d 25, 29-32 (1st Cir. 1998).

Michelin insists that (a) Carlson is a Daubert expert witness; alternatively, (b) even under Carmichael II, he is not qualified and his opinions lack a competent evidentiary foundation. Doc. # 327 at 9-32. Michelin thus challenges plaintiffs to show that Carlson is competent to testify and that his opinions are admissible.[12]

_____

[11] The U.S. Judicial Conference's Advisory Committee on Evidence Rules has published the following proposed amendment to F.R.E. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise provided that (1) the testimony is sufficiently based upon reliable facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

67 U.S.L.W. 2026 (7/14/98) (emphasis original); see also 67 U.S.L.W. at 2026 (7/14/98) (under the proposed amendments to F.R.E. 701-04, "[a]n opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist").

[12] The burden falls upon proponents of expert witness evidence to prove its admissibility by a preponderance of the evidence. White v. Chicago Pneumatic Tool Co., 994 F.Supp. 1478, 1481 (S.D.Ga. 1998) (citing Daubert, 509 U.S. at 592 n. 10). This burden is not meant to be onerous, but enough to enable the Court to determine whether the expert testimony advanced "can be of some use to the jury." Hulmes v. Honda Motor Co., Ltd., 960 F.Supp. 844, 865 (D.N.J. 1997), aff'd, 141 F.3d 1154 (3rd Cir. 1998); see also Moore v. Ashland Chemical, Inc., 151 F.3d 269, 274-75 (5th Cir..

In that respect, Michelin concedes that, if an expert advances purely "observational" or experience-based opinions like the beekeeper in Carmichael II, he is free to do so -- subject to F.R.Evid. 702/403's strictures. Doc. # 327 at 18-21. But once that expert invokes science (hence, scientific principles, chemical bonding and interactions, etc.), Michelin contends, he crosses into Daubert territory and thus must be Daubert-qualified. Id. at 15-18.

Here Michelin's argument gets more sophisticated. It in effect asks: what if the non-Daubert (e.g., beekeeper) expert's underlying assumptions are directly tied to processes, reactions, and phenomena (e.g., molecular bonding, chemical engineering) which themselves involve scientific principles? Then, Michelin contends, it may show -- through Daubert-qualified expert opinion -- that such assumptions are invalid (i.e., incompetent and thus inadmissible), and likewise the opinion those assumptions support. See doc. # 327 at 7-8.

In that regard, Carlson's testimony contrasts with his Carmichael I testimony. Here he spoke -- directly and through his underlying assumptions -- of chemical bonding, vulcanization-based

---

1998) (en banc). The expert witness's testimony "need only assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. As circumstantial evidence, [his] data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury." City of Tuscaloosa, 1998 WL 740059 at * 4.

While this Court must resolve disputed issues of fact against the non-movant under Rule 56, "'the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse of discretion standard.'" Schubert, 148 F.3d at 31 (quoting G.E. Co. v. Joiner, 118 S.Ct. 512, 517 (1997)). To that end, F.R.Evid. 104(a) authorizes the Court to consider "relevant information that would be hearsay but for the relaxed rules for admission under pre-trial consideration." Shepherd v. Michelin Tire Corp., 6 F.Supp.2d 1307, 1308 (N.D.Ala. 1997).

moisture and pressure interactions, and did not expressly disclaim reliance upon the underlying science involved. In other words, he did not simply testify, "I have seen a lot of tires over the decades and from my experience bright brassiness means this tire suffered a tread-separation defect."

Instead, he went far beyond that. See 11/17/97 Carlson dep. at 262 (opining that the subject tire's inadequate adhesion "much likely" had "something to do with the moisture in the creel room"; id. at 262-63 (and this results in a "zinc oxide or copper oxide on the surface of the coated steel belts such as would prevent the copper sulfide bond from forming"); id. at 266 (momentary reduction in pressure during vulcanization likely caused defective bonding); id. at 264 (inadequate pressure "affects the sticking"); id. at 267 (he is relying on that section of Grogan's book maintaining that "[d]uring the vulcanization process, the brass plating fuses with the sulphur in the rubber forming copper sulfide. It follows from this that a properly formed rubber-metal bond will convert the brass to black copper sulfide and leave no trace of brassiness") id. (thus, if an investigator sees "areas of bright shiny brass gleaming at him from the belt area of a failed tire," he "will have no difficulty in deciding that there was a deficiency in the bonding process"); see also id. at 251-256. Compare Carmichael II, 131 F.3d at 1436 ("Indeed, Carlson asserts no knowledge of the physics or chemistry that might explain why the ... tire failed") (emphasis added).

Michelin has countered with both experience and science-based testimony showing that the brass is not necessarily "used up" in that process:

26

> Vulcanization initiates a chemical reaction which causes a molecular layer of copper sulfide and other compounds to form between the steelcord's brass plating and the steel skim coat. Once that molecular layer forms, the brass and skim coat are no longer in direct physical contact, making total or near-total consumption of brass during vulcanization chemically impossible at standard vulcanization times, temperatures and pressures. Therefore, all tires with adequate bonding will generally have brass remaining on their steel belt wires after vulcanization, and many will have a "yellow" or "brassy" appearance of their steel belt wires.

Doc. # 327, exh. E (Leyden affidavit) ¶ 2; see also doc. # 260 (Harrison dep.) at 104; doc. # 327, exh. H (steel cord photos of new, worn and very worn tires). In fact, Michelin goes a step further, asserting that

> [t]otal brass consumption (or near-total brass consumption to the point where the brass is invisible) would cause inadequate bonding. Copper sulfide and the other compounds formed during vulcanization form an interlocking molecular bridge between the brass and the skim coat and bond well to brass, which in turn bonds well to steel. However, copper sulfide and the other compounds formed do not bond well directly to steel.

Doc. #.327, exh. E ¶ 2 (emphasis added).

Leyden, who in contrast to Carlson actually is "trained and qualified as both a chemist and a tire compounder," id. ¶ 1; see also doc. # 327, exh. D ¶ 2, attacks Carlson's theory head-on:

> Under Mr. Carlson's view, complete consumption of brass during vulcanization would imply that a direct bond must be formed between the copper sulfide and the steel which does not chemically exist.
>
> There is no such thing as "partial" covalent bonding between the brass and the steel belt skim coat. Given adequate amounts of brass and skim coat, the temperature and pressures of vulcanization will or will not cause the molecular cross linking. There is no such thing as a "partial" covalent bond; if the compounds formed at all, they are formed completely.

27

Doc. # 327, exh. E ¶ 2 (emphasis added).

Under Carlson's view, Michelin therefore contends, "the lack of remaining brass [in tire where all the brass "should" be consumed if properly vulcanized] would require a strong copper sulfide/steel bond, for example, which does not chemically exist. Doc. # 327 at 8 (citing exh. E ¶ 2). Because, as Leyden describes, the covalent bonding between the brass and the steel belt skim coat either had to be total or the bonding would not occur, the process by definition had to have been performed properly in the case of the subject tire because it made it to 62,000 miles without failing. Doc. # 327 at 8.

Michelin somewhat misses its target, for Carlson partially agrees with Leyden. See 11/17/97 Carlson dep. at 256 ("Q. Is it your view that bonding will be incomplete if there is any brass remaining on the steel cords after vulcanization? A. No. There can be a very, very thin layer of brass. It can appear as a very dull brassy coating"); id. at 269 (dull brass residue indicates proper vulcanization; bright brass suggests the opposite).

However, this back and forth exchange, along with the above Carlson deposition passages illuminating his vulcanizational deficiency and chemical bonding testimony, only further demonstrates that Carlson's expert opinion is not limited to Carmichael II, "beekeeper" level testimony, but in fact relies upon scientific bases.

Courts apply Daubert[13] when that line is crossed. See Michigan

---

[13] The Daubert court enumerated

a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors

Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 920 n. 15 (11th Cir. 1998). Michelin commences its Daubert attack by insisting that Carlson is not qualified to opine on the subject, because, inter alia, he is not a chemist or chemical engineering expert, nor a tire compounder (i.e., one who "formulate[s], among other things, steel belt skim coat compounds, vulcanization specifications, and brass alloy compositions to provide the appropriate elements and conditions for the necessary molecular cross linking," doc. # 327, exh. E ¶ 3). His formal education did not qualify him as a tire failure analyst, chemist or tire compounder; nor has he ever published in the areas of chemistry or tire compounding. Doc. # 327 at 10-11; id., exh. I (Paul dep.) at 278-80 (no published technical or scientific works on "bright brassiness" theory beyond

---

include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

Moore, 151 F.3d at 275 (citing Daubert, 509 at 593-95).

Under Daubert, "important differences exist between truthseeking in the courtroom and in the laboratory...." Moore, 151 F.3d at 275. Indeed,

[s]cientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final and binding legal judgment -- often of great consequence -- about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations.

Moore, 151 F.3d at 275-76 (quoting Daubert, 509 U.S. at 597).

29

Grogan's book).  Moreover, he admitted that belt wire/skim coat adhesion is a "chemical or rubber problem," or a compounding issue, not a basic "structural" or "design" issue.  Doc. # 327 at 11.

Plaintiffs respond by reciting Carlson's credentials (summarized in Carmichael II, 131 F.3d at 1434 n. 2 and Carmichael I, 923 F.Supp. at 1518).  See doc. # 338 at 2-4; doc. # 398, exh. E (resume); doc. # 452 at 1-2.  The Carmichael courts, incidentally, merely assumed that Carlson was qualified to testify as an expert in tire failure analysis.  131 F.3d at 1434 n. 2. This Court finds that such credentials (e.g., ten years as a MARC research engineer spent primarily on tire testing; seven years as a tire failure consultant as an S.E.A., Inc., senior project engineer) easily qualify Carlson to testify as a non-Daubert, "Carmichael II" level expert as to some aspects of tire design and failures.  See Deere, 175 F.R.D. at 164.

Under Daubert, however, the question is more complicated. Plaintiffs need not show that his testimony is correct, but only (by a preponderance of the evidence) that it is reliable.  Moore, 151 F.3d at 276.  Michelin says it is not.  It attacks Carlson's credentials.  It also cites, inter alia, Diviero v. Uniroyal Goodrich Tire Co., 919 F.Supp. 1353 (D.Ariz. 1996), and argues that neither Carlson's expertise nor his data/conclusions "fit" the science upon which he relies.  Doc. # 377 at 3; see also Moore, 151 F.3d at 276 (there must be "an adequate 'fit' between the data and the opinion proffered") (citing Joiner, 118 S.Ct at 519).

Diviero was a products liability case involving steel-belted radial tires.  The plaintiffs' expert (Forney) had extensive experience with bias-belted tires, but no significant experience

30

with steel-belted radials.   919 F.Supp. at 1356.   Similar to
Carlson, Forney had been in the tire industry for decades, examined
numerous tire failures and worked for a tire consulting service
company.   Id. at 1356.   However, Forney "demonstrated that he had
very little knowledge, understanding or experience of the
manufacture, components or chemical makeup of steel belted radial
tires."  Id. at 1357.  Applying Daubert, the Diviero court excluded
Forney's testimony because the nature of the two types of tires
differed greatly and because his methodology was conclusory and
unreliable.  Id. at 1358-60.

Affirming without deciding whether Daubert should have been
applied, 114 F.3d 851, 853 (9th Cir. 1997), the Ninth Circuit
focused on the fact that Forney's testimony went to whether a
defect in a Goodrich tire was the cause of the tire's failure.  Id.
at 853.   Similar to Carlson's planned testimony in Carmichael I,
Forney

> offered to testify that an adhesion defect caused the
> steel belts to separate.  He planned to discuss other
> possible causes for belt separation and then dismiss each
> possibility as the actual cause.  The evidence was
> offered to show that there were no viable causes for the
> failure of the tire other than a manufacturing or design
> defect rendering the tire unreasonably dangerous.

114 F.3d at 853.

But Forney, the Ninth Circuit emphasized, was simply unable to
dismiss other possible causes of the tread separation, and he
lacked knowledge about adhesion failures generally.  Id. Moreover,
he was unable to satisfactorily explain the reasoning behind his
opinions.  Under Rule 702 alone (hence, on non-Daubert grounds),
the Ninth Circuit concluded, the district court properly excluded
him.  Id.

31

The instant case is somewhat distinguishable.  Like Forney, Carlson lacks a lot of the basic credentials with respect to the "hard science" end of his opinions.  Yet, as the extensive recitation above shows, Carlson was able to explain the reasoning behind his theory (though it appears much of it simply by rehashing Grogan's book), and has been able to (e.g., during deposition testimony) discourse at the "hard-science" level in a manner which demonstrates a least a minimal grasp on some aspects of the subject (e.g., his testimony on whether brass is totally consumed during vulcanization _agrees_ with Michelin's expert's).

Moreover, he did -- on a non-scientific basis only -- purport to exclude at least some other potential causes of the tire's failure.  See 11/17/97 Carlson dep. at 205-06 (the subject tire had not been "overloaded or inflated" and there was "no consistent overdeflection"); _id._ at 217 (the "valve stem [had been] broken off" by the accident itself); _id._ at 220, 221-22.  In short, it has not been "demonstrated that he ha[s] very little knowledge, understanding or experience of the manufacture, components or chemical makeup of steel belted radial tires."  919 F.Supp. at 1357.

As for credentials, _Daubert_ does not demand much more than a reasonable degree of competency in a given subject; standing alone, credentials (or the lack thereof) are never dispositive.  _Waldorf v. Shuta_ 142 F.3d 601, 626 (3rd Cir. 1998) ("an otherwise qualified witness is not disqualified merely because of lack of academic training"); _Carmichael II_, 131 F.3d at 1434-37; _Bush v. Michelin Tire Corp._, 963 F.Supp. 1436, 1442 (W.D.Ky. 1996).

The Court finds Carlson to be borderline excludable under the

reasoning employed by both Diviero courts.  However, it is not necessary to definitely resolve the question on "expertise" or "credentialing" grounds, since a more definitive ruling can be made on Daubert's primary ground: whether there is a "fit" between Carlson's data and opinion.  This is a somewhat difficult area of law.  See City of Tuscaloosa, 1998 WL 740059 at * 4 n. 25 ("One factor left unenumerated by the Daubert Court is whether the methods used by the expert to derive his opinion satisfy the standards for scientific methodology that his profession would require of his out-of-court research") (quotes and cite omitted); Daubert, 509 U.S. at 593; Shepherd, 6 F.Supp.2d at 1309.

Here the Court's "foremost objective must be to rule out subjective belief or unsupported speculation."  Rogers v. Ford Motor Co., 952 F.Supp. 606, 615 (N.D.Ind. 1997); see also McMahon v. Bunn-O-Matic Corp., 150 F.3d 651, 657 (7th Cir. 1998) ("[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process") (internal quotes and cite omitted); Joiner, 118 S.Ct. at 519 ("[a] court may conclude that there is simply too great an analytical gap between the data and the opinion offered").

In Daubert-excluding a failure-to-warn expert in Shepherd, an exploding tire mis-mount case, the court emphasized that "[w]here a theory is untested except by having submitted it to comment by other professors, it is not thereby elevated to the degree of 'reliability' that an empirically tested theory reaches."  Id., 6 F.Supp.2d at 1313.  This concept figures into Michelin's argument that just because a flawed theory is repeated by others does not make it less flawed.

33

This Court agrees that the instant plaintiffs cannot simply rely on multiple repetition of the same "adhesion defect" theory, one that inescapably relies upon scientific principles, but couple it with no evidence of testing under established "principles and methodology" to support it. Daubert, 509 U.S. at 594-95. To that end, Michelin interrogated Carlson about the basis of his adhesion defect theory and probed for evidence of testing. He first stated "I don't know the specific cause but it's much likely something to do with the moisture in the creel room," [an area within the tire manufacturing plant "where wires are assembled either into rolls or put into the skim compound"]. 11/17/97 Carlson dep. at 262.

