EXHIBIT 2

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                   7/12/2016

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF WYOMING

3
        Brian Kehler,                    )
4                                        )
                Plaintiff,               )
5                                        )
        vs.                              ) Case No.
6                                        ) 15-CV-127-J
        Bridgestone Americas Tire        )
7       Operations, LLC, Commercial Tire,)
        Inc., and John Doe              )
8       Corporations/Entities 1-3,       )
                                         )
9               Defendants.              )
                                         )
10

11

12

13
        VIDEOTAPED DEPOSITION OF DENNIS CARLSON, M.S.M.E., P.E.
14

15                         Tucson, Arizona
                            July 12, 2016
16                           9:00 a.m.

17

18

19

20

21

22

23

24

25      BY:  Shelley E.D. Pearce, RPR
        Arizona Certified Reporter #50301

Kehler v. Bridgestone, et al.                         Dennis Carlson
                                                        7/12/2016

1                         I N D E X

2

3    WITNESS                                              PAGE

4    DENNIS CARLSON, M.S.M.E., P.E.

5         Examination by Mr. Smith                      6, 229

6         Examination by Ms. Rhodes                        228

7

8

9                      E X H I B I T S

      EXHIBIT
10    NUMBER              DESCRIPTION                    PAGE

11    Exhibit 1    Failure Analysis of a Tread            10
                   Separation Incident Involving a
12                 Bridgestone Medium Truck Radial
                   Tire, by Dennis Carlson, M.S.M.E., P.E.
13                 May 31, 2016

14    Exhibit 2    Carlson Engineering, Inc.              24
                   Curriculum Vitae of Dennis Carlson
15
      Exhibit 3    Testimony List, pages 1 - 26          47
16
      Exhibit 4    Carlson Engineering, Inc.,            49
17                 Invoice Nos. 3428 and 3389

18    Exhibit 5    Notebook labeled 3982                 53
                   Kehler v. Bridgestone, Tabs 1 - 12
19
      Exhibit 6    Notice of Videotaped Deposition       55
20                 Duces Tecum of Dennis Carlson

21    Exhibit 7    ASTM Committee F09.30 Task Group       63
                   on Truck/Bus Tire Test Development
22                 Phase I Final Report - 9/5/06

23    Exhibit 8    Deposition of Brian Kehler, dated      64
                   August 18, 2015
24

25

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                          7/12/2016

```
                                                          Page 3

1                          E X H I B I T S

2           EXHIBIT
            NUMBER              DESCRIPTION              PAGE
3
            Exhibit 9      Notebook labeled 3982            65
4                          Bridgestone Docs, including:
                           Three thumb drives
5                          Disk labeled 1/19/16 William Woehrle
                           deposition transcript and exhibits,
6                          Disk labeled Complaint Bridgestone
                           Initial Disclosures Brian Kehler
7                          Deposition, and
                           Disk labeled 3982 Kirizas [sic]
8                          Depo Exhibits

9           Exhibit 10     Copy of handwritten notes with     115
                           black and white photos
10
            Exhibit 11     Thumb drive labeled 3982 References 123
11                         and Photos

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                      7/12/2016

Page 4

```
 1                VIDEOTAPED DEPOSITION OF

 2                DENNIS CARLSON, M.S.M.E., P.E.,

 3     was taken on July 12, 2016, commencing at 9:00 a.m. at The

 4     Holiday Inn Express, 1564 West Grant Road, Tucson,

 5     Arizona, before Shelley E.D. Pearce, RPR, a Certified

 6     Reporter No. 50301 for the State of Arizona.

 7

 8     COUNSEL APPEARING:

 9          For the Plaintiff:
            RHODES LAW FIRM, LLC
10          By:  Diana Rhodes, Esq.
            2015 Warren Avenue
11          Cheyenne, Wyoming 82009
            307.634.4444
12          diana@drhodeslaw.com

13          For the Defendant Bridgestone Americas Tire
            Operations, LLC:
14          HOLLAND & KNIGHT, LLP
            By:  Colin P. Smith, Esq.
15          131 South Dearborn Street
            Suite 3000
16          Chicago, Illinois 60603
            312.578.6562
17          colin.smith@hklaw.com

18          For the Defendant Commercial Tire, Inc.:
            WHITE & STEELE, P.C.
19          By:  Grant Curry, Esq.
            Dominion Towers, North Tower
20          600 17th Street
            Suite 600N
21          Denver, Colorado 80202
            303.296.2828
22          gcurry@wsteele.com

