J. Kent Rutledge, #5-1392
Peter F. Howard, #5-5325
Lathrop & Rutledge, P.C.
1920 Thomes Ave., Suite 500
P.O. Box 4068
Cheyenne, WY  82003-4068

Marc R. Brosseau
Chad Lieberman
Brosseau Bartlett Seserman, LLC
6455 South Yosemite Street, Suite 750
Greenwood Village, CO  80111

Colin P. Smith
Robert E. Tonn
Holland & Knight
131 South Dearborn Street, Suite 3000
Chicago, IL 60603

*Attorneys for Defendant Bridgestone Americas*
*Tire Operations, LLC*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **BRIAN KEHLER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case Number 15-CV-127-J** |
| | ) | |
| **BRIDGESTONE AMERICAS TIRE** | ) | |
| **OPERATIONS, LLC; COMMERCIAL** | ) | |
| **TIRE, INC.; and, JOHN DOE** | ) | |
| **CORPORATINOS/ENTITIES 1-3** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC'S MOTION TO EXCLUDE
## CERTAIN OPINIONS OF PLAINTIFF'S EXPERT DR. JERRY OGDEN

---

Defendant Bridgestone Americas Tire Operations, LLC ("BATO"), pursuant to Federal

Rules of Evidence 702 and 703, hereby moves the Court to exclude certain opinions offered by

Plaintiff's expert Dr. Jerry Ogden ("Ogden").  In support of this motion, BATO states as follows:

## I.   CERTIFICATE OF CONFERRAL

Counsel for BATO has conferred both orally and via email with counsel for Plaintiff regarding this motion.  Both the telephone conversation and the emails took place on August 30, 2016.  BATO made reasonable good faith efforts to resolve the dispute.  Per those conversations, the Plaintiff's counsel has advised that the Plaintiff opposes this motion in all respects.

## II.   BACKGROUND

On March 30, 2016, the Plaintiff filed and served his expert designation which disclosed Ogden as one of his retained experts [DOC. 51].  Within the disclosure Ogden is identified as an "accident reconstruction expert."   The designation included a copy of Ogden's report, dated November 25, 2015, [DOC. 51-1] and copies of Ogden's C.V., testimony list and publication list [DOC. 51-2][1].   Ogden's opinions are focused on his theory that the tire failure caused a fracture in the steel components of the steering system, which caused the steering system to fail and which resulted in the Plaintiff's inability to control the FedEx tractor [DOC. 51-1].

## III.   LAW TO BE APPLIED

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), emphasized that Federal Rule of Evidence 702 requires trial courts to serve as evidentiary "gatekeepers" who must conscientiously screen expert testimony for relevance and reliability.  This requires that the court ensure that such testimony constitutes "good science," (*id.,* p. 593), and that expert findings are sufficiently "derived by the scientific method" or otherwise "supported by appropriate validation."  (*Id.*, p. 590).

---

[1] On April 21, 2016, the Plaintiff filed copies of Ogden's updated C.V., testimony list and publication list [DOC. 52].  The updates to these materials were not substantive in nature and Ogden's report was not updated.

In assessing the validity of an expert theory or technique, the Supreme Court in *Daubert* set forth a non-exclusive four factor test to be used in evaluating the admissibility of expert testimony: "(1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and a known rate of error; [and] (4) whether the theory has been accepted in the scientific community." *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (citing *Daubert*, 509 U.S. at 590).

The basic object of *Daubert* is to "ensure that the testimony has a 'basis in the knowledge and experience of' the expert's discipline and that the expert exhibits 'the same level of intellectual rigor' expected of an expert outside of the courtroom." *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 Fed. App. 643, 654 (6th Cir. 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  When faced with a proffer of expert testimony, the district court must determine at the outset whether the reasoning and methodology underlying the testimony satisfies the *Daubert* test and is thus "scientifically sound" and "based on facts which sufficiently satisfy Rule 702's reliability requirements." *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).  As the Tenth Circuit has made clear:

> [T]o be reliable under *Daubert*, an expert's scientific testimony must be . . . "ground[ed] in the methods and procedures of science" based on actual knowledge, *not "subjective belief or unsupported speculation."*  In other words, "an inference or assertion must . . . be supported by appropriate validation – i.e., 'good grounds' based on what is known."