Yet, he claimed to know of no "reliable test" to test "whether or not this corrosion actually occurred and [caused the tread-separation in this case]." Id. at 263. On this component, then, he relied on experiential knowledge, see, e.g., id. at 290-91 (he has seen "yellow cable indicative of adhesion defect" in at least five tire brands), yet nothing approaching the breadth of experience contemplated by the Carmichael II court.

Carlson next opined that there may have been a momentary reduction in pressure during the subject tire's vulcanization. id. at 264-266, but then conceded that he had "no information one way or another that that actually happened in this case other than" noting a "suspicious" way in which the subject tire's "insulator" component came apart. Id. at 265 ("It appears not to have been stuck to the wire and it came off in a regular matter. You can still see the product lines"). In fact, he refused to affirmatively opine on this point:

34

> Q.  So it's your opinion to a scientific certainty that
> there was a pressurization problem with the vulcanization
> of this tire?
>
> A.  No.

11/17/97 Carlson dep. at 267.

Nor did Carlson offer anything more than speculation as to other possible tire failure causes.  11/17/97 Carlson dep. at 287-89.  Michelin also questioned him about the factual and scientific bases to his "yellow wire" theory.  11/17/97 Carlson dep. at 267; see also id. at 289-90.  As mentioned above, Carlson relied upon Grogan's book but cited no testing or methodology from it, nor any other source.  Id. at 267-69.  Michelin then asked:

> Q.  Do you know whether Mr. Grogan has ever tested to see
> if his theory is true?
>
> A.  I'm not -- I don't know.  I don't think he's ever
> felt the need to.

Id. at 269.

Carlson then admitted that he had never conducted any such testing of his own.  Id. at 269-70.  He insisted that "[i]t was presented to me at Michelin that the brassy appearance is a defect."  Id. at 271.  However, he was unable to identify anyone in particular -- either at Michelin, MARC, Uniroyal Goodrich Tire Company, Uniroyal or the B.F. Goodrich Company -- who indicated to him that "brassy appearance is a defect."  Id. at 271-73, 274-75. Although he claimed that the ease with which he could personally pull an individual wire out of the subject tire constituted a test of and evidence in support of his adhesion defect theory, id. at 222-225, he cited no comparative evidence (i.e., whether non-defective tire wires behave the same way; measurably comparative

35

"pull-resistance" levels between defective and non-defective tires, etc.) nor controlled testing by himself or others to bolster such "test."

Michelin also asked:

> Q. Is it possible to objectively test to see whether or not your theory is true that yellow cable implies an adhesion problem?
>
> A. I have taken tires apart and have not seen yellow cable in nondefective tires:

11/17/97 Carlson dep. at 276;

> Q. And would you consider this to be a test of the theory?"
>
> A. Yes.

Id. at 279.

However, none of the "[p]robably five" tires that he took apart were Uniroyal or Michelin. Id., at 277 ("General tires" and "a Firestone tire," "almost all light truck"); compare 1/30/98 Carlson dep. at 57 ("They were all General tires"). And, even though he had conducted such "testing" just months before his deposition, he "[t]hrew them out," 11/17/97 Carlson dep. at 278; see also id. at 278-79 ("We were cleaning out our area. We had to redo our workroom"), though he claimed to have retained some photographs "[s]omewhere in my office," and "should" still have his notes within which he recorded the tires' serial numbers, id. at 278, only to later claim that they, too, were "discarded" -- perhaps accidentally. 1/30/98 Carlson dep. at 59-60 ("It could be an accident") (emphasis added). Michelin then pressed further:

> Q. Other than to peel off the upper belt and look at the wires, did you conduct any other testing during this evaluation? For example, did you test to see the thickness of the copper sulfide layer? Did you test to see what the *thickness* of the *remaining brass coating*

36

was?

A.  No.

Q.  Is that possible to do?

A.  *Yes*.

11/17/97 Carlson dep. at 279 (emphasis added).[14]

Carlson then evaded Michelin's follow-up question -- whether
anyone else had ever conducted such testing, id. at 279 ("A.  I
haven't"), and conceded that his "testing" consisted only of
cutting open randomly selected nondefective tires and finding no
"yellow wire."  Id. at 279-80; see also 1/30/98 Carlson dep. at 58-
59 (he recalled no other "yellow wire" testing in recent memory).
Yet, he did not cut open a controlled series of tread-separated
tires (nor cite to anyone else having done so) to compare how many
would reveal "yellow wire."  See supra note 14.  Nor did he have
any meaningful criticism of Leyden's (another Michelin expert's)
testing, which in Leyden's opinion "prove[s] that the appearance of
'brassy' wires does not indicate a tire adhesion problem."  Doc. #
398, exh. I at 26-27 ¶ 53.

The record therefore shows that Carlson, at bottom, invoked
scientific principles (thus precipitating Daubert's application)
but advanced next to nothing in the way of reliable testing or

---

[14]  This is a significant point because, as set forth above, even Carslon agrees that some
"brassiness" is normal.  Hence, the question to be answered, under the Carlson/Grogan
manufacturing defect theory, is *how much* "brassiness" or "yellow wire" must be found in a tread-
separated tire before one can competently opine that insufficient rubber/metal adhesion (i.e., the
manufacturing defect claimed here) occurred.  Michelin's expert's (Leyden's) comparative analysis
assertion (i.e., that Carlson's theory could be tested by using spectroscopy on both defective and
nondefective tires to measure the amount of remaining brass residue), see doc. # 327 exh. D ¶ 9,
remains unrebbuted.

methodology. Nor did he cite to any such testing by others in the
field. See also doc. # 327, exh. D ¶ 9 (Leydon knows of none).
What "testing" he did do bore no indicia of reliability (for that
matter, he discarded the results and, despite two subpoenas, purged
his photographs and handwritten notes, see 1/30/98 Carlson dep. at
59-60; Part II(C) infra).

Furthermore, Carlson's 1995 deposition testimony from another
tire-failure ("Taurus") case supports Michelin's contention that
his "yellow cable" theory was conceived for litigation purposes
rather than through legitimate scientific, much less any reasonably
methodological, inquiry:

> Q.  For the last 15 years, you've been noticing yellow
> cable?
>
> A.  I have seen yellow cable for that long, yes.
>
> Q.  And what did you think caused it until you read these
> expert depositions?
>
> A.  No tire company, I think, has ever pinpointed a cause
> in the manufacturing process that produces yellow cable.
> It's somewhat random, and the one tire company that I am
> familiar with has not been able to determine in their
> tires that it produces separations.
>
> Q.  That's Michelin?
>
> A.  Yes.
>
> Q.  And did they experience yellow cable?
>
> A.  Yes.
>
> Q.  And now, so you've been familiar with it, *but you
> didn't think it was a problem?*
>
> A.  *That's correct.*
>
> Q.  And now you've read an expert deposition where there
> is some opinion that it does indicate a problem?

38

> A.  Yes, there are people that believe that it does.
>
> Q.  Which experts are those?
>
> A.  Primarily Rex Grogan.
>
> Q.  And did he give that opinion in a case where he was testifying against a tire company?
>
> A.  I believe so.

Doc. # 377 at 10 & exh. R at 167-68 (emphasis added).

Grogan's "no trace" conclusion, to reiterate, has been impeached even by Carlson, and plaintiffs cite to no testing -- even though Carlson conceded such could be done -- to support Carlson's litigation-born, "bright brassiness" opinion.  Courts determining whether the proposed expert's testimony amounts to good science should "not ignore the fact that a scientist's normal workplace is in the lab or field, not the courtroom or lawyer's office."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) ("Daubert II").  On balance, then, Carlson fails all five of the general Daubert factors:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

Moore, 151 F.3d at 275 (citing Daubert, 509 at 593-95).

The Court is not overlooking plaintiffs' evidence suggesting that even Michelin's expert (Harrison) might subscribe to the "yellow wire" theory.  See doc. # 338 at 6-7; but see supra note 8. However, that has not been shown to be a dispositive admission, nor, likewise, the product of Daubert-reliable testing.

39

More importantly, radial tire technology has evolved over the decades -- the reason why, for example, Carlson conceded that he would not apply his "zero cap ply" design analysis to pre-1995 tires -- and neither Harrison's nor the NTSB investigator's 1987 comments have been shown, under the substantial similarity doctrine (see supra note 10), to be sufficiently relevant to a 1994-manufactured tire.

More convincing, however, is the "Hudson" testimony, illuminated in plaintiffs' 7/30/98 brief, concerning Michelin's own "adjustment process" analysis of tread and belt separations (excerpted infra at 44, 47-48). Doc. # 398 at 7. But plaintiffs are overlooking a couple of critical points here: even if their evidence reveals an "accepted industry truism" that "bright brassy" wire found in tread-separated tires indicates defective adhesion, again, Carlson proffered no testing or other methodology to support his opinion that all or virtually all "bright brassy" wire tires are adhesion-defective, at least to the point where tire-failure plaintiffs need only show "yellow wire" or "bright brassiness" to prove that a manufacturing defect occurred. To the contrary, once he agreed that some "brassiness" residue is normal, he (and thus plaintiffs) placed in issue just how much there should be to support his defect theory. He in effect agreed that, to proceed on this defect theory, a measurable benchmark (i.e., "X" amount of "brassiness" signals an adhesion defect) must be developed, and testing would be required to define "X." Yet, plaintiffs have failed to fill in that gap.

Furthermore, plaintiffs' manufacturing defect theory fails to surmount the substantial similarity doctrine, since many of the

40

tires referenced by these other "yellow wire" witnesses have not
been shown to be the same tire, much less the same general type of
tire, as the one at issue here.  See doc. # 130 at 98-100 (Carlson
himself noting that different skim compounds are used between
different tire classes).  For that matter, Carlson agreed that tires
can bear the same "yellow wire defect" yet _never_ fail.  11/17/97
Carlson dep. at 285-86.  Again, no one has competently opined that
"X" amount of "bright brassiness" found inside of a particular tire
(or tire line) _by definition_ makes it "defective."

That omission is critical because Michelin (a) has shown
that substantial numbers of tires -- both defective and nondefective
-- will turn up with "yellow wire" and yet will not fail during
foreseeable use; and (b) Carlson has not conducted any testing, nor
supplied the Court with any basis showing, for example, how _much_
"brassiness" must be found before one can competently opine that a
tire is defective.  Once Carlson agreed that tires can bear the same
"yellow wire defect" yet never fail, 11/17/97 Carlson dep. at 285-
86, he rendered his opinion testimony fatally deficient on this
claim.  Permitting Carlson's opinion to go to a jury, then, would
beckon at best an arbitrary result, not the reasoned, principled
verdict F.R.Evid 104, 403 and 702 were designed to ensure.

Therefore, absent a showing that "bright brassy" wire found
inside of a tire automatically (or, at least, more likely than not)
makes it "defective," it is not enough to simply state that "yellow"
or "bright brassy" wire was found here and thus a jury must decide
the negligent manufacturing issue.  Michelin properly reinforces
this result by emphasizing Carlson's 1995 testimony that "[n]o tire
company ... has ever pinpointed a cause in the manufacturing process

41

that produces yellow cable.  It's somewhat random and [Michelin,] the one tire company that I'm familiar with[,] has not been able to determine in their tires that it produces separations."  Doc. # 377, exh. R at 167; see also doc # 327, exh. H (attached photographic evidence).  He conceded that he himself "didn't think it was a problem," and was still "not convinced" as of 1995.  Id. at 168. He thus changed his mind only while paid to do so as an expert witness and while consulting the work-product of another "for hire" litigation expert.

That shifted the burden to plaintiffs to proffer much more than generic product defect assertions made by others, even if they are ex-industry employees.  See Daubert II, 43 F.3d at 1317-18 ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'  One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication").

Because plaintiffs have failed to meet Daubert's reliability prong (no testing, no peer review and publication, no known or potential error rate, no established testing standards, no general acceptance and, most importantly, not even a suggestion as to how much brassiness signifies a defect, see U.S. v. Gilliard, 133 F.3d 809, 812 (11th Cir. 1998)), Carlson's Daubert-level testimony on the negligent manufacturing claim must be excluded.  For that matter, Grogan's proffered report and testimony (see doc. # 398 at 10-11) will not be considered pursuant to this Court's 8/7/98 exclusion

42

order.  Doc. # 407.

Michelin's *in limine* motion therefore will be granted on these grounds and to that extent.  See also Mitchell v. Uniroyal Goodrich Tire Co., Inc., 666 So.2d 727, 727-30 (La. App.4 Cir. 1995) (In products liability action involving allegedly defective vehicle tire, proposed testimony of plaintiffs' expert on chemical properties of plastics, polymers, and adhesives did not satisfy the Daubert test -- adopted by Louisiana courts -- for reliability and relevance, notwithstanding plaintiffs' contention that test did not apply because expert's information was not experimental or theoretical and could not be expressed in terms of rate of error; expert's tire-related experience was limited to work on raw materials that might have been used in manufacture of tires, and expert testified that he had never investigated separation of tread from tire or looked at specifications of tire in question or of compounds used in that tire; moreover, expert *did not substantiate methodology he used in* determining that manufacturing defects were probable cause of separation of tread from tire's steel belt).

But plaintiffs have one last card to play on this issue, and in doing so they illuminate certain aspects of the previously cited Hudson testimony.  See doc. # 398 at 2-6; # 404 at 7-10.  Uniroyal, they emphasize, elevated Hudson to the position of a "failed tire analyst," doc. # 398, exh. A. at 111, even though he had only a high school degree and some college courses, doc. # 398, exh A at 101-03; see also id. at 105 (he "learned] on the job), and was not a chemist, tire compounder or tire designer.  Id. at 318.

Hudson, who took early retirement in 1992, id. at 110, trained other employees, including engineers, on "how to look for the

43

cause,... the different type of [tire] failures].... You don't just
call it a belt separation.   Does it stop tearing, is there
contamination.   And, I was showing them all about these different
things about the failure modes."   Id. at 300-01; see also doc. #
452, exh. 2 at 17.   In 1996, in what is known as the "Carver" case,
he was asked:

> Q.   And when you were instructed on how to perform your
> duties in failed tire analysis, sir, what were you told
> about the significance of having bright yellow wires or
> bright yellow steel cords?
>
> *     *     *     *
>
> A.   _I was taught that if I saw bright yellow, that means
> there was lack of adhesion between the wire cord and the
> rubber that surrounds the wire_.
>
> *     *     *     *
>
> Q.   In examining the tires during your tire failure
> analysis, sir, was there a condition code that related to
> bright yellow cords?
>
> A.   It fell under the condition of belt separation.

Doc. # 347, exh. A at 145-46; doc. # 398 at 6-7.

> Q.   Mr. Hudson, in the course of your training to become
> a failed tire analyst, were you taught that the presence
> of bright yellow cords is a condition that was associated
> with belt separation?
>
> [court ruling]
>
> A.   Yes, sir.

Doc. # 398, exh. A at 147 (emphasis added).

So, plaintiffs conclude, "real world" reality shows that
"Carmichael II" level (i.e., experience-based) testimony should be
admitted here.   Doc. # 398 at 2-6.   This necessarily implies that

44

the Court could admit Carlson's testimony but restrict him from any testimony that directly relies upon (or even "implies") a scientific basis. He could then, this argument goes, cite to Hudson's testimony as the type of data upon which other experts might reasonably rely. See F.R.Evid. 703.