23     ALSO PRESENT:

24          Bill Marinakis, Videographer

25
```

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                      7/12/2016

Page 5

1                    VIDEOTAPED DEPOSITION OF

2                 DENNIS CARLSON, M.S.M.E., P.E.,

3                         ---oOo---

4           THE VIDEOGRAPHER:  We are on the record.

5                Today's date is Tuesday, July 12, 2016.  The

6       time on the video monitor is 9:00 a.m.  This is the video

7       recorded deposition of Dennis Carlson, noticed by counsel

8       for the defendant Bridgestone Americas Tire Operations,

9       L.L.C., in the matter of Brian Kehler versus Bridgestone

10      Americas Tire Operations, L.L.C., et al., in the United

11      States District Court for the District of Wyoming; Case

12      No. 15-CV-127-J.

13               Our location today is The Holiday Inn Express on

14      Grant Road in Tucson, Arizona.  Certified court reporter

15      is Shelley Pearce of Kim Bata Reporting, located at 610

16      East Bell Road, No. 2216, Phoenix, Arizona 85022.  My name

17      the William Marinakis.  I'm the certified legal video

18      specialist for the firm of Video Dep, Incorporated,

19      located at 7776 South Pointe Parkway West, Suite 170,

20      Phoenix, Arizona 85044.

21               Counsel, will you please identify yourselves,

22      and state whom you represent for the record at this time;

23      starting with plaintiff's counsel.

24               MS. RHODES:  Diana Rhodes for the plaintiff.

25               MR. SMITH:  Colin Smith for Bridgestone

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                      7/12/2016

Page 6

1      Americas.

2                   MR. CURRY:  Grant Curry on behalf of Commercial

3      Tire.

4                   THE VIDEOGRAPHER:  Thank you, Counsel.

5                   The witness may be sworn in at this time,

6      please.

7                   DENNIS CARLSON, M.S.M.E., P.E.,

8      a witness herein, having been first duly sworn by the

9      Certified Court Reporter to speak the truth and nothing

10     but the truth, was examined and testified as follows:

11

12                               EXAMINATION

13     BY MR. SMITH:

14          Q.   Could you state your full name, please.

15          A.   Dennis Carlson.

16          Q.   And what is your address, Mr. Carlson?

17          A.   1548 South Euclid, Tucson, Arizona.

18          Q.   Mr. Carlson, do I understand correctly that

19     you're here today as a retained expert for the plaintiff

20     in the Kehler case?

21          A.   Yes.

22          Q.   And what law firm retained you in this case?

23          A.   I don't know the firm.  Ms. Rhodes, I think, is

24     the principal lawyer in it, but I haven't looked to see

25     what the law firm was.

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                        7/12/2016

Page 22

1           Q.   You don't hold any opinions in the areas of

2      biomechanics or occupant kinematics?

3           A.   Correct.

4           Q.   You don't hold any opinions in the area of human

5      factors?

6           A.   Correct.

7           Q.   And you don't hold any opinions in the area of

8      warnings, except for some comments you have about the

9      speed restriction issue?

10          A.   Correct.

11          Q.   All right.  We'll talk about that later.

12               Now, Mr. Carlson, you're an engineer; is that

13     correct?

14          A.   Yes.

15          Q.   Engineering is a science, isn't it?

16          A.   It is.

17          Q.   And do you claim that the tile failure analysis

18     that you do is a scientific process?

19          A.   Yes, I do.

20          Q.   And do you have a methodology that you follow

21     when you do that?

22          A.   Yes.

23          Q.   And the original source of that methodology was

24     in your work for Michelin Americas, correct?

25          A.   Well, that and my graduate work and

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 27

1       A.   No.

2       Q.   And, in fact, Michelin never used you as an

3    expert witness when you worked for Michelin Americas, did

4    it?

5       A.   That's correct.

6       Q.   You never testified on behalf of Michelin while

7    you worked there, did you?

8       A.   Did not.

9       Q.   And you were never in the product safety group

10    at Michelin when you were there, were you?

11       A.   No, I wasn't.

12       Q.   And you left Michelin in about 1987, correct?

13       A.   Yes.

14       Q.   So you had a total of about 10 working years in

15    the tire industry?

16       A.   Yep.

17       Q.   And when you left Michelin, that company deemed

18    you ineligible for rehire, correct?

19       A.   My supervisor did.  My last supervisor,

20    apparently, did that.  He never said that to me, but...

21       Q.   But you've seen the form, haven't you?

22       A.   I have.

23       Q.   You've seen the form and you maintained it as

24    part of your own records, didn't you?

25       A.   Well, it was mailed to me or given to me by

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                          Page 28

1        defense lawyers.  I haven't gone back to see if that's

2        what was in -- what Michelin mailed to me in my file,

3        but...

4            Q.   Well, your understanding was that form had

5        two boxes.  It had a box for eligible for rehire and

6        ineligible for rehire, and your supervisor checked the

7        ineligible for rehire box, correct?

8            A.   Yes, my last supervisor.

9            Q.   And, in fact, he had some critical things to say

10       about you in his final review of you, correct?

11           A.   Sure.

12           Q.   He said that you seemed to be unable to apply

13       your skills productively to your job, correct?

14           A.   Something like that.

15           Q.   He said, year after year, he showed little

16       improvement.  Said that, didn't he?

17           A.   Yeah, I only worked for him for about a year and

18       a half.  So, you know, that's kind of funny to me, but...

19           Q.   Okay.  He also said you failed to take total

20       responsibility for your job, didn't he?

21           A.   Yeah.  I got sideways with him.  I guess he

22       didn't like me for a while there, but all my other bosses,

23       I was ranked superior twice there by other bosses.

24           Q.   Twice in 10 years?

25           A.   Yeah.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                 7/12/2016

Page 29

1        Q.    Okay.

2        A.    And average the other nine times or seven times.

3        Q.    And your last supervisor had a number of

4    critical things to say about you?

5        A.    Yes.

6        Q.    Okay.

7        A.    But I was looking for another job at that time,

8    so maybe I let things go, slide a little bit.  But he and

9    I didn't get along.

10       Q.    You've not been an employee of any tire company

11   since the 1980s, correct?

12       A.    Not an employee.

13       Q.    And so it's been more than 25 years since you've

14   been working in the tire industry, correct?

15       A.    Yes.

16       Q.    And in 1994, you decided to focus your career on

17   testifying against tire companies, didn't you?

18       A.    Well, I was presented with a choice:  Work for

19   tire companies or work against them.  And, at that time,

20   Michelin had called me and told me that they weren't going

21   to use me because I had signed up a plaintiff case, and I

22   said I didn't like that restriction.  So I decided to go

23   with plaintiff.

24       Q.    So it's correct, then, in 1994, you decided to

25   focus your career on testifying against tire companies?

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                          7/12/2016

                                                          Page 30

1          A.   Yes, there was no -- there was a choice.

2          Q.   Okay.

3          A.   And in this business, there's a choice between

4     one side or the other, and I wanted more freedom.

5          Q.   Move to strike the nonresponsive portions of the

6     answer.

7               In your lawsuit consulting business,

8     Mr. Carlson, have you testified against Michelin?

9          A.   Yes, I have.

10         Q.   You testified against Goodyear?

11         A.   Yes.

12         Q.   Have you testified against Firestone?

13         A.   Yes.

14         Q.   Have you testified against Uniroyal?

15         A.   I haven't testified in court, but -- well, maybe

16    I have, yeah.  Okay, yeah.

17         Q.   I'm including any testimony.  You understand

18    that, Mr. Carlson?

19         A.   Okay.

20         Q.   Have you testified against B.F. Goodrich?

21         A.   Yes.

22         Q.   Testified against Armstrong?

23         A.   I'm sure I've had one case.

24         Q.   Have you testified against Cooper Tire?

25         A.   Yes.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                      7/12/2016