*Dodge v. Cotter Corp.* 328 F.3d 1212, 1221-22 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590).  "[A]ny step that renders the analysis unreliable renders the expert's testimony

inadmissible." *Mitchell*, 165 F.3d at 782 (quoting *In re Paoli R.R. Yard PCB Lit*, 35 F.3d 717, 745 (3rd Cir. 1994)).

A leading decision of the Tenth Circuit notes that the purpose of the *Daubert* inquiry is always "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Dodge*, 328 F.3d at 1223 (quoting *Kumho Tire*, 526 U.S. at 152).   In performing its evaluation, the district court generally should focus on the expert's methodology; however, the expert's ultimate conclusions are not immune from scrutiny, either.   *Dodge*, 328 F.3d at 1222.   "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered."   *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).   As the Court explained in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.*; *see also Dodge*, 328 F.3d at 1223 (recognizing that the *ipse dixit* of the expert is insufficient foundation for an admissible opinion).

## IV.   ARGUMENT

### a.   Ogden's theory on imbalanced caster

To understand Ogden's convoluted theory, it is important to understand caster with respect to vehicle steering systems.  Caster is a concept related to the wheels' desire to self-align out of a turn.   With a positive caster angle, the vehicle tends to self-align following the completion of a turn (e.g. imagine the steering wheel turning left by itself following a right turn).  Without positive caster the vehicle would not have a tendency to self-align and thus the driver would need to input additional steer to straighten the vehicle.   For a technical definition, the

caster angle is the angle between the intercept of the steer axis and the center of the tire contact patch[2]. *Fundamentals of Vehicle Dynamics,* Thomas Gillespie, 1992.

Ogden first opines that the failure of a steer axle tire, like the one in this case, causes the caster angle to change and become imbalanced with the companion steer tire. *Ogden report, p. 40 of 46.* He testified that this change in caster angle was "theoretical" and cites to no scientific authority – nor has he tested this theory. *Ogden depo.*, p. 11[3]. Part of the reason this opinion is only theoretical is because Ogden did not determine the caster angle of the tractor and testified that it cannot be determined because of the impact damage to the tractor. *Ogden depo., pp. 9-10.* Therefore, he could not determine the caster range of the tractor and could not quantify the alleged change in caster resulting from the tire failure. *Ogden depo., pp. 9-10.*

Without scientific support for his theory, Ogden next turns to the available physical evidence in this case for support – specifically the tire marks on the roadway. Ogden opines that "[t]he scalloped nature of the steer axle tire marks left by the Freightliner as it was directed towards the center median of the roadway is indicative of imbalanced caster." *Ogden report, p. 42 of 46.* Ogden cites to no other physical evidence to support his imbalanced caster theory. More importantly, Ogden cannot cite to any support in the scientific community for his theory. Ogden testified that "I have done thousands of reconstructions and I can honestly tell you this is the first time I have ever seen this type of condition with a heavy vehicle collision." *Ogden depo., pp. 141-142.* Ogden is unaware whether this concept has even been addressed by any

---

[2] Attached as **Exhibit 1** is a technical diagram depicting caster angles.

[3] Attached as **Exhibit 2** is a copy of Ogden's deposition transcript from the *Gooden/Cubillos* lawsuit. This deposition was premised upon the exact same expert report authored by Ogden and designated by the Plaintiff in this case.

scientific literature and testified that "I could care less whether the literature addresses it." *Ogden depo., p.142.*

Ogden's theory is inadmissible under F.R.E. 702, 703 and *Daubert*. His methodology is non-existent. His theory has not been tested, reviewed, published, or accepted by the scientific community. Rather, Ogden saw tire marks that he did not understand and theorized how they were made. Ogden developed a theory, skipped over the methodology, ignored the required analysis, scoffed at the literature and put forth opinions. Ogden's opinions regarding caster should be excluded.