In other words, like the beekeeper who could testify based on his established experience observing bees take flight, Carlson should be able to testify about his established experience observing "bright brassy," tread-separated (hence, defective) tires. The problem, of course, is that Carlson himself admitted he had not focused upon the "bright brassiness" distinction, much less even accepted it as a valid defect theory, until after his own 1995 Carver testimony, when he was a full-time paid expert witness. Nor has he claimed any long-term, experience-based level of knowledge that would permit the "I know it when I see it" result plaintiffs intend here.

In other words, he in effect would base his "experience-only" opinion primarily on Hudson's (and presumably others') own personal experience analyzing tires, and not his own. That is tantamount to the Carmichael II beekeeper testifying that bees take flight in the wind but then conceding that he had never extensively observed such phenomenon, while other beekeepers did. Yet, that is the very foundation to "experience-based" opinions (i.e., the beekeeper cannot be called to the stand in the first place because he lacks the relevant experience of observing bees take flight).

Even if Carmichael II survives Supreme Court review, arguably plaintiffs are stretching it too far here. Under this view, plaintiffs should, at a minimum, bring in the "other beekeepers"

45

(except that they are too late, see doc. # 407 (8/7/98 exclusion order)).  And, it is fair to ask whether they have shown that Carlson's bottom line -- essentially, that the mere (i.e., un-measured) presence of bright brassiness automatically demonstrates a manufacturing defect -- is a fact or quantum of data reasonably relied upon by other experts in the tire-failure field.  See 4 WEINSTEIN'S FED. EVID. § 703.05[2][a] (1997).  To that end, Hudson testified as a fact witness, not a fellow expert.  Doc. # 452 at 4.

Furthermore, Carlson's "literature" (hence, the sources upon which Carlson would purport to reasonably rely upon under F.R.Evid. 703) is Grogan's writing on the subject and the NTSB investigator's letter.  Yet, Carlson himself (joining with Michelin on this point) contradicts the "no trace" assertion contained in those sources, which have otherwise not been shown to meet the substantial similarity test.  See Barger 231 Ga.App. at 729 ("Without a showing of substantial similarity, the evidence is irrelevant as a matter of law [and there is nothing upon which the court's discretion can operate]").  That contradicted assertion is critical here, because it goes to the dispositive issue: whether the presence of "bright brassy" wire automatically (or at least more likely than not) demonstrates a manufacturing defect.  On balance, Carlson should not be permitted to testify on plaintiffs' manufacturing defect theory.

But what is preventing plaintiffs from presenting "bright brassy" wire evidence through, for example, someone other than Carlson?  As is further discussed below, the Court is informed of a recent (11/10/98) records-custodian deposition in South Carolina regarding tens of thousands of MARC-produced documents.  It is conceivable that evidence may be gleaned from that.  Moreover,

46

Hudson's testimony -- though not cited by Carlson in his depositions -- has a compelling quality to it:

> Q. Let me ask a slightly different question. Were you ever asked, sir, to examine these tires when there was a whole batch, a whole production run that were defective in belt separation? Were you ever asked to examine them to determine the likely cause of the belt separation?
>
> A. Yes, sir.
>
> Q. And did you make a finding as to what the cause was?
>
> A. Yes, sir.
>
> Q. And what was your finding in that regard?
>
> A. You want to know what I found?
>
> Q. Yes.
>
> [colloquy]
>
> A. Lack of adhesion between the rubber that surrounded the belt wires. *Bright brass coated wires, that would indicate lack of adhesion between the belt wires and the rubber, contamination.*
>
> \*       \*       \*       \*
>
> Q. [Y]ou told us that there were many occasions when there were production runs for the entire week that were defective with respect to belt separations. My question is, were there different defects on different occasions that led to the problems?
>
> A. Yes, sir.

Doc. # 404 at 9-10, exh. H at 166-67 (emphasis added); see also doc. # 452, exh. 2 at 32-34.

> Q. Did you come to learn the significance of the appearance of brassy cables in steel belted radial tires that had separated?
>
> A. Yes.... that the tire had not completed its normal cycle or it failed early and we found this bright brass,

47

> that means that the rubber ski[m] coat that goes over the
> brass wire wasn't compatible so it came loose and it
> failed the tire.

doc. # 452, exh. 2 at 39.

This testimony comports with Carlson's in the sense that
several manufacturing facility problems (moisture, pressurization
fluctuations during vulcanization, contamination) can produce
"different defects on different occasions that [can lead to bright
brassiness level, tread separation] problems." Id. Yet, there is
also Carlson's own Carver testimony showing that, by industry
standards, even Michelin, one of the "better" manufacturers, was --
at the time the subject tire was manufactured -- unable to ascertain
what caused the "yellow wire" phenomenon.

And, in the non-overruled portion of Uniroyal Goodrich v. Ford,
218 Ga. App. 248 (1995), partially rev'd on other grounds, 267 Ga.
226 (1996), the Georgia Court of Appeals reversed a products
liability verdict against a tire maker in part because the trial
court erred in admitting Hudson's testimony concerning tire-return
"adjustment data" not shown to be of the same "common green tire"
batch as the subject tire in that case. Id. at 259-60. "Further,
no showing of similarity of the tires, defects or the causes thereof
was made." Id. at 260. Thus, such testimony was inadmissible under
the substantial similarity doctrine. Id.

Here plaintiffs could go places with Hudson's testimony if they
can point to, for example, documentation or binding-admission
testimony showing that Michelin (or MARC) itself equated "X" amount
of brassiness with a manufacturing defect and that this encompassed

the 1992-94 production run on the subject tire,[15] consistent with the substantial similarity requirements set forth in note 10 supra. The Court is holding this issue open (i.e., plaintiffs may file a reconsideration motion) in the event that the MARC document production yields any fruit.

In the meantime, Carlson will be excluded under both Daubert and Carmichael II grounds with respect to plaintiffs' manufacturing defect theory. Should MARC-document production yield "defect" evidence admissible through fact witness and documentary evidence, plaintiffs should so inform the Court in their reconsideration motion. If, in that motion, they challenge the Court's ruling excluding Carlson, then they should focus on these three issues:

(a) Whether grounds exist to authorize Carlson to testify in a heavily restricted, "Carmichael II" only format (i.e., advancing no direct or implied scientific -- hence, Daubert-excludable -- bases to his opinion), and cite only to Hudson's and any similar "Rule 703" testimony.

(b) Whether such testimony's "probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." F.R.Evid. 403; Gilliard, 133 F.3d at 815-16.

(c) Whether, assuming the Court affirms its ruling that Carlson is incompetent to testify, nevertheless plaintiffs have another avenue to adduce "real world" (e.g., Michelin's or MARC's own documents) evidence showing, for example, that Michelin (and/or MARC) itself considered "bright brassy" wire to constitute a manufacturing defect and that, under the standard that emerges from such evidence, a jury should reach the negligent manufacturing issue.

The evidence adduced thus far shows that both questions (a) and

---

[15] Production of the subject tire line began at the Fort Wayne plant in 1992 and ceased in 1994. Doc. # 258, exh. A ¶ 11.

49

(b) should be answered in the negative.  For example, Hudson's direct knowledge stops at 1992.  In addition, his discussion of defects among "Uniroyal" tires apparently encompassed a wide variety of tires, including those of different innerdiameters, sidewall widths, aspect ratios, tread and sidewall designs, tread rubber compounds and steel belt skimcoats.  See 11/17/97 Carlson dep. at 320-21; doc. # 258, exh. A ¶ 4.  The connecting thread seems weak at best.  See Ford, 218 Ga. App. at 259-60.

As to question (c), however, Hudson's testimony provides some indication that the "brassiness" problem is generic to a broad range of tires, perhaps including the 1992-94 manufacturing run which produced the subject tire:

> Q.   Throughout your tenure with the company, did you understand that the appearance of brassy cables in a tire that had suffered tread belt separation meant that the tire was defective?
>
> [Objection]
>
> A.   Yes.
>
> Q.   And did you teach that to adjustment center personnel?
>
> A.   Taught it and placed it in my manual.
>
> Q.   And did you teach it to tire engineers who took your training course?
>
> [Objection]
>
> A.   Yes.

Doc. # 452, exh. 2 at 40-41.

Should plaintiffs travel the reconsideration route, their brief would be due within 15 days of the date this Order is served. Michelin may respond within 10 days thereafter.

50

For the moment, then, Michelin's *in limine* motion will be granted. Subject to the illumination of other supporting evidence on reconsideration, Michelin's summary judgment on plaintiffs' manufacturing defect claim also will be granted.

    4.   Failure To Warn

As mentioned above, plaintiffs also advance a negligent failure to warn theory.

> "In failure to warn cases, the duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product.... An actual or constructive knowledge requirement is consonant with Georgia tort law in general, see, e.g., ... Kemp v. Rouse-Atlanta, 207 Ga.App. 876, 429 S.E.2d 264 (1993) (negligent hiring and/or retention), and is in accord with the position taken by foreign jurisdictions and legal treatises.... Restatement (2d) of Torts, § 402A, Comment j (seller is required to give warning 'if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge' of the danger)." Chrysler Corp. v. Batten, 264 Ga. 723, 724-725, 450 S.E.2d 208 (1994).

Zeigler, 1998 WL 634891 at *2. "Whether a duty to warn exists depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger." Id. (quotes and cite omitted); Carmical, 117 F.3d at 494-95; Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp., 4 F.Supp.2d 1198, 1203 (S.D.Ga. 1998).

Michelin contends that (a) the subject tire contained all sidewall markings required by federal law, 49 C.F.R. § 571-119; (b) Carlson has no opinion on this claim;[16] and (c) no one has testified

---

[16]   Q. Based on your report, I take it you have no intention of offering any opinions about inadequacy of warnings accompanying this tire; is that true?

that, had a particular warning been given, it would have been heeded
and prevented the blow-out, loss of control and resulting damages.
Doc. # 311 ¶¶ 21-23.  Michelin also argues that, if it prevails on
its *in limine* motion excluding Carlson's testimony, it must triumph
on this claim, too.  Doc. # 310 at 24-25.

Plaintiffs point out that, even if they fail to prove a
manufacturing or design defect, once it is shown that a product's
danger is not obvious to the user, a manufacturer is under a duty
to warn about it.  Doc. # 315 at 11-12 (citing Stapleton v. Kawasaki
Industries, Ltd., 608 F.2d 571, 572 (5th Cir. 1979), modified, 612
F.2d 905 (5th Cir. 1980)).

The Court agrees.  See Zeigler, 1998 WL 634891 at **2-3
(evidence that bleach maker knew its "lemon scent" masked bleach's
deleterious vapors yet failed to warn users raised jury issue on
failure to warn and punitive damage claims).  Adding lemon scent to
bleach may not make it defective, and surely cannot be the product
of a manufacturing defect.  But it does blend an "unsafe design
feature" into it.  Id.; Stapleton, 608 F.2d at 573 n. 1.

Here there is no dispute that the subject tire's product
literature and sidewall do not warn about sudden tread separations
and resulting blow-outs.  See doc. # 316 at 11-12 (quoting 12/22/97
West dep. at 147-48, 149); doc. # 438 at 3 ¶ III; see also doc. #
356 (Laughery report) at 2 (reciting Ford's owner's manual warning:
"In case of sudden tire failure, avoid heavy brake application.
Gradually decrease speed.  Hold steering wheel firmly and move

---

A. Correct.

11/17/97 Carlson dep. at 8.

52

slowly to a safe, off-road place"); id. (deeming it deficient because it failed to warn of rollover hazard).

To that end, plaintiffs refer the Court to the affidavit testimony of Douglas Bender, father of deceased plaintiff Timothy Bender, who avers that he personally purchased the subject tire and, had he or his son been warned of the tread-separation blow-out possibility, either "would have taken particular steps to obviate this risk" [though he does not say what] or found "another mode of transport for the use of Timothy Bender and [his band]." Doc. # 316 at 14. Timothy, his father and acquaintances add, possessed a "great intellect" and meticulously maintained the subject van, so it is likely that he would have heeded such a warning. Id. at 14-15.

Boiled down, Michelin's argument essentially goes to proximate cause. After all, a "plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." Post Properties, Inc. v. Doe, 230 Ga.App. 34, 39 (1997) (quotes and cites omitted). Judges sometimes make obvious, common-sense judgment calls on this issue. See Henry, 60 F.3d at 1548-49 (failure of truck owner to examine warning on jack of which he was aware was proximate cause of accident which resulted from misuse of jack, even though owner was illiterate); Timmons, 982 F.Supp. at 1480 (vehicle manufacturers are under "no duty to warn consumers that head-on collisions with impact speeds in excess of 100 miles per hour are unreasonably dangerous").

In that respect, Michelin correctly points out that it is

plaintiffs' burden to adduce evidence showing that a warning of some sort should have been given, and that such failure proximately caused their damages.  Doc. # 336 at 6-7.  Yet, argues Michelin, "the plaintiffs have submitted no testimony from a purported 'ergonomics' or 'warnings' expert that a 'separation propensity' warning should have been given."  _Id._ at 7.

This raises two questions.  First, what warning should Michelin have provided and how?  Although plaintiffs did not plainly state it prior to Michelin's summary judgment motion, one of their untimely expert witness reports reveals their contention: while the subject tire's sidewall "contained a standard Safety Warning statement in raised lettering[, i]t provided no information regarding circumstances that could lead to on-road failures, and it said nothing about the implications of vibration for potential failure."  Doc. # 356 (6/11/98 Laughery report)[17] at 2; _see also id._ (the tire's "warning system ... was inadequate .... [because i]t failed to meet criteria for attracting attention.... The sidewall should have contained adequate warning information indicating events and circumstances that could result in tire damage or deterioration, the consequences of such damage or deterioration, and instructions for addressing such hazards and consequences"); doc. # 316 at 11-16 (warning should include the instruction that "tire vibrations may indicate an impending belt separation"); doc. # 398, exh. I ¶ 60.

Second, is expert testimony required to support this particular claim?  There can be no doubt that such experts are commonly used, especially where the defective warning theory invokes ergonomic

---

[17] The Court has excluded both Laughery as well as another proposed expert (Grogan) on F.R.Civ.P. 37(c)(1) grounds.  Doc. # 407.

theory (i.e., whether the typical product user would both heed and
be "warned" by a particular warning label) and human factors
engineering.  See Lemon v. Martin, 232 Ga.App. 579, 582 (1998),
cert. granted (10/5/98); Henry v. GM Corp., 60 F.3d 1545, 1550 n.
1 (11th Cir. 1995); Carmical, 117 F.3d at 495; Shepherd, 6 F.Supp.2d
at 1308; Deere, 175 F.R.D. at 162-63; Cole v. Goodyear Tire & Rubber
Co., 967 S.W.2d 176, 185 (Mo.App. E.D. 1998); Uniroyal Tire Co. v.
Trujillo, 711 So.2d 606, 607 (Fla.App. 3 Dist. 1998).

     But Michelin cites no authority showing that an expert is
required, while plaintiffs cite no authority showing that one is
not.  This much is certain: expert testimony "is particularly
appropriate where, as here, the trier of fact is presented with
evidence of a highly technical nature." Gisriel v. Uniroyal, Inc.,
517 F.2d 699, 701 (8th Cir. Ark. 1975).

     For that matter, Georgia's "proximate cause" law on failure to
warn theory conforms to the Alabama law applied in Shepherd.  There
the court ruled that a failure to warn claim in a tire-failure case
could not go to a jury absent some evidence that the allegedly
inadequate warning would have been read and heeded and would have
kept the accident from occurring.  6 F.Supp.2d at 1313.  The
Shepherd plaintiffs' expert, however, could only speculate that
mechanics injured by a tire-dismounting defect hazard would have
heeded his proposed sidewall warning.  Id. at 1310-12.  Thus, the
court Daubert-excluded his testimony, which effectively extinguished
that claim.  Id. at 1308.