                                                        Page 31

1          Q.   Have you testified against Pirelli?

2          A.   I think there's been at least one case,

3     couple -- couple cases maybe.

4          Q.   Have you testified against Kelly Springfield?

5          A.   Yes.

6          Q.   Have you testified against Dunlop?

7          A.   Yes.

8          Q.   Have you testified against Bridgestone?

9          A.   Yes.

10         Q.   Have you testified against Mohawk?

11         A.   Well, there's been at least one, I think.

12         Q.   Have you testified against Kumho Tire?

13         A.   Yes.

14         Q.   Have you testified against Yokohama Tire?

15         A.   Occasionally, yes, I have.

16         Q.   Have you testified against Dayton Tire?

17         A.   I think there's one of those.

18         Q.   Have you testified against Toyo Tire?

19         A.   Yes.

20         Q.   Have you testified against Denman tire?

21         A.   I think there's been two -- two tire cases

22    against Denman.

23         Q.   Have you testified against Sumitomo Tire?

24         A.   There's been a few.

25         Q.   Have you testified against Matador Tire?

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                 7/12/2016

Page 32

1          A.    There was one, yes.

2          Q.    Have you testified against Hankook Tire?

3          A.    I think there's one or two, yeah.

4          Q.    Okay.  Now, Carlson Engineering, which is the

5    business you operate, that's not a business that designs

6    or manufactures tires, is it?

7          A.    No, I won't do that work.

8          Q.    And, in fact, that's the case, hasn't it, for

9    25 years; you've not done any tire design or manufacturing

10   work, correct?

11         A.    That's correct.

12         Q.    And let's talk a little bit about Carlson

13   Engineering.  It's correct, essentially, that's just you

14   and your secretary, Ms. Gould, right?

15         A.    Yes.

16         Q.    Are there any other employees of that company?

17         A.    We have a cleaner, but there's no really

18   technical people.

19         Q.    Okay.  Now, we were talking about when you left

20   Michelin.  What you did then was, you went to work as an

21   expert in accident and litigation matters, correct?

22         A.    Yes.

23         Q.    And in the course of that work, you've actually

24   consulted and testified about a wide variety of different

25   products, correct?

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 41

1        role as an independent expert, you should try to be just

2        as fair to the defendants as you would be to the plaintiff

3        who hired you, correct?

4            A.   Yes.

5            Q.   Now, is it correct that in your present work,

6        you're not doing any kind of consulting that's not related

7        to lawsuits or potential lawsuits?

8            A.   That's correct.

9            Q.   And is it true that for, approximately, 25 years

10       or more, 100 percent of your consulting work is related to

11       lawsuits or potential lawsuits?

12           A.   I think that's probably accurate.

13           Q.   And is it also true that the vast majority of

14       your consulting work in lawsuits and potential lawsuits is

15       for plaintiffs or potential plaintiffs?

16           A.   Probably, yes.

17           Q.   Over 90 percent, correct?

18           A.   I would guess that.  I don't keep statistics,

19       but...

20           Q.   But that's what you've always agreed, haven't

21       you?

22           A.   Well, I think that's a good estimate, but...

23           Q.   In your work in litigation consulting,

24       Mr. Carlson, have you been -- have you had your expert

25       testimony excluded or been disqualified on multiple

Kehler v. Bridgestone, et al.                      Dennis Carlson
                                                   7/12/2016

                                                        Page 152

1        Q.   That's the non-serial side?

2        A.   Non-serial side.

3             And then the same note was made on the serial

4   number side.  I have no temperature in the tire, no

5   innerliner heat band.  There was some abnormal rib wear in

6   rib 4 and one place in rib 5, and the tread depths were 11

7   to 13/32nds.

8        Q.   Okay.  Anything else of significance that you

9   found in your examination of that companion tire?

10       A.   No.  It just has the same type of marking in the

11  pressure groove area, which is not a pressure groove, but

12  it has some vertical marks from the rim.

13       Q.   Now, you have in your file -- and I think we

14  don't know exactly what the source of them is, but you

15  have some X-rays, correct?

16       A.   Yes.

17       Q.   Is there anything in those X-rays that's

18  significant to your opinions in this case?

19       A.   No.  It shows the overlap joint.

20       Q.   And tell us where that overlap joint is again.

21       A.   Approximately, 70 to 80 -- 70 to 90 degrees

22  somewhere.

23       Q.   Where is the overlap?

24       A.   It looks like it's in belt number 2 in the

25  X-rays.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                   7/12/2016

                                                        Page 153

1          Q.   Of course, that's not what your report says,

2     right?

3          A.   Well, I may have it wrong here.  No, it's belt

4     number 1, it looks like.

5          Q.   That's right.  It's in the transition belt,

6     right?

7          A.   Right, yeah.

8          Q.   Belt number 1 is commonly called a transition

9     belt, correct?

10         A.   Yeah.

11         Q.   It's commonly referred to as a nonworking belt,

12    correct?

13         A.   It's referred to that, but it actually is a

14    working belt, but it reduces stress between the other two

15    belts.

16         Q.   Well, let's talk about that for a minute.

17              The belts that are commonly referred to as the

18    working belts in a tire of this type would be belts 2 and

19    3.

20         A.   Right.

21         Q.   And those are the belts that are under the

22    highest stress, correct?

23         A.   They have the highest stress.  And the belt

24    number 1 reduces the panographing shear stress in belts 1

25    and 2.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 154

1          Q.   All right.  Let's talk about this joint.  It
2     goes from 70 degrees on which side to 90 degrees on which
3     side?
4          A.   Well, it looks like it's 70 degrees on the --
5     well, that's probably the non-serial side to about
6     90 degrees on the serial side.  Let me see if that's
7     right.
8          Q.   Your report has it at 75 degrees on the
9     non-serial side and 90 degrees on the serial side --
10         A.   Okay.
11         Q.   -- is that correct?
12         A.   It looks like it could be.  I had a little
13    trouble orienting these, but I assume that the serial
14    number side is on the top.  I think that's what I figured
15    out.  So...
16         Q.   Well, I just want to know.  Is that what you're
17    going to tell the jury in this case, or do you want to
18    change what's in your report?
19         A.   No, I think I'll go with the report, 'cause it
20    was written while I was looking at it.
21         Q.   Okay.  So your final answer is that this splice
22    runs from 75 degrees on the non-serial side to 90 degrees
23    on the serial side, correct?
24         A.   Yes.
25         Q.   All right.  And, now, there's an overlap, but

KIM BATA REPORTING
(480) 502-9900

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                      Page 155

1      that overlap does not run all the way through the splice,

2      does it?

3          A.   Correct.

4          Q.   It actually -- the overlap only occurs towards

5      the serial side, correct?

6          A.   No.  The fourth wire overlap, but there's two --

7      two wires at the other side, it looks like.

8          Q.   All right.  So it's your testimony that there is

9      an overlap all the way through, although it becomes more

10     serious as it --

11         A.   It's much different.

12         Q.   Explain that.

13         A.   Well, it varies to where you have, like, three

14     or four wires that are overlapped on the serial number

15     side, and -- let's see, one, two, three -- it looks like

16     there's three wires overlapped, what we call that, which

17     means a total of six wires on top of -- you know, two --

18     three on top of the other three.

19              And then it kind of spreads out to over on the

20     other side, you have -- you have two, two wire overlaps

21     toward the serial number side, is what it looks like on

22     this.  I may have determined something different when I

23     looked at it without the X-ray or something.

24         Q.   Well, what's your opinion?  Where is -- where is

25     there a two-wire overlap and where is there a three-wire

Kehler v. Bridgestone, et al.

Dennis Carlson
7/12/2016

Page 156