### b.  Ogden's theory on the fracture of the steering knuckle spline

To understand Ogden's theory, it is important to understand the vehicle components at issue[4]. The central components at issue in Ogden's theory are the gearbox, u-joint and steering shaft[5]. Ogden theorizes that a separated piece of tread struck some part of the steering shaft, u-joint and/or gearbox and caused the system to fracture at the junction of the u-joint and gearbox. This in turn caused the steering system to be disabled and the Plaintiff to be unable to steer the tractor during the accident sequence. At its core, this theory is designed to excuse the Plaintiff from any responsibility for the crash. Ogden's methodology at all steps in this theory are unreliable and, at times, non-existent. Portions of the theory involve scientific disciplines outside of Ogden's expertise. The theory is based on speculation and advocacy for the Plaintiff.

This theory was born during Ogden's inspection of the vehicle on November 9, 2014, when, in a mess of other destroyed vehicle components, he noticed the u-joint was fractured

---

[4] Attached as **Exhibit 3** is a photo taken by BATO's retained expert John Scott on February 19, 2016, that depicts an intact steering system for a 2011 Freightliner Cascadia.

[5] Ogden often refers to the u-joint as a "knuckle" and the steering shaft as a "spline." These are Ogden's terms which are not commonly accepted in the fields of trucking mechanics, vehicle dynamics or accident reconstruction.

from the gearbox.  The theory has four parts, each discussed below:  (1) a piece of detaching tread had the capability of reaching those steering components; (2) a piece of the detaching tread physically impacted the steering components; (3) a piece of detaching tread can physically fracture steel; and (4) the fracture occurred while the tractor was still in the westbound lanes and under the Plaintiff's control[6].

First, Ogden theorizes that a piece of tread could actually reach the steering components. Ogden did not analyze the location nor measure the distance of the steering components to the subject tire[7].  *Ogden depo., pp. 132-133.*  He could have, but did not, use an exemplar vehicle in his methodology.  *Ogden depo., p. 132.*   He has not analyzed whether the directional plane of the tire, and thus a separating piece of tread, would even intersect with the steering components. *Ogden depo., p. 161.*   He testified that he does not have to conduct such an analysis because he can just see it.  *Ogden depo., p. 164.*  Ogden's opinion is theory without scientifically accepted principles, methodologies or evidence.

Second, Ogden next theorizes that a piece of the detaching tread impacted some part of the steering system.  However, Ogden cannot identify a piece of tread long enough to reach the steering system while still attached to the tire.  Rather, he only theorizes that one must exist from photographs taken by the WHP at the scene – although he failed to measure either one of his two candidate tread pieces.  *Ogden depo., pp. 130, 156-158.*  He speculates that a tread piece of significant length must exist, although none has been identified.  Likewise, Ogden cannot

---

[6] Attached as **Exhibit 4** is a collection of photos of the subject 2011 Freightliner taken by Ogden on November 9, 2014, that depicts the condition and location of the steering components **post-crash**.

[7] Attached as **Exhibit 5** is a collection of photos of an exemplar 2011 Freightliner taken by BATO's retained expert John Scott on February 19, 2016, that depicts the condition and location of the steering components **pre-crash**.

determine the orientation of the steering components at any time during the crash sequence and therefore cannot opine on where and which component the tread piece allegedly struck. *Ogden depo., pp. 147, 152-153.* Ogden opines that the tread piece impacted "the steering shaft and/or knuckle" and believes he sees rubber transfer marks on both components. *Ogden report, pp.42-43.* Without knowledge of the components' orientation at the time of the tire failure, and without any further analysis of the scuff marks on those components, Ogden is merely speculating that a piece of rubber impacted some portion of the steering system at some point in time. Ogden admits that every single other component in the same area of the tractor was damaged due to the impacts with the two vans after the tractor crossed into the eastbound lanes and that the u-joint alone was fractured by an unknown piece of tread while the tractor was in the westbound lanes of I-80. *Ogden depo., pp. 166-167.* Ogden's opinion is theory without scientifically accepted principles, methodologies or evidence.