     Here plaintiffs' proffered warning is supported by no expert
witness opinion and no evidence that government standards require
it.  Nor do they cite any published literature on such warning's

55

efficacy, much less industry practice.  More importantly, they do
not dispute that

> [v]ibrations seemingly emanating from a tire may have a
> variety of causes, including wheel imbalance, brake
> imbalance, axle imbalance, tire imbalance, vehicle
> misalignment, suspension problems, road surface
> abnormalities, a road hazard, and many other possible
> tire problems completely unrelated to the tire's design
> or manufacture. [For that matter, t]he most common cause
> of vehicle vibration is rotating mass imbalance. Drivers
> generally know that vibrations seemingly emanating from
> a tire may signal some kind of vehicle or vehicle problem
> which should be evaluated.

Doc. # 398, exh. I ¶ 60.

Michelin convincingly argues that there is a good reason why
no governmental agency or industry practice compels such a warning:
"Trying to craft a particular warning about a particular cause for
a general 'vibration'" is simply not feasible.  Id.  Tellingly,
Bender's affidavit does not state what he or his deceased son would
have done had either detected vibrations.  If Bender's response is
that he would have immediately pulled over and changed the tire (or
towed the van to a mechanic), then is it not fair for Michelin to
ask if the proposed warning is realistic, since some vibrations can
come and go, can emanate from a variety of non-tire defect sources,
do not consistently indicate that a vehicle-control level failure
is imminent, and any such warning must "work" for "the masses," not
just any one individual.

For that matter, no one disputes that (a) there is a limited
amount of space on the curb side of a tire's sidewall; and (b)
consumers are not generally in the habit of bending over to read
sidewall inscriptions when they buy new tires, much less thereafter.
It seems that at most plaintiffs advance rank speculation on a

56

critical component of their failure to warn theory, and fail to address a critical issue: what could possibly be communicated in a manner that would lead the typical user to heed it?

To summarize, the issue is whether Michelin should have issued a generic sidewall and/or product pamphlet warning that vibrations could mean a separating tread, sudden tire blow-out and vehicle rollover. Conceding that it has not done so, doc. # 438 at 3 ¶ III, Michelin has shown that, at a minimum, there exists a substantial technical issue for the jury to sift: whether the typical consumer would heed plaintiffs' proposed warning in a meaningfully way and thus be apt to sort out the many causes of vibrations (e.g., relatively innocuous, tire imbalance-caused vibrations versus those which signal an impending tread separation). Finally, is expert opinion required on this issue? The parties shall brief these issues within the same time frame set forth in Part II(B)(3) supra.

### 5. Punitive Damages

Michelin also argues that plaintiffs cannot, as a matter of law, recover punitive damages. Doc. # 310 at 13-23. "Pursuant to O.C.G.A. § 51-12-5.1(b), '[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.'" Zeigler 1998 WL 634891 at *3.

In Zeigler, plaintiff Zeigler sued "CloWhite," a bleach manufacturer, after she mixed an oxidizer with CloWhite's "lemon-scented" bleach and suffered injuries from exposure to the mixture's fumes. Id., 1998 WL 634891 at *1. The lemon scenting tended to

57

mask the danger, she alleged; and CloWhite knowingly failed to warn
of it. Id. The appeals court reversed the trial court's summary
judgment to CloWhite on strict liability and failure to warn
grounds, reasoning that a jury should decide those issues. Id.

In upholding Zeigler's punitive damages claim, the court first
illuminated CloWhite's intentional conduct:

> CloWhite put a lemon scent into its bleach which masked
> the otherwise noxious odor of the bleach. CloWhite's
> failure to warn consumers of the danger of inhaling the
> fumes they had masked must be considered in light of the
> fact that CloWhite also intentionally reduced the
> consumer's revulsion to the natural product by adding the
> lemon scent.

Id., 1998 WL 634891 at *3. Furthermore,

> CloWhite also possessed information which warned against
> mixing the lemon scent with strong oxidizers. CloWhite's
> decision not to include on its label a warning against
> inhaling the fumes of the product was made despite
> warnings of this danger contained in their MSDS [Material
> Safety Data Sheet]. Again, in reviewing the evidence in
> favor of the non-movant, CloWhite was aware of the above
> dangers and added the lemon scent, which enhanced the
> danger of inhalation of its fumes, yet failed to warn the
> user of such dangers.

Id., 1998 WL 634891 at *3.

"A jury," the Ziegler court concluded, therefore "could infer
a conscious disregard for the safety of others," one that was
"sufficient to support Zeigler's claim for punitive damages." Id.
So, by adding what it evidently thought to be a product
"enhancement" (i.e., lemon-scent to ameliorate the harsh odor that
bleach emits), and by failing to warn of its masking effect,[18]
CloWhite exposed itself to punitive damages for "intentionally" (i)

---

[18] An open and obvious danger is just one of several factors to be considered in a risk/utility
analysis. See Ogletree v. Navistar Intl. Transp. Corp., 269 Ga. 443, 445 (1998).

"masking" a hazard and (ii) failing to warn of the lemon scent's masking effect. _Id._

An evidentiary standard correlates to the claim raised here:

"In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect _and punitive damages_, provided there is a showing of substantial similarity. Mack Trucks v. Conkle, 263 Ga. 539, 436 S.E.2d 635 (1993). 'Without a showing of substantial similarity, the evidence is irrelevant as a matter of law [and there is nothing upon which the court's discretion can operate].' Carlton Co. v. Poss, 124 Ga.App. 154, 155, 183 S.E.2d 231(1971)." Gen. Motors Corp. v. Moseley, 213 Ga.App. 875, 877(1), 447 S.E.2d 302.

Barger, 231 Ga.App. at 729 (emphasis added). This is consonant with the Heath standard.

In essence, plaintiffs must prove that the subject tire was defective and that, from its own data, Michelin knew or should have known that it was placing separation-prone tires like the instant one into the stream of commerce. Traveling on Ziegler's rationale, it is possible to argue that, although the product itself was not defective, it contained a dangerous (i.e., blow-out) propensity of which Michelin should have but failed to warn. This takes the Court into a mammoth discovery dispute over Michelin's "adjustment data," discussed in Part III(D) infra. At the same time, this claim may fail if the failure to warn claim fails. For the moment, then, Michelin's summary judgment motion on plaintiffs' punitive damages claim will be carried with the case.

C. **Michelin's Sanctions Motion**

Michelin pursues alternative grounds to reinforce its _in limine_ motion's intent: exclusion (if not, a lesser sanction) of Carlson's

testimony based on his personal misconduct during this litigation.[19] See doc. # 252. As mentioned above, Michelin pursued the empirical basis of Carlson's "experience-based" knowledge: just how many of such tires has Carlson actually seen in support of his theory? And what became of those tires and related testing documentation? This, in turn, brings the Court to a voluminous part of the file filled with caustic contentions.

Carlson, Michelin maintains, purged his "other tires" evidence because he either never had it (and thus lied about examining other tires for the "brassiness" defect) or had it but purged it to avoid revelation of contradicting indications. Id. Michelin contends that in conjunction with Carlson's 11/17/97 deposition (on which this Court extensively relied above) it subpoenaed him to bring all "tangible things" upon which he relied to generate his opinion in this case, as well as related documents (e.g., his fee schedule, income documentation). Doc. # 168, exh. A ¶¶ 1-3, 39.

To Michelin, that meant that Carlson should have appeared with all of his "testing information," id. ¶¶ 12, 34, yet Carlson brought none of the written notes or photographs that he generated when testing tires in support of his "brassiness" theory. 11/17/97

---

[19] This Court has broad discretion to prevent and rectify the admission of lies and distortion by omission. See Harre v. A.H. Robins Co., 750 F.2d 1501, 1503-05 (11th Cir. 1985) (ordering relief on F.R.Civ.P 60(b)(3) new trial motion based on the "intractable conflicts" between an expert witness's trial testimony and his later case deposition testimony, "where the defense attorneys knew or should have known of the falsity of the testimony"), vacated in part on other grounds, 866 F.2d 1303 (11th Cir. 1989), cited in BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1475-76 (11th Cir. 1992) (District court's decision to admit testimony of broker's expert in suit by savings and loan association arising out of interest rate swaps was not manifestly erroneous and did not require new trial; record reflected no "intractable conflict" between expert's trial testimony and her earlier deposition, and association was able to use that deposition during cross-examination and had full and fair opportunity to establish any inconsistencies).

Carlson dep. at 278.  Nor did he produce, *inter alia*, his written fee schedule or billing file, which were otherwise producible.  Doc. # 168 at 3, exh. A. ¶¶ 10, 18; 11/17/97 Carlson dep. at 148-49, 161-63; doc. # 253 at 4-8.

In denying Michelin's post-11/17/97 Carlson deposition enforcement motion, the Magistrate Judge (MJ) noted that Michelin "conceded" its failure to personally serve Carlson, so he granted it leave to redepose him.  Doc. # 202 at 3.  In fact, Michelin made no such concession, see doc. # 167, though it now admits that in its brief before the MJ it erroneously stated the date that it served Carlson.  Doc. # 253 at 3-4 n. 2.

Carlson, for that matter, admitted to *some* form of service during his 11/17/97 deposition, see 11/17/97 Carlson dep. at 314 ("I received a subpoena, yes"); see *also* doc. # 191 at 2, though both the MJ and the parties appear to have initially overlooked that point.  Carlson later reaffirmed that he had been served, see 1/30/98 Carlson dep. at 62-63, though he then claimed that he could not remember *how* he was served.  *Id.*[20]

In a later brief (i.e., after Carlson's re-deposition), Michelin showed that it in fact had personally subpoenaed Carlson prior to his 11/17/97 deposition.  Doc. # 252, exh. 1 at 2.  The proof of service page had been omitted from Michelin's original subpoena enforcement motion, see doc. # 168, exh. A; # 334 at 66,

---

[20] Only *after* Michelin moved for sanctions over Carlson's conduct, and *after* the MJ commented critically about Carlson in a 4/22/98 hearing, doc. # 334 at 100, did Carlson change his tune.  In a 5/13/98 affidavit he insisted: "I have no recollection *whatever* of *ever* being served with the subpoena from [Michelin] addressed during my deposition of November 17, 1997."  Doc. # 342, exh. B ¶ 3 (5/13/98 Carlson Aff. ¶ 3) (emphasis added).  The Court finds this assertion plainly not credible.

61

which evidently led the MJ to reach his no-service conclusion -- a claim plaintiffs also made at the time.  See doc. # 193 at 4 (insisting that the 11/17/97 deposition subpoena had "never been 'served' on [Carlson] at all").

However, plaintiffs correctly point out that the *duces tecum* portion of the subpoena, which paralleled Michelin's document request to plaintiffs, see doc. # 252, exh. 5, contained some fairly broad document demands.  See, e.g., doc. # 168, exh. A at 3 ¶ 2 ("All tangible things provided to you by any source with your analysis and review of ... [a]ny case or incident involving" Michelin, Uniroyal, Goodrich, (etc.), tires).  Construed literally, the request could encompass a vast quantity of material, possibly subject to protective order restrictions imposed upon Carlson by other courts.

On the other hand, neither Carlson nor plaintiffs moved to quash the subpoena.  Nor did they contest Michelin's second subpoena, also personally served on Carlson, for his 1/30/98 re-deposition, see doc. # 252, exh. 3, at which the subject tire and rim were to be present.  See doc. # 199 (MJ's 1/7/98 Order directing same).  And, plaintiffs themselves had sought comparatively broad categories of discovery from Michelin, leading this Court to order some expensive data production.  See doc. # 178.

Additional events occurred which compounded this issue.  Just after Carlson admitted to having received the subpoena during his 11/17/97 deposition, plaintiffs' counsel insisted that Michelin would have to "work out some agreement" with Carlson to compensate him for the cost of Carlson's production.  11/17/97 Carlson dep. at 315.  Thus began the task of renegotiating the next round of

62

discovery production, something the parties later recognized would be somewhat altered by this Court's intervening (i.e., 12/3/97) discovery Order, doc. # 178. Doc. # 191 at 3-4.

In that regard, Michelin's 12/23/97 brief indicated some movement, characterizing plaintiffs' "concessions" that various documents "should have been produced." Doc. # 191 at 3-8. Chagrined over this characterization, plaintiffs insisted that during the 11/17/97 Carlson deposition they only agreed to produce information in response to Michelin's independent document request to plaintiffs (i.e., Carlson was representing himself on the subpoena). Since their response to Michelin's document request had not yet been due as of the 11/17/97 deposition, they did not have to produce the documents prior to that deposition. Doc. # 193 at 4-5.

"Furthermore," plaintiffs insisted, "by conceding, as it must, the absurdity of its demand that Mr. Carlson produce all of the *hundreds, or thousands,* of files in his office, [Michelin] only demonstrates again that its Motion should never have been filed." Doc. # 193 at 5 (emphasis added & original). Although Carlson produced no files from "other cases" at his 11/17/97 deposition, he confirmed that he had worked on over 100 tire cases since joining his present firm ("Edwards & Carlson") in 1994.[21] 11/17/97 Carlson dep. at 131; doc. # 253 at 7. He indicated that he had "a hundred

---

[21] Michelin wanted to review Carlson's files to learn the source of his zero-degree cap ply theory, since he admitted that he did not begin to testify about it until approximately 1995. Doc. # 253 at 6-7; see also 11/17/97 Carlson dep. at 306; id, at 307-08 (the technological development for using nylon caps, Carlson explained, had not sufficiently progressed until 1995); doc. # 252, exh. 6 at 277-301. Michelin sought to document its suspicion that Carlson concocted his new theory "for litigation expedience." Doc. # 253 at 7.

or more" file cabinets in his office, and that if Michelin were
willing to pay him $195/hour to search his files for the documents
Michelin wanted -- which could take a "[c]ouple months" -- he would
comply to the extent pending protective orders permitted. 11/17/97
Carlson dep. at 317-18.

    As Michelin points out, "[t]he story changed completely at Mr.
Carlson's second [1/30/98] deposition...." Doc. # 253 at 8.
Carlson and a member of his staff spent only "approximately eight
hours" searching for documents responsive to Michelin's subpoena.
1/30/98 Carlson dep. at 17. And, despite the two subpoenas served
upon him, he purged many of his office files as part of what he
claimed to be his "normal" expurgation practice. 1/30/98 Carlson
dep. at 37.

    Carlson explained that "[w]e needed the space" at his office,
so he discarded "a few very old files that [his retired partner had
been keeping but were now dormant]." Id. at 39-40. He also
discarded some of his own "inactive files." Id. at 40. On second
thought, however, he concluded that he had only discarded his
retiring partner's (Edwards's) files. Id. at 41. This "routine
housekeeping" occurred, he concedes, after 10/28/97 (the date
Michelin's process server claimed he served Carlson) but before his
11/17/97 deposition. 1/30/98 Carlson dep. at 36 ("we went through
a housecleaning in November...."); id. at 39, 40; see also doc. #
404 at 11.

    Michelin finds Carlson's explanation "rather amazing." Doc.
# 253 at 9. It maintains that Carlson violated both subpoenas, as
they extended to Carlson's partner's files, too, and thus Carlson
should not have discarded them. Id. Michelin thus seeks contempt

                                   64

and evidence-limiting sanctions.   Id. at 24-25.

Michelin lodges additional complaints.   Even at Carlson's second deposition, Michelin points out, he claimed that he still maintained approximately 100 active files, 1/30/98 Carlson dep. at 42, yet, even after two post-deposition (2/5/98 & 2/11/98) letters requesting full production, no "case files have yet been produced." Doc. # 253 at 10.   Michelin thus deduces that either Carlson and plaintiffs are misleading it about the 100 files or Carlson "illegally destroyed" them in the face of the 10/28/97 subpoena. Doc. # 253 at 10.