```
1       overlap?
2           A.   I think the three wire would be at the top on
3       the serial number side, but I'll have to get back to you
4       on this other one.
5           Q.   You're not sure, as you sit here today?
6           A.   Yeah, these X-rays aren't real sharp.
7           Q.   Okay.  You also found a dog-eared splice on the
8       serial side.
9           A.   Yes.
10          Q.   So that would be at about 90 degrees?
11          A.   Right.
12          Q.   Okay.  So let's talk about these conditions.
13               You felt the separation -- separation did not
14      initiate in the number 1 belt.  It initiated between the
15      number 2 and number 3 belts, correct?
16          A.   Yes.
17          Q.   And it's your opinion that it initiated at about
18      330, correct?
19          A.   Right.
20          Q.   So it's your opinion that the separation
21      initiated about, actually, around 90 degrees or a little
22      more than 90 degrees around the tire from this, correct?
23          A.   Yes.  The -- the crescent-shaped zone is
24      commonly called the initiation of separation, but it's
25      really the initiation of the growth of the separation
```

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                     7/12/2016

Page 157

1     across the tire.  It probably initiates someplace along

2     there.  It could have initiated here, you know, 75 or 90,

3     but -- and gone around the tire and then it goes across.

4          Q.    Are you changing your opinion again?

5          A.    No.

6          Q.    I asked you straight out earlier.  Where did the

7     separation initiate, and you said at 330 degrees.

8          A.    That's where they -- crescent-shaped --

9          Q.    Is that still your opinion or are you -- I asked

10    you about the separation, Mr. Carlson.

11         A.    You sure did.

12         Q.    And my question is --

13         A.    Right.

14         Q.    -- did it start at 330 degrees, or are you

15    changing your testimony again?

16         A.    No, that's where the crescent-shaped zone

17    started.

18         Q.    All right.  But, again, did I ask you where the

19    separation started and did you say 330 degrees?

20         A.    I was inaccurate, because it starts at the edge

21    of the number 3 belt and goes around the tire, and then it

22    starts crossing, and the 330 is where it starts crossing

23    the tire.

24         Q.    So you're changing your testimony?

25         A.    No, just explaining it the way I should have

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                      Page 158

1      explained it to start with, but...

2           Q.   Okay.  In any event, this -- this area with this

3      splice is, approximately, 90 degrees around the tire from

4      where the largest area of separation is in the

5      crescent-shaped zone, correct?

6           A.   Where the crescent-shaped zone starts.

7           Q.   And it's at a different level.  It's in the

8      number 1 belt, not in the number 2 and number 3 belts?

9           A.   Correct.

10          Q.   Okay.  You and I have talked about your liner

11     pattern opinion before, haven't we, Mr. Carlson?

12          A.   I think we have.

13          Q.   Have you ever specifically tested tires with and

14     without what you call liner pattern markings to determine

15     the effect of that condition on tire durability?

16          A.   No.

17          Q.   Can you point me to anyone who's tested that

18     kind of condition in tires with and without these markings

19     and determined that that condition did, in fact, have an

20     adverse effect on tire durability?

21          A.   No.  I mentioned several examples in the report.

22     I have a new one, but I can't talk about it yet.

23          Q.   You remember I asked about testing.  I didn't

24     ask about people just talking about this.  I asked you

25     about anybody who tested tires with and without this

Kehler v. Bridgestone, et al.                        Dennis Carlson
                                                      7/12/2016

Page 159

1     condition and determined that those markings had an effect

2     on tire durability based on testing.

3          A.   Right.

4          Q.   Can you identify anyone who has done that kind

5     of testing?

6          A.   I think one of my references is based on

7     testing, the Cooper work, and I know that the material

8     that was mentioned, that I think is in my report here,

9     from Michelin is talking about that.

10         Q.   Well, wait a minute.  Let's take this -- let's

11    take this a little slowly.  You didn't refer in your

12    report to any Cooper work.  What Cooper work are you

13    talking about?

14         A.   Rita Feczer.

15         Q.   She doesn't refer to any testing in that excerpt

16    you described.

17         A.   Well, I've read the reports.

18         Q.   I want to know if you can point me to testing,

19    Mr. Carlson.  It's real simple.

20         A.   Oh, okay.  Well, I have some testing coming, but

21    I don't have it in a report yet.

22         Q.   And you don't have it in the references you

23    brought with you here today, right?

24         A.   Right.

25         Q.   And what testing do you have coming that you

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                 7/12/2016

Page 160

1      haven't disclosed?

2          A.   Well, there's a guy that's done some testing,

3      and I have to find out whether it's protected right now.

4          Q.   All right.  So my question is, right now, can

5      you point me to any testing that proves that this

6      condition has an adverse effect on tire durability?

7          A.   No, it is work that has been coming from people

8      that, you know, have looked at tires for a long time, and

9      I forget what you call it, but experience based.

10         Q.   Well, there are a series of published studies

11     that go in the opposite direction that conclude that these

12     conditions don't have any impact on tirability [sic],

13     correct -- tire durability?

14         A.   Like what?

15         Q.   Pardon me?

16         A.   Like what?

17         Q.   Well, you're aware Mr. Herzlich published an

18     article in 2002 called Belt Misalignments and Belt to Belt

19     Tear Patterns, correct?

20         A.   And he didn't do any testing either about it.

21         Q.   He did -- he did studies is what I said.  He did

22     a study of finished tires.  You're aware of that published

23     study, correct?

24         A.   What he did was, he put belt alignments in the