Third, Ogden next theorizes that a separated tread piece could physically fracture the u-joint from the gearbox. In his report, Ogden speculates that the fracture could of occurred as a result of "the left front tire failure and/or a hard right steer of the steering shaft by the driver…". *Ogden report, pp. 42-43 of 46.* In that same report Ogden admits that determining the actual cause of the fracture "is beyond the scope of this engineering analysis." *Ogden report, p. 43.* With respect to a steer-induced fracture by the driver, one of the two possible explanations posited in his report, Ogden testified it was not possible. *Ogden depo., p. 91.* With respect to the tread-induced fracture, Ogden testified that he did not attempt to quantify the force imputed by a separating tread or whether that force is capable of breaking steel components. *Ogden depo., p. 140.* Rather, Ogden departed from his field of expertise and dove into metallurgy. Ogden is not a metallurgist, yet he opined that the fracture face of the u-joint was indicative of a "Mode III

stress intensity fracture" from an impact force that resulted in an "out-of-plane sheer and/or tear mode." *Ogden report, p. 42 of 46*.  Ogden did not conduct any metallurgical examination or analysis of the components or exemplar components to determine the cause of failure or the forces necessary to cause the failure.  At deposition he described the fracture having a "brittle section and a "ductile section."  *Ogden depo., p. 96*.  He then stated he did not like to use the terms "ductile" and "brittle" because those terms confuse jurors and, when pressed, could not define "ductile."  *Ogden depo., pp. 96-99, 145*.   He is unqualified to render metallurgical opinions and his methodology is based upon speculation.

Ogden's final piece of his theory is that the fracture of the u-joint occurred while the tractor was in the westbound lanes of I-80.  He needs this piece in order to exonerate the Plaintiff.  However, he has no evidence to support his theory.  In his report, Ogden opines that the "the steering shaft knuckle failure [occurred] shortly after the left front tire failure and well before the subsequent impacts with the [vans]."  *Ogden report, p. 44*.  In essence, the failure occurred at some time in the crash sequence.  At deposition, Ogden labeled[8] a location he calls "point B" on a photo of the westbound lanes of I-80 at the crash scene and when asked whether the u-joint fractured before that point, Ogden testified "I don't know.  It could have failed there or it could have failed shortly after."  *Ogden depo., p. 99*.  He cites to no physical evidence to support this final piece of the theory.  On a basic level, Ogden would need to know when the tread separation occurred in order to determine when the separated tread impacted the steering system.  But Ogden does not know when the tread separation occurred.  Rather, he testified that the markings in the westbound lanes are indicative of a deflated tire and testified further that he does not know if the tread separation occurred before or after the tire deflated.  *Ogden depo., pp.*

---

[8] Attached as **Exhibit 6** is exhibit 264 from Ogden's deposition in the *Gooden/Cubillos* lawsuit. This exhibit is the referenced photo of the westbound lanes with Ogden's markings.

*64-65.*  There is simply no scientific basis or cognizable methodology to support Ogden's theory and his opinions should be excluded.

## V.    CONCLUSION

Dr. Ogden is intent on exonerating the Plaintiff from any responsibility in this crash, but he has not followed any cognizable, scientific methodology and he ventured into scientific areas outside of his expertise.  This is not expert opinion.  It is advocacy rooted in junk, or even no, science.  For these reasons, Ogden's opinions should be excluded under F.R.E. 702, 703 and *Daubert*.  A proposed order has been submitted with this motion.

Respectfully submitted,

Marc R. Brosseau
Chad Lieberman
Brosseau Bartlett Seserman, LLC
6455 S Yosemite St, Suite 750
Greenwood Village, CO 80111
Telephone:  303-812-1200
mbrosseau@bbs-legal.com
clieberman@bbs-legal.com

J. Kent Rutledge
Peter F. Howard
Lathrop & Rutledge, P.c.
1920 Thomes Ave., Suite 500
Cheyenne, WY 82003-4068
Telephone - (307) 632-0554

Colin P. Smith
Robert E. Tonn
Holland & Knight
131 South Dearborn Street, Suite 3000
Chicago, IL 60603
(312) 578-6562

Attorneys  for  Defendant  Bridgestone Americas Tire Operations, LLC

{00181530.2 }

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that the foregoing document was filed and served upon

the entity or entities named below via CM/ECF and/or regular U.S. mail on September 2, 2016.

Diana Rhodes
Traci Rivinus
The Rhodes Law Firm
2015 Warren Avenue
Cheyenne, WY 82001

Richard Friedman
Sean J. Gamble
Friedman/Rubin
51 University Street, Suite 201
Seattle, WA 98101

Monty L. Barnett
Grant R. Curry
White and Steele, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202-5406

_____
Chad Lieberman