Some facts mitigate Carlson's contradictions.   He testified that he joined "Edwards & Carlson" in 1994.   In the Court's view, it was not unreasonable for him -- as a layman, not a phrase-parsing lawyer -- to read Michelin's requesting paperwork as seeking only Carlson's prior case files, not Edwards's.   In that vein, Michelin does not point to any active, material involvement by plaintiffs' counsel in impeding Carlson's subpoena obligations.     Still, Carlson's "on second thought" testimony seems inherently suspect. See also supra note 20.

On the other hand, Carlson is no stranger to the litigation process.   See doc. # 252, exh. 6 at (minuscript page) 4-5 (9/97 deposition in another tire failure case in which Carlson admits to being deposed approximately "80 times"); see also 11/17/97 Carlson dep. at 132 (he has analyzed approximately 350 tires).   His heavy reliance upon "I don't know," "I don't specifically recall" and other hedging, "weasel-worded" responses, is evident in his other-case (9/30/97) testimony, see id. at 12-13, 19-24; see also id. at 128-29 (he did not bother to bring the subject tire or his photos

65

to that deposition); see also 11/17/97 Carlson dep. at 185, and it is not unreasonable to suspect that he is simply holding back on producing his files for fear that Michelin might uncover contradictions and/or evidence adverse to his testimony.

Michelin plies an even stronger argument on the disparity between Carlson's daunting description of what it would take to review his files and respond to Michelin's subpoena (i.e., he went from "over a hundred file cabinets requiring a couple of months of full-time work to search," doc. # 253 at 9, to a mere eight hours searching some 100 case files with the help of only Edwards and his secretary). It also criticizes plaintiffs' counsel for adverting, in an opposition brief, to the "hundreds, if not thousands, of files" Michelin sought, doc. # 253 at 10.

Carlson's exaggeration, or misstatement, is problematic. Plaintiffs now say he "meant" to communicate that there were 100 _files_, not filing _cabinets_. Doc. # 298 at 1; see also doc. # 404 at 14-15 (emphasizing that Carlson never used word "cabinets" but merely agreed to defense counsel's characterization). At first, plaintiffs submitted no affidavit (or other form of sworn testimony) from Carlson to support his "correction" of the very statement which plaintiffs did not hesitate to exploit. See doc. # 298 at 1; doc. # 334 at 65-66. But several months later, after Michelin's counsel underscored the exaggeration at a 4/20/98 hearing before the MJ, see doc. # 334 at 65-66; see also id. at 92-102, plaintiffs saw fit to back the "correction" up with the 5/13/98 Carlson affidavit, doc. # 342, exh. B; doc. # 404, exh. A, part of which this Court has already found patently incredible. See supra n. 20.

To that end, the Court agrees with Michelin. See doc. # 389

66

at 13. It might be believable that Carlson simply misspoke when he first communicated "file cabinets" instead of files. But he then reinforced the illusion of 100 file cabinets (as opposed to "files) when he offered to review them _only_ if Michelin agreed to pay him $195/hour to search for the documents Michelin wanted. The mendacity clue is found in his estimate of how long it would take:

> A.  Pay me in advance, I would do some amount of work and then see how far that would go.
>
> Q.  How long do you think it would take you to comply with the subpoena fully presuming there were no confidentiality concerns?
>
> A,  Couple months.
>
> Q.  _Couple of months of full-time work?_
>
> A.  _Yeah._
>
> Q.  By you and your entire staff?
>
> A.  Yeah.
>
> Q.  How many _file cabinets_ do you have in your office?
>
> A.  A _hundred or more_.

11/17/97 Carlson dep. at 317-18.-(emphasis added).

Given the surrounding circumstances, the Court has no trouble concluding that Carlson knowingly exaggerated the task in order to discourage Michelin's counsel from probing his files. Consequently, the Court rejects as not credible Carlson's belated claim that he "misspoke" on this issue. As such, it is imposing upon him an F.R.Civ.P. 45(e) contempt and inherent-power sanction, for he violated his obligation to obey a subpoena by telling the truth when testifying about production under it. Should Carlson make it back into this case (e.g., upon reconsideration), Michelin shall be free

to communicate to the jury that the Court has found him to be untruthful in response to a lawful subpoena.

Also troubling is Michelin's showing that it sought all information about tests or studies addressing Carlson's "yellow cable" or "brassiness" defect theory. Carlson testified, during his 11/17/97 deposition, that within the last year he had "taken tires apart and [had] not seen yellow cable in nondefective tires." 11/17/97 Carlson dep. at 276. Michelin questioned him further:

Q. When during 1997 or late '96 did you do this?

A. Sometime during that period of time.

Q. Summer of '97?

A. Yeah. I've cut other tires apart and pulled them apart.

Id. at 276.

This "testing" involved five light truck tires which he threw away while "cleaning out" his offices -- cleaning which occurred *after* Michelin served him with its subpoena -- but he also claimed that he saved photographs of the tests and handwritten notes recording the tires' serial numbers. Id. at 277-78; doc. # 253 at 11-12. Carlson considered the tire cuttings "to be a test of [his tread-separation] theory." Id. at 279. Plaintiffs raised no opposition to Carlson's turnover of his testing information to defendants. Doc. # 180 at 3.

Yet, even though in November Carlson claimed that he had left his photographs "[s]omewhere in my office," see 11/17/97 Carlson dep. at 278, he still failed to produce them at his 1/30/98 deposition. 1/30/98 Carlson dep. at 53 ("I cannot find them"). Also during his 1/30/98 deposition, he revealed that he in fact had

68

discarded his hand-written notes "[s]ometime after July [1997]."
Id. at 55. And, he now (in a 5/13/98 affidavit) insists that the
tires he discarded included none made by Uniroyal Goodrich. Doc.
#.342, exh. B ¶ 7.

In Michelin's view, this evidence supports a finding that
Carlson is trying to conceal his own adverse testing results. Doc.
# 253 at 13. It refers this Court to Carlson's 9/30/97 testimony
(hence, before his 11/17/97 deposition) in another defective tire
case, in which he was asked whether he had conducted any testing to
support his "brassiness" theory. Doc. # 253 at 13-14. There
Carlson insisted that he could not test his theory:

> Q. Mr. Carlson, the fact is you have done nothing to
> establish, prove or support this theory of yellow color
> or brassiness, have you?
>
> A. I have talked with other experts, I've seen the data
> in the industry.
>
> Q. You have done no testing, right?
>
> A. Well, it's something that I can't test.
>
> Q. You cannot test?
>
> Q. No.

Doc. # 252, exh. 6 at 276-77.

In contrast, he claimed here that his theory not only could be
tested, but that in fact he had conducted such testing, 1/30/98
Carlson dep. at 53, yet he "threw out" for "office-cleaning"
purposes his test tires, and now cannot find his photographs and
notes. Id. at 53-54, 55-56. Michelin reasonably infers that either
Carlson never performed the tests but wants others to believe that
he did, or he did perform the tests but is concealing unfavorable

69

results. Doc. # 253 at 14. Plaintiffs initially were conspicuously silent on this point, see doc. # 342, then have sought to minimize its importance. See doc. # 404 at 4-7.

After the MJ expressed notable concern over Carlson's conduct, see, doc. # 334 at 100, 118, plaintiffs responded by distancing themselves. Doc. # 342 at 1-3. They emphasize that they do not control Carlson and that, in contrast to instances where a Michelin employee might destroy evidence (in which case such conduct may properly be imputed to Michelin), his conduct should not be imputed to them. Id. They also insist that the subpoena was "grossly improper on its face" because it was overbroad, doc. # 342 at 2; doc. # 404 at 4, yet they ignore the fact that no one moved to quash or restrict it. And, they focus on their claim that Carlson has produced "all matter he intends to rely on as to this case[,]" doc. # 342 at 5; see also doc. #.404 at 5, while ignoring the fact that Michelin sought more than that, specifically, information Carlson perhaps would not want illuminated in this case.

In that respect, plaintiffs insist the missing tires amount to much ado about nothing because they were not of the Uniroyal Laredo brand. See doc. # 404 at 4-5. Yet, throughout this case they have been the first to emphasize that broad categories of tires can be compared to support their negligent manufacturing and design claims. As an additional sanction, then, Carlson (should he make it back into this case on reconsideration) will be barred from citing to any other tires he has claimed to have personally tested.

Michelin next points to evidence showing Carlson in fact had cut only two, not five, tires for testing purposes. Doc. # 389 at 2-8. On top of that, it illuminates several other inconsistencies

70

related to the tire cuttings. Some of them Carlson can credibly
explain as recollection failures (he has, after all, testified in
some 80 depositions), while some of them he cannot. The Court finds
the above sanctions sufficient, and Michelin may use the
inconsistencies to cross-examine Carlson should he ever testify
here. Finally, Michelin's remaining arguments are moot in light of
the Court's summary judgment on Carlson's design-defect theory.

> D.   Plaintiffs' Appeal from the MJ's 4/22/98 Order;
>      Plaintiffs' Other Compulsion/Sanctions Motions

Professing great frustration and outrage, plaintiffs complained
of stonewalling, lies and distortions within Michelin's discovery
responses, then urged this Court to unsheathe its "Samurai Sword"
and strike Michelin's Answer. Doc. # 215. In his 4/22/98 Order,
the MJ denied plaintiffs relief. See doc. # 330; # 340 exh. A.   In
their appeal to this Court, doc. # 340; see also 348 ("reply
brief"), plaintiffs explain that they have sought "real world"
support for their "bright brassiness" theory, and reasonably
suspected that such could be obtained in Michelin's "adjustment" and
related (e.g. NTSB) data. See, e.g., doc. # 354 (explaining
Michelin's tire-diagnostic and computerized adjustment process,
showing the special emphasis Michelin places on recording and
further studying "tread-separation" based tire adjustments).

Michelin's most convincing argument here is that the plaintiffs
are seeking adjustment and tire-failure data on tires (a) not shown
to be usable in determining "whether a defect existed, or what the
tire's condition was when (the adjustment was) made"; and (b) not
shown to be "substantially similar" to the subject tire. Doc. # 341
at 5-6; see also doc. # 346 at 12-15.

"Plaintiffs' essential position seems to be," Michelin

71

contends, "that statistics summarizing other occurrences may be admissible even when the other occurrences are not." Doc. # 341 at 3. The Court notes that at a 4/20/98 hearing the MJ authorized an extension of discovery. See doc. # 334 at 108 (limiting it "to either the exact tire at issue here or the common green tires we have discussed for many months, or any other tires that MAR[C] has studied that have the same skim compounds or coating as the [subject] or common green tires share"); id. at 109 ("So I would permit, and think this is being somewhat lenient, the plaintiffs to seek discovery from MAR[C] if they want to do it"); id. at 110 (authorizing depositions at Michelin's "adjustment centers"); # 354 at 1.   In the meantime, his 4/22/98 Order overruled plaintiffs' "strike" motion, see, e.g., doc. # 330 at 4, from which plaintiffs now appeal.  Doc. # 340.

     A post-hearing deposition, plaintiffs now contend, exposes "smoking gun" information: that Michelin all along has been analyzing and computerizing tread-separation tire failures, and thus has been capturing and utilizing product defect data. See doc. # 354 at 1-9. This amounts, they contend, to the knowledge necessary to support punitive damages, and is contrary to the lies and misleading assertions that Michelin has made to plaintiffs and this Court.  Id.  Plaintiffs detail the deposition testimony of John Goodson, who became a Michelin "employee on (12/1/93), when [Michelin] took over adjustments of Uniroyal Goodrich tires from his prior employer, a Uniroyal Goodrich affiliate." Doc. # 354 at 2 (citing exh. B (Goodson dep.) at 13-16, 56); see also doc. # 421 (Goodson dep.).

     Goodson testified that, at the Michelin adjustment center where

72

he works, he and fellow technicians call up (on computer terminals)
data on each tire they inspect (the data is gleaned from each
adjustment form, which is inputted into the adjustment center's
computer system so it can be accessed at each technician's
terminal). Goodson then verifies the failure category of each tire.
Goodson dep. at 41-43. He does that by inputting each tire's DOT
number (which informs him of the tire's time and place of
manufacture), then conducting a visual inspection. Id. at 43-44.
If he cannot manually open the tire he cuts into it with a knife.
Id. at 45.

Goodson then codes the tire and transmits the data to
Michelin's Greenville, S.C. site if it is "a special interest tire."
Id. at 46; see also id. at 51 (correcting his earlier testimony that
such data was transmitted to MARC; "I mean not to MARC but to
Michelin in Greenville"). A "special interest tire," which includes
a tread-separated tire, "goes back to [Michelin Greenville]," id.
at 46, while others are either resold or scrapped. Id.; see also
id. at 25-26 ("special interest" tires have "conditions that's on
tires that MARC wants to see"); id. at 28 (that includes "tread
separations"); id. at 30-31 (Michelin's -- or MARC's -- "special
interest" in tread separations has been ongoing since Michelin "took
over" in 1993).

In this way, Goodson can verify dealer warranty information
(e.g., if the dealer failed to indicate on the adjustment form that
the tire suffered a tread separation, Goodson adds that
information). Id. at 46-47. He then codes (i.e., inputs at his
terminal) the actual cause of the tire's failure. Id. at 47-48.
However, while he inspects and codes for tread separations, he is

73

not trained or experienced in determining any of the *causes* of tread
separation. Id. at 47. Of the 30-40 tires he inspects each day,
he recalled coding only one tread separation during the past year.
Id. at 50-51. After his adjustment center inputs the written claim
forms into its computer system, it sends them to Greenville for
imaging, Id. at 57. Goodson did not detail what such "special
interest" entails, and what exactly Michelin (or MARC) does with,
for example, a tread-separated tire after he passes it on.

According to plaintiffs, this testimony "puts the lie" to
Michelin's claims that it did not track tread-separation data, much
less computerize it. This "lie" is particularly egregious,
plaintiffs contend, since Michelin has complained about how
"expensive" it's been to produce (pursuant to this Court's 12/3/97
Order) "raw" adjustment forms data to plaintiffs, then analyze it
for them. See also doc. # 384 at 7 (insisting that Michelin
produced 70,000 raw forms to plaintiffs without informing them that
it already was in computer-readable form). Further, plaintiffs
point out, Michelin recently revealed to a Texas federal district
court -- contrary, they claim, to its representations to this Court
-- the existence of its imaged adjustment form database. Doc. # 354
at 5, exh. C.

All of this shows, plaintiffs conclude, that Michelin has
actively concealed such data to keep plaintiffs from using it to
show Michelin's knowledge of product defects and hazards -- core
components to, for example, failure to warn and punitive damages
claims. Doc. # 354 at 6. And, plaintiffs maintain, it contradicts
Michelin's 6/4/98 *in limine* motion with respect to adjustment data,
doc. # 341; see also doc. # 349 (supplement), where it insists that

74

it does not comprehensively inspect the tires returned by the dealers. See doc. # 341 at 1 ("the adjustment process does not involve determining the cause of any tire condition for which the adjustment was made, whether a manufacturing or design defect existed, or what the tire's condition was when sold").

It also contradicts, plaintiffs contend, West's affidavit claiming that Michelin only "looks at the tires returned by the dealers to confirm their basic condition when returned[,]" but "does not conduct the extensive forensic investigation that would be necessary to determine what caused the condition observed." Further, plaintiffs maintain, Michelin violated this Court's orders directing disclosure to plaintiffs of all adjustment data related to the subject tire. Doc. # 384 at 7.