25     tires and did do those testing, but it was improper

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                        7/12/2016

                                                        Page 161

1        methodology, 'cause he didn't run them long enough.

2            Q.   Okay.

3            A.   And he didn't do the right testing to develop

4        separation.

5            Q.   You criticize what he did, but he did publish a

6        paper on it, correct?

7            A.   Yes, but it had nothing to do with pattern

8        marks.

9            Q.   Well, in fact, he did -- you admitted this in

10       the past, Mr. Carlson, that he concludes in his paper, the

11       belt-to-belt tear pattern paper, that those conditions are

12       not causative of tread/belt separation.   Does he say that?

13           A.   Testing.

14           Q.   Does he say that in the published paper?

15           A.   Yes, he does do that, but it's just kind of --

16           Q.   Did Mr. Bolden do that in his component

17       interfacial tearing appearances paper?

18           A.   Yes, but --

19           Q.   Did Mr. Rancore [phonetic] --

20           A.   -- it is not based on testing.   He does not

21       have --

22           Q.   Did Mr. Ranc- --

23                THE COURT REPORTER:   I'm sorry.   One at a time,

24       please.

25                THE WITNESS:   Excuse me.

Kehler v. Bridgestone, et al.

Dennis Carlson
7/12/2016

Page 162

1    BY MR. SMITH:

2         Q.   Did Mr. Rancore [phonetic] publish a paper --

3         A.   Yes.

4         Q.   -- with that same conclusion?

5         A.   And, again, it is, essentially, a concl- -- a

6    opinion of his.

7         Q.   Did Mr. Brico publish a paper also saying those

8    conditions do not cause tread/belt separation?

9         A.   Yes, I believe he did.

10        Q.   All right.  Now, in your report -- so you admit

11   you've seen all four of those published papers, correct?

12        A.   Uh-huh, yes.

13        Q.   All right.  Now, you site some depositions in

14   lawsuits, correct?

15        A.   Yes.

16        Q.   And, of course, you know, there's numerous

17   people who have testified in depositions that those

18   conditions don't cause tread/belt separations.

19        A.   I imagine so.

20        Q.   Well, you've seen them.  You've been in cases

21   where people have testified to that --

22        A.   Sure.

23        Q.   -- over and over, correct?

24        A.   Sure.

25        Q.   All right.  Now, those depositions are not a

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                   7/12/2016

                                                      Page 163

1        published engineering paper, are they?

2            A.   No, they're not.

3            Q.   Okay.  Now, you, in your report, identify two

4        published works, don't you?

5            A.   Yes.

6            Q.   And one of them is Mr. Bozarth's paper, correct?

7            A.   Correct.

8            Q.   That's a paper called, "Watch for the Diamonds."

9            A.   Yes.

10           Q.   And you and I have talked about this before,

11       correct?

12           A.   Yes.

13           Q.   And you know Mr. Bozarth did not do any testing

14       or analytical work that cited in his paper, correct?

15           A.   Correct, no.

16           Q.   And Mr. Bozarth has actually testified under

17       oath in a case that you were in that you have misused and

18       misinterpreted his work, correct?

19           A.   Yes, only because it was recapping rubber, which

20       has no effect.  It's not a reason --

21           Q.   He testified --

22           A.   -- to eliminate.

23           Q.   -- he testified in litigation that his paper

24       only applied to retreaded tires, correct?

25           A.   Yes.

Kehler v. Bridgestone, et al.                           Dennis Carlson
                                                           7/12/2016

                                                         Page 164

1         Q.    And he testified that your use of it to refer to

2    non-retreaded tires was a misuse and misinterpretation of

3    his work, correct?

4         A.    That's what he said.

5         Q.    And he also said in his testimony that what you

6    called liner pattern in that very case was not the pattern

7    he was talking about, in the James Ray Clark case in

8    Kentucky, correct?

9         A.    Yeah.

10        Q.    And you've read his testimony?

11        A.    Sure.

12        Q.    Okay.  And he, in fact, referred to your opinion

13   as completely wrong, didn't he?

14        A.    Yep.

15        Q.    Okay.  Now, the other thing you cite is

16   Mr. Giapponi's book, correct?

17        A.    Yes.

18        Q.    Now, did Mr. Giapponi identify any testing or

19   analytical work behind his publication about liner pattern

20   marks?

21        A.    I don't think so.

22        Q.    And the fact of the matter is, you don't think

23   Mr. Giapponi is an authoritative source, do you?

24        A.    No, I said that his book has authoritative parts

25   in it.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                 7/12/2016

                                                      Page 165

1         Q.   But you disagree dramatically with a lot of

2    parts in that book, don't you?

3              MS. RHODES:  Object to the form.

4              THE WITNESS:  I do, but he has certain parts in

5    it that I think are okay.

6    BY MR. SMITH:

7         Q.   Well, in fact, you and he don't actually agree

8    on his liner pattern part, do you?

9         A.   Well, that would be a matter of semantics.  I

10   think he says, if you go through the three or four pages

11   he talks about it, he agrees that those are marks of bad

12   adhesion.

13        Q.   Well, but he actually says this, doesn't he,

14   quote:  When a tire tears during a tread and belt

15   attachment, it typically and randomly tears in a

16   multi-planer fashion, crossing the various layers or

17   planes.  However, at times, it tears along the planes of

18   the layers.  This type of tearing can yield an appearance

19   of the original surface of the laminate material,

20   including manufacturing imprints.  Seeing this surface

21   does not mean it was not adhered nor bonded.

22             That's what he says, right?

23        A.   But he --

24             MS. RHODES:  Object to the form.

25             THE WITNESS:  -- he goes on and --

Kehler v. Bridgestone, et al.                     Dennis Carlson
                                                    7/12/2016

Page 166