The argument here primarily turns on the depth of Michelin's returned-tire analysis and the use Michelin makes of the resulting data. Michelin has maintained all along that it only skims the surface of the data pool that it generates (i.e., it simply tracks returns generally, but not to the point of illuminating any manufacturing and/or design defects). Yet, the "special treatment" to which Goodson testified suggests that Michelin keeps an eye out for what it feels is an excessive number of "tread separations" for a given tire line. At that point, plaintiffs reasonably surmise, Michelin naturally conducts a further inquiry to see what, if anything, went wrong.

In "rolling thunder" fashion, plaintiffs filed even more motions based upon Goodson's "revelations." However, it is worth pausing here to explore the word parsing in which Michelin evidently indulged. It may be technically true, as West avers, that

75

"[t]ypically, the adjustment process does not involve determining what the tire's condition must have been at the time of manufacture or fire sale for use." Doc. # 341 at 1 (emphasis added). But it also now seems likely that a tread separation perhaps is an atypical case, of "special interest" to Michelin, and thus further study in fact is conducted. That, in turn, would leave a scent rightly picked up by plaintiffs' counsel.

Fresh on that trail, plaintiffs' counsel filed a Second Motion to Compel, doc. # 357; see also doc. # 358 (brief), aimed at forcing Michelin to produce, over Michelin's "irrelevancy," "overbroad," and "unduly burdensome" objections (hereafter, the "standard objections"), data on all instances where a "Uniroyal" or "Uniroyal Laredo" tire separated, while in use by consumers during 1987-96. Doc. # 358 at 7. Plaintiffs seek the same with respect to "Michelin" labeled tires, as well as related categories of information. Id. at 5. The implication here is that, since the data is computerized, retrieving it is not all that burdensome after all, and it is relevant to this case to show knowledge of manufacturing and/or design defects in entire tire lines, inclusive of the subject tire. Here plaintiffs cite the "Evans Deposition" at 24-26, 38-41 and 44-46 (see doc. # 460, exh. 2) to establish, according to plaintiffs, that Michelin uses data generated by Goodson and fellow technicians "to address actual or potential deficiencies in its manufacturing operations." Doc. # 358 at 6.

In their Third Motion to Compel, doc. # 360, plaintiffs seek, over the same "standard objections," "documents and tangible things" arising from 1990-onward "Quality Assurance Meetings" Michelin has been conducting. Id. at 5. Here Michelin also raised the

76

"substantial similarity" objection and time-scope limitations.  Id. at 5-6.  Michelin has produced documentation on a more restricted (temporally) scope, but plaintiffs want more.  Id.[22]

Stepping up the pressure, plaintiffs next filed a "Motion for ... Contempt ... and for Other Relief," doc. # 363, moving to strike Michelin's *in limine* motion on adjustment data (i.e., doc. # 341), and to find West in contempt for attesting to an affidavit now shown by Goodson to be misleading.  Doc. # 363 at 1.  They also seek attorney's fees.  Id.  In their "Second Supplemental Brief (Etc.)," doc. # 384, they superilluminate what they contend to be Michelin's past inconsistencies, including Michelin's failure to timely comply with Court orders on disclosing the totality of MARC's relationship to Michelin.  Doc. # 384 at 2-5.

Significant here is plaintiffs' reference to the "convenient ignorance" of a defense witness as to MARC's relationship with Michelin, id. at 4-5, as well as their reference to Michelin Product Safety Department Manager, Jan Ourada.  According to plaintiffs, Ourada identified multiple steps to Michelin's adjustment process: (1) it develops statistical analyses of trends in adjustment levels as to specific tires and tire sizes; and (2) when overall adjustment levels exceed an "industry standard" of 1.5%, it conducts a detailed engineering analysis to determine the cause of those excessive rates.  See doc. # 384, exh. C at 3-5; # 318 at 3-5.  It must follow, plaintiffs contend, that Michelin then takes steps to

---

[22] The remainder of plaintiffs' discovery requests, as addressed in this particular motion, go to the minutiae of Michelin's manufacturing and quality control processes, id. at 6-29, documents regarding Dr. K. Laughery (the expert this Court has since excluded), id. at 29-30, transcripts or depositions of any other failure-to-warn experts, id. at 30, and similar requests with respect to Grogan. Id. at 30-33.

correct the problem, and in the process expose its own manufacturing and/or design defects, yet Michelin just won't admit it. Doc. # 318 at 3. And if Michelin in fact does not take those corrective steps then "that failure would itself constitute powerful evidence of a reckless indifference to safety so as to support a return of actual and punitive damages." Id. at 5.

Plaintiffs also underscore the constantly "revised" adjustment rates Michelin (per Court Order) has furnished to them. See doc. # 318, exh. A ("the adjustment rate for tires of the same skim coat compound at the Fort Wayne plant is [SEALED], and the adjustment rate for all Uniroyal Tires is [SEALED]"). Michelin did not tie these numbers to any particular period of time, id., exh. A, and in any event later revised them, following a "second analysis," to what plaintiffs interpret as [SEALED] and [SEALED] respectively. Doc. # 318 at 7 & exh. B at 4. Even at that, plaintiffs accused Michelin of understating the adjustment rates by including 1997 (thus, unsold) tires in its analysis. Id.

Plaintiffs view Michelin's subsequent (third and fourth) "revisions" with heightened suspicion, doc. # 318 at 5-8 & exhs. D-F, though Michelin claims that it merely corrected a "mathematical error" and supplemented its findings because plaintiffs failed to specify exactly what data rates they sought. See doc. # 370 at 7 n. 3; see also id. & doc. # 419, exh. C (2/26/98 West aff.) at 12 ¶ 4 (Michelin produced an additional analysis following plaintiffs nonspecific objection to the first); accord, doc. # 258 at 14-15. Much debate revolves around plaintiffs' claim that an adjustment amount over 1.5% is "the 'industry standard' for investigation and action." See doc. # 318 at 7, 8 (claiming Jan Ourada disclosed this

78

but providing no supporting record cite).[23]

In doc. # 385, plaintiffs supplement their contempt motion on their claim that West's affidavit violated F.R.Civ.P. 56(g). Doc. # 385 at 1. Michelin, they contend, attempted to conceal its "fully computerized adjustment system" and falsely claim that it routinely discarded adjusted tires, when in fact Goodson's testimony showed otherwise. By not refuting this in their original "Contempt" motion, plaintiffs contend, Michelin has now conceded the point. Id. They also point to Ourada's testimony (in the "Vela") case showing that, in contrast to West's affidavit, Michelin in fact does computerize its adjustment data, though it cautiously avoids generating precise data ripe for plaintiff lawyers' picking. See Doc. # 385, exh. A (Ourada testimony in Vela case showing that Michelin assembles adjustment rates for specific tires but is limited to "a simple division of the total number of tires produced in a period of time and compared to the number of returns processed for that tire").

Next, plaintiffs filed a "Second Motion for a Finding of Contempt" against Michelin, once again seeking to strike Michelin's Answer, in light of Michelin's having "confessed to willful

---

[23] However, Thomas Oliver, "Senior Quality Engineer of a Michelin Central Quality Group," doc. # 305, exh. F ¶ 4, swears that "[t]o [his] knowledge, there is no threshold adjustment rate for any group of tires which, if exceeded, triggers an investigation into tire quality. ... [He has] never heard of such a threshold existing, [has] never heard that any group within [Michelin] monitors adjustment rates for groups of tires, and have never heard of an investigation into tire quality begin triggered by some adjustment rate threshold." Id. Evans, the Fort Wayne plant Quality Assurance Manager, likewise swears to the same, Doc. # 305, exh. E ¶ 5. He also avers that Michelin "does not generate actual or projected adjustment 'rates' (numbers off adjustments divided by the applicable production)." Id. ¶ 2. In discharging his responsibility for "ensuring the quality of tires manufactured at [the Fort Wayne plant], he "did not receive or use for any purpose adjustment rate information or adjustment rate projections." Id. ¶ 3.

destruction, secreting or withholding of verified, coded, and computerized adjustment data, in specific contempt of" this Court's directions. Doc. # 390 at 1. In responding to plaintiffs' document requests, Michelin claimed that it had no "unproduced computer files," but this was contradicted by Goodson's testimony that computerized data (e.g., coding of tread separations) is generated and transmitted to Michelin's Greenville, South Carolina Home Office. Doc. # 390 (brief) at 2. Michelin, plaintiffs conclude, either destroyed such data or is now willfully refusing to produce it; either way, this warrants contempt sanctions.

Days later, plaintiffs filed their "Fifth Motion to Compel Discovery" from Michelin, doc. # 393, this time highlighting "the cornucopia of [Michelin's] misconduct," including its concealment of its "fully computerized adjustment system" and MARC's "very extensive" role in operating it and producing "detailed analysis of failed tires received for adjustment thereby." Doc. # 394 at 1. Plaintiffs perch this motion -- once again -- on Goodson's "devastating testimony," id., and now seek Michelin's 12/1/93-present "code books" (containing Michelin's method of coding tire failures in its adjustment centers).

Plaintiffs also seek to compel all "computer files generated from [12/1/93-present] with respect to tire adjustment center examinations for tires manufactured at Fort Wayne, Indiana." Doc. # 394 at 5. They also want any documents or things reflecting examinations of each tire "after [it is] received at a [Michelin] adjustment center," id. at 8, since, Goodson's testimony shows, this would include tread-separated tires -- the essence of what is relevant to plaintiffs' burden of proof here. Id. at 11.

80

Plaintiffs further demand essentially the same data but unrestricted by any dates, _id._ at 11-16, in addition to the documents and things Michelin uses to train "adjustment center tire inspectors, technicians, or other employees."   _Id._ at 16-18. Finally, plaintiffs seek documentation on how Michelin utilizes and analyzes data generated at tire adjustment centers, _id._ at 18, as well as any documentation on adjusted tires or tire condition codes "which have at any time been designated as of special interest to MARC, or to inspections, analyses, or examinations of such tires by MARC or otherwise." _Id._ at 21.

In their "Reply Brief in Support of Their Second and Third Motions to Compel," doc. # 396, plaintiffs cite the _Ford_ case, 218 Ga. App. at 260, to document that, while Carlson may have testified "that Michelin generally had no serious or significant incidence of separation as to its tires, _id._ at 1, "Uniroyal certainly has...." _Id._  They again point to Goodson's testimony in emphasizing that Michelin has the computer data available to produce but simply will not.   _Id._ at 1-2.   And, they again complain that Michelin is stonewalling them, producing "nothing reflecting as to internal plant operations, reports or analyses." _Id._ at 2 (emphasis original); _see_ _also_ _id._ at 3-4 (contrasting "Oliver" deposition testimony on tire plant quality assurance testing and "uniformity specification procedures" with Michelin's non-production of documents on same).

Plaintiffs also exploit the apparent looseness in Goodson's testimony (he corrected himself once after using MARC and Michelin Greenville interchangeably, and the Court finds his testimony at best unclear as to whether he meant "Greenville" when he said "MARC"

81

and vice versa) when they complain that Michelin has engaged in "fraudulent" disclosures "as demonstrated by its willful omission" of the "fact" that MARC has analyzed all of Michelin's tread-separated (and adjusted) tires since 12/1/93 or earlier. Doc. # 396 at 3.

Plaintiffs also have complained, repeatedly, that Michelin failed to timely disclose MARC's existence to them. See, e.g., doc. # 384 at 2-3. The MJ adequately addressed that in his 8/3/98 Order granting plaintiffs a 90-day extension of time within which to conduct further discovery as to MARC. Doc. # 399 ("As previously noted in this Court's [4/22/98] Order denying plaintiffs' motion to strike, plaintiffs have known of MARC's existence throughout most of this litigation and that MARC designs and tests tires manufactured by [Michelin]"); see also doc. # 258 at 4-8. The MJ noted that plaintiffs had subpoenaed MARC in South Carolina (S.C.). Id.

That pursuit resulted in satellite litigation, tenaciously resisted by MARC, see doc. # 434, exh. B, C & D (unsuccessful stay and appellate mandamus motions); see also doc. # 417 at 2-4, before an S.C. federal court which issued an 8/19/98 order directing MARC to produce, in conjunction with this Court's 12/3/97 Order and the MJ's 4/22/98 Order,

> all requested matter as to (1) the same tire as the subject tire in this case; (2) any "common green" tires, and (3) all tires made with the same skim compound as the subject tire. [¶] [Also, because the MJ's Order] did not address direct subjects addressed by the subpoena, MARC shall produce all matters requested insofar as it relates to the defect theories alleged by Plaintiffs: (1) a manufacturing defect evidenced by "brassy cables" and (2) a design defect evidenced by lack of ... 0 degree belts. This production shall be subject to any applicable order of the United States District Court of Southern Georgia.

82

Doc. # 434, exh. A.

MARC's subsequent production included 25,000 documents "on dark colored, non-copiable paper" (in an effort to protect its claimed proprietary data on tire composition), many significantly reduced from their original size. Doc. # 434, exh. F. at 1; id. at 2; see also doc. # 444 (amended, 10/7/98 order) (finding that plaintiffs made a prima facie showing that MARC and its defense counsel subverted the court's discovery order; setting an 11/2/98 sanction hearing against defense counsel).

In "Plaintiffs' Fifth Supplemental Brief" (filed 10/27/98) on their Objection to the MJ's 4/22/98 Order, plaintiffs disclose their dissatisfaction with MARC's disclosure as ordered by the S.C. court. Doc. # 451, exh. A (complaining that MARC produced "no records in reference to brassy cables and no records of MARC's analysis of tread separated tires that are returned to them by Michelin adjustment centers"; nor any records regarding "MARC's ongoing communications with the Ft. Wayne plant regarding the design and construction of Laredo tires").

Running throughout plaintiffs' compulsion/sanctions motions is an entirely reasonable suspicion: that there exists a vein of information which, once properly mined, will reveal what plaintiffs have all along suspected -- Michelin's actual or constructive knowledge that it placed defective tires in the stream of commerce, and that one of them found its way onto plaintiffs' van. At great expense and with herculean vigor, plaintiffs have acted upon that suspicion.

But plaintiffs' quest has collided with -- as of this moment -- insurmountable realities. First, Michelin evidently shunted much

83

of its research and testing off to a corporate relative -- a technique used elsewhere. See Small v. Lorillard Tobacco Co., Inc., 672 N.Y.S.2d 601, 607 (N.Y.Sup. 1997), rev'd 677 N.Y.S.2d 515, 525 (N.Y.A.D. 1 Dept. 1998).  The utility of doing so here was obvious. Michelin could then plausibly deny possessing the information plaintiffs want, then suggest that they could pursue it from MARC, see doc. # 258 at 8-13, a "third party" which, not surprisingly, has fought plaintiffs tooth and nail.

Second, Michelin has employed a reasonably clever self-insulating tactic.  Seemingly it has the means -- but simply declines -- to assemble data which, with little "computer effort," could better identify and illuminate manufacturing and/or design defects.  See doc. # 403 at 3-5 (insisting that all the Goodsons of Michelin's adjustment world contribute only data for an "Accounting Database" that goes back only for the previous 12 months, and is used only for truing up dealer-issued refunds and exchanges, but otherwise "contains no information about tire production"); see also doc. # 258 at 15-18; id. at 16 (before 1990, "Uniroyal Goodrich Tire Company computer-calculated adjustment information and generated various analytical documents," but since that time Michelin has not); doc. # 370 at 4-7; # 376 at 1-6; # 415 at 1-2 (it is only a "financial/accounting database").