```
 1        BY MR. SMITH:
 2            Q.   Wait a minute.  Wait a minute.
 3                 MS. RHODES:  Objection to form, foundation.
 4        BY MR. SMITH:
 5            Q.   You disagree with that, don't you?
 6            A.   Yes, I think that he is misstating what that is.
 7        He's saying things that -- but anyway...
 8            Q.   So -- so my point, Mr. Carlson, is, you don't
 9        even agree with him on this whole issue of liner pattern?
10            A.   Yes.  When he's talking about materials that
11        occur during a different phase of the failure, and he
12        should know that, that that is -- the tearing at the end
13        of the separation is not the -- the thing that started
14        2,000 miles or 200 miles before, which is a separation of
15        fatigue separation.  That is a rapid tearing.  It has
16        nothing to do with the fatigue separation, which is a slow
17        process.
18                 Now, you can calculate that the rate of failure
19        is around 200,000 times faster during that than in the
20        separation process.  So it's a different failure mode, a
21        different part of the tire, and it has nothing to do with
22        a separation failure.
23            Q.   So you think he's wrong, and you disagree with
24        him?
25            A.   That part of it, yes.
```

Kehler v. Bridgestone, et al.                              Dennis Carlson
                                                             7/12/2016

Page 167

1       Q.   Okay.

2       A.   He goes on, and he does indicate that it will.

3       Q.   Okay.  Now, can you identify any tire science or

4  tire engineering body that has ever indicated its general

5  acceptance of the proposition of what you call liner

6  pattern marks having a negative effect on tire durability?

7       A.   I don't think that they're in the business of

8  doing that, to say that tires can fail for reasons that --

9  the tire manufacturer.  They kind of stay away from that

10  kind of issue.

11      Q.   So you can't identify anything like that?

12      A.   No, but people have come out and said that this

13  is a valid indicator, people that have come out that --

14  like Mr. Smith and so forth.

15      Q.   Mr. Smith, where did he say that?

16      A.   He has a paper that he published and said that.

17      Q.   You didn't cite that in your report.

18      A.   It's in my references.

19      Q.   But you cited the things you relied on in your

20  report, didn't you?

21      A.   No, it was just the most important parts.

22      Q.   So is it your contention that John Smith has

23  published a paper --

24      A.   No --

25      Q.   -- saying --

KIM BATA REPORTING
(480) 502-9900

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 173

1        Q.   So you weren't very happy with these X-rays?

2        A.   No.

3        Q.   Okay.  Well, I want to talk about the process by

4    which you reached your opinion that the condition of the

5    splice caused or contributed to belt separation.  Are you

6    with me?

7        A.   Sure.

8        Q.   Can you point me to any testing anyone has

9    performed on belt conditions in an all-steel truck tire

10   that indicates that a splice with an overlap or a dog ear

11   in the transition belt can cause a separation between the

12   working belts 2 and 3?

13       A.   No.

14       Q.   Can you identify any published literature of

15   anybody that's concluded that a splice condition like this

16   in the nonworking transition belt can cause a separation

17   between the working belts 2 and 3?

18       A.   No, I can't.

19       Q.   Can you identify any community of tire

20   scientists or tire engineers that has ever indicated its

21   general acceptance of the concept that splice conditions

22   like this in the nonworking transition belt can cause a

23   separation in the working belts 2 and 3?

24       A.   No, I can't say that.  I've just seen it in many

25   of my cases.

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                        7/12/2016

                                                         Page 174

1          Q.   Well, can you identify any published

2     literature -- let's just talk about two belt tires.  Any

3     published -- I'm sorry.  Let's back up.

4               Can you identify any testing that says that a

5     splice like this, even in the working belts, can cause a

6     separation 90 degrees around the tire?

7          A.   No.

8          Q.   Can you identify any publication that says a

9     condition like this, even in a working belt, could cause a

10    separation 90 degrees around the tire?

11         A.   No.

12         Q.   Can you identify any community of tire

13    scientists or tire engineers that has ever indicated its

14    general acceptance of the proposition that a condition

15    like this, even in the working belts, could cause a

16    separation 90 degrees around the tire?

17         A.   I know that Mr. Woehrle has that opinion.

18         Q.   That's another person who testifies for

19    plaintiffs --

20         A.   Yes.

21         Q.   -- against tire companies?

22              MS. RHODES:  Objection, form.

23              THE WITNESS:  Yes, he has found several tires,

24    which I think he is going to publish about where they have

25    a one-to-one correlation with the -- with a problem in the

Kehler v. Bridgestone, et al.                     Dennis Carlson
                                                  7/12/2016

                                                    Page 175

1       belt and the separation.

2       BY MR. SMITH:

3           Q.   And that is, actually, already published, and

4       that condition is right in the area of the separation, not

5       90 degrees away, right?

6           A.   He has a situation that he's published where it

7       is in the area where the joint comes from.

8           Q.   Right.  And I asked you about anybody who's

9       expressed an opinion about a separation 90 degrees away.

10          A.   Well, he has that, and he has seen that in other

11      tires, as I have.

12          Q.   Okay.  So he's told you that?

13          A.   Yes.

14          Q.   Okay.  So that's --

15          A.   I've seen the results of it.

16          Q.   That's one other plaintiffs' expert, correct?

17          A.   Yes.

18          Q.   All right.  Anybody else you can point to?  I'm

19      talking about a community that's expressed a general

20      acceptance.

21          A.   There aren't that many plaintiff people.  So...

22          Q.   So the answer's nobody else?

23          A.   No, I don't think so.

24          Q.   Okay.  Now, you're aware, are you not, that

25      there's published literature to the contrary that says

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                        Page 176