Instead (at least according to the Ourada testimonial excerpt plaintiffs furnish), Michelin at most seeks to note only "trends" emerging from what it contends are "insufficiently similar" tire groups.  See also doc. # 258 at 17 (citing Evans testimony that, "at yearly quality assurance meetings, [only] the top 2-3 adjustment 'conditions' for all tires [have been] presented to [Michelin's]

Central Quality Group") (emphasis added); _id._ (Evans further
"explained, however, that no adjustment rates or other 'analyses'
[have been] presented....").  In this way, one supposes, Michelin
could better design and manufacture around such problems without
identifying any one particular tire brand defect (something that
would otherwise bring its resulting data within the "sufficient
similarity" doctrine and assist plaintiff's lawyers).

Evidently sensing Michelin's tactic, plaintiffs have advanced
a fall-back argument: that it is reckless of Michelin to _not_ gather
and analyze such data. Doc. # 318 at 5. In other words, plaintiffs
contend, tire makers _should_, lest they risk punitive damages
verdicts, generate and maintain admissible-quality, tire-failure
data. _Id._ That perhaps would lead to greater accountability for
design defects and negligently manufactured tires. Yet, plaintiffs
supply no citation in support of that argument, which is not
surprising; industry-record keeping regulations are derived from
public policy choices best made by the executive and
legislative branches of government.

For the moment, then, the Court generally must side with
Michelin. Goodson never testified that he or those like him traced
down the cause of the tread or belt separations, which were
relatively rare (at least in Goodson's realm of experience). And,
plaintiffs have not shown that Michelin assembles tire adjustment
data any more comprehensively than what it claims: for use in
reconciling warranty refunds with its dealers. It may, quite
craftily, use just enough of its adjustment data to spot negative
performance trends across tire lines, but the Court has been shown
nothing that brings such data within the "substantial similarity"

85

level that plaintiffs ultimately must show to prevail here.

Lurking behind all this is the possibility that Michelin in fact is stonewalling and lying, if only by omission. The S.C. court has been assiduous in ordering disclosure from MARC and sanctioning those who thwart it. See, e.g., doc # 434, exh. E. This Court is not informed whether that litigation has run its course. Of course, the Court always retains jurisdiction -- even long after a case has been settled -- to address any fraud perpetrated upon it. See In re E.I. Du Pont De Nemours & Co., 918 F.Supp. 1524, 1540-41 (M.D.Ga. 1995), aff'd on jurisdictional but rev'd on other grounds, 99 F.3d 363, 367-68 (11th Cir. 1996); see also A.H. Robins Co., 750 F.2d at 1503-05 (ordering relief under F.R.Civ.P 60(b)(3)).

At the same time, the Court recognizes that the sheer factual density of this case enables easy accusations. Compare doc. # 426 at (plaintiffs' insist that Michelin is in contempt for failing to timely disclose tire "audit" or "inspection" documents in connection with Ford uniformity requirements) with doc. # 445 at 1-3 (showing that such documentation had nothing to do with Fort Wayne plant and referenced tires bearing no connection to the subject tire); with doc. # 451 at 1-2 (such is true, plaintiffs respond, but it was submitted to show the existence of "audits" and "analyses" which, it must be reasonably assumed, "apply as to the subject tire and plant here").

Nevertheless there remains one loose end: what has become of the "special interest" tires sent to Michelin or MARC from Michelin's adjustment centers? See Goodson dep. at 30-31 (Michelin's -- or MARC's -- "special interest" in tread separations has been ongoing since Michelin "took over" in 1993). West avers

that he has

> personally reviewed a list of "special interest" tires designated by [MARC]. The list does <u>not</u> include all tires which experienced a tread or belt separation, only certain types of tires with this condition. Neither the subject tire nor any of its "common green" tires are encompassed by the list.

Doc. # 374, exh. A (7/6/98 West Aff.) ¶ 6 (emphasis added).

Michelin essentially invites plaintiffs to just take West's word for the implied assertion -- that of the "special interest" tires collected and analyzed, none are substantially similar to the subject tire. Yet, plaintiffs may unearth contradicting data in the tens of thousands of MARC documents just produced through the S.C. litigation (the Court is informed that the MARC records custodian was scheduled to be deposed on 11/10/98). The parties may brief this point within the same time parameters set forth in Part II(B)(3) <u>supra</u>. In so doing, they shall inform the Court when the S.C. court satellite litigation and resulting discovery has concluded.

For the moment, the Court finds no basis for striking Michelin's Answer and affirms the MJ's 4/22/98 Order. Nor does it find it necessary to disturb the discovery parameters set by the MJ, nor those proposed by Michelin in its responses to plaintiffs' second and third motions to compel (doc. ## 372-373) and "protective order" reply brief, doc. # 438, subject to this Court's "special interest" tire discussion herein (i.e., if it has not already, Michelin shall, within ten days of the date this Order is served, produce all "special interest" data on 1992-94, Fort Wayne-produced, Laredo light truck tires built on the same common green platform as the subject tire; the Court assumes that MARC, pursuant to the S.C.

87

order, is producing likewise).

The Court does not deny plaintiffs' sanctions motions lightly. Part of the problem stems from the complexity and scope of the tire manufacturing process itself. "Common green" tires for the subject tire included seven "private label" brands (e.g., Sears). Doc. # 258, exh. A ¶ 6. Moreover, tires (like the subject tire) bearing the "Laredo" or even "LT 235" designation are not necessarily "common green" tires. Id. ¶¶ 9-13. And, while production of the subject tire began at the Fort Wayne plant in 1992 and ceased in 1994, id. ¶ 11, that one plant alone manufactures "over 8 million [tires] a year," id. ¶ 15, so to simply order document production on millions of tires is unrealistic and unreasonable.

Even at that, the Court (earlier in this litigation) indulged plaintiffs by essentially doing just that, see doc. # 60, exh. E ¶ 2 (document request on "the tire line which is the subject of this case or any tire or tire line utilizing the same common green tire"), enforced by doc. # 178 at 37; see also doc. # 60, exh. E ¶ 3 (documents reflecting "adjustment or claim rates as to any tire line which utilizes the same skim compound as the tire line which is the subject of this case"); ¶ 4-10 & exh. G ¶¶ 2, 4 & 6, also enforced by doc. # 178 at 37.

Granted, a more liberal relevancy standard applies to discovery than to admissibility determinations, see Briney v. Deere & Co., 150 F.R.D. 159, 163 (S.D.Iowa 1993) (determination as to admissibility, in products liability action, of evidence of similar accidents is not necessarily dispositive of whether such information is discoverable; scope of discoverability may be broader than scope of ultimate admissibility), but Michelin has since shown that

what has been ordered covers potentially millions of tires, see doc. # 258, exh. A ¶ 15, including "(1) passenger and light truck tires, (2) tires of sizes from 12 to 16.5 inches, (3) tires with at least 4 different load ratings, (4) tires with different tread compounds ... undertread compounds ... sidewall-to-sidewall widths ... aspect ratios .... manufacturing specifications ... applications ... recommended inflation pressures ... sidewall reinforcements ... [and] bead constructions." Id. ¶ 16.   Even assuming that plaintiffs' present complaints about the inadequacy of Michelin's production on that score are valid, the Court fails to see how -- except for the "special interest" tires -- further production in the areas plaintiffs now seek to compel would materially assist their case (the Court is not, however, disturbing the S.C. court-ordered production).

For that matter, Michelin also has shown that the subject tire is not substantially similar to the 1984 Laredo tire at issue in the NTSB documentation before the Court. See doc. # 258, exh. A ¶ 18 (they have "different manufacturing specifications, tread compounds, undertread compounds, skim coats and steel belt assemblies"). Indeed, Michelin's evidence shows that ordering discovery on tires and processes going back to the 1980s is no longer productive. (Relatedly, Michelin has produced the NTSA file that plaintiffs have pursued.  Doc. # 330 at 5; # 305, exh. F ¶ 2).

Under the substantial similarity doctrine, then, the primary focus of any remaining (i.e., S.C.-ordered) discovery should now be confined to documents, testimony and other data uncovering evidence of "bright brassy" wire-based tread separations which support plaintiffs' defective manufacturing theory -- one that they would

89

seek to prove through "real world" evidence derived from Michelin
(or MARC) itself, or from other, independently generated sources.
If plaintiffs can show (e.g., from MARC-derived, "special interest"
or other evidence just produced in S.C.) that "bright brassiness"
in a statistically significant number of the Fort Wayne, 1992-1994
manufactured tires[24] more likely than not reveals a manufacturing
defect substantially similar to the subject tire's "brassiness"
level, then Michelin should show why (a) plaintiffs have not then
satisfied the "substantial similarity" doctrine; and (b) the Court
should not then vacate its rulings on Michelin's *in limine* and
summary judgment motions extinguishing plaintiffs' manufacturing
defect claim.

E.   "The *Client* Comes First"

The Court would be remiss if it did not pause to comment on the
extraordinary "paper war" that has erupted between plaintiffs and
Michelin.  It has consumed, cumulatively, *hundreds* of hours of the
Court's (including the MJ's, *see* doc. # 334 at 2) time.[25]  Add to
that the time expended by the S.C. court and the Fourth Circuit in
satellite litigation which may yet continue to percolate.  And yet,
no less than nine motions (the "Ford" side of this case) remain to
be reached, as well as some of the still-pending instant motions

---

[24]  This would include "special interest" tire evidence showing that MARC in fact has
examined "substantially similar" tires revealing a tread-separation based defect.  Again, such
evidence would fit into the "real world" showing that plaintiffs may make.  And, it would include
any evidence showing Michelin's (or an affiliate's) response to a tread-separation defect (e.g., an
ameliorating manufacturing or design change directly addressing the defect).

[25]  The Court is tempted to order that opposing counsel be confined together in perpetuity,
where they can spend the rest of their days responding to each other's endless denunciations and
"supplemental" briefs.

subject to the additional briefing ordered above.

The incredible volume and intensity of briefing suggests that counsel may have over-invested (in time, money and emotions) in this case. That too often leads to an acrimony-coated entrenchment which inhibits the independent judgment all lawyers must exercise in deciding what is best for their client. It is the client, after all, who comes first.

No seasoned lawyer would miss the opportunity to re-evaluate the strength of his case at this juncture. Accordingly, counsel are directed to discuss settlement within five days of the date this Order is served. Within one week they should report to the Court their progress and what is inhibiting settlement. The Court will consider assisting the parties if a joint request from all parties is received at that time.

III. CONCLUSION

Michelin's Motion for Partial Summary Judgment (doc. # 284) against the plaintiffs is GRANTED as to plaintiffs' defective design and manufacturing claims, and, subject to the further briefing[26] ordered above, DEFERRED as to plaintiffs' failure to warn and punitive damages claims.

Michelin's subpoena-enforcement/sanctions motion re: Dennis Carlson (doc. # 252) is GRANTED IN PART AND DENIED IN PART. Michelin's Motion In Limine (doc. # 326) to exclude Carlson's testimony is GRANTED IN PART AND DENIED IN PART. Michelin's Motion In Limine (doc. # 303) regarding "adjustment rate" data and analyses is GRANTED WITHOUT PREJUDICE to further motion by

---

[26] The briefs shall be limited to 12 pages.

91

plaintiffs should the South Carolina court-ordered "MARC" documents provide grounds for reconsideration.

Michelin's motion to withdraw (doc. 437) its Motions to Compel (doc. # 380; # 383) is GRANTED. Michelin's time-extension motion (doc. # 386) and its "Clarification"/time-extension motion (doc. # 435-1, # 435-2) are GRANTED, as the Court has considered the referenced motions herein.

Michelin's Motion In Limine (doc. # 435-3) is GRANTED IN PART (as to the in limine motions identified on page 2 ¶ 3(c), and on pages 3-6 ¶¶ (2), (3), (4), (5), (7), (10), (11), (12), (13), (14)-(17), with item (9) subject to reconsideration following production and analysis of the "MARC" documents and plaintiffs' additional briefing ordered above), DENIED IN PART (¶ 18 is moot in light of this Court's previous "quadfurcation" Order), and DEFERRED as to items appearing on page 2 ¶ 3(a)-(b), and on pages 3-6 ¶ (6), (8).

Plaintiffs' appeal (doc. # 340) from the Magistrate Judge's 4/22/98 Order is DENIED. Plaintiffs' Second Motion to Compel (doc. # 357) is DENIED. Plaintiffs' Third Motion to Compel (doc. # 359) is DENIED. Plaintiffs' Motion for Contempt (doc. # 363), as supplemented, doc. # 385, is DENIED. Plaintiffs' Second Motion for Contempt (doc. # 390) is DENIED.

Plaintiffs' Fifth Motion to Compel (doc. # 393) is DENIED. All other sanction or compulsion motions filed by plaintiffs against Michelin, but not explicitly addressed here, are DENIED. However, Michelin is directed to produce, within ten days of the date this Order is served, the "special issue" tire data as described above.

Finally, much of the file is "sealed" to protect proprietary

92

information. But much is not.[27] While "[t]here is no First Amendment right of access to public information," <u>Foto USA v. Bd. of Regents of Univ. Sys. of Flor.</u>, 141 F.3d 1032, 1035 (11th Cir. 1998), nevertheless courts recognize a qualified First Amendment presumption in favor of access to, and thus public disclosure of, court records. <u>U.S. v. McVeigh</u>, 119 F.3d 806, 811-12 (10th Cir. 1997), <u>cert. denied sub nom</u>, 118 S.Ct. 1110 (1998); <u>Bergen Brunswig Corp. v. Ivax Corp.</u>, 1998 WL 113976 at * 2 (S.D.N.Y. 3/12/98) (unpublished) (collecting cites).

This Court will not consume its time and resources sorting out what, if any portions of this Order, might disclose "sealed" information.[28] Therefore, any party with standing to object shall, within 10 days of the date this Order is served, show the Court why the instant Order should not be unsealed. Should no objection be filed, the Clerk shall unseal this Order and note that event on the docket.

SO ORDERED, this 17th day of November, 1998.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[27] For each motion or brief filed under a protective order the Clerk has been limiting the corresponding docket entry to "sealed document," thus failing to specify the title of each document. Yet, nothing "proprietary" has been disclosed in the style of a given motion or brief that the parties have filed, and the Clerk's practice has needlessly burdened the Court. The Clerk therefore shall retroactively amend each docket entry to identify what has been filed, and similarly identify any future "sealed" documents.

[28] Incidentally, the Court concurs with the reasoning contained in the MJ's 11/6/98 Order (doc. # 458) at 3-4 (refusing to seal the brunt of the Goodson deposition because it "appears neither confidential nor damaging to [Michelin's] position").

UNITED STATES DISTRICT COURT
Southern District of Georgia

Case Number:    4;96-cv-00087
Date Served:    November 17, 1998
Served By:      Faye B. Harris

Attorneys Served:

    Jeffery Lawrence Arnold, Esq.
    Billy N. Jones, Esq.
    George Brinson Williams Jr., Esq.
    Charles W. Wickliffe III, Esq.
    Eugene G. Partain, Esq.
    Robert P. Monyak, Esq.
    William H. Pinson Jr., Esq.
    Luhr George Beckmann Jr., Esq.
    William J. Conroy, Esq.
    Evan S. Eisner, Esq.
    Christopher J. Graddock, Esq.
    Earl W. Gunn, Esq.
    Charles K. Reed, Esq.
    Bruce R. Kaster, Esq.