 1      those kinds of conditions, even in the working belts, have
 2      no impact on tire durability, correct?
 3          A.   Yes.
 4          Q.   But you're not aware of any literature going in
 5      the other direction, the direction you're advocating?
 6              MS. RHODES:   Objection, asked and answered.
 7              THE WITNESS:   There is a paper, which I
 8      mentioned to you before, where they talk about how
 9      separations start in anomalies, and I've given you that
10      reference.   It's in my reference list.
11      BY MR. SMITH:
12          Q.   But that's not specific to belt splice
13      anomalies, correct?
14          A.   No, it's talking about just any kind of anomaly
15      is --
16          Q.   Right.
17          A.   -- where they start.
18          Q.   Right, okay.
19          A.   And, of course, the belt edge is an anomaly;
20      that is where they start.   And if they're real bad,
21      they -- certainly would be logical that they would start
22      there.
23          Q.   You understand that my question is specifically
24      about belt splice conditions in steel belts, correct?
25          A.   Sure.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                       Page 177

1          Q.    And you're not aware of anything like that?

2          A.    Well, you're trying to limit it to --

3          Q.    I am.  Yes, that's my question.

4          A.    Right.

5          Q.    You're not aware of anything that --

6          A.    Certainly the engineering exists that an anomaly

7     means anomaly; and I think the other reference does talk

8     about, you know, anomalies starting -- the process of an

9     anomaly starts the separation, and this is an anomaly.

10         Q.    Okay.  You've said that already.  So I'll move

11    to strike the nonresponsive question [sic].  My question

12    repeatedly has been about steel belt splice conditions.

13         A.    Yeah.

14         Q.    You can't identify anything like that, correct?

15         A.    No.

16               MS. RHODES:  Objection, asked and answered.

17               MR. SMITH:  Pardon me?

18               THE WITNESS:  I think I've answered what I --

19    BY MR. SMITH:

20         Q.    You've answered that, no, you're not aware of

21    anything like that.

22         A.    Right, that uses that language.  You can keep,

23    you know, making it as fine as you want to eliminate

24    everything.

25         Q.    Let's talk a little bit more about your

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                  7/12/2016

Page 219

1          Q.   What was my question?

2          A.   I've answered it.

3          Q.   What was my question?

4          A.   There isn't any standard.

5          Q.   All right.  There's no standard for endurance

6     hours for medium truck tires, industry standards?

7          A.   In the industry --

8          Q.   Right.

9          A.   -- that is universal among the industry.

10         Q.   Is there any industry standard for temperature

11    performance for medium truck tires?

12         A.   There is not anything written down --

13         Q.   Okay.

14         A.   -- that indicates that.  That is not an

15    absolving of your responsibility because of the tire.

16         Q.   Move to strike the nonresponsive portion.

17              I want to ask you a little bit about the opinion

18    you have about warning or communication of information

19    regarding speed rating.

20         A.   Yes.

21         Q.   Is it correct that in the past, you've testified

22    you don't consider yourself to be a warnings expert?

23         A.   I don't do certain types of warnings.  I don't

24    write them, and I don't evaluate them.  But, as an

25    engineer, that is one of the things that can be done in --

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

                                                        Page 220

1        when you have a problem.  You fix it by technical means or

2        you warn against it or you guard against it or you recall

3        it.

4              Q.    You have, in fact, in the past testified, I am

5        not a warnings expert, correct?

6              A.    That's right, but I have been qualified by a

7        judge in Texas to give warning opinions.

8              Q.    You've never designed any warning that's been

9        used on any product, have you?

10             A.    I do not do that.

11             Q.    It's never been your field to do that kind of

12       work or make those kinds of recommendations about what

13       specific warnings could or should be used with any tire,

14       correct?

15             A.    Yes.

16             Q.    And it's correct that you don't have the

17       expertise to determine what warning may or may not be

18       effective, correct?

19                   MS. RHODES:  Object to the form.

20                   THE WITNESS:  Well, I don't evaluate them, so I

21       don't try to.

22       BY MR. SMITH:

23             Q.    All right.  And so you've said in the past you

24       don't have that expertise, correct?

25             A.    Well, I don't think I do but, certainly, I can

                        KIM BATA REPORTING
                          (480) 502-9900

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 221

1      do certain things about warnings.

2           Q.   When you were at Michelin, you were never

3      involved in writing warnings, correct?

4           A.   That's right.

5           Q.   Michelin didn't put warnings on tires, did it?

6           A.   Yes, that's correct.

7           Q.   Okay.  And it didn't put warnings about speed

8      ratings on its medium truck tires, did it?

9           A.   Not at that time.

10          Q.   And it makes tires today that don't have

11     warnings about speed ratings, correct?

12          A.   I don't think I've checked lately, but I've seen

13     some with them.

14          Q.   And you also know there's some that don't

15     have -- well, do they have English language warnings or do

16     they just have a speed symbol?

17          A.   I'm sorry?

18          Q.   The Michelin tires you've seen, have you seen

19     any that have an English language warning on them about

20     speed rating?

21          A.   No, all I see is the letter rating.

22          Q.   All right.

23          A.   And that's been used for quite a few years on

24     Michelin tires.

25          Q.   But you also know Michelin makes tires without a

Kehler v. Bridgestone, et al.                          Dennis Carlson
                                                        7/12/2016

Page 222

1    letter rating?

2         A.   I think in certain companies -- countries they

3    do that, but --