_____ Copy placed in Minutes

_____ Copy given to Judge

_____ Copy given to Magistrate

02-0151-CV

NO. ~~2001-36441~~

| | | |
|---|---|---|
| SONJA CARR, INDIVIDUALLY AND | § | IN THE DISTRICT COURT |
| AS NEXT FRIEND OF TRISTAN | § | |
| CARR, AND CHERYL LOCKHART, | § | |
| INDIVIDUALLY AND AS NEXT | § | |
| FRIEND OF AMBER LOCKHART, | § | |
| JAQUELINE CORBELL, LACIE | § | |
| STALL AND DEANNA DUROY | § | |
| | § | Cixogol upc |
| VS. | § | ~~HARRIS~~ COUNTY, TEXAS |
| | § | |
| COOPER TIRE AND RUBBER | § | 2-21 dz |
| COMPANY, KING MOTORS, INC., | § | |
| AND JOHN WHITT CHEVROLET | § | ~~127~~TH JUDICIAL DISTRICT |
| CO., INC. | § | |

## ORDER GRANTING MOTION TO COMPEL

On the 17th day of June, 2004, came on for consideration the Defendants'

Motion for Additional Time for Expert Deposition and the parties appeared, upon

due notice, by and through their respective attorneys of record, and the Court,

having carefully considered the matter, is of the opinion that said motion should

be granted, in part. In this regard, IT IS ORDERED as follows:

1.   Dennis Carlson shall appear for his oral deposition on or before July

     17, 2004 at the law offices of Jerry A. Pusch, 2701 Louisiana Street,

     Houston, Texas 77006.

2.   The Defendants shall have an additional three hours to interrogate

     Dennis Carlson.

3.   Dennis Carlson shall be required to answer all questions regarding the

     opinion of the Court in the case styled *Thomas J. Griego, et al v. Ford*

FILED
12:25 p.m

JUL - 6 2004

JAMES BERHERDT
Clerk, Dist. Court, Confident, 14, 12
By Diana Martin Deputy

352425.1

*Motor Co., et al,* Cause No. CV496-87 (S.D. Ga., December 10, 1998) and all related questions regarding his involvement in that case;

4.  Dennis Carlson is further cautioned that he should avoid making unresponsive or evasive answers to questions directed to him. Should Mr. Carlson continue to make unresponsive and/or evasive answers to questions propounded to him by defense counsel, he risks further action by this Court including, but not limited to, exclusion as an expert witness at the trial of this case.

5.  If Dennis Carlson brings any documents or other materials with him to this deposition that have not been previously produced at the time of the initial deposition in this case, then defense counsel shall have additional time in which to interrogate Mr. Carlson on those matters.

IT IS SO ORDERED.

SIGNED this _6_ day of _July_, 2004.

GUS J. STRAUSS, PRESIDING JUDGE

I, JAMES BEHRENDT, Clerk of the District Court, in and for Guadalupe County, Texas, do hereby certify that the above and foregoing is a true and correct copy of the original now on file. Given under my hand and seal of said Court at office in Seguin, Guadalupe County, Texas on the

_____ day of _____, 2004

JAMES BEHRENDT, Clerk 25th Judicial District, Guadalupe County, Texas

_____ Deputy

382426.1

APPROVED AS TO FORM ONLY:

2701 Louisiana Street
Houston, Texas 77006
(713) 225-9700
(713) 523-4150 Facsimile

By: _____
     JERRY A. PUSCH
     State Bar No. 16410500

ATTORNEY FOR PLAINTIFFS
BALL & WEED, P.C.
745 E. Mulberry, Suite 500
San Antonio, Texas  78212
(210) 731-6309
(210) 785-2909 Facsimile

By: _____
     J. MICHAEL MYERS
     State Bar No. 14760800

ATTORNEY FOR DEFENDANTS

382428.1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1338625 (S.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Nevil v. Ford Motor Co.S.D.Ga.,1999.Only the
Westlaw citation is currently available.
United States District Court, S.D. Georgia,
Brunswick Division.
Jill Mock NEVIL, et al., Plaintiffs,
v.
FORD MOTOR COMPANY, et al., Defendants.
No. CV 294-015.

Dec. 23, 1999.

ORDER

BOWEN, Chief J.
\*1 In the captioned case, Defendant General Tire,
Inc. ("General Tire") has filed a Motion for Sanctions
and/or a Motion to Show Cause Why Dennis Carlson
Should Not Be Held in Contempt. Upon
consideration of the briefs submitted by counsel, the
hearing held on November 30, 1999, and the relevant
law, it is hereby held that Mr. Carlson is in contempt
of court. Accordingly, General Tire's Motion for
Sanctions is GRANTED for the reasons set forth
below.

I. Background

Plaintiff filed a products liability lawsuit against
Defendants. Plaintiffs retained the services of Mr.
Dennis Carlson ("Carlson") as an expert witness in
the case. The case was settled and dismissed in 1996.
During the discovery phase of the trial, the parties
signed a Stipulated Protective Order ("Protective
Order") that restricted the use and dissemination of
confidential and proprietary information disclosed
during discovery. Mr. Carlson also signed this
protective order. General Tire contends that Mr.
Carlson violated the terms of this Protective Order by
disclosing General Tire's confidential information to
third parties unrelated to this litigation.

II. Legal Analysis

General Tire has filed a Motion for Sanctions and/or
a Motion to Show Cause Why Dennis Carlson
Should Not Be Held in Contempt. These motions are
filed pursuant to Federal Rule of Civil Procedure

37(b). Rule 37(b) provides that the Court may enter
any "just" order, including an order of contempt, for
failure to obey the Court's discovery orders. Rule
37(b) applies to protective orders entered under Rule
26(c). Rule 26(c)(7) allows parties to enter into
protective orders to ensure that "a trade secret or
other confidential research, development, or
commercial information not be revealed or be
revealed only in a designated way."

The Protective Order signed by the parties in this
cases contains the following language:
Absent a further order of the Court, those documents
marked as Confidential Material, as described in
Paragraph 1A, shall not be used for any purpose other
than the prosecution or defense of this captioned
action, and shall not be shown, disseminated or
disclosed in any matter to anyone other than covered
persons without the prior written agreement of
General Tire or order of the Court after due notice to
General Tire.

Mr. Carlson signed an acknowledgment of the
Protective Order which reads:I hereby acknowledge
and affirm that I have read the terms and conditions
of the Protective order agreed to by the parties in Jill
Mock Nevil v. Ford Motor Company and General
Tire, Inc., Civil Action No. CV294-15, on August 2,
1995. I understand the terms of the Order as a
condition to being provided access to the
Confidential Documents furnished by General Tire,
Inc. ("General Tire"). Further, by executing this
Written Assurance, I hereby consent to the
jurisdiction of the above-captioned Court for the
special and limited purpose of enforcing the terms of
the Protective Order.

\*2 General Tire argues that Mr. Carlson should be
sanctioned for violating the Protective Order and
disclosing protected trade secrets in two separate
proceedings, *Mun et al. v. Uniroyal Goodrich Tire
Co.* and *Siegel v. Sears Roebuck & Co.* In *Mun et al.
v. Uniroyal Goodrich Tire Co.,* General Tire
maintains that Mr. Carlson violated the Protective
Order during his deposition testimony taken on
February 20, 1996. The specific testimony is as
follows:Q: All right. Now, as I understand it, that
background information which is deemed
confidential or protected has not been released in any
fashion into the public domain or otherwise so that
we could actually see it, correct?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1338625 (S.D.Ga.)
(Cite as: Not Reported in F.Supp.2d)

A: That is my understanding, yes, sir.

Q: All right, counsel who is here today, Cora Perez, has been kind enough to provide us with a sheet that indicates the three cases in which these things have occurred, one being Tincley v. General Tire, correct-

A: Yes.

Q: -being handled by Tom Conway on the Plaintiff's side; Laschuck vs. Firestone, being handled by Tom Dasse in Phoenix, right-

A: Yes, sir.

Q: -and Nevil vs. General Tire, and apparently the lawyer Plaintiff's lawyer there is Brinson Williams?

A: Yes, sir.

Q: All right. Are the documents which are part of the protected materials in these cases still in your possession and control?

A: Yes.

Q: Generally speaking, would they classify as manufacturing and design documents, or do they fall into some other category?

A: I think they would fall into that category, yes.

Q: Just generally speaking, how do they assist you at all in reaching your opinions without revealing any of the confidential information?

A: They show some of the design processes-two of the cases show some of the design processes that some of the other companies have gone through.

Q: Those companies apparently being General Tire and Firestone?

A: Yes.

Q: The design processes you are talking about, is it the nylon cap ply processes?

A: Yes. Two of those refer to that.

Q: Which cases refer to that?

A: The ones against General.

(Carlson Dep. at 10-11.)Q: Now, what did you look at historically to find out about various manufacturers? I appreciate that you brought this sheet with you today, and We'll make this an exhibit to your deposition in a little while. The sheet I was reading from, I appreciate you bringing that over today. What studies have you done about tire manufacturing from the late 1980s through the 80s in terms of the use of nylon cap plies and ultimately why a manufacturer stopped using them in most instances?

A: I've seen a lot of papers by manufacturers. For instance, General calls it the Legacy Plus. They put out a series of tires called the Legacy and the Legacy Plus. The only difference is that they put a zero-degree belt in there, and some manufacturers have indicated that they have used it to control separation problems in their plants.

*3 Q: Okay. Who? Who said that?

A: It's in part of the documents here, General did.

Q: Oh, the protected documents?

A: Yes.

(Carlson Dep. at 206.)Q: I don't see how any of those records from General Tire, from what you have described to us generically, have any bearing on your opinions here, true?

A: They support some of my opinions, yes.

Q: They do?

A: Yes.

Q: The General Tire exhibits?

A: Yes.

Q: You mean modifications or changes in manufacture?

A: Yes, the using of zero-degree belts to correct production problems.

Q: Are you saying that General Tire in some fashion used zero-degree belts to avoid the contamination separation thing that we have here?

A: They proposed it and gave an estimate of how much it would help?

Q: With regard to contamination separation?

A: The separation problem they were having at the time.

Q: Was there a separation problem based upon contamination from people's hands?

A: That was part of it, there was a contamination issue. They had a design issue also.

Q: You are sure these records support what you are saying?

A: Yes.

(Carlson Dep. at 301-02.)

General Tire also argues that Mr. Carlson violated the Protective Order in his deposition testimony in *Siegel v. Sears Roebuck & Co.*, taken on January 18, 1996. The specific testimony in this case is as follows:

Q: How many other companies tires have you testified are defective for lack of a cap ply?

A: Well, many of the other major manufacturers.

Q: Can you name them?

A: Well, Firestone and General, probably Goodrich-though I don't remember Goodrich.

(Carlson Dep. at 337.)Q: Do you have any explanation how it is that all the different tire designers working for all these different companies are putting out defective tires?

A: They don't want to spend an extra 50 cents in their tire.

Q: Is there any reason why you believe that's the case?

A: Yeah.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1338625 (S.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d)**

Q: What are the other reasons? Any other reasons?
A: I said that is-no. That is the reason.
Q: You believe it is purely a cost issues?
A: sure.
Q: Have you ever seen any documents suggesting that?
A: Yeah.

(Carlson Dep. at 338-39.)Q: Have you ever done it for any tire you believe should have had a cap ply?
A: No.
Q: Why haven't you tried to do that?
A: Didn't need to.
Q: Can you give me a list of any Michelin tires made ever that are nonhigh-speed rated that have cap plies?
A: No. I don't think so.
Q: Are there any, to your knowledge?
A: Not to my knowledge.
Q: Have you ever conducted any tests to measure the separation propensity of tires with and without cap plies?
A: I haven't done any.
Q: Do you know of anybody else that has done such a test?
A: Yeah.
Q: Who?
A: Well, there's some manufacturers, I've read their memos and such that indicate that separations are reduced a considerable amount by nylon cap plies.

*4 (Carlson Dep. at 340-41.)Q: What studies have you seen where a manufacturer took a tire with a cap ply and an identical tire without a cap ply and measured and compared their separation propensity? Have you ever seen such a study?
A: No, I have seen the results of that in some of the papers that I've seen under protective order. There is also an STL film that shows a tire with a cap ply and without failing, and you can see the difference in the failure mechanism that-you know, the one with the nylon cap fails at a much higher speed and fails less dramatically.
Q: Any other studies or tests which in your mind prove the desirability of zero-degree cap plies?
A: No.
Q: Okay, the confidentiality documents you're talking about, is that the General Tire documents?
A: Sure.

(Carlson Dep. at 341-42.)

In response to this deposition testimony, Mr. Carlson maintains that he merely disclosed the existence of General Tire documents without disclosing their substance. Further, Mr. Carlson argues that much of

the disputed testimony concerns information in the public domain, not trade secrets. He denies any wrongdoing and contends that he did his best to follow the terms of the Protective Order.

Notwithstanding Mr. Carlson's contentions, it is evident that Mr. Carlson disclosed information in his deposition testimony about the General Tire documents covered by the Protective Order. At several points in his testimony, Mr. Carlson discloses specific information contained in General Tire studies. Even if this general information is already in the public domain, his testimony reveals that he learned of this information from General Tire documents. Assertions that this evidence came from specific General Tire documents violates the terms of the Protective Order. Accordingly, I find that Mr. Carlson's actions are in contempt of this Court.

Because Mr. Carlson has committed serious violations of the Protective Order, Defendant's Motion for Sanctions is GRANTED. Although Mr. Carlson's disclosures violate the letter of the Protective Order perhaps more than the spirit of the agreement, the disclosures are serious enough to warrant a reprimand from the Court.

General Tire, however, has requested minimal sanctions. These include the following:
1. An order sanctioning Mr. Carlson and/or an Order to show cause why he should not be held in contempt of court for violating the terms of the August 8, 1994 Protective Order;
2. An order enjoining Mr. Carlson from showing, discussing, or divulging Confidential Material obtained from General Tire in any manner which would violate the August 8, 1994 Protective Order issued by this Court;
3. An order requiring Mr. Carlson to return all Confidential Material which is the subject of the August 8, 1994 Protective Order issued in this case; and
4. An order requiring Mr. Carlson to identify all cases and provide the address of counsel of record in which he has shown, discussed or disclosed Confidential Material in violation of the August 8, 1994 Protective Order issued in this case.

*5 General Tire is basically seeking an order reaffirming the terms of the Protective Order and requiring Mr. Carlson to provide information concerning any other violations of the Protective Order, Because General Tire's requested relief is not overreaching, it is hereby GRANTED.[FN] Further conduct violating the terms of the Protective Order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1338625 (S.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

will likely result in more serious sanctions being
entered against Mr. Carlson.

> FN1. In regard to General Tire's request for
> return of documents, Mr. Carlson has
> testified under oath that he does not have
> any of these documents in his possession.
> Specifically, Mr. Carlson testified at the
> November 30, 1999 hearing as follows:
> Q: Have you any document, any copy of any
> document, any recording, any electronic
> data, or any reproduction by any other
> means, of any material that you received
> confidentially in the Nevil case?
> A: No, I don't.
> Q: Have you returned all of that in
> accordance with the agreement you signed?
> A: Yes.
> Q: Have you destroyed any of that, apart
> from or in a way different from that which
> you agreed to?
> A: I don't think so. I don't understand.
> Q: Well, have you gotten rid of any of it
> prior to this hearing?
> A: Oh, no, sir.
> Q: You are telling me that everything you
> have done with all of the confidential or
> privileged material has been done strictly in
> accordance with the agreement you signed?
> A: Yes, sir.
> Q: Did you make any copies of that
> material for your private use in your office?
> A: No, sir.
> (Nov. 30, 1999 Hr'g Tr. at 32-33.)

### III. Conclusion

It is ordered that Mr. Carlson is found to be in
contempt of court. Accordingly, General Tire's
Motion for Sanctions (Doc. No. 207) is GRANTED.
Each party will bear its own costs.

S.D.Ga.,1999.
Nevil v. Ford Motor Co.
Not Reported in F.Supp.2d, 1999 WL 1338625
(S.D.Ga.)

Briefs and Other Related Documents (Back to top)

• 2:94cv00015 (Docket) (Feb. 04, 1994)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.