4         Q.   Well, they do that here, don't they?

5         A.   -- I haven't seen one in long while, but -- so

6    I'm not sure I can agree with that, but I'll have to go

7    look.

8         Q.   So you don't know, one way or another, what

9    Michelin does with all their truck tires it makes?

10        A.   Well, the ones I've seen have a letter rating.

11        Q.   Okay.   Now, you don't have any reason to believe

12   that Mr. Kehler would understand a letter rating?

13        A.   Well, that's not the question.   It could have,

14   you know, prevented this accident if they had put it on

15   there, and there was no reason for you not to have put it

16   on there.

17        Q.   But we know Mr. Kehler testified that he didn't

18   look at any of the markings on the sidewalls of this tire,

19   correct?

20             MS. RHODES:   Objection.

21             THE WITNESS:   Not very many people do, but you

22   don't -- that's not an excuse for not putting it on there.

23   It doesn't cost you anything to put it on there.   Why

24   would you specifically exclude it?

25   BY MR. SMITH:

Kehler v. Bridgestone, et al.                                    Dennis Carlson
                                                                    7/12/2016

                                                                    Page 223

1            Q.    You, Dennis Carlson, don't have any basis upon

2       which to contend that putting a letter rating on this tire

3       would have changed Mr. Kehler's behavior, given that he

4       didn't look for any markings on the tire?

5            MS. RHODES:   Object to form, foundation.

6            THE WITNESS:   I don't think it could have hurt.

7       I think that there has to be -- I would prefer an English

8       language speed limit on there that meant something --

9       BY MR. SMITH:

10           Q.    Okay.

11           A.    -- but it would have to be something above 75 to

12      put on there, because you can't, you know, build a tire

13      when there's 80 mile per hour and 85 mile per hour speed

14      limits in this country.

15           Q.    Do you have any basis to say that any language

16      on the tire would have changed Mr. Kehler's behavior given

17      that he did not look for any markings on the tire?

18           MS. RHODES:   Objection, form, foundation.

19           THE WITNESS:   I don't know if anybody can say

20      that for sure, but it certainly -- there's a chance that

21      it could have.

22      BY MR. SMITH:

23           Q.    Now, how would it have affected his behavior if

24      he specifically testified in this case that he didn't look

25      at any markings on this tire?

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                    7/12/2016

Page 226

 1              Do you remember that testimony, Mr. Carlson?

 2         A.   Yeah, yes.  Truck drivers generally don't read

 3     the sidewall.  That's the reason the tire companies have

 4     to build a tire that has a good safety margin.  This one

 5     doesn't.

 6         Q.   So my question, quite simply, Mr. Carlson, is,

 7     given that Mr. Kehler testified that he didn't look at the

 8     markings on the tire, how would a different marking change

 9     his behavior?

10              MS. RHODES:  Objection, calls --

11              THE WITNESS:  It could have helped.

12              MS. RHODES:  -- form, foundation, calls for

13     speculation.

14     BY MR. SMITH:

15         Q.   My question isn't your conclusion.  It's how it

16     would have changed his behavior if he didn't read the

17     markings.

18              MS. RHODES:  Same objection.

19              THE WITNESS:  Well, he might look on there, he

20     might have read it.  It's not an excuse for not putting it

21     on there when most people do put it on there.  It doesn't

22     cost you anything to put it on there.  Why didn't you put

23     it on there?

24     BY MR. SMITH:

25         Q.   Now, you've testified you're not an expert in

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                      7/12/2016

                                                      Page 227

1        warning effectiveness, correct?

2            A.   Yes.

3            Q.   You've also testified you're not an expert in

4        the things that -- about warnings that may or may not

5        change people's behavior, correct?

6            A.   Well, I generally don't do that.

7            Q.   Right.

8            A.   But this should have had it on there.

9            Q.   All right.  We know what your opinion is,

10       Mr. Carlson.  Would you stick with my questions.  Okay?

11       My question is --

12           A.   I'm sticking with what my opinion is.

13           Q.   Yeah, well, I want you to answer my questions

14       instead of making the speeches that you want to make.  So

15       here's my --

16               MS. RHODES:  Objection, argumentative.

17       BY MR. SMITH:

18           Q.   -- question.

19               Have you ever done anything to test the

20       effectiveness of any warning?

21           A.   No, I don't have to.

22           Q.   Do you have any data here in your file today

23       that in any way suggests that an English language warning

24       of any kind would change anyone's behavior?

25           A.   No, that's not my job.

Kehler v. Bridgestone, et al.                    Dennis Carlson
                                                   7/12/2016

                                                         Page 233

1        STATE OF ARIZONA  )
                           )   ss.
2        COUNTY OF MARICOPA)

3

4              BE IT KNOWN that the foregoing deposition was

5        taken before me, SHELLEY E.D. PEARCE, RPR, Certified

6        Reporter No. 50301, for the State of Arizona; that the

7        witness before testifying was duly sworn by me; that the

8        transcript is a full, true, and accurate record of the

9        proceedings all done to the best of my skill and ability;

10       that preparation, production, and distribution of the

11       transcript and copies comply with law and code as required

12       by ACJA 7-206(F)(3) and in compliance with ACJA 7-206

13       (J)(1)(g)(1) and (2).

14             (x) Pursuant to request, notification was

15       provided that the deposition is available for review and

16       signature.

17             ( ) Review and signature was waived.

18             WITNESS MY HAND this 22nd day of July, 2016.

19

20                          /s/ Shelley E.D. Pearce

21                          _____
                            SHELLEY E.D. PEARCE, RPR/CSR
                            Arizona Certified Reporter
22                          Certificate No. 50301

23

24       /s/ Kim Bata Reporting
         KIM BATA REPORTING
25       Registered Reporting Firm R1034