

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Alodie Gooden, as Wrongful Death Representative of the Estate of Tanya Gooden and Cameron Gooden,

Plaintiff,

v.

Bridgestone Americas Tire Operations, LLC; FedEx Ground Package System, Inc.; and John Doe Corporations/Entities 1-3,

Defendants.

Civil Action No. 15-CV-45

* * * * * * * * *

Gina Cubillos, as Wrongful Death Representative of the Estate of James Ednie,

Plaintiff,

v.

Bridgestone Americas Tire Operations, LLC, FedEx Ground Package System, Inc.; and John Doe Corporations/Entities 1-3,

Defendants.

Civil Action No. 15-CV-50

---

DEPOSITION OF JERRY S. OGDEN, Ph.D., P.E.
March 11, 2016

---

APPEARANCES

ON BEHALF OF THE PLAINTIFF ALODIE GOODEN:
JAMES E. FITZGERALD, ESQ.
MICHAEL FITZGERALD, ESQ.
The Fitzgerald Law Firm
2108 Warren Avenue
Cheyenne, Wyoming 82001
Phone: 307-634-4000
E-mail: jim@fitzgeraldlaw.com
E-mail: michael@fitzgeraldlaw.com

ON BEHALF OF THE PLAINTIFF GINA CUBILLOS:
STEPHEN H. KLINE, ESQ.
Kline, McCorkle & Pilger
First Interstate Bank Building
401 West 19th Street, Suite 306
P.O. Box 1938
Cheyenne, Wyoming 82003
Phone: 307-778-7056
E-mail: steve@kmplaw.net

ON BEHALF OF THE DEFENDANT BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC:
MARC R. BROSSEAU, ESQ.
CHAD M. LIEBERMAN, ESQ.
Brosseau Bartlett Seserman, LLC
6455 South Yosemite Street, Suite 750
Greenwood Village, Colorado 80111
Phone: 303-515-2480
E-mail: mbrosseau@bbs-legal.com
E-mail: clieberman@bbs-legal.com

ON BEHALF OF THE DEFENDANT FEDEX GROUND:
CRAIG PAUL KAPP, ESQ.
Sundahl Powers Kapp & Martin, LLC
1125 Carey Avenue
P.O. Box 328
Cheyenne, Wyoming 82001
Phone: 307-632-6421
E-mail: pkapp@spkm.org

PURSUANT TO WRITTEN NOTICE, the deposition of JERRY S. OGDEN, Ph.D., P.E., called for examination by the Defendant Bridgestone Americas Tire Operations, LLC, was taken at the Law Office of Brosseau Bartlett Seserman, LLC, 6455 South Yosemite Street, Suite 750, Greenwood Village, Colorado, commencing at 9:02 a.m. on March 11, 2016, before Claudia R. Booton, a Notary Public and Registered Professional Reporter in and for the State of Colorado.

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Mr. Brosseau | 6, 248 |
| By Mr. J. Fitzgerald | 206 |
| By Mr. Kline | 241 |
| By Mr. Kapp | 255 |

| EXHIBITS | | PAGE |
|---|---|---|
| 257 | Notice of Deposition Duces Tecum | 6 |
| 258 | OEC Forensics Communications Report, 11/25/15 | 7 |
| 259 | Calculations | 39 |
| 260 | Calculations | 39 |
| 261 | Handwritten Notes | 39 |
| 262 | Parameters of ECM Download | 39 |
| 263 | Photograph, Bates HA 865 | 62 |
| 264 | Photograph, Bates HA 863 | 87 |

| EXHIBITS (cont.) | | |
|---|---|---|
| 265 | Photograph, HA 872 | 120 |
| 266 | Photograph, HA 644 | 122 |
| 267 | Photograph, Bates HA 644 | 123 |
| 268 | Photograph, Bates HA 625 | 124 |
| 269 | Photograph, Bates HA 625 | 124 |
| 270 | Photograph, Bates HA 828 | 124 |
| 271 | Photograph, Bates HA 829 | 124 |
| 272 | Photograph | 126 |
| 273 | Photograph, Bates HA 883 | 126 |
| 274 | Photograph, Bates HA 881 | 120 |
| 275 | Photograph, HA 886 | 129 |
| 276 | Photograph, Bates HA 880 | 130 |
| 277 | Photograph, Bates HA 876 | 129 |
| 278 | Photograph | 126 |
| 279 | Photograph | 139 |
| 280 | Photograph | 145 |
| 281 | Photograph Referencing CCW Torque Direction | 145 |
| 282 | Photograph | 150 |
| 283 | Photograph | 150 |
| 284 | Photograph | 151 |
| 285 | Photograph | 151 |
| 286 | Photograph | 174 |
| 287 | DDEC Reports - Last Stop Record, Bates HA 453 - 455 | 175 |

1  EXHIBITS (cont.)
2  288      Photograph                          179
3  289      Listing of Items Generated          182
4  290      GPS Survey Point by WHP             183
5  291      Ogden Curriculum Vitae              183
6  292      Photograph                          207
7  293      Photograph                          222
8  294      Photograph                          223
9  295      Photograph                          225
10 296      Photograph                          226
11 297      Photograph                          226
12 298      Photograph                          227
13 299      Remainder of Ogden File             256
14 300      Placeholder Exhibit for Requested   259
            Documentation to be Submitted at
15          Later Date
16 (Exhibit 299 was withdrawn and copies will be submitted
   to the original record at a later date by the deponent.)
17
   (Exhibit 300 will be submitted to the original record at
18 a later date by the deponent.)
19
20
21
22
23
24
25

1              P R O C E E D I N G S
2          JERRY S. OGDEN, Ph.D., P.E.,
3  having been first duly sworn, was examined and testified
4  as follows:
5              EXAMINATION
6  BY MR. BROSSEAU:
7      Q.   What is your name?
8      A.   It is Jerry S. Ogden, O-g-d-e-n.
9      Q.   And you have a Ph.D.?
10     A.   Yes.
11     Q.   When was that awarded?
12     A.   It was awarded in October, and then I
13 walked in December of last year.
14     Q.   Okay.
15     A.   Actually September.  Pardon me.
16     Q.   Congratulations.
17     A.   Thank you.
18         (Exhibit 257 marked.)
19     Q.   Do you recognize what we've marked as 257?
20     A.   Yes.
21     Q.   What is it?
22     A.   That's a notice of deposition for my
23 deposition today.
24     Q.   And it has appended to it or has listed on
25 it a list of materials on pages 2 and 3 that are

1  requested for you to produce; is that right?
2      A.   Yes.
3      Q.   Have you brought everything?
4      A.   I have, in fact.
5      Q.   And as I understand it from the brief
6  discussion we had before we began, you have your
7  materials that you produced here today on a combination
8  of electronic media as well as hard copy?
9      A.   Correct.
10     Q.   And everything is on the table?
11     A.   Looks that way, yes.
12     Q.   You authored a report in this case,
13 correct?
14     A.   Yes.
15         (Exhibit 258 marked.)
16     Q.   Does Exhibit 258 appear to be an accurate
17 copy of that, but for the original report included some
18 deposition summaries?
19     A.   Without going line by line, it appears to
20 be the same.
21     Q.   And you actually have a copy of your
22 report in one of the binders you brought with you?
23     A.   I do.
24     Q.   Okay.  Is Exhibit 258 the only report
25 you've issued in this case?

1      A.   Yes.
2      Q.   That report, when it was issued in
3  November of 2014, was your best effort to state the
4  opinions that you hold in this matter?
5      A.   Yes.
6      Q.   And as far as you're concerned, it was
7  complete?
8      A.   Yes.
9      Q.   Have you done work since issuing your
10 report that's been marked as Exhibit 258?
11     A.   Yes.
12     Q.   What have you done?
13     A.   I've gone through and derived the
14 equations for the kinematic trail and pneumatic trail.
15 I've gone through and calculated -- well, actually, I did
16 that before -- speeds by gear ratio.  And then I've gone
17 through and actually assuming speeds of 78.4 miles per
18 hour and 75 miles per hour what the timing of this
19 incident would be over the distances traveled.
20     Q.   And you're talking about from first
21 documented physical evidence of the scene to point of
22 rest of the tractor?
23     A.   That's correct.
24     Q.   That distance is approximately 597 feet?
25     A.   Correct.  In addition to that, I've also

1  reviewed through John Scott's supplemental report, and I
2  have some diagrams and some different elements to address
3  some of the issues where he and I differ.
4      Q.    Have you -- you have not issued any report
5  pertaining to your work there, correct?
6      A.    That's correct.
7      Q.    Why?
8      A.    Because I just received that, and so I did
9  not have enough time to issue a report.
10     Q.    When did you receive it?
11     A.    I believe I just received that last
12  Friday.
13     Q.    Has any of the work that you've done or
14  any of the documents you've received changed any of the
15  opinions that you set forth in Exhibit 258?
16     A.    No.
17     Q.    You use the term "pneumatic trail." Is
18  that synonymous, as you use that term, to caster trail?
19     A.    Caster trail is a combination of kinematic
20  trail and pneumatic trail. So when you look at caster
21  trail, you set caster on a vehicle. The idea is to set a
22  positive trail. I can explain if you would like.
23     Q.    Okay. When you said you did equations for
24  pneumatic trail, did you also do them for kinematic
25  trail?

1      A.    Yes. The equations are actually for --
2  the derivation is actually for kinematic trail.
3  Pneumatic trail is based upon contact patch and
4  distortion of the contact patch, which gives a negative
5  trail element for the pneumatic portion.
6      Q.    And in order to do that calculation in
7  this case, did you have to determine the caster range?
8      A.    No, because it's all determining the
9  equations so you can see what the equations of motion
10  are. You can't determine the caster angle on this
11  because of the impact.
12     Q.    So the caster angle is not a component of
13  the calculation for kinematic trail or pneumatic trail?
14     A.    It is. That's two different questions. I
15  did not calculate or determine what it is, but it is part
16  of it because it goes into the inclination of the
17  kingpin.
18     Q.    So what you're saying, though, is you were
19  able to determine or calculate a pneumatic trail or
20  kinematic trail without knowing what the caster angle
21  was?
22     A.    I did not say that.
23     Q.    That's why I'm asking you. Were you able
24  to do it without knowing what the caster angle was?
25     A.    I did not calculate it. What I did is

1  derive the equation so we can look at the equations of
2  motion for the vehicle that allows us to be able to
3  understand how those influence caster.
4      Q.    So what you have done is formed an opinion
5  qualitatively about the effect of the change in caster?
6      A.    Yes. I would agree with that.
7      Q.    But you have not quantified that change?
8      A.    You cannot.
9      Q.    Is it your opinion that the caster angle
10  was changed as a result of the fracture of the steering
11  knuckle spline?
12     A.    No.
13     Q.    Was there any change in the caster angle
14  as a result of the crash of this tractor?
15     A.    Yes.
16     Q.    What caused the change in the caster
17  angle?
18     A.    There is several different stages we have
19  to look at. The first is when we have disruption of the
20  pneumatic integrity of the tire, as the tire falls to the
21  ground, the intercept of the kingpin position or what we
22  call a kinematic trail versus the location of the center
23  of contact, theoretically, on the vertical of the center
24  of the hub increases.
25          When you increase the caster angle, that

1  produces what we call oversteer. And the whole idea
2  behind pneumatic trail being back behind is to offset the
3  kinematic trail so that the caster of the vehicle, as it
4  drives down the roadway, has positive trail, but not too
5  positive, so that you're able to have self-aligning
6  torques that bring the wheels back in the center as the
7  vehicle moves.
8      Q.    Self-center and steer?
9      A.    That's right. And basically it's a moment
10  that's created when you have the caster angle intercept
11  for the kinematic and the pneumatic trail so that you
12  have the actual caster in front of the tire. When side
13  forces are placed at the point of the contact on the
14  roadway, it creates a moment.
15          And if the moment is about the intercept
16  of the caster on the roadway in front, then that causes
17  the wheels to self-align back towards the front. If it
18  ends up being in the back, that actually induces steer to
19  the tire. So that's why we try to have a positive
20  caster, kinematic trail and the pneumatic trail.
21     Q.    When you refer to contact, you're talking
22  about contact patch?
23     A.    That's correct.
24     Q.    And when you talk about oversteering, are
25  you talking about that as defined by SAE, vehicle

Page 13

1  dynamics terminology or in a broader sense?
2      A.    Oh, yes -- no.  I mean, in vehicle
3  dynamics, standpoint oversteer is always oversteer.
4      Q.    I don't know what you mean.
5      A.    Oversteer means that, theoretically, if I
6  have an oversteer condition in my wheel, either left or
7  right, if I have my vehicle traveling in a straight
8  direction and I make a slight right turn, with oversteer,
9  the vehicle will actually go towards the left.  And
10  that's because the back axles are actually steering the
11  vehicle in that case rather than the front axles.  And so
12  oversteer is a condition we don't like.
13           NASCAR folks try to get as close to
14  neutral steer as they can so they have extremely fast
15  response, but it's very difficult to have stability.
16  When we have road vehicles, whether they be passenger
17  vehicles or heavy trucks, we want to have understeer.
18  That way we have the sensation of the road wheel angle is
19  different to the heading of the vehicle which is what we
20  call the slip-or-scrub angle of the vehicle.  There's a
21  difference between those.
22           So as I turn the road wheel, I'll turn the
23  road wheel at a greater angle than the actual vehicle
24  moving.  That generates lateral forces on the outside of
25  the edges of the tires which allows that vehicle to move

Page 14

1  and it curves back.
2      Q.    When you define oversteer, are you talking
3  about it as a combination -- as the vehicle combination
4  or the tractor only?
5      A.    Well, it will influence the combination,
6  but we're influencing the tractor only.  Where the
7  tractor goes, the trailers go because they're pinned
8  together.
9      Q.    And the vehicle dynamics terminology
10  defines steer gradient with reference to the Ackermann
11  steering?
12      A.    That's correct.
13      Q.    Do you know what the Ackermann steer angle
14  is here?
15      A.    I do -- well, no.  I can't tell you what
16  the Ackermann steer angle is because the vehicle has been
17  destroyed.  I can tell you what an Ackermann steer angle
18  is.
19      Q.    Can you tell us what the Ackermann steer
20  angle was before the crash?
21      A.    I cannot.  I don't have any information on
22  the vehicle.
23      Q.    Do you know what the steer gradient of the
24  tractor was before the crash?
25      A.    I don't.  I can't do that without having

Page 15

1  the vehicle in its undamaged condition.
2      Q.    Have you looked at any exemplar vehicles
3  in connection with your work in this case?
4      A.    No.
5      Q.    Why?
6      A.    Because it's really not part of my
7  analysis.
8      Q.    Without looking -- if you did look at an
9  exemplar vehicle, would you be able to determine what the
10  steer gradient was of this vehicle before the crash?
11      A.    I could probably calculate it, yes.  If I
12  know what the sidewall stiffnesses are of the vehicles,
13  if I know what the slip angles are, I can measure the
14  slip angles.  Then the -- being able to determine what
15  the steer gradient is is basically an academic
16  calculation.
17      Q.    And is it correct, then, you don't know
18  what the change in steer gradient was at any time during
19  the accident sequence?
20      A.    That's correct.
21      Q.    How do you know that the vehicle ended up
22  being oversteer?
23      A.    Can I have my photographs?  Somebody has
24  my file that has -- the blue ones.
25           MR. KLINE:  Can you read the question

Page 16

1  back?
2           (The question was read.)
3      A.    Oversteer is a condition where the rear
4  axles are starting to take over.  It's a problem.  And
5  this happens oftentimes in passenger vehicles when, say,
6  for instance, we have higher tread values in front than
7  we do in the back, and the back begins to slip.  The
8  front will actually be guiding as the rear is coming
9  around.  It induces a condition we call a yaw.
10           In this particular case, when we look at
11  the front marks, we can clearly see in the scene
12  photographs -- very near to the point where we see the
13  initiation of the front tire marks, we see the rear
14  wheels of the tractor moving out.  We see these dark thin
15  lines.  Those are not braking lines.  Those are actually
16  induced yaw.  That means that we're loading the outside
17  of that tire.  And the outside edge of that tire is
18  leaving a very thin, dark line, because it's actually
19  weight-shifting to the outside of those axles.
20           The trailer is pushing on it, and then the
21  trailer follows; and then the trailer in the back will
22  follow.  And we see these lines diverging, and that's due
23  to oversteer.  It means that now the rear end is steering
24  the front end.  Tail is wagging the dog.
25      Q.    (By Mr. Brosseau)  So by looking at the

1  trailer tire marks, you can tell us that the tractor has
2  gone oversteer?
3      A.    No. I'm looking at the tractor tire
4  marks. The trailer marks develop later on, but I can see
5  the driver is on the right side. Those outside tires are
6  leaving marks.
7      Q.    So by the time we see the drive axle tire
8  marks that you're referring to -- that's what you're
9  referring to, right, tire marks in the drive axles?
10     A.    Yes.
11     Q.    By the time we see the drive axle tire
12  marks, in your opinion, the vehicle has already
13  transitioned to oversteer?
14     A.    The vehicle is -- well, yes. That is a
15  definition of oversteer. Once the rear wheels start
16  trying to gain on the front wheels, that puts us into
17  yaw.
18     Q.    Is that something that's recognized in the
19  vehicle dynamics community, that definition?
20     A.    Should be.
21     Q.    Is it?
22     A.    I don't know. I would imagine so. I
23  think you could find that in Dean Karnopp's book or
24  Wong's book or even Mr. Gillespie's book. You could find
25  it in any of the SAE -- that would tell you that that's

1  one of those indications.
2      Q.    You're aware Dr. Gillespie is a witness in
3  this case?
4      A.    I am.
5      Q.    So you would expect Dr. Gillespie would
6  agree with your assessment that -- or your testimony that
7  if you see the rear tires tracking like they do here
8  outside the radius described by the front, that the
9  vehicle is in oversteer?
10     A.    It's an oversteer condition that's
11  inducing the yaw. I would expect he would agree with
12  that, yes.
13     Q.    Do you recognize Dr. Gillespie as an
14  expert in vehicle dynamics?
15         MR. KAPP: Object to the form.
16         MR. BROSSEAU: What's the basis?
17         MR. KAPP: I don't have to give you a
18  basis.
19         MR. BROSSEAU: I have a right to cure my
20  question if there's a problem with the question. Your
21  objection is meaningless unless you give me an
22  opportunity to cure. I'm asking if you wish to give me
23  an opportunity to cure.
24         MR. J. FITZGERALD: And I just record the
25  local rules require that.

1          MR. KAPP: If you're about to seek the
2  witness' approval or confirmation of your witness, I
3  think it's an improper line of questioning.
4      Q.    (By Mr. Brosseau) You can answer the
5  question.
6      A.    I don't establish expertise for anybody.
7  That's actually the judge's job.
8      Q.    So, for example, when you cited the Wong
9  book, you're not saying that Wong has expertise in the
10  area?
11     A.    No. I'm saying that Wong is able to give
12  you -- well, I'm not saying he has expertise -- certainly
13  he has expertise in the area. It doesn't mean that he's
14  an expert in expert courses of legal designation. And
15  since we're all in a legal process, I'm going to have to
16  leave it there.
17     Q.    Does Dr. Gillespie, in your opinion, have
18  expertise in vehicle dynamics?
19     A.    Certainly he does.
20     Q.    Do you have expertise in vehicle dynamics?
21     A.    Yes, I do.
22     Q.    Based on?
23     A.    Based on my education, training, and
24  experience. I have not only education in multilink,
25  multibody dynamics, planar dynamics, advanced dynamics,

1  and vehicle dynamics, I also have training through
2  Society of Automotive Engineers and dynamics that include
3  vehicle dynamics and heavy vehicle dynamics.
4      Q.    Have you ever taken any courses from Dr.
5  Gillespie?
6      A.    I think I did a number of years ago, but
7  I'm not sure. I took a vehicle dynamics course in -- at
8  the Ford Fairmont plantation in the mid to late '90s.
9  I'm not sure that he was one of the instructors or not.
10  I just don't recall. That might have been about the time
11  his book came out.
12     Q.    Do you have a copy of his report in this
13  case?
14     A.    I do.
15     Q.    Do you have any disagreements with it?
16     A.    No. I think, in general, he's describing
17  exactly what would occur in a steady state or in a
18  condition where we don't have any indication of failure
19  to the steering components, and he doesn't opine to that.
20     Q.    Let me just ask it again broadly. Do you
21  have any disagreements with anything Dr. Gillespie stated
22  in his report?
23     A.    In general, I don't, under the conditions
24  that he's cited.
25     Q.    And how about specifically?

Page 21

1    A.    No.
2    Q.    Would you agree that in the absence of
3  confounding environmental driver or other vehicle factors
4  of steer axle tire failure, it should be controllable by
5  the driver at highway speed?
6         MR. KAPP:  Object to form.
7    A.    If you could --
8    Q.    (By Mr. Brosseau)  Wait a second.
9         MR. BROSSEAU:  What's the basis?
10        MR. KAPP:  You haven't established
11  foundation, and I'm not -- you know what, I'll make my
12  objections.  I'm not going to be answering your
13  questions, Mark.  Okay?  And if for some reason I don't
14  make an adequate objection, the Court will decide that,
15  if and when it comes up.  All right?
16        MR. BROSSEAU:  Let me just ask this
17  question, Paul.  If I ask you to state the basis for your
18  objection, are you going to decline to do so?
19        MR. BROSSEAU:  Other than object to the form
20  which the rules require?
21        MR. BROSSEAU:  Yeah.
22        MR. KAPP:  Yeah, I'm not going to take you
23  through my thought process.
24        MR. BROSSEAU:  Okay.  Well, I just want
25  the record clear on that.  I appreciate it.

Page 22

1    A.    Could you restate the question?
2         MR. BROSSEAU:  Please.
3         (The question was read.)
4    A.    I'm not quite sure I understand your
5  question.  Maybe you should rephrase it.
6    Q.    (By Mr. Brosseau)  Sure.  You agree that,
7  generally speaking, a steer axle failure on a vehicle
8  such as the one involved in this crash -- meaning the
9  FedEx vehicle, not the minivans -- doesn't mean that
10  everything is lost, correct?
11   A.    That's a statement from my report, All is
12  not lost.
13   Q.    And by that, is it correct that what
14  you're saying is that unless you have other things going
15  on such as environmental problems, driver factors or
16  other vehicle problems, this vehicle should be
17  controllable under the circumstances of this accident?
18   A.    And I guess I need to understand what you
19  mean by environmental and driver and other.
20   Q.    Sure.  In performing an accident
21  reconstruction, before you reach an opinion as to the
22  cause or causes of an accident, is it correct that the
23  job of the accident reconstructionist is to evaluate the
24  contribution to the accident of driver and vehicle and
25  environmental factors?

Page 23

1    A.    It depends on the case, but, in general,
2  yes.
3    Q.    Okay.  And have you attempted to do that
4  in this case?
5    A.    Yes and no.
6    Q.    What's the no part?
7    A.    The no part is that part of the
8  environmental is something we cannot address, which is we
9  do not know all the friction values for the vehicle from
10  transitioning it from the westbound lanes to the median
11  to the eastbound lanes.  So we can make some general
12  assumptions that may be relatively correct.  But we
13  cannot necessarily assess all of those.
14   Q.    If the steering knuckle spline had not
15  fractured as you have opined, would the driver of this
16  vehicle, in your opinion, have been able to control his
17  vehicle?
18   A.    I think it's probable, yes.
19   Q.    And as a general matter, would you agree
20  that a tractor-trailer combination such as this one
21  operating highway speeds, if there are not vehicle
22  problems such as the one you opine occurred here or
23  driver factors -- and if you're having a problem with
24  that, I can define that.
25   A.    I would like you to.

Page 24

1    Q.    Sure.  In evaluating driver factors, as
2  you said is frequently done in accident reconstruction,
3  is it correct that you're looking at such things as
4  driver inputs?
5    A.    Sometimes, yes.
6    Q.    And the driver inputs generally are use of
7  accelerator, brakes, or steering, correct?
8    A.    Or combination of those, yes.
9    Q.    But it's going to be one or more of those
10  three things when you talk about driver inputs, correct?
11   A.    Typically, yes.
12   Q.    And by environmental, we're usually
13  talking about anything external to the vehicle, correct?
14   A.    I accept that, yes.
15   Q.    So, for example, when you talked about
16  roadway coefficients or coefficients in the median or in
17  the oncoming lanes, those would be environmental factors,
18  correct?
19   A.    That's correct.
20   Q.    It would also include such things as other
21  traffic, correct?
22   A.    To a certain degree, aerodynamics as well,
23  grade, curvature, so geometric confines certainly.
24   Q.    Super elevation?
25   A.    Geometric confines.

1    Q.    Weather?

2    A.    Yes, because weather may, such as wind or

3 wetness on the roadway from rain or ice, snow, et cetera.

4    Q.    Okay.  And so let's go back to driver for

5 a second.  When we look at the issue of driver factors,

6 one of the things we're evaluating -- or you're

7 evaluating in a case such as this is what steering was

8 made by the driver, correct?

9    A.    If it's possible, yes.

10    Q.    Was it possible in this case to evaluate

11 anything the driver did in the way of steering?

12    A.    Yes.

13    Q.    And to the extent you were able to do so,

14 did you make that evaluation?

15    A.    Yes, I did.

16    Q.    Did you also attempt to determine whether

17 the driver braked?

18    A.    Yes, I did.

19    Q.    Okay.  And were you able to make some

20 determinations regarding that?

21    A.    Yes.

22    Q.    Did you make any determinations about

23 whether the driver applied throttle during the course of

24 the accident sequence?

25    A.    Yes.

1    Q.    Did the driver apply throttle at any point

2 during the accident scene?

3    A.    There's no evidence.

4    Q.    One way or the other, or that he did?

5    A.    No, meaning from the ECM download, there's

6 no throttle application.

7    Q.    Is the ECM data reasonably reliable for

8 the purposes of you making that determination?

9    A.    Yes.

10    Q.    As a ballpark figure -- and I recognize

11 that you've testified you've done some calculations,

12 including some since your last report, regarding the

13 amount of time that this accident took.  Is it correct

14 that, in general, we're talking about an event that took

15 place between 10 and 11 seconds?

16    A.    There's certain assumptions you have to

17 make to do that.

18    Q.    Tell me what they are.

19    A.    The assumptions are speed, obviously.

20 That's our hardest element to deal with.  But if we

21 assume for the sake of the evidence that we currently

22 have, which includes the GPS data, includes the

23 statements of the driver, that our speed is somewhere

24 between 75 and 78.4 miles per hour at the time that we

25 see the initiation of those tire marks, then the timing

1 is between 10.38 and 10.85 seconds.

2    Q.    So with those assumptions, we're talking

3 about an event roughly between 10 and 11 seconds?

4    A.    Yes.

5    Q.    And would it be true that the faster that

6 he's going at the inception of those tire marks, the

7 shorter the duration of the accident sequence?

8    A.    That is correct.

9    Q.    Do you have any evidence that the driver

10 was at a speed different from 78.4 miles per hour at the

11 first tire mark?

12    A.    Yes.

13    Q.    What is that evidence?

14    A.    The GPS data.

15    Q.    Anything else?

16    A.    No.

17    Q.    What does the GPS data show you that is --

18 that leads you to a conclusion that his speed is

19 different from 78.4 miles per hour at the first tire

20 mark?

21    A.    Our GPS data shows us two bracketed speeds

22 that are at or about either side of the tire failure

23 event.  And those speeds are 78.4 and I believe 58 -- let

24 me check my report because I have it in here.  And I want

25 to be accurate on this.  58.2 miles per hour.

1    Q.    That's stated at least in part on page 44

2 through 46?

3    A.    Yes.  That is my Conclusion 1.

4    Q.    Do you believe that there is as between

5 those two speeds -- first of all, do you believe that

6 there is a reasonable possibility that there is a speed

7 other than one of those two speeds at the first tire

8 mark?

9    A.    You asked me a reasonable possibility.

10 Those two words do not go together.  I think reasonable

11 probability might be because reasonable and possibility

12 usually are oxymorons.  So what we want to look at is a

13 reasonable probability, and the answer is it is more

14 likely than not that it's neither of those speeds, but it

15 could be either.

16    Q.    Do you have an opinion to a reasonable

17 probability what the driver's speed was at the first

18 documented tire mark?

19    A.    Between 58.2 and 78.4, but I think that we

20 can narrow that down based upon other evidence that is

21 subjective, unfortunately.  But subjective evidence that

22 helps us to be able to maybe narrow that down to a range

23 that makes more sense.

24    Q.    What range makes more sense?

25    A.    I think 75 to 78.4 makes more sense.

1     Q.     Makes more sense than 58.2?
2     A.     I can explain why.
3     Q.     Please do.
4     A.     At 58.2, you actually have negative times
5  at the very end, meaning there's not enough time and not
6  enough friction when everything is happening.  So if you
7  run this through an analysis, speeds below about 65 start
8  running into a problem on time.  And so that means our
9  speed is most likely closer to that 75 to 78.4 mark.
10    Q.     Let me understand as you're using the term
11 "probability" in this context.
12    A.     Certainly.
13    Q.     Is it, in your opinion, reasonably
14 probable that the driver was traveling at a speed of 59
15 miles per hour at the first documented tire mark?
16    A.     No.
17    Q.     Is it reasonably probable that the driver
18 was traveling at a speed of 70 miles an hour at the first
19 documented tire mark?
20    A.     Boy, that's a tough one.  It's probable.
21 That's about all I can say.
22    Q.     If you were asked a question at trial, Dr.
23 Ogden, how fast was Mr. Kehler driving when that first
24 tire mark shows up, what is your answer?
25    A.     Well, 58.2 to 78.4 is our data.  However,

1  I think it's more probable than not out of that range
2  that he's traveling between 75 and 78.4.
3     Q.     Now, tell me why you believe 75 to 78.4 is
4  more probable.
5     A.     When I start looking at the average
6  deceleration rate over the entire distance, the 596.5
7  feet that's being covered during the time that we have
8  the first disruption of that tire -- the marks with the
9  gouge and then the cam -- or the caster wobble in those
10 front axles divergence of the drive and the trailer
11 that's going off into the median towards the left and
12 crosses over, that average friction at 75 is a .32.  .32
13 mu is pretty realistic for looking at the fact that we
14 don't have full braking in the first portion of this
15 impact; that we are entering the median and sometime
16 while in the median, braking is occurring to the vehicle.
17 And then we most likely have near full braking for at
18 least most, if not all, of the remaining portion of the
19 travel within the eastbound lanes.
20        At 78.4 that mu becomes a .344 or .34.
21 That, again, supports that.  If we get slower and slower
22 speeds, that friction becomes less and less and less,
23 which means that there's essentially no braking at all
24 during any portion of the event.
25    Q.     When you use the term "braking" in this

1  context, are you talking about application of the service
2  brake?
3     A.     Yes, service brake applications.
4     Q.     When you say mu of .32 or -- you also said
5  .34, you ran a calculation that was -- or you ran some
6  numbers that were presented on an Excel spreadsheet
7  back -- and produced to us back when you did your first
8  disclosure, correct?
9     A.     I think so.  I looked at it yesterday or
10 the day before yesterday, and I have it right here.  I
11 actually went through.  It doesn't make a big difference,
12 but I went through and looked at the rolling radiuses and
13 made sure that the rolling radius were correct for each
14 of these tires.
15        The values that were in there before were
16 defaults.  It makes a difference of tenths of miles per
17 hour on each of the gears.  But I went through, looked at
18 my gear ratios and my axle ratios for the transmission,
19 calculated each of those values as you see, which
20 provides us that graph that tells us the maximum speeds
21 capable for this vehicle in each gear governed at 3,000
22 work hours.
23    Q.     When did you do that analysis?
24    A.     This analysis I did originally.  This is
25 an original analysis that I did.  But yesterday or the

1  day before, I went through and made sure that we didn't
2  use the default values but we use the actual tire values.
3     Q.     I have not seen that before.
4     A.     It was provided to you.
5     Q.     Can you show me where?
6     A.     Yes.  It was in the data.  When you
7  requested it, it was on the thumb drive.
8     Q.     Got it right here.
9     A.     Okay.
10    Q.     Let's plug it in.  Do you have yours or do
11 you want to use ours?
12    A.     I don't have a computer.
13    Q.     Okay.
14    A.     It will be under Analysis.
15    Q.     We've got two Analysis documents.
16        Dr. Ogden, we just looked at a flash drive
17 that was produced to us back at the time following your
18 initial disclosure.  I'll represent that's the only thing
19 that I've received from your file until today and your
20 report that's already been marked as 258.
21        You said that you thought also produced
22 were the graphs we just saw?
23    A.     Yeah.  The graph is part of that, and I
24 believe, because you're using Excel 2010, some of the
25 graphing functions don't correlate between.  And that's

Page 33

1   been a problem with the Office 365 version which is the
2   most modern of 2015.  You may have lost the graph.  But
3   the graph should have been the very last page.
4       Q.    Are you saying that it is actually on this
5   flash drive?
6       A.    It should be -- it's in that calculation,
7   because that calculation sheet that you have is a
8   template that I use.  I use it on nearly every single ECM
9   download.  When I crawl under a truck and I count the
10  teeth on the tow ring and I determine what the axle ratio
11  is by scraping it off and looking on it and going through
12  and looking at all of those elements, I'll actually
13  calculate these.
14         So the graph is part of it.  It's just
15  naturally part of it.
16      Q.    So when we see, like, a 3.42 ratio which
17  is the one for this truck --
18      A.    Yes.
19      Q.    -- you're saying that should be here?
20      A.    Yes.
21      Q.    Okay.  And in any event, you produced it
22  back to counsel in November of 2014 with the intent that
23  it be produced as part of your disclosures?
24      A.    Yes.
25      Q.    Is that right?

Page 34

1       A.    Yes.
2       Q.    If we were to plug this into another
3   computer, one that you think that isn't limited in its
4   versions, we would be able to see that graph that you're
5   saying is on here?
6       A.    I don't know.  I would hope so, because
7   that's what I provided to you.
8       Q.    You never provided anything to me,
9   correct?
10      A.    Well, I should say that's what I
11  provided --
12      Q.    To counsel?
13      A.    -- in the analysis data.  There's one
14  other area that we may want to look at.  I didn't see
15  your folders.
16      Q.    Come look at it.
17      A.    Sure.  Thank you.
18         What we were just looking at was GPS
19  analysis and GPS Google Earth.  The file that should be
20  on here should say -- I've got to think of how it's
21  named.  Engine speed, I think is how it's --
22      Q.    Engine speed?
23      A.    Yeah.
24      Q.    And you don't see that folder on there?
25      A.    I don't see it.  Well, that could have

Page 35

1   been an error when this was produced, but I don't know.
2   But, basically, what it tells you is, based upon the
3   configuration of this vehicle with this Eaton Fuller
4   13-speed transmission, with the ratios for each gear, and
5   the axle ratio through the axle ratio for this particular
6   vehicle, up to 3,000 RPMs, it would show you the max
7   speeds -- actually, it gives you all of the speeds all
8   the way through the RPM cycle.  But it will show you the
9   maximum speeds.
10      Q.    Does that also have as a component in
11  there the horsepower?
12      A.    No.
13      Q.    Did you run it to 4,000 RPMs?
14      A.    No.  This vehicle is governed at 3,000, so
15  you're not going to reach 4,000.  But the way this is
16  done is also using the rolling radius and the average
17  revolutions per mile, and this provides you the speeds.
18         And so the calculation -- I might have it
19  in here.  The calculation is the speed is the RPM in
20  actually revolutions per second divided by the average
21  revolutions per mile times the transmission gear ratio
22  times the axle ratio.  And then you just use the RPMs
23  anywhere from idle speed at 500 up to a maximum of 3,000.
24  And then this vehicle is actually governed at -- I
25  believe it was 93 -- just under 94.

Page 36

1       Q.    93.95?
2       A.    I was going to say 93.85 or 93.95, just
3   under 94.  And so you block out those, so you don't graph
4   those.  And that's what provides you with the graph of
5   the speeds that can be achieved in each of these gears.
6       Q.    When you talked about rolling radius, you
7   need to have a tire that you're using, correct?
8       A.    That's correct.
9       Q.    And the tire that you're using is off of
10  the drive axle?
11      A.    That's correct.
12      Q.    Which tire did you use?
13      A.    Outside tire.
14      Q.    Okay.  On Number 1 or Number 2?
15      A.    Both.
16      Q.    Are they the same?
17      A.    Yes -- well, no, they're not.  The number
18  1 -- actually Axle Number 2 is Michelin XDN2s, and the
19  Number 3 outside is XTA Michelin.  And the Number 3 left
20  outside is a Michelin XDN2.  They have slightly different
21  revolutions per mile.  Their loaded radiuses range
22  between 18.4 and 18.9 inches.
23      Q.    Okay.  And I haven't seen your
24  calculations so if you can tell me which tire did you
25  use?

Page 37

1    A.    You average them because the average of
2  all of those is actually the propulsion of the vehicle
3  down the road.
4    Q.    Is there any relationship between the
5  speedometer and the cab and the tire size?
6    A.    Yes.
7    Q.    What is that relationship?
8    A.    It depends on the tire size.  If you have
9  a larger tire size than what the speedometer is
10 calibrated for, the speedometer will read a lower speed
11 than the actual ground speed in a straight-line motion.
12 If the tire size, meaning the rolling radius, is smaller
13 than the tire size at which the speedometer is calibrated
14 for, then the speedometer will read a higher speed than
15 the over-the-road straight line speed of the vehicle.
16   Q.    Given the tires that were on the drive
17 axles were out of position on this vehicle, was the
18 driver in the cab getting a true reading from the
19 speedometer?
20   A.    No.
21   Q.    Which direction was it occurring?
22   A.    It was erring on the low side, meaning the
23 vehicle's over-the-road speed was slightly higher than
24 what he would see on the speedometer.
25   Q.    How does that relate to cruise control on

Page 38

1  this vehicle?
2    A.    Cruise control obviously is based upon the
3  speedometer speed that you're setting.  That's how you're
4  viewing it.  So when I'm setting my cruise control at 75
5  miles per hour, my speed will be slightly greater.  I can
6  calculate -- I didn't calculate that, but that can be
7  calculated.
8    Q.    Is it in the range of about 1 percent
9  greater in this case?
10   A.    I can't say.  I would calculate it.  But I
11 would imagine that it's probably a little bit higher but
12 maybe not much.  The difference between these tires and
13 the ones that the vehicle is rated for is actually only a
14 difference in sidewall height of about 3 millimeters.
15   Q.    So just so we're clear and the record's
16 clear, in the event the driver testified, for example,
17 that he set his cruise control -- and this is a
18 hypothetical -- at 78 miles an hour, in fact, that
19 vehicle would be going slightly faster than 78?
20   A.    Sure, that's correct.
21   Q.    Can I get a copy of those pages that you
22 were referring to that you said you thought would have
23 been produced to us with this flash drive?
24   A.    You know, if you would like, I can -- if
25 you want a copy of everything in Tab E, which is my

Page 39

1  analysis --
2    Q.    Sure.
3    A.    It's right here.  That also has all my --
4  talking about the kinematic trail, pneumatic trail, which
5  adjusts for your caster.  This is the analysis for that.
6  This also gives you the analysis of the effects of your
7  road wheel direction and slip and how that affects
8  oversteer and understeer, calculate from -- here is your
9  Ackermann angle and going through all that, no problem.
10   Q.    Okay.  Thank you.
11   A.    I derive this for a left turn.  It's
12 usually derived for a right turn for SAE coordinates.  I
13 just switched coordinates so it made it easier.
14   Q.    Are you talking about for J-266 purposes?
15   A.    Yeah, because usually you report points
16 down on that vehicle.  In this case, I still had positive
17 numbers.  I just switched my coordinates for a left turn.
18   Q.    But you are saying, if you want J-266, it
19 will run to the right?
20   A.    You would be going to the right, that's
21 correct.
22         MR. BROSSEAU:  Why don't we take a couple
23 of minutes.
24         THE DEPONENT:  Sure.
25         (Recess from 9:50 a.m. to 10:01 a.m.)

Page 40

1         (Exhibits 259 through 262 marked.)
2    Q.    (By Mr. Brosseau) Dr. Ogden, you've
3  provided us with your -- a portion of your file from your
4  work product.
5         What would you characterize that Section E
6  as being?
7    A.    Section E in my section of my notebook is
8  called Calculations.
9    Q.    And we copied those and broke them into,
10 as you've suggested, three different collections, in
11 essence?
12   A.    Yes.
13   Q.    And one of those is marked as 259.  A
14 second is 260, and a third is 261.
15   A.    That's correct.
16         MR. KAPP:  And, Mark, is it your intention
17 to ultimately make his file an exhibit or just portions
18 of it?
19         MR. BROSSEAU:  Probably portions.
20         MR. KAPP:  Okay.
21         MR. BROSSEAU:  I'm trying to save a tree
22 or two.
23         MR. KAPP:  I'm going to just throw it in
24 at the end anyway.
25         MR. BROSSEAU:  I'll leave that to you.

1  You already assured me you weren't going to ask any
2  questions, so we'll have to do it as --
3          MR. KAPP:  That won't be a question.  That
4  will be a statement.
5      Q.   (By Mr. Brosseau)  I also had the reporter
6  mark while we were off one other document that I think
7  you're familiar with, 262.
8          Are you familiar with that?
9      A.   Yes.  This looks like it's off of the
10  parameters portion of the ECM download.
11      Q.   And that ECM download is one that was
12  either done by Martonovich or by Martonovich in
13  combination with somebody from Fay Engineering, correct?
14      A.   Martonovich didn't do one for us.  I did
15  it.
16      Q.   Oh, okay.
17      A.   I did the download.  So this is either
18  mine or the one that was done by Fay Engineering.  They
19  will be the same.
20      Q.   Do you recognize this as being from the
21  subject tractor?
22      A.   I do.
23      Q.   I'm curious -- and to give you the
24  context, it's in reference to RPM.
25      A.   Yes.

1      Q.   I see two RPM -- references under common
2  limiters towards the top.
3      A.   Yeah.
4      Q.   One at 3,000 RPM and one at 4,000 RPM.
5  And then in the section under PGR 005, I see references
6  to 4,000 RPM.
7      A.   Yes.
8      Q.   And you said that this engine is limited
9  to 3,000 RPM.
10          How do you know that?
11      A.   It's limited -- engine speed is limited
12  vehicle stop, 3,000.  Max engine speed is 4,000.  I just
13  misstated that.
14      Q.   So the max engine speed is what for --
15      A.   4,000.
16      Q.   So why did you calculate it using a max of
17  3,000?
18      A.   Because, basically.  That's all I can tell
19  you.  I mean, I can do it at 4,000, but 3,000 is -- 4,000
20  is redlining the vehicle.  So I think -- I can certainly
21  do it at 4,000.  But I just misread this and went to
22  3,000.  It's not going to make a big difference in the
23  curve.  You just continue those up because they're
24  straight line curves.
25      Q.   The exercise that you use the 3,000 RPM

1  was to determine, among other things, what the maximum
2  speed this vehicle could do, correct?
3      A.   No.  It's maximum speed in each gear.  So
4  if we look at -- let me show you here.  We know what the
5  maximum speed of the vehicle can do.
6      Q.   What is that?
7      A.   That's 93.95 miles per hour governed
8  speed.  So anything that we can calculate that's higher
9  would be irrelevant anyway.  So if you continue these
10  down, you'll see that none of that would matter.
11          So at 3,000 RPMs, in fact, max speed in
12  13th gear occurs at about -- between 2,100 and -- let me
13  turn this right here -- between 2,000 and 2,100 RPMS.  So
14  4,000 RPMs doesn't give you any more speed.
15      Q.   Let me back up and get more basic.  What
16  was the reason for attempting to determine the max speed
17  of the vehicle in different gears?
18      A.   Every time I do a download, this is the
19  process.
20      Q.   For what purpose?
21      A.   Just so I know the behavior of the
22  transmission.
23      Q.   Did this lead to any of your conclusions?
24      A.   Not at all.  It's just a step I naturally
25  do.

1      Q.   So the work that you did, at least
2  reflected in this work, is not pertinent to the opinions
3  you've formed in this case?
4      A.   That's correct.
5      Q.   It is your opinion that this vehicle was
6  capable of being driven on the day of this accident at
7  93.95 miles per hour?
8      A.   It can achieve that, yes, if the
9  conditions are correct.
10      Q.   Is there anything about the conditions
11  that were incorrect for allowing it to achieve 93.95
12  miles per hour at the time of this accident?
13      A.   May not be able to do it on a flat road.
14  It may be able to do it on a downward incline road.  Load
15  is the issue in the vehicle.
16      Q.   Do you know what the load was in this
17  vehicle?
18      A.   I do not.
19      Q.   Have you made any attempt to determine it?
20      A.   No.  It's not really important for my
21  analysis.
22      Q.   Okay.  So at this point, you don't know
23  whether it actually could do 93.95 at the time of the
24  accident.  It may have been able to.  Is that right?
25      A.   That's correct.

1      Q.    And if you wanted to determine whether
2  load would impede its ability to do 93.95, you would have
3  to do additional work which you have not done yet?
4      A.    And I'm not going to do, that's correct.
5      Q.    Have you done all the work that you've
6  been asked to do?
7      A.    And more, yes.
8      Q.    So you've done more work than you've been
9  asked to do?
10     A.    Certainly.
11     Q.    What were you asked to do?
12     A.    I was asked to initially document the
13  scene and the vehicles, and that was it.  And we
14  responded within about 16 hours of -- 16 to 18 hours of
15  the incident.  I was actually at the scene by eight
16  o'clock in the morning the next day documenting the
17  scene.  The Chevrolet was actually still on scene but was
18  pulled off to the side when we arrived.  And a tow truck
19  was strapping it in to take it off and take it to the tow
20  yard.  That was the initial thing I was asked to do.
21          And so we went through and we documented
22  that information.  Much later on we were asked to -- of
23  course, we were asked to download the vehicle.
24     Q.    The vehicle in this case being the
25  tractor?

1      A.    That's correct.  And then as a part of the
2  process, we inspect -- we also went through and looked at
3  the braking system that we could, because part of it is
4  destroyed, and you can't measure what's destroyed.  That
5  wasn't a specific request but that's something I normally
6  do.
7          And we obtained -- we noticed that there
8  was a Garmin GPS in the vehicle.  We called the client --
9  it was Amanda Good at that time -- and requested
10  permission to keep that Garmin so that we could later
11  download it if necessary to determine if there was any
12  GPS data which obviously we have.
13     Q.    Which obviously what?
14     A.    We have now.
15     Q.    Thank you.  So you were giving us a
16  chronology of your activities as it related to the scope
17  of your assignment?
18     A.    Yes.
19     Q.    Could you continue, please.
20     A.    Later on the case was transferred to Lloyd
21  Smith at Murane & Bostwick.  And Lloyd asked us to do
22  some analysis.  But also we were asked to do some
23  additional tasks.  One was the observation of inspections
24  of the freightliner that were conducted by various other
25  individuals, removal of the right front steer tire as

1  well as the left front steer tire so that those could be
2  put into evidence and analyzed by other folks.
3          Additional download of the ECM unit for
4  the freightliner, and that included removal of the three
5  components.  Actually I think only two components were
6  removed so that they could be bench downloaded, if I
7  recall right.  Mat did those.  And then the analysis to
8  determine, if I could, what my opinion was as to how this
9  event occurred, and so that's what precipitated the
10  report.
11     Q.    I noticed within your report, Exhibit 258,
12  that there were several pages that addressed the two vans
13  that were part of this crash.
14     A.    Yes.
15     Q.    It looked like at one point you were
16  looking at an issue related to nondeployment of the Dodge
17  front airbags.
18     A.    Yes.
19     Q.    Have you formed any opinions regarding the
20  reason or reasons that those bags did not deploy in this
21  case?
22     A.    I can tell you reasons that are not
23  associated, but I can't tell you reasons why they didn't.
24  Does that make sense?
25     Q.    If you can tell me what those reasons are,

1  it might make more sense.
2      A.    Certainly.  The airbag control module in
3  the Dodge has capacitors, and those capacitors --
4  actually, it's the roll sensor, but the capacitors store
5  energy --
6      Q.    I'm sorry.  Did you say roll?
7      A.    Roll sensor, yeah.  The capacitors store
8  energy.  And the purpose of those capacitors to store
9  energy is that in the loss of energy, there's still
10  enough to be able to send a command and deploy the
11  airbags.
12          In this particular case, signals --
13  command signals were actually generated from the control
14  module to fire these airbags.  That included the knee
15  bolsters, the fronts, but they did not deploy.
16          Even with power interruption during the
17  impact, there should have been energy from these
18  capacitors to deploy those airbags.  I can see that this
19  vehicle has been modified and modification of that
20  vehicle and putting additional components inside for the
21  handicap accessibility and operation of that vehicle
22  could potentially have disrupted some of that
23  communication.
24          And if that's the case, then you have an
25  issue with those airbags that are going off that are an

1  issue by those individuals that had done those
2  modifications.
3          The other potential is that this vehicle
4  could potentially also have been -- had a problem from
5  the factory, meaning that as it leaves Chrysler's plant,
6  there's an issue with the communication between the ACM
7  and the ability to deploy these airbags.  But we don't
8  have that information, and that's really beyond the scope
9  of what I'm here to do, because I'm not here to look at
10  that particular reason.
11         But that is a reason that I think is
12  important to look at.  And the deployment of the
13  airbags could have been very important for the front seat
14  occupants of the vehicle.
15      Q.    Whether, in fact, they were important
16  would require a biomechanical analysis; is that true?
17      A.    Well, yes and no.  It's going to require
18  additional analysis to determine why they didn't deploy.
19  And then obviously kinematic analysis, which is an
20  engineering analysis, to determine how the motion is
21  going to be affected during the deployment of the event.
22         Biomechanically or biomedically, you can
23  look at the attenuation that's provided from the airbag
24  system.  And you're going to have to look specifically at
25  the driver and the passenger because they have two

1  different experiences in this impact.  The outcome may be
2  very different for both of them.
3      Q.    When you say "kinematic analysis" in this
4  context, you're talking about an analysis of the
5  occupants' kinematics; is that right?
6      A.    That's correct.  Kinematics means the
7  geometry direction.  It just means the direction in which
8  that motion is occurring.  It has nothing to do with the
9  forces that are applied.  It's really a Newton's first
10  law application of inertia.
11      Q.    In terms of whether a nondeployment of the
12  airbags had any relationship to any of the injuries
13  sustained by either of the front seat occupants, that
14  issue -- the injury mechanism, injury causation, injury
15  potentiation is not within your fields of expertise; is
16  that right?
17      A.    I do not opine to those areas, that's
18  correct.
19      Q.    Were you present when the right front
20  wheel and tire -- steer axle, right front steer axle of
21  the tire was taken off of the tractor?
22      A.    No.
23      Q.    You testified, if I wrote it down
24  correctly, that that was something that was done later?
25      A.    That's correct.

1      Q.    Was that after Lloyd came in?
2      A.    I don't recall at this point.
3      Q.    You have video of that demount?
4      A.    That's correct.
5      Q.    Where was that demount done?
6      A.    I don't recall at this point.
7      Q.    Do you know if it was at an Elway
8  dealership?
9      A.    I don't recall.
10      Q.    Did OEC have possession of the right front
11  wheel and tire at some point?
12      A.    I don't think so.  I think the tire was
13  removed and was shipped, but I don't recall,
14  specifically.  I don't recall ever having possession of
15  it.  I would have known, but I think it was removed and
16  shipped.  And I think we scheduled for that shipping, but
17  I do so many different cases like this that I can't
18  recall which one was which, so --
19      Q.    But when you say shipped, you mean shipped
20  from the facility that removed that wheel and tire?
21      A.    Yes.  And I believe it was shipped to
22  someone to look at, but I --
23      Q.    Do you know if that someone was Bill
24  Woehrle?
25      A.    I don't know whether it was Bill Woehrle

1  or whether it was Bridgestone or who it was.
2      Q.    While we're on that topic of Woehrle, do
3  you know Bill Woehrle?
4      A.    Generally.
5      Q.    Have you ever worked with him on a matter
6  that you've investigated?
7      A.    I've been on both sides working with Bill.
8      Q.    Do you recognize him as a person having
9  expertise in tire design and manufacture?
10      A.    Yes.
11      Q.    Do you recognize him as somebody that has
12  expertise in tire failure mode analysis?
13      A.    Yes.
14      Q.    Are you offering any opinions as to what
15  caused this tire to fail?
16      A.    I am not.
17      Q.    Are you offering any opinions in this case
18  with respect to the design or manufacture of this tire?
19      A.    No.
20      Q.    Or of the materials used in the
21  manufacture of the tire?
22      A.    No.
23      Q.    Other than how this tire performed on this
24  vehicle, are you offering any opinions related to the
25  subject tire?

Page 53

1    A.    Only those contained within my report,
2 that's it.
3        Q.    Fair enough.  We've talked about your
4 familiarity, a little bit at least, with Dr. Gillespie
5 and with Mr. Woehrle.
6    A.    Uh-huh.
7        Q.    You have -- in the past you've actually
8 been a co-worker with John Scott?
9    A.    Well, actually, he worked for me.  I was
10 his supervisor for a while.
11       Q.    At Alcorn?
12   A.    Yes.
13       Q.    And you've also had occasion since that
14 time at Alcorn to be in cases in which John has also been
15 involved, correct?
16   A.    Sorry.  I don't understand your question.
17       Q.    John at some point left Alcorn, correct?
18   A.    Yeah.  So did I.
19       Q.    And since those days at Alcorn, the two of
20 you, on occasion, have worked on the same matter?
21   A.    We have, both on the same side and on
22 opposite sides.
23       Q.    Okay.  Have you ever done any work in a
24 matter with Lew Grill?
25   A.    I've only seen Lew on the opposite side.

Page 54

1        Q.    And you're familiar, then, with him, at
2 least to some extent, from litigation matters in which
3 you've been involved?
4    A.    Yes.
5        Q.    Do you have any relationship with
6 Mr. Grill other than through your work on litigation
7 matters?
8    A.    None.
9        Q.    Have you ever come across Pete Philbrick?
10   A.    Yes.
11       Q.    In connection with litigation matters?
12   A.    Yes.
13       Q.    Anything other than litigation matters?
14   A.    No.
15       Q.    Same question regarding Joe Grant; do you
16 know Joe Grant?
17   A.    No, other than this matter.
18       Q.    Do you know Brian Queiser?
19   A.    No, other than this matter.
20       Q.    Do you know Dennis Ritchie?
21   A.    I don't know.  That name is familiar, but
22 I don't know him.
23       Q.    Is it true that you are not addressing any
24 issues as to the propriety or the reasonableness of the
25 conduct of CLR Transportation?

Page 55

1    A.    Correct.
2        Q.    Is it correct you're not offering any
3 opinions as to the reasonableness or the propriety of the
4 conduct of FedEx Ground?
5    A.    Correct.
6        Q.    Is it correct that you're not offering any
7 opinions as to the propriety and reasonableness of the
8 conduct of Steven Marks?
9    A.    Correct.
10       Q.    What areas, if any, of the conduct of
11 Brian Kehler are you addressing in this case?
12   A.    My opinion is that he has no control of
13 the vehicle once the disruption of the steering
14 mechanisms occurs and, therefore, there's nothing that he
15 can do.  That's my comment.
16       Q.    Anything else that you're addressing
17 regarding the conduct of Mr. Kehler?
18   A.    Yes.
19       Q.    What else?
20   A.    Braking has not actually occurred until
21 he's in the median and the vehicle is already off the
22 roadway, the travel portion of the westbound lanes of the
23 roadway.
24       Q.    Anything else about the conduct of
25 Mr. Kehler that you're addressing?

Page 56

1    A.    No.
2        Q.    Is there physical evidence of applications
3 of the service brake by Mr. Kehler in the median?
4    A.    Yes.
5        Q.    Is there application -- is there evidence
6 of application of service brake by Mr. Kehler in the
7 eastbound lanes?
8    A.    In the eastbound lanes, yes, I believe
9 there is.
10       Q.    We were talking earlier before I
11 distracted myself about documents in Section E of your
12 binder --
13   A.    Yes.
14       Q.    -- copies of which we made Exhibits 259,
15 260, and 261.
16   A.    Yes.
17       Q.    We also talked about those in reference to
18 a flash drive which have been provided to us.  And my
19 understanding -- you tell me if this is correct -- is you
20 believe that those materials probably should be with the
21 collection that was on the flash drive that we plugged in
22 and showed you earlier; is that right?
23   A.    Yes.  And I also believe that could very
24 well have been error on the part of what we see when that
25 was put in.  I don't know -- and I apologize.  There's no

1 way for me to know that.
2    Q.    I'm not looking to attribute fault to it.
3 I'm trying to find out where materials are or were and
4 make sure that I didn't miss something that was produced.
5    A.    Sure.
6    Q.    One of the things that I noted on that
7 flash drive that I did not see in Exhibit E, and I think
8 you saw it also when you looked at my associate's screen,
9 is that there was an Excel spreadsheet that had some
10 calculations on it that related, at least in part, to
11 speed.
12    A.    GPS, correct.
13    Q.    And that also had columns which reported
14 numbers for longitudinal deceleration, correct?
15    A.    Longitudinal deceleration?
16    Q.    Yeah.
17    A.    Well, longitude and latitude are provided
18 in the speed numbers.  There could very well be, but I
19 don't have the sheet in front of me.
20    Q.    Let me put it this way, you told me -- you
21 testified earlier that if you used a speed at the
22 initiation -- so we're clear -- in fact, let's clear that
23 up now and make sure we stay on that so we can use the
24 same terminology.
25          When you talk about a distance of 597

1 feet, we're talking about two final rests from a point,
2 correct?
3    A.    Correct.
4    Q.    And the point that you're using for that
5 measurement is the first documented physical evidence in
6 the westbound lanes?
7    A.    That's correct.
8    Q.    And that physical evidence is a tire mark;
9 is that correct?
10    A.    That's correct.
11    Q.    And that mark was identified by the
12 Wyoming Highway Patrol on the day of the accident,
13 correct?
14    A.    Yes.
15    Q.    And, in fact, it was marked with orange
16 paint?
17    A.    That's correct.
18    Q.    And when you went out the next morning,
19 you found that same mark, correct?
20    A.    Yes.
21    Q.    And you photographed -- you took lots of
22 photographs of it?
23    A.    I did.
24    Q.    Did you find that when you were out there
25 that orange paint was still there?

1    A.    Yes.
2    Q.    Did you look to see whether that tire mark
3 extended farther to the east --
4    A.    Yes.
5    Q.    -- than where the Wyoming Highway Patrol
6 painted it?
7    A.    Yes.
8    Q.    And did you find any evidence that it did?
9    A.    No.
10    Q.    You would agree that tire marks over
11 time -- when I say "over time," I'm including within the
12 roughly 16 hours between the time of the crash and the
13 time you were out there -- do have a tendency to
14 dissipate somewhat, correct?
15    A.    In 16 hours, highly unlikely.  If we're
16 talking 16 days, probably.
17    Q.    Do you understand that traffic passed over
18 that section where the tire mark was after the accident
19 and before you were there?
20    A.    Yes.
21    Q.    Would you agree, then, that the distance
22 from the first documented tire mark identified by the
23 Wyoming Highway Patrol to point of rest was at least the
24 farthest east mark left by a tire from this vehicle?
25    A.    Yes.

1    Q.    It may have been farther east, but you
2 don't find any physical evidence of that, correct?
3    A.    Yes, that's correct.
4    Q.    Is it fair to call that the first
5 documented physical evidence?
6    A.    Certainly.
7    Q.    That's an appropriate way to refer to it
8 in talking about accident reconstruction?
9    A.    Certainly.
10    Q.    So if we talk about the first mark and if
11 we try to use that as shorthand, can we agree we're
12 referring to that point, 587 feet, for final rest and as
13 the mark identified by you and the Wyoming Highway Patrol
14 as the first physical evidence in the westbound lane at
15 this crash?
16    A.    Yes.
17    Q.    Thank you.  So if we look, then, at that
18 first mark, what produced that first mark?
19    A.    The left front tire, right front tire, and
20 the rim on the left front tire.
21    Q.    Do you find a rim mark at the beginning of
22 that mark?
23    A.    Yes.
24    Q.    Do you have a photograph that you can show
25 me that shows that rim mark?

1    A.    Yes.

2    Q.    You're handing me a collection of

3 photographs, at least some of which have a Hirst

4 Applegate, HA, Bates number, correct?

5    A.    Yes.  The one specifically is on the top.

6 And if you'd like, I can take that one off, if you would

7 like.

8    Q.    Certainly.  And if you wouldn't mind, if

9 we could -- you can take that off and circle for me the

10 rim gouge or the rim mark --

11    A.    Yes.

12    Q.    -- and we can mark it.

13    A.    Could we make copies of these so mine are

14 not -- because these are my originals that I have.

15    Q.    Sure.  Let's do so.

16         MR. KAPP:  Off the record.

17         (Recess from 10:29 a.m. to 10:44 a.m.)

18    Q.    (By Mr. Brosseau)  You gave us copies of

19 some of your file material.  I think -- are these all

20 prints of photographs?

21    A.    They are.  Do you want me to read those

22 for the record?

23    Q.    Actually, let's take them -- they're in a

24 group for a reason; is that right?

25    A.    Just because they're scene photos.

1    Q.    Okay.  Let's go ahead and -- we might as

2 well mark them as a group.

3    A.    Okay.  If you would like, once we have

4 them marked as a group, we can go A, B, C, D or whatever.

5    Q.    Absolutely.  Sounds great.  You've done

6 this before.

7    A.    Not my first rodeo.

8         (Exhibit 263 marked.)

9    Q.    Exhibit 263 is a set of prints matching

10 the prints that you brought with us and handed to me just

11 before we took the break.

12    A.    That's correct.

13    Q.    And they are all scene photos?

14    A.    Yes.

15    Q.    Are they all scene photos taken by OEC?

16    A.    No.  These are all -- most of these should

17 be scene photos taken by Wyoming Highway Patrol.

18    Q.    Okay.  You pointed me, at the beginning,

19 to a print that you said would show a rim gouge from the

20 left steer axle tire, correct?

21    A.    That's right.

22    Q.    Are we looking at that photo now?

23    A.    Yes.

24    Q.    Could you please circle or indicate in

25 some fashion the rim gouge that you're referring to?

1    A.    (Deponent complied.)

2    Q.    Okay.  And you've drawn two ovals in kind

3 of dashed fashion on roughly the center of the first

4 page, 263?

5    A.    That's correct.

6    Q.    Does that represent both the outboard and

7 inboard wheel flange?

8    A.    Yes.

9    Q.    What lane are we looking at that has those

10 two circles?

11    A.    This is the outside or right westbound

12 traffic lane of I-80.

13    Q.    Sometimes also called Number 2?

14    A.    I don't number them that way.  That's very

15 confusing.

16    Q.    Okay.  And that foreground where you've

17 drawn the circles, is the right lane the lane towards the

18 top where the yellow fog line is the left lane?

19    A.    Inside lane, yes.

20    Q.    Do those rim gouges continue along the

21 path of that tire?

22    A.    Yes.  They are intermittent.  As the tire

23 builds up mass underneath the rim -- with the rim off,

24 and then every once in a while you will see rim gouges

25 irregularly, but they will be positioned along that

1 distance.

2    Q.    How do you know that that's the rim rather

3 than the tire sidewall?

4    A.    That's the gouge, so the tire sidewall is

5 not going to gouge the roadway.

6    Q.    And what causes the intermittency of the

7 gouging from the left steer axle wheel?

8    A.    I believe I just described that.  It's the

9 mass of the tire.  The tire is not moving in conjunction

10 with the wheel.  So the intermittency is that oftentimes,

11 what's happening is the rim is rolling up onto the tire

12 or a portion of the tire and lifted off of the roadway

13 surface.  It could be for a distance and then drops back

14 down.

15    Q.    Is the tire -- is this the very first

16 evidence -- the first point we've talked about, the first

17 mark?

18    A.    Yes.

19    Q.    Okay.  And by this, we're talking about

20 what you've just circled -- the two circles you've placed

21 on Exhibit 263?

22    A.    Yes, and that is marked as HA 000865.

23    Q.    Is the tire deflated by that time?

24    A.    That's the nature of the rim gouges, yes,

25 so it is debeaded and deflated.

1    Q.    And, in fact, in your opinion, it must be
2 deflated given the path and orientation of this tractor
3 in order to produce those rim marks if those do come from
4 the left steer axle?
5    A.    That's correct.
6    Q.    Did this tire experience a tread
7 separation during the course of this accident?
8    A.    Yes.
9    Q.    Did it occur before or after the
10 deflation?
11    A.    I don't know.  I would -- I don't see any
12 evidence of any kind of rubber marks that are typical of
13 a still inflated yet tread separated tire which usually
14 leaves marks on the roadway in rubber -- dark rubber
15 marks that are leading up to the point where complete
16 separation of the tread from the carcass occurs.  I don't
17 see that, so my opinion from looking at that, it's
18 unlikely, but it could have occurred for a very short
19 distance, a very short period of time just before
20 deflation.
21    Q.    I caught most of your answer, I think, but
22 what I'm missing is, do you have an opinion as to whether
23 a tread separation preceded the deflation?
24    A.    I don't know.  That's what I was
25 indicating.

1    Q.    Do you see any evidence on the surface of
2 the westbound lanes of a tread separation initiating or
3 occurring?
4    A.    Potentially, yes.
5    Q.    Is there anything you can point to and say
6 to a probability that is such evidence?
7    A.    Probably not.
8    Q.    Probably not?
9    A.    Yeah, probably not.  We can clearly
10 see -- do you want me to explain?
11    Q.    Please.
12    A.    Okay.  We can clearly see that deflation
13 of the tire and disruption of the tire's integrity occurs
14 at this point.  I mean, we can see that occurring because
15 where the gouges are is also the initiation of our tire
16 marks.  And the tire marks are very irregular on the left
17 front, meaning that the edges are leaving marks at
18 irregular intervals but are also due to the imbalanced
19 caster moving back and forth because the tire's both
20 steer axle tires are seeking equilibrium throughout this
21 event.
22    Q.    Would you agree that the appearance, the
23 characteristics as photographed and as you saw them at
24 the scene, of the left steer axle tire are different from
25 the appearance of the right steer axle tire?

1    A.    Yes.
2    Q.    The left steer axle tire exhibits
3 characteristics of -- among other things -- a deflated
4 tire, correct?
5    A.    Yes.
6    Q.    There is no such appearance to the right
7 steer axle tire, correct?
8    A.    Correct.
9    Q.    And also to simplify this so we don't
10 lapse into something that we later find not
11 understandable, if we talk about steer axle, there's also
12 front tires.  Are you okay with that for now, or would
13 you prefer to stay with steer axle?
14    A.    I prefer to stay with steer axle because
15 that way we have definition of axles.
16    Q.    Then we'll stay with steer axle.  You do
17 characterize both steer axle tire marks, at least while
18 the vehicle is in the westbound lanes, as scallop marks,
19 correct?
20    A.    Yes.
21    Q.    I didn't see any place that you describe
22 the tire mark from the left steer axle as being evidence
23 of deflation except to the extent that you do comment
24 that you see rim marks.  Is that fair?
25    A.    Yes.  I don't use those words,

1 specifically.  I think it's understood.
2    Q.    In other words, if you say that a
3 tire -- if you say that a wheel is leaving rim marks, at
4 least under these circumstances, implicit in that is that
5 the tire is deflated?
6    A.    Yeah.  I think that's a fair observation.
7    Q.    Do you have an opinion as to how quickly
8 this tire deflated?
9    A.    I don't, other than quick.
10    Q.    What does "quick" mean?
11    A.    Fast.
12    Q.    Can you quantify it?
13    A.    No, probably not.  I could say that it
14 would be certainly something that would occur quicker
15 than the ability of the human perception to put a time
16 on.
17    Q.    Is there an accepted time definition
18 within your field for the term "blowout"?
19    A.    None that I'm aware of.
20    Q.    You testified that there may be some
21 evidence of a tread separation occurring while the
22 vehicle is still in the westbound lanes, although you
23 were hesitant to opine to a probability that there is
24 such evidence?
25    A.    That's not correct.  That's not the

1 question that was asked. The question you asked me was,
2 At these marks, is there evidence of tread separation?
3 That's a different question.
4    Q.    I agree it's a different question. I
5 thought I asked the other, but let me ask it to make sure
6 the record is clear.
7        Is there any evidence that you can point
8 to, that you can describe to a probability as a tread
9 separation occurring while the vehicle is in the
10 westbound lanes?
11    A.    In the westbound lanes?
12    Q.    Yes.
13    A.    Yes.
14    Q.    What is that evidence?
15    A.    There's several pieces of evidence,
16 actually. One is, in my opinion, the tread separation
17 produces an impact into the steering shaft and the U
18 joint which is part of that whole steering knuckle at the
19 top that is creating a fracture. And that fracture is
20 producing a failure at the spline for the steering input
21 shaft that goes from the base of that U joint into the
22 top of the steering gear box. That's producing the loss
23 of stable caster.
24        The second element that we see is we
25 actually can see that a piece of the fender -- or pardon

1 me -- a piece of the tire had separated that was long
2 enough in its total length that it was able to strike and
3 remove and leave rubber transfer marks on the left front
4 bumper wraparound that is at the leading edge of the left
5 front fender for that vehicle.
6        We can actually see the unit number
7 painted on that piece of the fender and a piece of the
8 tire that is setting right adjacent to that fender which
9 is slightly downstream from the area where the initiation
10 of the marks are but before the vehicle crosses over into
11 the median.
12    Q.    Anything else?
13    A.    I think that's the evidence, in my
14 opinion, that supports that.
15    Q.    I want to go back to this issue about the
16 tire marks being made by the left steer axle tire while
17 the vehicle is in the westbound lanes.
18    A.    Uh-huh.
19    Q.    You've described those as scallop marks?
20    A.    Yes.
21    Q.    You've described them also as being
22 characteristic of a deflated tire?
23    A.    Yes.
24    Q.    And you've described that wheel as making
25 rim marks on the pavement?

1    A.    That's correct.
2    Q.    And you have attributed the pattern of the
3 scalloping, as I understand it, to an imbalance in the
4 caster?
5    A.    That's correct.
6    Q.    Is there anything that you see in the tire
7 mark or marks made by the left steer axle while this
8 vehicle is in the westbound lanes that you see as
9 characteristic of a tread which is separating from a
10 tire?
11    A.    I don't have an opinion on that.
12    Q.    What is wheel hop?
13    A.    It's a layman's term for when you have
14 imbalanced mass transfer between wheels. It can either
15 be side to side or front to back.
16    Q.    Is there a vehicle dynamics terminology?
17    A.    I think that some people use that. Wheel
18 hop is typically where the weight is being transferred.
19 I think there's another term for that vehicle
20 dynamics will use, but wheel hop may be that term.
21    Q.    You're talking tramp?
22    A.    Tramping, yes.
23    Q.    There's -- wheel hop is different from
24 tramp, correct?
25    A.    They're similar, but tramping usually is

1 side to side. Wheel hop is usually weight transfer
2 that's from front to back, but I think that's -- or it's
3 vice versa.
4    Q.    Let me see if you will accept this.
5    A.    Okay.
6    Q.    Is wheel hop the vertical motion of a
7 wheel?
8    A.    Yes.
9    Q.    Is tramp the out-of-phase hop between the
10 two tires on the same axle?
11    A.    Yes, that's correct.
12    Q.    Are you prepared to accept those for the
13 purposes of this deposition?
14    A.    I am.
15    Q.    Okay. Is there any evidence that you see
16 of left steer axle hop?
17    A.    No.
18    Q.    Do you see any evidence of right steer
19 axle hop?
20    A.    I don't.
21    Q.    Do you see any evidence of tramp?
22    A.    No.
23    Q.    What would you see if there were tramp?
24    A.    If you had tramping, you would have the
25 frequency at which the right wheel and the left wheel are

1  moving would be different.  And these are moving in sync.
2  When you place this on, you can actually see where it's
3  in sync.  And I understand that Mr. Scott believes
4  differently, but I think he's wrong.  I think he's
5  misread the evidence.
6       Q.    Are you aware of -- let me preface this
7  and put it in context.  Your report cited four
8  references?
9       A.    Yes.
10      Q.    Are there any other publications, tests,
11 or studies that you intend to refer to in connection with
12 your work in this case?
13      A.    Probably.
14      Q.    What?
15      A.    It depends.  I have an additional one that
16 I put into my file in preparing for this deposition that
17 deals with brake actuation lag time and rise and all that
18 which deals with braking and how the air system in a
19 truck functions and how the compression of the treadle
20 valve is not commensurate with the application of brakes
21 like we have in a hydraulic system and the air system
22 requires buildup and rise and there's a lag time between
23 those which extends what we call the perception/response
24 time because that's added into it.
25      Q.    Your report didn't mention anything about

1  perception or reaction time, correct?
2       A.    It doesn't because that's in response to
3  some of the issues that were provided in the supplemental
4  report that Mr. Scott -- that I received on Friday.
5       Q.    Do you intend to address
6  perception/reaction time in this case?
7       A.    I do.
8       Q.    Have you cited any literature related to
9  perception or reaction time or have you produced any
10 today?
11      A.    I haven't, but I can give some literature
12 right here, if you'd like.
13      Q.    Sure.  Give me a list.
14      A.    Typically, what we function on with
15 perception/response time in the most typically reported
16 perception/response time is the Johansen studies that are
17 cited within the AASHTO manuals for design, and we have
18 both mean or the average driver response time as well as
19 what we call 85th percentile.  For design, they function
20 on 85th percentile.
21      For the purposes of accident analysis, we
22 typically function on the average or mean.  For a simple
23 event for an unexpected simple occurrence, where a driver
24 must decide what they are going to do, that time is
25 usually between about a second and a half to two and a

1  half seconds.  We usually default on the lower side of
2  that for most collision events.  But as things become
3  more complicated, that time increases.
4       For a truck -- for instance, this
5  particular freightliner, as you're driving, you have --
6  if you decide you're going to brake, you not only have
7  the time period to decide that braking is your most
8  likely opportunity or what you need to do, but the
9  application of the treadle valve, which is an air valve
10 that floods the chambers that allows for the setting of
11 your brakes, when you apply that brake system, air
12 pressure has to build up in those chambers to be able to
13 push that push rod to be able to turn the torsion bar.
14 This goes in to turn the S cams to push the shoes onto
15 the outside of that drum.
16      That process -- the actual lag time
17 between pressing and the beginning of that air rise is
18 typically between one-tenth and two-tenths of a second.
19 Pressure will rise up to about 60 to 70 PSI, and the time
20 frame of about three-tenths to maybe as much as
21 five-tenths of a second.
22      So you have a time period of about a half
23 a second is what you're looking at between the time I
24 apply the brake and actual brake application occurs.  So
25 that is -- that extends the reaction time, if you will,

1  because it's part of that.  And so a typical truck driver
2  will add in his reaction about a half second to the time
3  periods that we see in the Johansen study where they are
4  looking at drivers responding with either steering input,
5  et cetera, and that's the actual initiation of the
6  input.
7       Q.    When did Mr. Kehler apply a service brake
8  in this accident?
9       A.    That occurred, according to the ECM data,
10 about 2.2 seconds before the impact with the Chevrolet
11 Venture which is the Chevrolet Venture -- is that king
12 event that we see that is producing a change basically
13 for the ECM.  We don't have any of the speeds, but it's
14 triggered.  Part of that is triggered by a fault code,
15 and I believe that that fault code was an issue with
16 fluids which would have occurred when the Chevrolet
17 Venture and that left front steer axle wheel strikes the
18 Chevrolet Venture, rips that left rear wheel off of the
19 Chevrolet Venture as it spins and goes off to its final
20 rest and also pushes that left front wheel of the
21 freightliner back or rearward.  And now we're going to
22 start having those fault codes.
23      And that 2.2 seconds places, based upon
24 the diagram you see here, places the initiation of
25 braking right in the middle of the median, no braking for

1  that. And the ECM record only places braking at that
2  point. So it's kind of that moment when you're already
3  in the median, and there's nothing you can do.
4      Q.     What reliance, if any, do you place upon
5  the absence of a hard brake event being recorded?
6      A.     I think that that's due to some of the
7  anomalies we see in the ECM. I really think the ECM
8  issue -- they communicate differently because you have
9  three modules. And if you have interruption between the
10 motor control unit and then you have the CPC 2 that's in
11 this vehicle and they're not communicating, then one is
12 not writing to the other. And speeds, switches, such as
13 braking and clutch and all those are recorded by one but
14 not the other.
15         And speeds are recorded by one but not the
16 other. And when they go to write that permanent record,
17 if there's an interruption in that communication, you
18 lose that piece of the information. And I think that's
19 what's occurred here, is that because of that occurring,
20 we didn't have enough time to write in all those speeds
21 which is the last thing that is done in recording that
22 record.
23     Q.     When you say "interruption," you're
24 talking about power interruption?
25     A.     Yeah, power interruption and communication

1  interruption.
2      Q.     And so the fact that there's not a hard
3  brake event recorded doesn't mean there wasn't a hard
4  brake event as defined?
5      A.     That's correct, exactly.
6      Q.     And a hard brake event, as defined, would
7  be what under -- with the equipment that was on this
8  vehicle?
9      A.     I think it's 8 miles per hour per second
10 is the rate at which braking should occur to trigger a
11 hard braking event.
12     Q.     And is there a minimum speed the vehicle
13 must be traveling in order to trigger that?
14     A.     Not for this vehicle here. But,
15 obviously, you're going to have to be traveling greater
16 than 8 miles per hour because you have to be able to
17 decelerate 8 miles per hour per second. This is a 1
18 hertz system for the speed, and so it's recording --
19     Q.     One hertz?
20     A.     One hertz, yeah. So that's one of the
21 things you have to deal with.
22     Q.     So if this were a deceleration from 75 to
23 67 in a second or less or from 10 to 2 in a second or
24 less, it should trigger a hard brake event and record it
25 if it weren't for a power interruption?

1      A.     If it weren't for a power interruption.
2      Q.     Is it correct, given the decelerations you
3  see here, at some point during this accident sequence,
4  there should have been a recorded hard brake event but
5  for the power interruption?
6      A.     That's correct. And that should have
7  occurred either in the median or at impact with the Chevy
8  Venture.
9      Q.     And that's -- when you say that that's
10 where it should have occurred, is it because of what you
11 told us before about the perception/reaction coupled with
12 the delay and the application of the brakes or something
13 else?
14     A.     Something else, but that is true.
15     Q.     Okay. What is the something else?
16     A.     The something else is that we actually can
17 see -- which is a different system -- that the brake
18 actuator is actually being applied 2.2 seconds before the
19 impact with the Chevy Venture. And so if that was
20 sufficient braking and sufficient deceleration of that
21 vehicle, that should have triggered a hard brake event.
22         If the braking isn't sufficient to slow
23 the vehicle down enough, then it will not trigger a hard
24 braking event. That could also be a reason because we
25 don't have the ability to slow that vehicle down.

1      Q.     Do you have an opinion what you're stating
2  to a probability as to what the driver's perception and
3  reaction time was in this accident?
4      A.     I would say that it's reasonable to assume
5  that somewhere between -- and taking into account brake
6  lag, that if he's reacting really fast, that it's
7  somewhere between a second and a half to two seconds.
8      Q.     When you say taking into account, I want
9  to break this into -- I think you have three components,
10 perception time, reaction time, and then effectiveness of
11 the braking system given the brake system of this
12 vehicle; is that right?
13     A.     Theoretically, yes.
14     Q.     How about practically? Are you saying all
15 three components are at work here?
16     A.     Yes.
17     Q.     So what are you adding when you say
18 theoretically?
19     A.     Theoretically, perception of reaction
20 cannot be necessarily broken into two pieces. They are
21 occurring simultaneously. There was a study that was
22 done in 2009, I believe, where a gentleman -- part of his
23 graduate work tried to make these algorithms for
24 separating perception and then reaction. And what he
25 actually found is that you can't because my perception

and my reaction may be different than your perception and your reaction. But the cumulation of those two for me and you may be very similar. But it's just our ability to do each of those are different and characteristic for each individual.

So, typically, what we do is perception and reaction are combined as one element.

**Q. And in this case, you believe a fair number for perception and reaction, leaving aside the brake effectiveness component would be?**

A. A second to a second and a half. And that's assuming he's on the ball and being somewhat reactive normally.

**Q. Are there any other studies or authors or papers within the human factors field applying -- I'm sorry -- applied to drivers and looking at perception/reaction that you are comfortable citing? You gave us one.**

A. Yes.

**Q. Any others?**

A. Highway safety manual, which is also part of the AASHTO, deals with the same thing when you're looking at human factors as it relates to driver reaction. My master's is in traffic and highway safety. I have a lot of human factors analysis and study, so I'm

very familiar with a lot of these studies.

And then Dr. Paul Olson did a number of studies. He came up with a specific number which I think from an average is probably all right. I think his number was 1.67 seconds or basically 1.7 seconds.

That's a best fit, but not everybody is going to react at that best fit. So, typically, from an engineering standpoint, because we are animals bound by boundary values, we like to give you a range.

And in my opinion, this is the most prudent and often quoted range for perceptual response time.

**Q. So you do have expertise, you've said, in the human factors field?**

A. Yes.

**Q. So you're familiar with Paul Olson's work?**

A. Yes.

**Q. Robert Delage?**

A. Yes.

**Q. Jeff Muttart?**

A. Muttart was actually the one I was discussing about the algorithms.

**Q. Out of A&M?**

A. I think he's out of A&M, yeah.

**Q. And you're aware that all three of those**

**authors I mentioned say it's inappropriate to attempt to apply rules of thumb or average numbers for human perception/reaction time to an analysis of any individual accident?**

A. That's right. That's why you have to range it. And that's my point. I think Olson, when he came out with his initial paper -- I think he was with Michigan. I'm not sure -- his original paper came out with a 1.67. Of course, that was glommed onto and grabbed onto by the institutes like IPTM and Northwestern. So that became -- everybody reacts within 1.67. You will see that a lot with police officers because that's what they're taught.

I think after he did that, he bit his tongue and wished he had never said that because that is a reasonable medium that some people will be a little quicker and some people will be a little slower; and so you need to establish that range.

I think Muttart's whole concept was to provide that range as much as he could from looking at the power curve analysis of what he had in his data. And he tried to separate out perception and response and realized you can't separate those, really. They are intrinsically related and very individual. And so these are your ranges.

Certain things he did go through which I find interesting is he went through in his algorithms and looked at different kinds of events, different kinds of choices of what you can do, and how in those algorithms that may give you a range that's a little bit different than someone who has different situations, different elements to react.

**Q. And also all of those authors, you would agree, are of the school that it is necessary in order to evaluate perception/reaction time for any event to look at least at two major components being the individual and the task. Would you agree?**

A. I don't know if they specifically say that, but I will tell you that that is my opinion --

**Q. Okay.**

A. -- that the individual and the task are the elements that establish what that is. That's why I look at Johansen's study because Johansen's study looks at a bit system.

**Q. Let's talk about the reaction -- perception and reaction time --**

A. Certainly.

**Q. -- as it relates to task.**

A. Uh-huh.

**Q. When you offer your number of a second,**

1  second and a half, something like that, what types of
2  tasks are you including within that?
3       A.   In my opinion, the tasks that would be
4  associated with this are -- first of all -- and I have to
5  relate it specifically to this incident.
6       Q.   Please do.
7       A.   We have the failure of the tire.  And as
8  Mr. Kehler describes the boom, bang, bang, and as
9  Mr. Marks describes the bang, bang, bang, that is
10 occurring.  So we have, first of all, the initiation of
11 the event, what is occurring.  And then once he
12 experiences that, he has to decide what his reaction is
13 to do.
14            And Mr. Kehler said, I turned right, but
15 the vehicle continued to go left.  And as hard as I
16 turned right, it would not turn right and it continued to
17 turn left.  So now what is the next option I have to do?
18            So now he has a couple of different
19 conditions that he's looking at to decide what he's going
20 to actually execute in the process.  And then that would
21 lead to the reaction once he's entering the median of
22 braking.
23            And so I think the time period there might
24 be a little bit more to the second, to the second and a
25 half, but I think when you look at brake lag time and

1  pressure build up, it actually fits the timing for this
2  vehicle's event at 78.4 to 75 miles per hour.
3       Q.   When you say that you think that will be a
4  little bit longer, what will be a little bit longer?
5       A.   The perception -- the decision -- the
6  response, I guess, the decision -- I like how the highway
7  safety manual goes about the process.  You have
8  detection, identification, decision, and response, DIDR.
9            So detection is, boom -- or in the case of
10 Mr. Marks, bang, bang, bang.  That's detection.
11            Identification, I have a wheel blowout.
12 Then decision, what is occurring, what do I need to do,
13 and then response, to take my appropriate action or the
14 action I decide to do according to that information that
15 I've just processed.
16       Q.   How long -- what was the
17 perception/reaction time to the point where Mr. Marks
18 attempted steer input?
19       A.   That I can't tell you.
20       Q.   Why?
21       A.   Because there's no evidence of any
22 steering input.
23       Q.   There's testimony that he put it in steer.
24       A.   I understand that, but there's no evidence
25 on the roadway of any steering input, not by the driver.

1       Q.   What causes the first movement of the
2  vehicle in a counterclockwise direction?
3       A.   That's due to the fact that we have loss
4  of integrity of the tire which is creating drag, and that
5  drag at the left front creates left steer.  So you blow
6  your left front tire.  It creates a left steer.  You blow
7  your right front tire, it creates a right steer, because
8  of the imbalance drag on those steer axle tires.
9       Q.   When does the fracture steering knuckle
10 spline occur?
11       A.   Somewhere between the point of the
12 initiation of where our marks are on the roadway and
13 where we see the tire marks starting to curve towards the
14 left.
15       Q.   Where do the tire marks start to curve to
16 the left, as you've described?
17       A.   Let me show you in my diagram and in my
18 photographs here.
19       Q.   Okay.
20       A.   We are looking at HA 000863 from Exhibit
21 263.
22       Q.   I'm going to modify what we're doing
23 before. I'm sorry for the interruption.  But let's just
24 go ahead and mark that second exhibit you just started
25 talking about as a separate exhibit.

1            (Exhibit 264 marked.)
2       Q.   So 264 is another print of a photo taken
3  by whom?
4       A.   This is Wyoming Highway Patrol.  They took
5  this after my investigation, after I had been to the
6  scene.  It was the next day, but after.
7       Q.   So this is November 9, 2014?
8       A.   That's correct.
9       Q.   And you were using this photograph to tell
10 us or show us what?
11       A.   We're seeing the initiation of the tire
12 marks, and there's a slight gap.  And I'm going -- can I
13 mark on this?
14       Q.   Please.
15       A.   I'm going to mark for you a gap here.
16 There's a gap that's occurring between the initial marks
17 that we see from the gouges and the initial tire mark
18 where the orange and the first incipiation, if you will,
19 of the darkest tire marks, and they start to curve off
20 towards the left.
21       Q.   And is it your opinion that by the time of
22 where that mark starts curving left, which is from the
23 top line on Exhibit 246, that at that point, the steering
24 knuckle spline has fractured?
25       A.   Yes.

1    Q.   So by that time, Mr. Marks has attempted
2  to put in left -- I'm sorry -- right steer?
3    A.   Probably not.
4    Q.   Okay.
5    A.   That's too short of a period of time.
6       MR. KLINE:  You meant Mr. Kehler?
7       MR. BROSSEAU:  Mr. Kehler.  Thank you.
8    A.   If you will, in Wyoming, the dash marks
9  you see in the roadway are approximately 10 feet.  The
10 gap is 30 feet between those dashes, which is a standard
11 skip gap but not every state is that way.
12   Q.   (By Mr. Brosseau)  But is 40 feet,
13 roughly, from the beginning of one lane divider mark to
14 the beginning of a next lane divider mark?
15   A.   Roughly.  And that usually is the case in
16 the state of Wyoming.
17   Q.   Okay.
18   A.   And if we look at the first line -- and
19 that first line I'm going to mark as A.  And the second
20 line I'm going to mark as B.  And if we look at the gap
21 where A is in that gap, it is approximately 80 percent of
22 that gap.  So if we have 30 feet, we're looking at
23 approximately 6 feet.  And then I take approximately
24 halfway through the skip which is 5 feet, that's a
25 distance of somewhere between -- that's approximately 11

1  feet there.  But that's a distance of somewhere
2  between -- we can reasonably say 10 and 15 feet.
3    Q.   From?
4    A.   From the initial marks --
5    Q.   A?
6    A.   -- that we see at A, which are the rim
7  gouges, to the point when the tire marks begin to curve
8  to the left.  If we're traveling, say -- let's use 15
9  because that's going to give us our longer period of
10 time.
11      If we're traveling at 78.4 miles per hour,
12 that gives us a time period of about one-tenth to maybe
13 1.13 seconds of time between when that tire deflates,
14 hits the road, and the vehicle begins to turn left.
15   Q.   Okay.  So 78.4 miles per hour, this
16 vehicle is traveling roughly 111 feet per second?
17   A.   That's correct.
18   Q.   And if it's traveling 15 feet, then it
19 tells us it's traveling at about, what, an eighth of a
20 second?  Is that what you calculated?
21   A.   .13.
22   Q.   Okay.  About an eighth of a second?
23   A.   I don't know what an eighth is --
24   Q.   .125 is an eighth, right?
25   A.   I don't know.  That's probably right.

1    Q.   That's fine if you don't know.
2    A.   I don't deal with the fractions.  I deal
3  with the decimals, but that's about right.
4    Q.   So did Mr. Marks steer by the point that
5  you've marked B on Exhibit 264?
6       MR. KAPP:  Mr. Kehler.
7       MR. BROSSEAU:  Mr. Kehler.  Thank you.
8    A.   No.  He could do no physical input by that
9  time.
10   Q.   (By Mr. Brosseau)  So if the marks that
11 you show as beginning at B, are those the marks from a
12 sign of a tire which is experiencing caster imbalance?
13   A.   Yes.
14   Q.   And is it experiencing caster imbalance
15 resulting from a fractured steering knuckle spline?
16   A.   In my opinion, yes.
17   Q.   So it is not probable that the driver
18 inputted any steer to cause that steering knuckle spline
19 to fracture, correct?
20   A.   No.
21   Q.   It's not correct?
22   A.   That's correct.
23   Q.   So the driver could have inputted steer to
24 cause that steering knuckle spline to fracture at Point
25 B?

1    A.   No.  I need to explain, if I may.
2    Q.   Please do.
3    A.   It's not that the driver is necessarily
4  inputting steer.  It's that the driver's grasp on the
5  steering wheel to keep it straight transmitted through
6  the steering shaft into the universal joint from the
7  universal joint through that steering input shaft spline
8  into the steering box which is power assisted with the
9  fluid with the torsion bar that's on the inside that
10 allows flow.  Once that wheel hits and begins to turn,
11 the driver is still steering straight but the wheels
12 begin to move left.  That induces a torque.
13      And that torque is induced not by
14 volition, but by the mere fact that the driver's holding
15 onto the steering wheel and is actually magnified due to
16 the fact that we have the power assist.
17   Q.   Is it your opinion that the -- what's
18 resisting -- strike the beginning.
19      Is it your opinion of what's resisting the
20 turn of that steering wheel's effectiveness to turn is
21 the tire and rim in contact with the roadway?
22   A.   No.
23   Q.   What is resisting the steering wheel to
24 turn?
25   A.   There's no ability for the driver to steer

1 because he's no longer connected to the steering box.
2    Q.    I'm talking about before the disconnection
3 occurs.  As I -- let me see if I can understand your
4 report correctly.  As I understand your report, you're
5 saying that this vehicle went left and exited the roadway
6 and eventually crashed into two other vehicles because
7 the steering knuckle spline was fractured, preventing the
8 driver from being able to steer and keep his vehicle
9 under control; is that right?
10    A.    I think that's what I just stated, yes.
11    Q.    And there are two possibilities --
12 reasonable possibilities or, in your case,
13 probabilities -- you prefer that term, I assume?
14    A.    Yes.
15    Q.    Two probabilities for what caused that
16 steering knuckle spline to fracture, correct?
17    A.    Yes.
18    Q.    One of which is that there was tread
19 separating from the left steer axle tire which impacted
20 some part of the steering system -- we can talk later
21 about exactly what that was -- but it impacted some part
22 of the steering system which fractured the spline?
23    A.    That's correct.
24    Q.    And the other reasonable probability is
25 that the driver steering, whether by holding it straight

1 or trying to steer to the right, somehow caused the
2 fracture of that spline?
3    A.    No.  I think you're misunderstanding my
4 report.
5    Q.    It sounds like it if you say no.
6    A.    I believe that there's a combination of
7 two.  And I can see on the fracture face surface that
8 there's not only shear, but there's also torque.  And
9 this is again where -- I think Mr. Scott is significantly
10 underestimating or misinterpreting the data.
11         We can see a couple of different things.
12 We have what are called torque witness marks which are
13 part of the -- when a torque occurs, you will see these
14 striation lines that are part of that initial fracture
15 face.  But we also see shear that is coming into the
16 initial portion of the fracture.  And then the back
17 portion of that fracture is just essentially what we call
18 catastrophic failure.
19         That's the part that's rough and looks
20 like sandpaper.  That is as a result of the fact that the
21 materials can no longer hold their integrity.  They just
22 don't have that ability and they just come apart.  And so
23 when we look at the fracture face, we can see very
24 distinctly a very small area where shear and rotation due
25 to torque in that system is causing that.  That's why we

1 call it a Mode 3 failure.  Mode 3 is kind of a catch-all.
2 It means that we have more than just one element that's
3 occurring here.
4         In my opinion, it's both shear and torque.
5 So the driver holding onto the steering wheel in and of
6 itself and by itself is not likely to produce torque
7 enough to fracture that unless we have a faulty material,
8 meaning that the spline is faulty.  And that would be a
9 products issue for TRW and also for freightliner.
10         However, because we had a tire failure on
11 the right before and that didn't occur, I think that's
12 unlikely.  But what we see here, in my opinion, is both
13 shear and torque that's occurring.  And at that small
14 portion of the initial fracture face, I believe that
15 that -- we can show, and I can show you that evidence of
16 where that is occurring.
17    Q.    Is this failure of the steering knuckle
18 spline something that would not have occurred had the
19 tread not interacted with it?
20    A.    It would not have occurred, I agree.
21    Q.    So this did not occur just because the
22 driver was trying to steer the vehicle?
23    A.    No, I don't believe so.  I mean, that can
24 occur.  I actually did a case here in Denver where that
25 occurred.  But that was an issue because somebody tried

1 to mess with the steering box, and thought they could
2 adjust it -- they weren't a mechanic -- and it actually
3 popped right out of -- the spline popped right out.  So
4 there's a screw that goes in so that those teeth of the
5 spline, when it goes in to be able to turn the worm gear
6 that goes inside of the steering box -- when that set
7 screw comes in and it hits between two of those teeth on
8 the spline, it keeps the spline from popping out.  And
9 that's the only time that I've seen that.
10         I actually distorted and twisted the teeth
11 and it popped right now, but I don't think that we have
12 that issue here.
13    Q.    Is this failure ductile or brittle?
14    A.    Well, there's a brittle section of it
15 which is the back section, but the ductile portion of it
16 is in front, meaning the shear.  The shear that's
17 occurring is deforming it in the front and then the
18 torsion.  But the back portion of it is pure brittle in
19 the back, because it just -- the failure of the material
20 just pops off.  It's a tempered steel.
21    Q.    So it first experiences a ductile failure
22 and then a brittle?
23    A.    I don't like to use those terms.  I like
24 to use the terms the shear and torque as your initial
25 Mode 3 failure that's occurring in the front.  The back

1 portion is basically failed because the materials can no
2 longer hold onto the other portion of the material.
3      Q.   Why don't you like using terms "ductile"
4 and "brittle"?
5      A.   Because I don't think they're very
6 descriptive for jurors.  I don't think they understand
7 that.  I think they understand the other portions, and I
8 tend to use those because a juror can understand shear,
9 because they've all used scissors.  They all understand
10 that those are parallel opposing forces.
11          They can also understand something that's
12 being twisted and broke because they probably broke a
13 stick or broke the barrel of a pen.  And they've
14 understood how some of those are occurring.
15          Here I have a different kind of mode, but
16 if I put a mode in that's one secured and the other hits,
17 I have equal and opposite forces, which, in my opinion,
18 is occurring here which is producing shear.  Once it
19 starts to fail at the leading portion of where that is
20 being applied, the remaining portion of it just simply
21 cannot hold on, and it's brittle from the standpoint that
22 it just breaks like glass does because it doesn't have
23 the integrity to hold on.
24      Q.   Understanding that you may not want to use
25 the terms because jurors don't follow it, you certainly

1 do have an understanding as an engineer, correct?
2      A.   Yes.
3      Q.   Okay.  What is a ductile fracture as an
4 engineer?
5      A.   I'm not sure what the actual definition
6 is.  I just don't use them.  I mean, brittle is
7 usually -- the ductile fractures are more fractures based
8 on shear, fatigue.  We see that where something is
9 bendable.  It's ductile.  And so you see bending shear or
10 bending fractures.  If we're looking at something that is
11 torsion, shear, if we're looking at something that is
12 ductile, it has the ability to bend.
13      Q.   And, similarly, are you unable to give me
14 a definition of brittle?
15      A.   No.  Brittle is something that can't bend
16 and sort of like concrete.  It does have some elasticity.
17 But when it breaks, it breaks with a brittle face,
18 meaning it does not resist bending forces very well.
19      Q.   What are the characteristics of a brittle
20 face?
21      A.   Typically, it's very rough like sandpaper.
22 And it has a tendency to be irregular or it can, in this
23 particular case, be across an entire surface.  But it has
24 a stippled face to it.  It looks pitted almost because
25 it's rough.  That's where it's breaking because it no

1 longer has its integrity to hold on like concrete does.
2      Q.   What is the time between the shearing
3 failure and the torsional failure?
4      A.   I believe they're occurring at the same
5 time.  They're simultaneously.  That's why it's a Mode 3.
6 These are all occurring at once.
7      Q.   And is the brittle and the ductile
8 occurring at the same time?
9      A.   No.  The ductile portion of the shear
10 that's occurring initially occurs before the remaining
11 portion.  The entire failure event has those modes in it.
12 But the shear begins the brake, and then the force that's
13 being applied continues until it can no longer hold on
14 and then it becomes brittle and breaks off.
15      Q.   And has the steering knuckle spline, then,
16 failed on or before the time we see on Line B, Point B,
17 on Exhibit 264?
18      A.   I don't know.  It could have failed there
19 or it could have failed shortly after.  And here's the
20 reason why.  There isn't enough time between A and B for
21 a driver to respond.  Say, if I'm responding in an
22 instinctive manner, half to three-quarters of a second.
23      Q.   Or .2 to .25 in the case of things like
24 rumble strips or potholes, correct?
25      A.   Well, that's something that's expected.

1      Q.   Rumble strips are expected?
2      A.   Yeah, sure.  If you're driving down the
3 roadway and you hear a rumble strip, you know what this
4 is.  You don't have to decide what it is.  But if you're
5 driving down the roadway and you have a failure to a tire
6 that's occurring, you don't know what that is yet.
7 That's a little bit different.
8          Rumble strip I know is on the side of the
9 roadway and I may hit a rumble strip, but I know it's a
10 rumble strip and I know I've drifted.  But if I'm driving
11 down the roadway and I have a tire failure, I don't know
12 it's a tire failure until already I'm starting to lose
13 control.
14      Q.   You know if you're losing your horizon,
15 your horizon is deviated.
16      A.   You don't know immediately.  It takes time
17 to perceive.
18      Q.   How long does it take you?
19      A.   I don't know, and I would say that -- I
20 would personally say that it's going take at least a half
21 a second for someone to be able to start detecting that
22 their horizon is changing, as you put it, or their
23 position of roadway.  It's not going to be immediate.
24 Nothing we do is immediate.
25          And so if we are looking at the response

1  to something from that -- I don't remember the original
2  question now.  I'm sorry.
3       Q.    I'll start another way.
4            Is driving an iterative task?
5       A.    Yes.
6       Q.    What does that mean?
7       A.    That means you have many different things
8  that you're inputting into the task in order to
9  accomplish one goal.
10      Q.    And it also means that we are -- in the
11 case of driving down the road, we are making constant
12 steering corrections, correct?
13      A.    That's part of it, but we're also
14 monitoring traffic to know whether our lane position is
15 where we want to be.  We're also determining whether
16 traffic is approaching from the front, the rear, to the
17 side.  We may be looking at the scenery.  We may be
18 determining where we are on the roadway in anticipation
19 for an exit.  Part of that is the navigation process,
20 obviously.  And it's also scanning the road ahead to look
21 for objects and obstructions or any circumstances that
22 may be out of the ordinary.
23      Q.    And is it testimony in this case, given
24 your opinions regarding perception and reaction time,
25 that until this driver, Mr. Kehler, recognized that there

1  was an issue, could identify it as a tire, and make a
2  decision as to what to do, he did not steer.
3       A.    With the caveat of what I discussed
4  before, yes.
5       Q.    Which caveat?
6       A.    The caveat is that he's holding onto the
7  wheel while the wheel is turning.
8       Q.    He didn't make a volitional decision to
9  turn the steering wheel left or right until after he
10 recognized an issue, perceived it was a tire, and made a
11 decision as to what to do; is that your testimony?
12      A.    There's one other element.
13      Q.    Go ahead.
14      A.    The sensation of the vehicle moving to the
15 left as well, so that's another element.
16      Q.    And additive element?
17      A.    Yes.
18      Q.    That would lengthen the time from
19 beginning of perception to the end of reaction?
20      A.    Probably not.
21      Q.    Is it included with one of the other three
22 components?
23      A.    I think it's part of the perception, the
24 identification, and that -- first we detect it and then
25 we have to identify, and so it's part of that

1  identification.
2       Q.    In this case, when did Mr. Kehler first
3  perceive that something was going on?
4       A.    Probably at least a brief period of time.
5  That could be half a second.  I mean, he knows -- he
6  perceives that something has happened, has heard the
7  noise.  That doesn't necessarily mean that it's
8  registered yet.  So there's going to be a time period
9  down there.  And I don't have a specific time for you.
10 There's no way I can give you a specific time.  I can
11 estimate.
12      Q.    Was Mr. Kehler's first awareness of
13 something going on a vibration or a noise?
14      A.    I think he said he felt a vibration and
15 then the noise almost immediately after.
16      Q.    How far was the vibration east of the
17 circles that you've put on Exhibit 263?
18      A.    I cannot tell you.
19      Q.    Can you approximate it?
20      A.    Cannot.
21      Q.    Is it miles?
22      A.    He said it was almost immediate, so I'm
23 pretty certain it's not miles.  But it's probably
24 measured in feet.
25      Q.    When you say probably, it's your opinion

1  that it was probably feet?
2       A.    Well, based upon his observation.
3       Q.    There's no physical evidence that you
4  could answer that question; is that correct?
5       A.    That's correct.
6       Q.    So we're relying upon his testimony?
7       A.    That's all we have.
8       Q.    And when you say it probably was, you're
9  making some -- you've formed some impressions based upon
10 his testimony?
11      A.    Well, not just his, but also Mr. Marks'.
12 Mr. Marks comports with Mr. Kehler -- comports with his
13 testimony, and that's all we have.  We have no physical
14 evidence to refute what they say.
15      Q.    If he experienced a vibration before the
16 marks you placed in Exhibit 263, does that mean a tread
17 sep preceded a deflation?
18      A.    Yes.  That would indicate to me it
19 probably did.
20      Q.    Okay.
21      A.    It started to separate or at least the
22 profile of the tire is changing.
23      Q.    Meaning going out of round?
24      A.    It's either going out of round or it's
25 changing its ability to grip the road.  May I --

1    Q.    Certainly.

2    A.    When we have a tire patch, the tire patch

3  deforms, and it drags slightly behind the direction of

4  travel at high speed.

5    Q.    We're going to get into pneumatic trail

6  now?

7    A.    We are.

8    Q.    Okay.

9    A.    We're going to discuss that a little bit.

10  And so when I set a vehicle down on the roadway, the

11  contact patch that is generated by the contact between

12  the surface of that tire and the surface of the roadway

13  static is essentially directly down.  It's set directly

14  down from the hub vertically.

15        Once I start to move that vehicle, then

16  that contact patch due to the deformation of the

17  materials in the tire starts to lag behind that center

18  point and that creates what we call pneumatic trail.

19        That means the center of the contact point

20  is actually setting behind the vertical center line at

21  the hub.  That's a process of a flexible material.

22        So that's the issue of the pneumatic

23  trail.

24    Q.    So how does pneumatic trail address the

25  question of whether we have a tread sep versus a blowout?

1    A.    Well, as I deform that patch, if I start

2  having separation, the patch characteristics change.  So

3  let's say I have a separation at one portion of the tire

4  and not on all of the others -- let's say it's a small

5  patch.  Maybe it's a foot long, the circumference, just

6  for example.  Each time that wheel rolls over, the

7  deformation of that contact patch at the roadway changes.

8  Because now no longer is it in contact with the tire;

9  it's actually going to distort more.

10        So each time I roll over, I feel this bump

11  because the pneumatic trail is changing and it will

12  change at a regular rate.  And as that wheel is spinning,

13  I sense the vibration.  And that change in the pneumatic

14  trail either produces -- while in this case it would

15  produce a significant difference in camber, which would

16  mean that I would probably go closer to a negative camber

17  in this particular case which is going to cause my wheel

18  to shimmy, vibrate -- not camber -- caster.  It's going

19  to cause that wheel to vibrate.

20        That brings up another point.  When you

21  change camber, you change caster.  When you change caster

22  and camber, you change tow.  Every little thing affects

23  every little thing in the dynamics.  That's one of the

24  phrases we like to use.

25        So when that occurs, that creates a

1  vibration, and that can be sensed as that continues to

2  grow.  At very small levels, I may not feel it because

3  I'm somewhat insulated from that particular contact with

4  the roadway through the friction and the steering gear

5  box and the power assist.  But we try to not insulate the

6  driver so much they don't have a good feel for the road.

7    Q.    Are you aware of any literature that

8  addresses the issue or reports results of any studies

9  regarding the occurrence of noise and vibration preceding

10  the detachment of tread from the tire and tread

11  separation?

12    A.    Not specifically.  I didn't review any

13  specifically for this case, so I can't answer that.  But

14  I somehow recall an SAE paper that was done in -- I want

15  to say the late '80s.  I may be confusing that with

16  something else.

17    Q.    Tell me what you recall with whatever that

18  paper was.

19    A.    I can't really tell you the specifics of

20  it.

21    Q.    Can you tell us how long it takes a tire

22  to separate or this tire to separate?

23    A.    No.

24    Q.    Can you approximate it at all?

25    A.    No.

1    Q.    Are you aware of any literature or any

2  studies relating to perception/reaction time involved in

3  tire tread separations?

4    A.    No.

5    Q.    Are you aware of any literature or any

6  studies that report how drivers respond by simulator, by

7  actual event, by anecdotal studies to tire tread

8  separations?

9    A.    Yes.

10    Q.    What do you know in that regard?

11    A.    I'm familiar with the same studies that

12  were quoted by Dr. Gillespie and also by John Scott

13  discussing the issues of controllability with a steer

14  axle tire failure.  I agree completely.  If you have

15  steering integrity, most drivers -- a skillful driver

16  will certainly be able to control that vehicle and be

17  able to bring that vehicle to a safe stop.

18    Q.    Are you aware of any literature on those

19  issues other than that cited by Mr. Scott and Dr.

20  Gillespie?

21    A.    I can't tell you what they are, but I'm

22  certain there probably is other literature.

23    Q.    Are you aware of any authors of any of

24  those other studies other than those cited by Mr. Scott

25  and Dr. Gillespie?

1    A.   No. I'm sure there are, but I'm not
2  familiar with them.
3    Q.   We talked about rumble strips. Are you
4  familiar with Dr. Samala?
5    A.   Possibly.
6    Q.   Are you familiar with any
7  perception/reaction time studies related to the rumble
8  strips?
9    A.   Yes, from TRB, Transportation Research
10  Board.
11    Q.   What can you cite there?
12    A.   I can't cite anything, but I recall
13  addressing some of these at the design class I had back
14  in the '90s, addressing issues of rumble strips for the
15  purpose of alerting drivers as they may diverge to the
16  outside edges or the inside edges of the roadway, but
17  that's been 20-some-odd years ago.
18    Q.   Is there any published material that
19  you're aware of?
20    A.   TRB has a lot. And I would imagine if you
21  search in the TRB literature that you can find issues
22  dealing with rumble strips, because I know that that was
23  a major focus in the '80s and '90s for highway safety and
24  part of the highway safety improvement.
25    Q.   So if I wanted to find that literature,

1  look in TRB for the '80s and 90s, and I'm likely to find
2  driver perception/reaction time related to rumble strips?
3    A.   I think all you have to do is probably --
4  well, I don't know about driver perception/response, but
5  I do know about -- well, I would imagine it would have
6  driver perception/response. I'm trying to think of what
7  we did. It's not an issue I normally work with, so bear
8  with me.
9    Q.   Sure.
10    A.   I believe part of the studies were done by
11  the Texas Highway Safety Institute, which is Texas A&M at
12  Riverside, doing some of those studies. I believe that
13  was in the '80s.
14    Q.   TTI?
15    A.   Pardon?
16    Q.   Texas Traffic --
17    A.   Well, back then it was --
18    Q.   -- Transportation Institute?
19    A.   Well, that's what it is now. But back in
20  the day, it was not TTI. It was the Texas Transportation
21  Safety Institute. TTSI, I think is what it was or they
22  left the S out. But their studies -- they do a lot of
23  stuff with not only pavement types, but they do a lot of
24  barrier impact for guardrails and attenuation devices, et
25  cetera. They've done a lot of that. They even did

1  mailboxes which is an interesting one as well.
2    But I believe those studies may have come
3  from there, but I'm not positive. If you Google actually
4  what you're asking for, you will probably come up with a
5  number of TRB studies, probably studies all over. There
6  may even be some Federal Highway Administration studies
7  as well as some studies from -- I'm not sure if the
8  Institute of Transportation Engineers would have done
9  that or ASCE, but there's potential.
10    Q.   Let's go back to Exhibit 264. As I
11  understood your testimony, you said that at Point A,
12  which was marked by the police of orange paint and which
13  you identified, that's the point where the first
14  documented physical evidence of this accident appears?
15    A.   Correct.
16    Q.   And at Point B -- also at Point A, you see
17  evidence of rim gouging from both the inside and outside
18  inboard and outboard flanges of the left steer axle
19  wheel?
20    A.   Correct.
21    Q.   And you circled those on Exhibit 263. You
22  also find tire marks that begin there. And then it's
23  characteristic changes at the point you identified as B
24  on 264.
25    A.   It begins to curve, correct.

1    Q.   And is the change that occurs at Exhibit
2  (sic) B the result of the fractured steering spline?
3    A.   No.
4    Q.   What causes the change at B?
5    A.   That's our imbalance caster, and -- not
6  our imbalance caster yet. It is our issue of the
7  oversteer that's produced by the failure at the left
8  front which is causing that left steer because we have
9  drag at the left front wheel.
10    Q.   Has the vehicle gone oversteer
11  at that point?
12    A.   It's approaching oversteer at that point.
13    Q.   Meaning it's still neutral?
14    A.   It's probably going towards neutral into
15  oversteer.
16    Q.   And it's coming from understeer?
17    A.   It's coming from -- well, there's no steer
18  initially. Understeer/oversteer only occurs when you
19  have a turn. But when it's turning, we have a drag at
20  left front. And the drag at the left front causes the
21  steer axle tires to turn to the left. That's redirecting
22  the front of the cab towards the left.
23    As it is developing into that left turn
24  very quickly, you'll have the oversteer issue because no
25  longer now do we have much control with the front. The

1   rear axle -- the drive axles start taking over the steer.
2           When a vehicle steers -- if I may use
3   Exhibit 261, we have a slip angle in front, and we have a
4   slip angle at the rear.  You will notice in this case, a
5   left steer, the slip angle that's generated between the
6   direction of the tires, typically we want that to be
7   significantly larger than the opposite direction that we
8   have of a slip angle for the rear.
9           So during a steer, you actually will have
10  the front tires turning one direction and the rear tires
11  are inducing a slip and a turn in the opposite direction,
12  unless you have quadsteer.
13      Q.     Actually, a vehicle which is parked at the
14  curb and not driving at all has a steer gradient,
15  correct?
16      A.     Sure, it does, but it is a low speed steer
17  gradient that is controlled primarily by the Ackermann
18  angle.  It's only entirely by the Ackermann angle.  But
19  here when we're looking at high speed, we have other
20  elements.  We have the Ackermann.  We have the slip
21  angles and the difference of those slip angles which is
22  producing what our direction of those tires are with
23  respect to the direction of which the vehicle is moving.
24      Q.     With respect to steer gradient, what does
25  linear range understeer mean?

1       A.     What is linear range understeer?  That's
2   when I'm in -- typically they're doing that in a swept
3   steer.  When I'm turning a vehicle, the linear range is
4   not the transient portion but within the portion where my
5   steer is established, and I'm continuing in a safe
6   continued steer.  You used to do it with steer pads.
7           They take a stopper and return the wheel
8   and you lock it to the stopper.  There's a transition
9   that we call the transient period where the turn will
10  actually peak the forces on the outside higher than the
11  inside and then it will rest back.  And it changes all of
12  those dynamics.
13          And so once I'm in that constant steer,
14  that is -- that's the linear portion.  That means the
15  steer is set; it is not changing.  There's a transient
16  period of being able to transition into the steer where
17  those forces will peak.  That's the most critical part
18  where yaw is often induced.
19      Q.     Are the limits of linear range -- and by
20  that, I mean the lower and upper portions of linear
21  range -- defined by lateral acceleration?
22      A.     Say that again.
23      Q.     Is the bottom and the top of a linear
24  range defined by a lateral acceleration as we're talking
25  about linear range understeer?

1       A.     I'd have to look at the equation.
2       Q.     Let me ask you, did this vehicle, up until
3   Point B, ever experience or exhibit an oversteer
4   characteristic with oversteer defined as J 670?
5       A.     In my opinion, yes.  And that's occurring
6   when we see the beginning of the marks of the drive axles
7   coming up from the outside.
8       Q.     After Point B then?
9       A.     After Point B.
10      Q.     So at Point B this vehicle has not yet
11  exhibited evidence of being an oversteer vehicle?
12      A.     I think it's starting at about Point B,
13  actually.
14      Q.     Is the first evidence you have of this
15  vehicle being an oversteer vehicle when the drive axle
16  marks first appear?
17      A.     Yes.
18      Q.     By the time the drive axle marks appear,
19  has the steering knuckle spline fractured?
20      A.     Probably.
21      Q.     Is it the fracture of the steering knuckle
22  spline that causes this vehicle to become oversteer?
23      A.     It contributes to it, yes.  Every little
24  thing contributes to every little thing, and I believe
25  so, yes.

1       Q.     What other than the fracture steering
2   knuckle spline contributed to this vehicle becoming
3   oversteer?
4       A.     The inability of the driver to be able to
5   react to the countersteer.
6       Q.     And what contributed to the inability of
7   the driver to react with countersteer?
8       A.     The fracture of the spline at the -- for
9   the input shaft at the top of this steering gear box.
10      Q.     So did anything other than the fracture of
11  the steering gear input shaft or steering knuckle spline
12  cause or contribute to this vehicle becoming oversteer?
13      A.     Yes.
14      Q.     What?
15      A.     I described that previously.  That's the
16  loss of our caster balance.  Once you lose the left front
17  tire and the ability of the left front tire to steer,
18  your slip angle at the front decreases, and that means
19  the slip angle at the rear remains what it can -- so it
20  becomes the dominant feature.
21          And when you have a dominant rear steer
22  angle compared to the -- slip angle as compared to the
23  front axle slip angle, that is the definition of an
24  oversteer condition.
25      Q.     Would you agree that a rear axle tread

1  separation or blowout, deflation, is going to cause a
2  vehicle such as this to become less understeer?
3      A.   Less understeer?
4      Q.   Less understeer.
5          MR. KAPP:  Can you read the question back
6  again?
7          (The question was read.)
8      A.   No.
9      Q.   (By Mr. Brosseau)  Would you agree that a
10 front tire steer axle failure such as you have here will
11 cause this vehicle to become more understeer?
12     A.   No.
13     Q.   Are you aware of any literature that
14 addresses that issue?
15     A.   No.
16     Q.   Are you aware of any literature that talks
17 about what happens when you have a tire disablement such
18 as a tread separation or a blowout on a vehicle in terms
19 of the effect on steer grading?
20     A.   I don't think so, no.  There probably is,
21 but I'm not aware of any.
22     Q.   Do you know who Mark Arndt is?
23     A.   Yes.  Here's what we look at, the dynamics
24 of this vehicle.  And when we look at the dynamics of
25 this vehicle and we look in particular with what's

1  occurring here, the failure of a steer axle means that
2  I've lost my ability to steer with the tire that has
3  failed.  And if I lose my ability to steer with the tire
4  that has failed, I have, in effect, reduced my slip
5  angle.
6          If I reduce my net slip angle between
7  those in the front, the rear remains the same.  That
8  creates less understeer.  And to the degree of the weight
9  or the mass that's on each of these vehicles and how it's
10 distributed can result in a condition of oversteer.
11         MR. KAPP:  Just for the record, when he
12 was talking about -- he was talking about an exhibit, and
13 that's 261.
14         THE DEPONENT:  That's correct.
15     Q.   (By Mr. Brosseau)  Would you agree that if
16 you put a vehicle onto a circle and you increase its
17 speed around the circle, there are three options and only
18 three options that are going to occur, assuming it
19 doesn't crash into something?  One is it's going to spin
20 out, and the other is it will go into the circle or it
21 will reach its maximum velocity?
22     A.   Certainly.
23     Q.   Spin out, plow in, or reach terminal
24 velocity?
25     A.   Certainly.

1      Q.   And a vehicle which is understeer will
2  require more steer to keep the circle?
3      A.   That's correct.
4      Q.   Less steer if it's oversteer to keep the
5  circle?
6      A.   If we're talking about dual steer, not
7  quadsteer.
8      Q.   Correct.  We're talking dual steer here,
9  correct?
10     A.   Correct.
11     Q.   I'm talking about a vehicle such as this.
12         And terminal velocity means you just can't
13 go any faster, correct?
14     A.   You can go -- terminal velocity means
15 that's at the point where I go into yaw.  Typically, they
16 will talk about critical speed of the vehicle.  So if I'm
17 turning at its critical velocity for that curve, then I'm
18 at the maximum capable ability of that vehicle to
19 maintain that particular radius at that particular speed.
20         If I increase my speed with the same steer
21 angle, I will go outside.  If I decrease my speed with
22 the same steer angle, I'll go inside.
23         MR. KAPP:  What do you guys want to do
24 about lunch?
25         MR. BROSSEAU:  Let's go off the record.

1          (Recess from 12:04 p.m. to 1:10 p.m.)
2      Q.   (By Mr. Brosseau)  We started through some
3  photographs, prints of photographs that you brought with
4  you.  And we've talked about 263 and 264.  And there were
5  some others that you pulled out thinking that apparently
6  they might be worth demonstrating some opinions or bases
7  for those.  You have that collection in front of you.
8          Do you want to just take us through those?
9      A.   Yes.
10     Q.   Please do.  I'll tell you what, before we
11 get through them, let's just mark them.
12         (Exhibits 265 through 278 marked.)
13     Q.   Dr. Ogden, we have now had marked copies
14 of photographs that you brought with you, and we've
15 marked those 265 through 278.  And you're going to go
16 ahead and tell us what you found significant as it
17 relates to your opinions and your work that led you to
18 bring these with you?
19     A.   Yes.  In particular, when we're looking at
20 265, it is showing the curvature.  This is just beyond
21 Point B that we identified in 264.  Actually, Point B is
22 right on the left-hand side that you see the dash mark,
23 and there's a tar mark.  That's about where Point B was.
24     Q.   Could you use your blue Sharpie and mark
25 where that is, please?

1    A.   I can.

2    Q.   Thank you.

3    A.   I put approximate B, because that's -- if

4  we look at 264, you can see the tar mark just above where

5  Point B intersects. That's actually what we see here.

6  So this is right where we start to see the curvature.

7  And you can see where the tire is starting to

8  leave -- this is the right front steer tire leaving just

9  marks on the outside edge of it.

10       And the outside edge is leaving these

11  marks just past Point B, and then the curvature

12  continues, and then we see the caster imbalance

13  occurring. You can actually see some of that caster

14  imbalance past that line of approximate B further towards

15  the right-hand side where the tire mark is already

16  starting to oscillate.

17       Oscillation is not going to be instant at

18  the same frequency. It's going to develop into it and

19  become more significant until the oscillation reaches its

20  maximum point. And so we can see where that is

21  occurring.

22    Q.   When you say "maximum point," are you

23  talking about in terms of deviation or frequency or both?

24    A.   Both.

25    Q.   Please continue.

1    A.   Yes. That's what we see on 265.

2    Q.   Okay.

3    A.   266 is showing us the median crossing, and

4  this is from the eastbound traffic lanes looking towards

5  the median. And now we can start to see dirt that is

6  displaced into the westbound lanes. Part of that is due

7  to the fact that we have one in the trailer -- the rear

8  trailer on the FedEx double --

9    Q.   Into the east --

10    A.   Median. Into the east boundary lanes.

11    Q.   I think you said westbound. You mean

12  eastbound.

13    A.   Okay. I believe I said eastbound. But if

14  I said westbound, I do mean eastbound.

15    Q.   Go ahead.

16    A.   And I'm looking towards the east here in

17  this particular photograph. And I can see the crossing.

18  And you can also see where the front tires are coming

19  across the median that we have the front wheel and the

20  front tire, and then you can see on the right side it

21  becomes thicker. That would be indicative of braking.

22    Q.   Is that just on the right side that's

23  thicker?

24    A.   The right side is the only one that's

25  going to do that. The left side is going to stay

1  constant because it doesn't have a tire on it.

2    Q.   The right side is also going to tend to be

3  a heavier mark because that's the side that's more

4  loaded, correct?

5    A.   The left side?

6    Q.   The right side.

7    A.   Oh, the right side, yes. But the right

8  side also has a tire on it. And it is loaded on that

9  right side because weight transfer or the shift will go

10  to that outside. We also see two large sections of the

11  tire tread.

12    Q.   Actually, could you, so we have that

13  preserved, just circle --

14    A.   I actually in the next one --

15    Q.   Thank you.

16    A.   -- identify -- what I do first --

17    Q.   Next is 267?

18    A.   That's correct. 266 and 267 are coupled,

19  meaning they are the same photo. And then the evidence

20  I'm showing you is -- first, I'm showing you the blank

21  photo, and then I'm showing you the evidence.

22    Q.   See, you know exactly how I take a

23  deposition.

24    A.   This is how I like to do my depositions,

25  too, so . . .

1       MR. KAPP: Well, I'm glad you guys are

2  having fun. At the end you can do pinky shakes and sing

3  Kumbaya and all that. That's good.

4       THE DEPONENT: That was tongue and cheek,

5  by the way.

6       MR. KAPP: Not from my end.

7    A.   268 and 269 are again scene photos that

8  are closeups that, again, show those two pieces of the

9  tire tread from the left front steer axle tire.

10       270 and 271 are pieces of that tread that

11  were photographed by a police officer. First one

12  identifies a large crescent-shaped piece, and then 270

13  zooms in on it.

14    Q.   (By Mr. Brosseau) 271 zooms in on it?

15    A.   Pardon me. 271 zooms in on it. And my

16  understanding is Mr. Scott believes that he sees a nail

17  in this tread. And I think that's a bit of a reach to

18  say that that's a nail. I see many little pieces in this

19  tread, and I see actually a piece of a rock. And that

20  could be anything from a rock or a piece of aggregate or

21  a piece of metal or a piece of anything.

22       And there's no evidence that what is seen

23  on here actually penetrates through the tread. It is

24  just actually caught in the tread groove. But there's

25  another reason why I think it's very clear that this is

1 not a nail. When a nail is trapped or captured into the
2 tread and it's being pushed in, it has to have force to
3 push it in.
4     That force actually comes from the
5 application of the normal force of the vehicle pressing
6 down onto the roadway that the mass of it and the normal
7 force pressing back from the ground that pushes that nail
8 in.
9     As that tire continues to revolve, it
10 actually polishes off that object. If that was a nail --
11 particularly since it's sitting right on the outer edge,
12 it would be bright and shiny. It is actually, when you
13 zoom in on it, dark brown.
14     So there's two things. And most likely, I
15 believe it's not a nail. I also don't think the Wyoming
16 Highway Patrol would take a picture of this if it was a
17 nail and not take a picture of the back side if it went
18 through the tire.
19     Secondly, I also think that if this was a
20 nail, in fact, there is no evidence this has
21 chronically been in a tire, then it could have been
22 picked up in the median. Medians are full of crap, so --
23 and that's, unfortunately, what happens when you have a
24 median on a very busy highway like you have on I-80.
25     Q.    Before you move from there, let me ask,

1 have you read the deposition of William Woehrle?
2     A.    No.
3     Q.    FedEx tire expert?
4     A.    No, I haven't.
5     Q.    Please go ahead.
6     A.    Yes. 272 is just showing you the unit
7 number of the truck, 125417, so that I can correlate that
8 with the next photograph which is 273. 273 is the left
9 front bumper wraparound trim panel on the freightliner,
10 and it has that same number, 125417.
11     And you can also see rubber transfer marks
12 that are deposited, interestingly on this case, on top of
13 and forward of the opening of the wheel well.
14     Q.    Could you circle on 273 those rubber
15 transfer marks you are referring to, please?
16     A.    I sure can.
17     Q.    You've now done so with two circles?
18     A.    I have because there's two spots where we
19 actually can see rubber transfer that's on there. That
20 means that the -- as you look at the stripping or
21 striping of it, that means that the tread has separated
22 at this point. And there's pieces of it, most likely the
23 cords, that still have some rubber that are extended out;
24 cords that we can see, potentially portions of the tire
25 that is contained in 278 which actually sat next to it.

1 We see those strips.
2     Q.    Is 278 a different piece of tread?
3     A.    278 is different than 270 and 271.
4     Q.    How do you determine that one tread piece
5 versus the other tread piece probably did that?
6     A.    Well, this tread piece, 278, was found
7 right next to the front portion of that bumper wraparound
8 making it the likely culprit but doesn't make it the only
9 culprit. There could be several pieces of it that are
10 actually sticking out that could have hit this portion.
11     Q.    When you say "found," you mean
12 photographed for the first time that we have any
13 evidence, photographed near each other?
14     A.    Well, what I mean found means the
15 highway -- the Wyoming Highway Patrol located it and
16 photographed it at that location. That's the evidence we
17 have.
18     Q.    When you say "located it," what do you
19 mean?
20     A.    It was located and it was also surveyed in
21 the GPS survey that was completed by the Wyoming Highway
22 Patrol. Its location is actually in points which I have
23 in some of my diagrams, all those points. You can
24 actually see where they surveyed the location of those
25 elements as well.

1     Q.    Have you formed the opinion that both that
2 bumper corner that appears prominently in 273 as well as
3 the tread piece in 278, when they came to rest before
4 they were moved or disturbed were located in close
5 proximity to each other?
6     A.    They probably were.
7     Q.    And it's, therefore, your opinion that it
8 is probable that the tread piece in -- well, not certain,
9 but probable that the tread piece in 278 is the piece
10 that's responsible for the rubber transfer marks that you
11 see on the bumper piece in 273?
12     A.    It could be, yes. I think it's probable
13 that it is one of the pieces or -- or if multiple had
14 struck it. I can't tell you that multiple pieces didn't
15 strike it.
16     Q.    Let me go back to the beginning of the
17 question.
18     Are you able to state an opinion to a
19 probability whether the tread piece shown in 278 is the
20 tread piece that made any of the marks on the bumper
21 piece that's shown on 273?
22     A.    I think it's probable.
23     Q.    Thank you.
24     A.    Yes.
25     Q.    Continue then. Is that the end of the

1  photos?

2      A.    No.  There's more photos.

3      Q.    Okay.

4      A.    The photographs also show and identify the

5  bumper piece as it was originally laying.  It was

6  actually laying with its face up, the numbers up.  And

7  then it was turned for the photographs that we see here.

8          277 is the original photograph that shows

9  the location of where they were photographed and

10  documented in the scene survey.

11      Q.    "They" meaning the tread piece that we

12  talked about in 278 and the bumper piece in 273?

13      A.    Yeah.  My apologies.  That's correct.  I

14  should have been more articulate with that.

15          272 is the inside view of the bumper

16  wraparound where it is adjacent to the front edge of the

17  left front wheel well where it connects there.  You can

18  see rubber transfer on the inside in this particular

19  photo.  You can see some marks that are towards the

20  right-hand side as well as prominently along the top

21  which is associated with the marks that we see in 273

22  along the back top edge and the face of that bumper

23  corner near the wheel well flare.

24      Q.    Is it your testimony that the marks we see

25  in 275 are essentially the same as we see in 273, but

1  more on the inside rather than the outside of that same

2  piece?

3      A.    That is correct.

4      Q.    Okay.  Please continue.

5      A.    276 shows the leading edge, meaning the

6  edge closest to where it connects to the front bumper,

7  meaning further to the front of the vehicle.  And this

8  photograph shows the inside view.  And we can actually

9  see clear up towards the front, again, those same rubber

10  transfer marks consistent with what we see on the other

11  portions of that bumper wraparound paneling.

12          And this evidence, in my opinion,

13  demonstrates that at least one piece of the tire, as it

14  separated, was quite lengthy, long enough that not only

15  could it reach all the way towards the front corner to

16  strike and create these marks, but what would be well in

17  length long enough to also strike this steering column.

18          MR. KAPP:  Steering what?

19          THE DEPONENT:  Steering column.

20          MR. KAPP:  Okay.  Is that the same as a

21  shaft?

22          THE DEPONENT:  Yes.

23          MR. KAPP:  Okay.

24          THE DEPONENT:  But when I say "column," we

25  usually combine the shaft, the universal joint, together.

1      Q.    (By Mr. Brosseau)  Does that cover all

2  the -- that group of photographs?

3      A.    It does.

4      Q.    Let me ask you to hold onto those that you

5  last talked about involving that bumper piece.

6      A.    Yes.

7      Q.    Do you call it a fender, call it a bumper,

8  or what do you call it?  What's your preferred --

9      A.    Bumper wraparound.

10      Q.    Bumper wraparound.  That bumper

11  wraparound, before it was detached, attached to the rest

12  of the bumper on the -- essentially the left front corner

13  of the tractor?

14      A.    That's correct.

15      Q.    If you were to line up that bumper piece

16  with the left front corner before deformation, where

17  would those rubber transfer marks be with respect to the

18  longitudinal center line of the left steer axle tire?

19      A.    They would be in two locations.  Some

20  would be into the inside closer to where that bumper --

21  the end of the bumper is and the attachment is.  That's

22  what we see on the inside demonstrated by Photograph 276

23  and then the marks on 275 and 273 would be to the

24  outside, meaning that this is most likely oscillating

25  inside and outside as it's detaching.

1      Q.    How far inboard are the most inboard marks

2  on that bumper wraparound piece with respect to the

3  center line of the left steer axle tire?

4      A.    The bumper wraparound piece adjoins with

5  the front bumper relatively close to that left front

6  frame rail.

7      Q.    Can you quantify the distance between the

8  inner most rubber transfer mark on that wraparound bumper

9  piece and the longitudinal center line of the steer axle

10  tire?

11      A.    No.

12      Q.    Have you done anything with any exemplar

13  vehicle in this case?

14      A.    No.

15      Q.    Have you done anything to determine what

16  the precrash distance was between the left steer axle

17  tire and the closest portion of the steering gear?

18      A.    Can you repeat that, please?

19      Q.    Sure.  Have you done anything to determine

20  the distance between any portion of the left steer axle

21  tire and the steering gear of this vehicle before any

22  deformation occurred?

23      A.    In general, yes.

24      Q.    How much is the dimension?  What's the

25  difference?

1    A.    I don't have the dimensions.  I can tell
2 you that it sets forward of the left front wheel but
3 adjacent to it to the inside.  And, remember, our wheel
4 is turned to the left.  So as this is whipping around,
5 it's doing one of these numbers, meaning that it is
6 moving more in an ellipse that is not only straight but
7 is also straight, meaning in line with the tire but is
8 also describing a horizontally canted position with
9 respect to the forward direction of the vehicle because
10 that wheel is turned to the left.
11         And as the wheel continues, the tire --
12 the wheel continues to move, but the tire independently,
13 that's going to change directions constantly, because
14 that tire has no way to maintain a steady forward track.
15    Q.    Does that tire ever turn straight ahead or
16 to the right at any point in this accident sequence?
17    A.    I would imagine that it turns in all
18 directions during this accident sequence.  The tire
19 itself deflated.
20    Q.    Does it ever turn to the right from -- or
21 at any time when the tire is -- the left front -- the
22 left steer axle tire is in the westbound lanes?
23    A.    I'm sorry.  I don't understand the
24 question.  Maybe repeat it.
25    Q.    I'll explain.  We know that this accident

1 sequence, as you've reconstructed it, starts in the
2 westbound travel lanes?
3    A.    Yes.
4    Q.    And, in fact, the tractor is in the
5 outside or right of the two lanes?
6    A.    Correct.
7    Q.    It is in the right of those two lanes when
8 it first leaves some sort of evidence of a tire failure?
9    A.    Yes.
10    Q.    At some point, as soon as that occurs, you
11 are seeing that tire turning to the left; is that right?
12 Is that correct?
13    A.    You say "that tire."  Which tire?
14    Q.    Left steer axle.
15    A.    The wheel is, certainly.  The tire will
16 follow the wheel, but the tire is not integral with the
17 wheel anymore.  So the tire can be going in any
18 direction.  So at any time that we see it with the marks
19 that we see, that tire is not integral with the wheel.
20 So because the wheel is going to the left does not
21 necessarily mean the tire is as well, because it's no
22 longer beaded.  So it can be rolling and doing different
23 things.
24    Q.    Let's take it step by step then.  Does the
25 left steer axle wheel ever turn to the right while the

1 vehicle is in the westbound lanes?
2    A.    No.
3    Q.    Is there evidence that you have that the
4 tire carcass -- I'm distinguishing it from any flailing
5 tread or loose tread pieces -- became outboard of either
6 the inside or outside flange of the left steer axle
7 wheel?
8    A.    Yes.
9    Q.    What is your evidence?
10    A.    We have it at rest that way.  It's
11 actually inside.
12    Q.    Do you have any -- how does that tie to
13 evidence that it was outboard of the inside or outside
14 flanges of the wheel while the vehicle was in the
15 westbound lanes?
16    A.    I can't tell you it wasn't.
17    Q.    Do you have any evidence that the tire
18 carcass, leaving aside any loose pieces or flailing tread
19 while the vehicle was in the westbound lanes, ever got
20 outside the inside or outside flanges of the left steer
21 axle wheel?
22    A.    All I can tell you is there's no evidence
23 to tell us either way that at any particular time that it
24 did or did not.
25    Q.    So we don't know whether the tire got

1 outside the flanges while the vehicle is in the westbound
2 lane; it might have or it might not have?
3    A.    That's correct.
4    Q.    We know the wheel never turned to the
5 right --
6    A.    That's correct.
7    Q.    -- while the vehicle was in the westbound
8 lanes?
9    A.    That's correct.
10    Q.    Did the wheel ever turn to the right
11 during this accident sequence?
12    A.    I think I answered that.  You mean the
13 whole entire axle sequence?
14    Q.    Yes.  From the time this accident starts
15 until the vehicle comes to rest, is the left steer axle
16 wheel ever turned to the right of straight ahead?
17    A.    I think so, yes.
18    Q.    And what point does it first turn to the
19 right?
20    A.    After it impacts the cable median barrier,
21 and then that redirects the front axle towards the right.
22    Q.    If the steering knuckle spline -- and that
23 is your term for the component of the fracture?
24    A.    It's the input shaft.  We're calling it
25 the spline itself, yes.

1     Q.    When you say "we're," you're calling it
2  the spline?
3     A.    That's correct.
4     Q.    It also often is called the input shaft of
5  the steering gear?
6     A.    Yeah.
7     Q.    But if we say "spline," are we talking
8  common language?
9     A.    We are, and you can use either you like.
10    Q.    Once the spline fractures and the driver
11 tries to turn the steering wheel, what happens?
12    A.    He has no input into the front wheels.
13    Q.    What happens when he tries to turn the
14 steering wheel?
15    A.    It depends.
16    Q.    On what?
17    A.    Depends on what happens to the universal
18 joint between the time that it fractures and the time he
19 attempts to put steering input into it.
20    Q.    If the driver -- after that fracture
21 occurs, regardless of when it -- after it occurs and the
22 driver tries to steer by turning the steering wheel to
23 the right, what kind of resistance will he have to that
24 steering wheel turning?
25    A.    Depends.

1     Q.    On the same thing, on the --
2     A.    Yes.  It depends on where that knuckle --
3  the whole system, meaning the universal joint, the
4  remaining portion of the spline connected into the
5  steering shaft goes.  There's many places it can go.  It
6  can go to the left and be free.  And then the wheel would
7  simply spin.  But it could bounce to the right and not be
8  free and be restricted up against the engine block or
9  some other component to where no matter what you do, it
10 won't turn because it's locked by impingement, if you
11 will.
12    Q.    Is there any evidence that there was any
13 impingement?
14    A.    Yes, I think so.
15    Q.    Show me.
16    A.    Yes.  My blue folder.  This, again, is
17 where Mr. Scott and I disagree.  Mr. Scott identifies
18 some marks that he believes are produced by impact.  It
19 could have impact with either the Chevrolet or the
20 Chrysler minivan.  But this is good evidence of
21 impingement as well.  We can see right along the outer
22 edge of the lower portion of the universal joint there's
23 a piece of material that looks like that universal joint
24 was wedged into something.  You can actually see where
25 it's scraped off a portion of it and then scraped on the

1  lower part.
2           That could be just as consistent as
3  wedging into something.  And then when the impact occurs,
4  it dislodges it, because now we're bending the frame,
5  moving the engine block back, and that baby can pop out
6  just as easy.
7           This mark here would be consistent.  I
8  can't tell you that it was, but it would be consistent
9  with that.  And do you want to mark that?
10    Q.    Yes, please.  And I'd like to have you
11 circle that edge, that U joint, that you're showing us if
12 that's a fair way to characterize it.
13          (Exhibit 279 marked.)
14    Q.    Have you now circled that on 279?
15    A.    I have.
16    Q.    Do you have any shots of any photographs
17 that shows anything further that would relate to
18 evidencing whether this got locked up?
19          MR. KAPP:  What was the question?
20          (The question was read.)
21    A.    I don't have anything additional.
22    Q.    (By Mr. Brosseau)  Is this your only
23 physical evidence that there may be some impingement?
24    A.    Yes.
25    Q.    And if it were impinged, could you

1  quantify what kind of force it would be resisting, the
2  amount of force that this would resist that would be
3  directed down the steering column to this U joint?
4     A.    Now it's a one-to-one ratio because the
5  amount I can steer is the amount I can turn that.  And
6  the driver -- once he turns the wheel, if it's locked and
7  it doesn't move, then the wheel doesn't move, unless he
8  has the power to be able to either defeat the area where
9  that impingement has occurred or break the U joint
10 which -- I highly doubt he has the ability to break that
11 U joint.  But that's what you're facing.
12          And so if it's locked in and that is
13 pinned in there, that wheel won't turn.
14    Q.    And what is -- can you quantify the force
15 either in shear or torque -- torsional force that would
16 be necessary to fracture the spline?
17    A.    No.
18    Q.    Can you estimate it at all?
19    A.    No.
20    Q.    Have you attempted to determine the amount
21 of force that the maximum force that could be transmitted
22 to this spline by a tread separating from this tire?
23    A.    No.
24    Q.    Why?
25    A.    It's not my issue.

1    Q.    Is it, as you see it, your issue to
2  determine what caused this fracture?
3        A.    I believe I have.  I don't think I need to
4  quantify the forces and I don't think it's necessary
5  because I think it's self-evident the failure occurred.
6    Q.    The failure being the fractured spline?
7    A.    That's correct.
8    Q.    Whether it occurred in the crash or
9  occurred from the tread is something you knew was an
10  issue, correct?
11        A.    No.  Actually, when I first did this
12  collision analysis, I had no idea what the issue was.  I
13  just gathered the evidence.  But I could see that we had
14  an issue as far as the tire marks and the nature of those
15  tire marks because those tire marks are not trouncing and
16  they are not -- we are not having a weight shift that is
17  creating these marks.  We have the wheels swinging back
18  and forth.
19            We can clearly see it in the scrub pattern
20  of each of those wheels.  That is very unusual.  I have
21  done thousands of reconstructions, and I can honestly
22  tell you this is the first time I have ever seen this
23  type of condition with a heavy vehicle collision.  I've
24  never --
25    Q.    You're talking about this caster

1  imbalance?
2    A.    That's correct, the caster imbalance.
3    Q.    And is it also correct you've never seen
4  it reported in the literature?
5    A.    I don't know whether the literature would
6  address it or not.  I could care less whether literature
7  addresses it.  It's purely an engineering issue.  If
8  you're an engineer and you have the knowledge, you can
9  figure --
10    Q.    Whether the literature addresses it or
11  whether you've seen it before, you know that's what
12  happened here?
13        A.    In my opinion, that's what it is, yes.
14    Q.    And as part of this analysis, it didn't
15  occur to you that there would be a question about whether
16  there was adequate force from the tread to fracture; is
17  that true?
18        A.    I am not at all surprised that tread
19  striking this would cause that.  I've seen it --
20  actually, if you look at your -- either your Ackermann
21  arm in the back that ties into your tie rod which is
22  cast -- I've seen those distorted by wheels that have
23  hit -- or by tire components that have hit them.
24            If you look at your steering arm where
25  that whole length -- the drag length comes in to the

1  wheel, I've seen those bent by that as well.  Those are
2  much, much more significant than the spline.
3    Q.    I appreciate the testimony, but I'm
4  asking, is it correct you've never considered whether it
5  might be an issue as to whether this tread was capable of
6  fracturing that spline?
7    A.    No, I don't think it's an issue.  I think
8  it is capable of it.
9    Q.    Have you read the deposition testimony of
10  Lew Grill?
11    A.    I have.
12    Q.    Did you see his testimony that this is
13  like a cupcake striking a helmet of an NFL player?
14    A.    I think that is a Lew Grill-ism.
15    Q.    Did you see that testimony?
16    A.    I did.
17    Q.    Have you done anything to evaluate that
18  testimony?
19    A.    I have no cupcakes or NFL helmets to
20  evaluate that.  I think it's from an individual who has
21  no engineering background, no material science
22  background, no accident reconstruction background, a
23  sophomoric statement.
24    Q.    You had in your blue folder some
25  additional photographs.  And by a quick glance at them,

1  it looked like they tended to deal with the steering
2  system components.
3    A.    Yes.
4    Q.    Is it correct you brought those so you
5  could explain to us what you find significant in the
6  damage to that steering system as it relates to the cause
7  of this accident?
8    A.    That's correct.
9    Q.    And please do that.
10            MR. BROSSEAU:  Let's go off the record.
11            (Recess from 1:47 p.m. to 1:50 p.m.)
12    Q.    (By Mr. Brosseau)  We're now looking at
13  prints of photographs taken by you at your office of the
14  steering gear -- or -- steering components in the FedEx
15  tractor?
16    A.    Yes.  These were taken by me, actually.
17    Q.    Okay.
18    A.    These photographs.
19    Q.    If we're going to talk about them, we
20  probably ought to mark them.  How many do we have, about?
21    A.    Well, let's --
22    Q.    Or do you want to talk just first and then
23  we can figure out if we want to mark them?
24    A.    Yes.
25    Q.    Let's do that.

1      A.    We're going to talk first from the
2  photograph itself.  We can see that there is the ductile
3  portion --
4      Q.    Let me stop you.  Let me mark it.
5      A.    We're going to have two of them.
6          (Exhibits 280 and 281 marked.)
7      Q.    We now have marked 280 and 281 as a
8  coupled set of photos.  Can you tell us what is
9  significant in those?
10     A.    280 is just my photograph of the U joint
11  in the input spline that fractured.  And I'm showing
12  directions of force and also evidence of the torsion
13  that's occurring.  Within the upper photograph, you can
14  actually see marks, very clear, in fact, a little bit.
15  And then you can also see marks that are coming in at a
16  different direction.
17          These marks are showing that not only do
18  we have the shear which is coming in to produce what we
19  call the ductile fracture face -- that's where when it's
20  hit, it's deforming.  Sometimes -- like, when you pull
21  taffy, it's ductile and it thins out and then, boom, it
22  breaks.
23          And then on the back, we can see that
24  brittle portion.  That's that stippling, that rough --
25  almost looks like concrete.  This portion of the fracture

1  here is any elastic basically.  It has no elastic
2  properties.  The first portion has some elastic
3  properties.
4          The force direction for the shear is
5  coming in to the face of the fracture for shear.  The
6  torsion removes the chemical bonding between materials;
7  and, boom, you have the separation.
8          The central portion is a torsion bar that
9  is used to regulate the fluid flow of the power steering.
10  That torsion bar is actually fixed with a pin inside of
11  the upper portion of that input shaft spline that goes
12  into the U joint, and it's also pinned down into the
13  lower portion.
14          And so as you're twisting and you're
15  turning the vehicle, that spline -- one is stationary.
16  That's the one that's inside, and the one on the outside
17  turns or twists that little bar, that torsion bar.
18  Torsion means a twist about longitudinal access of
19  something.
20          So in this case, just like I'm
21  demonstrating with this pen, I put a torsion to it.  It
22  twists and then it has elastic properties that behaves
23  like a torsion spring so that it will restore back to its
24  normal position when you're facing the wheels forward,
25  and then it will twist in the opposite direction when we

1  turn in the opposite direction.  That opens up and closes
2  that fluid assist valve that's coming into the steering
3  box.
4          Here's an important factor.  That bar is
5  in torsion.  So in reality, the position of that bent bar
6  does not necessarily -- it can, but does not necessarily
7  tell us where it was positioned when the crash occurred
8  because it can be twisted completely different.
9          And so the fact that it happens to be
10  sitting adjacent to the location where we see the shear
11  and the actual fracture face, if we will, of the initial
12  portion of that force input may be coincidental, because
13  it is a torsion bar.  It could have been facing in any
14  other direction and twisted back as soon as it failed.
15     Q.    Or it could be impinged in its current
16  location?
17     A.    It could be.  I don't think it is, though,
18  because I remember when I picked it up, it moved.  And so
19  here's one element we have to look at.  We have to look
20  at the directions of applied forces.  In order to apply
21  shear in one direction, you have to have force applied.
22  And when you have it stationary, there's an equal -- an
23  opposite force that must occur, in other words --
24     Q.    I've heard that.
25     A.    Yeah.  It's interesting how that occurs.

1  So for a Newton's third law application into this, it
2  produces shear.  And it may very well be that the bending
3  of that torsion bar is because as the shear is produced
4  and that force is pushing it, it is actually bending the
5  bar in one direction and the opposite direction, if we
6  will, kind of like a shaped S.
7      Q.    Where is the -- if we look at Exhibit
8  281 -- and by the way, just so we're clear -- you may
9  have said it.  280 and 281 are identical except for the
10  arrows and the labeling that you placed onto 281?
11     A.    Correct.
12     Q.    Where, with respect to what we're looking
13  at in 281, is the front of the vehicle?
14     A.    I have no idea.  There's no way to tell
15  that.
16     Q.    So are you able to tell the direction from
17  which the shear force is coming?
18     A.    There's really no way to do that.
19     Q.    Okay.  And when we talked earlier, you
20  talked about torsional force and shear force.  Is it a
21  combination of those forces or is it just one which
22  produces the fracture of the spline?
23     A.    It's the combination of the two.  It's a
24  Mode 3 fracture.
25     Q.    And when you say it's a combination, does

1  that mean -- let me back off that and put it this way:
2  Is it correct, in your opinion, torsional force alone is
3  inadequate to produce the fracture of the spline?
4      A.    Well, in general, that's not true.
5      Q.    In this case?
6      A.    In this case, it probably is true, yes.
7      Q.    And so a shear force is necessary to
8  produce this fracture in this case?
9      A.    That's correct.
10     Q.    And other than to show the shear forces
11  you have with the arrow here, are you able to tell us
12  anything further about where that force is coming from?
13     A.    Yes.
14     Q.    Tell us.
15     A.    Okay.  Let me show you with regards to
16  Mr. Scott's statement regarding this.  And I believe you
17  have some additional ones over here.
18     Q.    I have several additional.
19     A.    All right.  Here we go.  Mr. Scott would
20  like us to believe that the impact produced by the
21  collision either with the Chevrolet Venture or the
22  Chrysler is the element that is producing the failure of
23  that steering input spline, that shaft.  The reason why I
24  use spline is because typically when they're toothed to
25  set in and engage, that is a spline.  It's a shaft.

1  Doesn't matter.  That's a side note.
2          So when we're looking at how that is
3  functioning in this particular case, we have to look at a
4  couple of different things.
5      Q.    When we look at those couple of different
6  things, would it be helpful to refer to a photograph?
7      A.    Yes, it would.
8      Q.    Let's mark those two photographs if we
9  might.
10         (Exhibits 282 and 283 marked.)
11     Q.    Let me hand you Exhibits 282 and 283,
12  Doctor.  Tell us what those photos tell us.
13     A.    282 and 283 are photographs that I took
14  that shows the universal joint that is at the end of the
15  steering shaft.  And I have it set on -- I believe that's
16  the left front frame member so that we can kind of get a
17  look at it.  There's an impact mark that Mr. Scott has
18  identified and believes is the element that produced the
19  force that resulted in the fracture of the spline or that
20  steering input shaft.
21         Now, if we look carefully, there's a
22  couple of identifying features we want to see.  First of
23  all, on the bottom portion of the universal joint, the
24  portion that's closest to where it conjoins with the top
25  of the steering gear box, we can see there's a nut that's

1  on the side where the scraping deformation is present on
2  the bottom portion of that universal joint.
3          On the opposite end is the bolt head.
4  This becomes important when we look at a view of that
5  same portion of the steering U joint when it is now set
6  on the side to where we can see the fracture face, which
7  is an additional set of photographs I have present.
8      Q.    Would it be helpful if we mark these?
9      A.    It would, in fact.
10         (Exhibits 284 and 285 marked.)
11     Q.    Using Exhibits 284 and 285, can you
12  explain what you're talking about here?
13     A.    Yes.  Now, remember we talked about, in
14  using 282 and 283, that the impact force direction that
15  would have produced the damage on the upper portion of
16  the U joint that is suspect to being connected to the
17  spline is on the nut side of that connector.
18         On the nut side of the connector, which we
19  see in Photograph 284, it would have applied a force in
20  the direction that I'm showing in the arrow on 285.  This
21  is the point where the impact occurred and the arrow
22  showing the direction of force applied to that upper
23  portion.  It's actually in the wrong direction to produce
24  shear that we have on the spline.
25         So that tells us that the shear that was

1  on the spline was not produced by the mark that is
2  identified by Mr. Scott.  The forces are not in the
3  proper direction to produce the failure.
4      Q.    And are the forces that were necessary to
5  produce the shear coming in the proper direction from the
6  tire tread?
7      A.    Depending on the orientation of the
8  universal joint at the time when the impact occurs, yes.
9  But I can't tell you what that orientation is because
10  once it comes off, it just spins, and there's no way to
11  tell what it is.
12     Q.    Are you familiar with the terms "lifting"
13  and "peeling" separations?
14     A.    Yes.
15     Q.    Is this a peeling or lifting separation?
16     A.    I would not qualify this as either a
17  lifting or peeling separation.  I would qualify this as a
18  shear and torsion.
19     Q.    We're talking completely different things.
20  Let me clarify.
21     A.    I think we are.
22     Q.    When treads separate -- when treads
23  separate from tires, are you familiar with the fact that
24  they often are referred to as either peeling separations
25  or lifting separations?

1    A.    I have no opinion on tires.
2    Q.    You're not familiar with the -- I'm not
3 talking about the causes, but the mechanism as the tread
4 is coming -- detaching itself from the carcass, how it is
5 flailing other than you're saying it's going to be moving
6 in and moving out as the tire itself is moving
7 directions?
8    A.    I have no opinion on the mechanisms, but
9 we can clearly see the results of it which are on the
10 left front bumper wraparound as well as identified in my
11 inspection in my photos of the rubber transfer that's
12 actually on the face of the upper portion of the U joint
13 that connects to the steering shaft as well as on the
14 steering shaft itself.
15    Q.    As the -- if the tread is a mechanism that
16 produces a fracture of the spline, is it correct that the
17 tread has to reach the spline?
18    A.    No.
19    Q.    What parts could it reach instead of the
20 spline to produce the fracture?
21    A.    The shaft and the U joint.  And once
22 striking the shaft and the U joint, the shear, meaning
23 the motion between the U joint where it connects and
24 rotates at the top of the steering gear boxes, that's
25 where our shear is being produced.  It's not actually a

1 direct impact into the U joint, but it's the
2 differentiation of that motion that's occurring between
3 the gear box and the U joint.
4    Q.    In fact, in this case, you see some
5 transfer marks or what you refer to as transfer marks on
6 the shaft itself, correct?
7    A.    On the shaft and U joint, yes.
8    Q.    And to the extent that they're on the U
9 joint, if they are from this tread and are causally
10 related to the spline fracture, then the tread has to
11 reach the U joint to the extent the U joint is involved?
12    A.    That's correct.
13    Q.    And if they're on the shaft, the tread has
14 to reach the shaft?
15    A.    That's correct.
16    Q.    Okay.  Is it correct that the U joint is
17 inboard -- we talked about the box overall, but it is
18 inboard of the left steer axle tire in the nondeformed
19 condition, precrash?
20    A.    Yes.
21    Q.    Okay.  And I understand you haven't
22 quantified the distance between those two, but it is
23 inboard and it is located slightly below the top of the
24 tire; is that right?
25    A.    It is -- meaning the U joint?

1    Q.    Yes.
2    A.    It is inboard and approximately adjacent
3 to the top --
4    Q.    Okay.
5    A.    -- of the tire, yes.
6    Q.    And the shaft runs essentially up and
7 rearward from the U joint; is that right?
8    A.    Yes, diagonal.
9    Q.    For the tread to make contact in a fashion
10 that would damage -- strike that.
11         In order for the tread to reach the
12 steering components, as you have opined, with sufficient
13 force to fracture the spline, does the tread still have
14 to be connected to the carcass?
15    A.    Most likely, yes.  I believe it would be.
16    Q.    So if the tread is off by the point that
17 it's making contact with the shaft or the U joint, it
18 probably does not have enough force to, in part, produce
19 the fracture, correct?
20    A.    I don't know.
21    Q.    When you say it probably has to be
22 attached, is not the corollary also true; and that is, if
23 it's not attached, it probably doesn't have enough force?
24    A.    No.  It doesn't mean one without the
25 other.  But we do have evidence it probably was because,

1 otherwise, we don't have the marks clear up on the upper
2 portion near where the front frame rail and the
3 wraparound at the bumper connects near the frame rail and
4 on the other corner.  So it tells it's sufficiently long
5 enough to reach there which is quite a distance away.  It
6 should be sufficiently able to reach up in the area where
7 the steering column components are.
8    Q.    Did the tread flap that reached the bumper
9 wraparound piece, was that the same tread piece that made
10 the marks on the steering shaft?
11    A.    I have no idea, but it's probable.
12    Q.    Why is it probable?
13    A.    Because it would be long enough.
14    Q.    Aren't there two pieces long enough out at
15 the scene that you saw that would be long enough?
16    A.    There probably are.  But I'm saying that
17 it's probable that that one -- and you're assuming again
18 that that's only hit once.  That could be hit several
19 times.  And I don't know that it wasn't hit several
20 times.
21    Q.    I'm not making that assumption.  I'm
22 asking you, you said you need a long enough piece.
23 You've got two pieces that are long enough, don't you?
24    A.    I believe so, yes.
25    Q.    One of which doesn't come off until the

1 vehicle is at least in the median, correct?
2    A.    That's correct.
3       Q.    So that piece couldn't have done it,
4 right?
5    A.    I don't know that it couldn't have done
6 it.
7       Q.    By that point, the fracture has already
8 occurred, in your opinion, correct?
9    A.    It has, but what I'm telling you is that
10 was at one time attached. So that doesn't mean that that
11 wasn't the portion that was flailing that hit it. It
12 becomes detached later, but it doesn't mean that it
13 wasn't the portion that hit. I can't tell you which
14 portion --
15       Q.    Okay.
16    A.    -- or which ones --
17       Q.    Okay.
18    A.    -- if they're multiple.
19       Q.    So the record is clear, in your opinion,
20 you need a tread piece that's long enough probably to be
21 attached to the carcass and make contact with the
22 steering shaft and/or U joint while the tread is still
23 attached to the carcass probably?
24    A.    Probably, yes.
25       Q.    And there are at least two pieces that

1 you've seen that related to the left steer axle tire that
2 are possible candidates for being long enough to reach
3 those steering components?
4    A.    Did you say at least two?
5       Q.    Yes.
6    A.    Yes.
7       Q.    Okay. There are only two that you know
8 about, but there could be more?
9    A.    There's actually three pieces.
10       Q.    That are long enough?
11    A.    Well, here's the key. When they're at
12 rest, we've had a lot go on. But they could have been
13 attached at different times, and we see them at rest but
14 we have no idea why they're there.
15       For instance, the piece that is sitting
16 next to the bumper wraparound could have at the time been
17 attached to one of the other two pieces. It could have
18 been its own independent piece. I can't tell you that
19 because I don't know because I didn't observe it. So
20 there's the potential of three pieces. And I can't tell
21 you which one or if all three didn't make contact.
22       Q.    When you say you didn't observe it,
23 there's at least one piece near the bumper wrap that you
24 did not personally see?
25    A.    No. I said I did not observe which one

1 contact -- meaning I wasn't there present watching the
2 wheel fail -- or the tire fail and watch it, so I can't
3 tell you.
4       Q.    So we'll eliminate you as a cause of this
5 accident?
6    A.    Yes, I think so.
7       Q.    As the tread flap is coming off the tread,
8 recognizing that you're not prepared to say whether this
9 was a lifting or a peeling separation, are you able to
10 say whether the tread that was doing this damage made the
11 damages the tire was -- as the flap was attached at the
12 front end of the flap, in other words, in the direction
13 of the tire as it's rotating coming over the top or, for
14 example, a piece that is trailing the tire as it's
15 rotating?
16    A.    I think logic prevails it has to be a
17 trailing piece. A leading piece will be due to -- the
18 rotation will actually hug closer to the carcass of the
19 tire, whereas the trailing piece will stay out away from
20 the tire and rotate and slap forward.
21       Q.    Okay. It has to be a --
22    A.    A trailing piece, otherwise it doesn't
23 extend.
24       Q.    Have you made any -- let me back up.
25       You haven't seen a transcript of John

1 Scott's deposition, correct?
2    A.    No.
3       Q.    Are you aware from his supplemental report
4 what he determined was the distance between the center
5 line and the steer axle tire and the U joint or spline?
6    A.    No. I would imagine it's probably 10 to
7 24 inches.
8       Q.    If, indeed, the steering components we
9 talked about that necessarily would have to be impacted,
10 that being the U joint and steering shaft, one or the
11 other or both, are inboard as they are, what is the
12 mechanism by which the tread as it's rotating around the
13 tire gets inboard that 18 to 24 inches?
14    A.    Well, there's an assumption I think
15 Mr. Scott is making that he's not thinking about, so that
16 tire is not facing forward. The wheels are turning to
17 the left. So that means the back end of that tire, if
18 it's still trailing at least in the direction of the
19 wheel, is closer to the frame rail, in fact, very close
20 to the frame rail. And the outboard portion of that tire
21 is away from the frame rail because it's turned towards
22 the left.
23       That means as it rotates, it necessarily
24 will come very close not only to that steering shaft but
25 also the universal joint, because we know the wheels are

1  not straight.  And I think the assumption of the straight
2  line distance and the wheel rolling straight and the
3  trailing piece following behind, it would trail in a
4  direction that is not in intercept with the steering
5  shaft or the U joint.
6       Once you turn that wheel and that tire is
7  rotating now not forward in line with the direction of
8  the vehicle's body, but at an angle to it, now it comes
9  very close to the frame rail and then away from the frame
10  rail in the front.
11       Q.    Have you made any study, have you done
12  anything to document, and have you made any measurements
13  that would show that the tread piece, even when assuming
14  that the tire is -- assuming the tire is still on the
15  wheel while it's in the westbound lanes, if you take that
16  wheel and you turn it to full stop to the left, whether
17  it will be on a plane that will reach any of these
18  steering components?
19       A.    I don't have to do that study.  I think
20  it's very clear.  And the reason for that is when at full
21  stop to the left, the back edge of that tire is going to
22  be literally inches away from the inside frame rail
23  rather than measuring with fractions of feet.  That's
24  because we want a very hard left or right turn and low
25  speed turning circle so that the way the Ackermann is set

1  on the inside wheel, the inside wheel will turn much
2  tighter than the outside wheel.  That's the Ackermann
3  effect; because if we have them both turning at the same,
4  then we have them working against each other during the
5  turn.  That's why your Ackermann arm is bent as it leads
6  into the tire rods.
7       So as I turn to the left, the left will be
8  tighter than the right.
9       Q.    So if we were to take -- and understanding
10  from your testimony, you haven't done it.  But if you
11  were to take, say, an exemplar Cascadia substantially
12  similar in design and put the same tire size on and turn
13  this steering wheel as far left as you can turn it and
14  then see what the plane is described by that steer tire
15  at that point, is it your testimony that that plane would
16  intersect either the portion of the shaft or the U joint
17  that has rubber transfer marks?
18       A.    No.  The plane won't.  The plane will go
19  underneath and it will intersect underneath.
20       Q.    Longitudinal plane?
21       A.    That's irrelevant.  You have a
22  three-dimensional system.
23       Q.    You tell me X, Y, or Z.  Which hits it?
24       A.    Yes.
25       Q.    Which one?

1       A.    Yes.
2       Q.    Which one?
3       A.    All.
4       Q.    X, Y, and Z all --
5       A.    All.  Let me tell you why they do it.
6  Because once you take that piece of the tire out, that
7  piece of the tire is also elastic.  It has properties
8  that when it's moving, it can move side to side and it
9  can whip as it comes through.  And if I have any angular
10  rotation due to the fact that tire is no longer perfectly
11  torous and round -- torous meaning the shape of the tire
12  as we look at the cross cut section and round as in the
13  circumference -- then that causes that tire, just as we
14  see in our physical evidence, to move side to side.  And
15  that side to side is going to cause that piece to also
16  move side to side.
17       Q.    I don't think you're answering the
18  question that I asked.
19       A.    I think I am.
20       Q.    Let me try again.  And that's the plane of
21  the tire, assuming that you turn the wheel to full stop,
22  and you said you want to talk about all the planes, but
23  you're also describing the way it gets in there is
24  dependent, at least, in part of the elasticity of that
25  tread moving outside the plane described.

1       A.    Not necessarily, but it will.
2       Q.    But isn't what you described as a way to
3  get it outside the plane is the tire because of its
4  elastic properties flailing outside the plane?
5       A.    No.  No.  First of all, the plane will
6  intersect.  Here's how we look at it.
7       Q.    Intersect what?
8       A.    Let me show you.  If I have a plane of a
9  tire -- my computer is the direction of turn of that
10  tire.
11       Q.    Okay.
12       A.    And this is the plane.  Here's the
13  steering shaft.  That plane intersects.
14       Q.    That's what I'm asking you.  You're saying
15  that you don't need to do the analysis; you can see that
16  it does?
17       A.    Yes.
18       Q.    And it's going to intersect at the point
19  where the rubber transfer marks are made?
20       A.    Well, and it has to because it's there and
21  I see it, so yes.
22       Q.    Assuming that you're correct that's what
23  does this while the tread is still on and long enough to
24  produce the damage?
25       A.    I saw this vehicle within a day and a

1 half -- or half a day, I should say, less than a day
2 after it occurred. I actually physically observed the
3 evidence, and I believe that evidence was completely
4 missed by the other inspectors, and they never bothered
5 to wipe off the dirt that was on those to see if it was
6 present. And I think that was an error on their part.
7 And this is something that we clearly saw and recorded.
8     Q.    You said that you have some comments or
9 done some analysis in response to Mr. Scott. We've
10 talked about some of that, correct?
11     A.    I think we talked about most of it.
12     Q.    Did we talk about all of it?
13     A.    Pretty much the main points I wanted to
14 get, I think.
15     Q.    How about any small points? I'd like to
16 make sure I have a complete collection of all of your
17 opinions.
18     A.    Well, Mr. Scott has missed the -- he's
19 fixated on the fracture of this spline as being produced
20 by the impact. He's also fixated on believing that if
21 this spline fractures, then it should have damaged the
22 power steering reservoir or it should have damaged the --
23 all of the components to include, I believe, the fuel
24 filter, all those areas. There's a problem with that, is
25 that we can clearly see on the bumper wraparound left

1 front panel that while it was connected to the vehicle,
2 it was struck and torn free from its fastening points at
3 the left front of the vehicle by a portion of that tire
4 as it whipped and hit it.
5     We see the marks actually wrap around the
6 back portion and actually strike into the front and the
7 interior portion of that panel. Well, if that were the
8 case, then just simply that evidence right there shows
9 you that you don't have to have damage to any of the
10 hoses that are in that location. You don't have to have
11 damage to the fuel filter. You don't have to have damage
12 to the power steering reservoir, because we know that
13 that occurred and we also know that that left front
14 bumper corner panel was found closest to the point where
15 our marks begin further from the point where it crossed
16 the median.
17     So that tells us that it occurred during
18 that tire separation. And I think his fixation on that
19 has taken him away from realizing that the damage to the
20 fuel filter and the damage to the power steering
21 reservoir and the damage to all of those components
22 adjacent to the engine compartment, the left frame rail
23 buckling, the fact that that left front wheel is pulled
24 all the way back, those are all impact induced. Those
25 are impact induced from striking with the Chevrolet

1 Venture first and then also the final impact that we see
2 with the Chrysler.
3     And they do not have to necessarily occur
4 at the same time that the damage and the fracture to the
5 universal joint at the steering gear box occurred.
6     Q.    Do you have any further comments on Mr.
7 Scott's work?
8     A.    I think his determination of speed --
9 unless his determination of speed is essentially similar
10 to what I've just got done saying, Listen, let's assume
11 this is your start speed, then this would be your
12 deceleration. I think that that is relatively the same,
13 but there's also another caveat we have to look at very
14 carefully. Here it is.
15     Impact with Chevrolet will produce a rapid
16 deceleration of the vehicle much, much higher than a
17 breaking coefficient can generate. I think we would all
18 agree with that. Impact with the Chrysler will generate
19 a deceleration or a negative acceleration of that vehicle
20 much greater than any breaking coefficient can produce.
21     So for averaging all of those deceleration
22 values over the full length, we have to look at one thing
23 very important. Most of the deceleration occurred at
24 those two impacts. So that means the actual true roadway
25 and median deceleration rates must be much lower than

1 what we have for calculating the average.
2     That means if it's much lower, breaking
3 cannot occur, not while he's in the westbound lanes and
4 not until he enters the center median. And so those are
5 key factors. I disagree that any breaking has been
6 applied while that freightliner was in the westbound
7 lanes, and I think the physical evidence washes that out.
8     Q.    Anything else you disagree with Mr. Scott?
9     A.    There was one other point that I was
10 thinking of while I was giving that one.
11     MR. KLINE: Before you do that, can I have
12 the first part of that prior answer read back? I could
13 not hear when he said what the most --
14     MR. BROSSEAU: We're going to get there,
15 if you want.
16     MR. KLINE: Okay. I didn't hear what he
17 said the most significant deceleration point was.
18     A.    That I can answer, if you want. The most
19 significant deceleration occurs --
20     MR. KLINE: If we're going back over this
21 ground, then I'll just let the record stand for what it
22 is.
23     MR. BROSSEAU: Certainly.
24     Q.    (By Mr. Brosseau) And you said you think
25 there's one other thing you disagree with Scott on?

1   A.   Yes.  Let me think about it.  I think
2   primarily I don't think this is a driver error issue.
3   This is not a driver error issue.  This is an issue of a
4   fracture of a mechanical component that directs that
5   vehicle that is fracturing at the earliest portions of
6   this collision sequence to the point where the driver has
7   no steering control.  And the lack of steering control
8   and the lack of right steer is not due to the lack of
9   right steer input.
10          But the lack of continuity between the
11  steering wheel with the steering shaft with the U joint
12  into that input spline through the worm gear and the gear
13  box with the power assist into the pitman arm and into
14  that drag link, that is pushing that wheel either left or
15  right.
16      Q.   Anything else?
17          MR. KAPP:  Object to form that it's overly
18  broad.
19      A.   I think that Mr. Scott also neglects to
20  consider the ECM braking data, which is not associated
21  with the same module that's recording the speeds of the
22  vehicle.
23      Q.   (By Mr. Brosseau)  This is the 2.2 seconds
24  before?
25      A.   That's right.

1   Q.   Okay.
2       A.   So the braking -- if the braking was 2.2
3   seconds before, the most significant first event that is
4   occurring is the impact with the Chevrolet Venture.  But
5   if we assume that that was insufficient and that it
6   wasn't until we had impact with the Chrysler minivan that
7   we had the event that would establish our zero and our
8   deceleration at the proper rate, then that places braking
9   even further into the westbound lanes, meaning the
10  driver's attempt to control and this left steer is not as
11  Mr. Grill's or anyone else's -- is not induced by
12  braking.  It's not a braking issue.  It is a problem with
13  the failure of the steering system.
14          And then the driver -- the only other
15  option he has remaining is to be able to apply his
16  brakes.  If we look at perception response times, we were
17  assuming the first thing the driver decides to do is
18  attempt to steer, but that steering does not function,
19  and his next attempt is to brake the vehicle to slow it,
20  then it is extremely consistent with not only the ECM
21  braking data, but the time distance chart that I showed
22  you which means the braking is occurring in the median or
23  as he's entering the westbound lanes.
24      Q.   Anything else?
25          MR. KAPP:  Same objections, to the form

1   and overly broad.
2       A.   I knew there was one I wanted to tell you,
3   and I can't think of it right now.  As we progress into
4   the deposition, if I remember that, may I address that?
5       Q.   (By Mr. Brosseau)  You may.  Please do.
6       A.   Thank you.
7       Q.   Now, you said there were two significant
8   decelerations?
9       A.   Yes.
10      Q.   They were the two impacts with the vans?
11      A.   Yes.
12      Q.   And is it correct you have not attempted
13  to determine the extent of either deceleration?
14      A.   No.
15      Q.   That is correct?
16      A.   It is correct.
17      Q.   So you just know that those are heavy
18  decelerations.  But beyond stating that qualitatively,
19  you have not calculated it quantitatively; is that true?
20      A.   It cannot be done, but, yes.
21      Q.   And tell us why it cannot be done.
22      A.   Because we do not have adequate stiffness
23  data to be able to tell us about that.
24      Q.   Are you talking like Neptune stuff?
25      A.   No, I'm talking about -- well, yes,

1   Neptune stuff to a certain degree.
2       Q.   What's non-Neptune that you're talking
3   about?
4       A.   I'm talking about my dissertation and a
5   group of papers that I wrote regarding what's called the
6   G data delta V system of equations.
7          It's generalized deformation and total
8   velocity change analysis system of equations.  This
9   allows us to be able to use Newton's third law to be able
10  to fill in blanks that we couldn't do before.  I went
11  through and reformulated the algorithms to include
12  vehicle rotation, intervehicular friction, tire ground
13  forces.  And then when we're impacting, we also look at
14  the effects of an offset or oblique impact and those
15  rotational forces that are also being contributed into an
16  impact event.
17          This gives us more of a direct planar
18  dynamics view of collisions, much better than we had
19  before.  And the accuracy is typically between 6 and 8
20  percent, and it's better than anything we've had before.
21          One thing it allows us to do is if we have
22  good reliable stiffness factors for vehicles -- for one
23  vehicle but I don't for the other, then I can use a
24  Newton's third law relationship between the two and solve
25  for the unknown and calculate what I need to find, which

1 required previously to have stiffness values for both of
2 those.
3          On the Chevrolet Venture, we not only
4 struck into the side of the vehicle, but we also struck
5 an axle. And that is a very different stiffness value
6 than if I was to generate that from a side impact test,
7 clearly very different, because axle is a hard zone, but
8 also I'm striking soft and hard zones in combination. I
9 have no stiffness factors for the front of the
10 freightliner. We just don't have them.
11          Now, if I was to impact into the front of
12 the Chrysler, I could do an analysis except for one
13 problem. I don't know what damages were initially
14 present on the vehicle from the impact with the
15 Chevrolet.
16          If I could quantify that, then I could do
17 the Chevrolet -- or the Chrysler's impact with the front
18 of the freightliner and then back that out and know what
19 the remaining energy of the total amount of damages on
20 the freightliner which allows me to be able to solve the
21 equations to figure out what the energy dissipation was
22 on the Chevrolet. Unfortunately, I can't do that.
23 There's no way to do that.
24     Q.    So you have not quantified the
25 deceleration of either impact?

1     A.    I can't.
2     Q.    And you understand Mr. Scott hasn't
3 either, correct?
4     A.    That's correct. In fact, I believe that
5 he's indicated that that's a missing value that he can't
6 account for.
7          (Exhibit 286 marked.)
8     Q.    Do you recognize 286 as a scene photo?
9     A.    I do.
10     Q.    Do you know who took it?
11     A.    That is a highway patrol photo, it looks
12 like, to me.
13     Q.    Do you see a number of tire marks
14 associated with this vehicle in that photograph?
15     A.    That is not a highway patrol photo.
16 That's my photo.
17     Q.    Do you recognize the number of tire marks
18 associated with this vehicle in that photo?
19     A.    I do.
20     Q.    Are you able to identify which tires made
21 which marks?
22     A.    I think I can.
23     Q.    Please do. And if you can use that same
24 blue Sharpie, I would appreciate it.
25          MR. BROSSEAU: Off the record.

1          (Recess from 2:47 p.m. to 2:51 p.m.)
2          (Exhibit 287 marked.)
3     Q.    (By Mr. Brosseau) Dr. Ogden, did you, per
4 my request, on 286 label various tire marks that show in
5 that exhibit that relate to the subject tractor --
6     A.    Yes.
7     Q.    -- except for the left front?
8     A.    I think you asked me for the -- do you
9 want me to label all of them?
10     Q.    All of the tire marks that you see from
11 the tractor-trailer combination.
12     A.    Certainly.
13     Q.    Have you now labeled all the tire marks
14 you associated with this tractor-trailer combination that
15 appear in Exhibit 286?
16     A.    Yes.
17     Q.    And ROS means?
18     A.    Right outside. That means you're dealing
19 with duals.
20     Q.    Then I asked you if you could find for us
21 the document that you said indicates that there was a
22 break event, and you said earlier 2.2 seconds before or
23 from something?
24     A.    It's not 2.2. This is a 1-hertz system.
25 It is 2 seconds.

1     Q.    So where you said 2.2 before, you're
2 saying 2?
3     A.    That's correct. The 2.2 relates to, I
4 believe, the ACM data that was related to, I believe, the
5 Chrysler. And then it led -- there was a total amount of
6 that braking plus 1.4 seconds of the emergency brake
7 actuation system that had occurred.
8          So this is two seconds. It's a 1-hertz
9 system, meaning that it can be anywhere from 2 to 2 and a
10 half seconds.
11     Q.    And you are looking at the third page of
12 Exhibit 287?
13     A.    Indeed, yes.
14     Q.    And which data are you looking at for this
15 purpose?
16     A.    You look under the brake column.
17     Q.    And down, I assume, that you're going to
18 say to the area where there is seven yeses?
19     A.    That's correct.
20     Q.    Is there any power interruption going on
21 in this period of time?
22     A.    No.
23     Q.    When does the power interruption occur?
24     A.    Most likely with the impact with the
25 Chrysler.

1    Q.    Why is this data showing zero as vehicle
2  speed at the time that the braking was going on?
3    A.    Because vehicle speed is written within
4  the -- I believe it's 15 or 16 seconds after the vehicle
5  comes to final rest.  There's a requirement that after
6  the vehicle comes to final rest, it must be stopped
7  for -- I believe it's either 15 or 16 seconds, whereas it
8  pulls all that speed data off the engine rest.  But we
9  don't have that communication.
10        So when the vehicle comes to final rest,
11  there is no communication so there's no data to pull.
12    Q.    And does that depend on which version of
13  ECM you're looking at?
14    A.    It does, but for this particular vintage
15  DDEC, that's how it records.  And I believe it's 15 or 16
16  seconds, but I don't recall.
17    Q.    What is your basis for that statement that
18  that's the time for this particular unit?
19    A.    My memory from my HVEDR course that I
20  retook here about a year and a half ago and also from
21  that resource -- I could be off by that time period a
22  little bit, but I believe that's what it is.
23    Q.    So that means that in the last 15 or 16
24  seconds this should be showing zeros?
25    A.    No.  It simply means that it's gathering

1  that information and writing it.  And after that, it will
2  show zeros, yes.  When it has come to a stop, if it comes
3  to a stop within the time frame after the 000 time.
4        The 000 time is an event time.  It is not
5  the time when the vehicle stops.  It is basically telling
6  you that an event occurred that met the criteria for
7  recording the information.  If it's a last stop record,
8  the 000 may be when it comes to a complete stop.
9    Q.    And why is there a 1.0 and a 0.5
10  sandwiched between a whole bunch of zeros under vehicle
11  speed?
12    A.    That's probably because of fault code or
13  just an anomaly in the system.
14    Q.    Do you know, can you give an explanation
15  or are you saying those are maybes?
16    A.    Those are maybes.  And I think the best
17  way to go, I don't know.
18    Q.    When you say the best way, your best
19  answer is you don't know why it's showing this?
20    A.    I don't think there's a way to be able to
21  tell.
22    Q.    Do you happen to know which version of ECM
23  this is?
24    A.    I do.  It should be on the very first
25  page, or you could run the VIN and look, if I don't have

1  it in here.  I would imagine this is a 10, a DDEC 10,
2  because of the year and -- oh, here we go.  Reports
3  configuration page 1 of 1, ECM type, DDEC 10.
4    Q.    Is there an R22 associated with it?
5    A.    Yeah.  The ECM S/WR22 or 20008, yes, a
6  software version of it.
7    Q.    Are you aware of any published literature
8  that talks about the necessity for things like an elegant
9  stop in order to collect this data?  Do you know what an
10  elegant stop is?
11    A.    Maybe you can describe it for me.
12    Q.    Are you aware of any literature talking
13  about elegant stops?
14    A.    No.
15    Q.    Are you aware of any literature talking
16  about last stop records?  Are you aware of any published
17  literature on the topic?
18    A.    Not offhand, but I do know that there is
19  some and I have reviewed some, but I can't tell you what
20  it is.
21        (Exhibit 288 marked.)
22    Q.    I hand you Exhibit 288.  Towards the lower
23  right there is an object that is in the median.
24        Do you recognize that?
25    A.    I do.

1    Q.    What is it?
2    A.    Piece of tire.
3    Q.    Is it one of the pieces of tire that you
4  previously circled?
5    A.    No.
6    Q.    Could you circle the piece of tire that
7  you see in Exhibit 288?
8    A.    Sure.
9    Q.    Do you have an opinion as to whether that
10  piece of tire came from the subject tire?
11    A.    I would imagine it does.  I think it's
12  probable that it did, but I don't know for sure.
13    Q.    As I understand your testimony, you
14  believe the probable piece of tread that we saw that was
15  approximately located to the piece of bumper wraparound
16  probably came off sometime around the time that the
17  bumper came off?
18    A.    That's correct.
19    Q.    Other than that, other than that piece, do
20  you have an opinion as to when any other piece of tire
21  tread came off this tire?
22    A.    No.
23    Q.    You brought with you -- you said -- to put
24  it in context, in your report, Exhibit 258, you cited
25  four reference sources, and you said, There's another one

1  I brought with me in addition.
2     A.   Correct.
3     Q.   And that other one is a paper by Fawzi
4  Bayan, et al.?
5     A.   Yes.
6     Q.   And that's SAE 2009-01-2918?
7     A.   That is correct.
8     Q.   Have we now addressed all of the
9  literature that you've cited or referred to for your
10  work in this case?
11     A.   Specifically, yes.
12     Q.   How about generally?
13     A.   No.
14     Q.   What other general literature are you
15  relying upon for your work in this case?
16     A.   I have an extensive education, training,
17  and experience over nearly 30 years.  And, I mean, I have
18  textbooks that I have used that I've garnered knowledge
19  from.  I have -- I'm an avid reader of dynamics books,
20  believe it or not.  Somebody may sit down and read a
21  Clancy novel; I read a book by JD Greenwood on advanced
22  theoretical dynamics.  That's just the kind of guy I am.
23        I have from training courses that I've had
24  materials that I've reviewed, so that all goes into the
25  elements that generate that.  And so some of those are

1  tangibles and some of those are intangibles.  Does that
2  make sense?
3     Q.   Did you refer to any publication
4  specifically in your work in this case?
5     A.   Yes.
6     Q.   Other than the five we've now talked
7  about?
8     A.   No.
9     Q.   You also produced a number of binders that
10  comprise some of your file materials.  I want to identify
11  what you do have in your file.  And I'm not sure the best
12  way to inventory it.  But we were -- we earlier took a
13  look at a flash drive that was produced at the time of
14  your disclosure.  We've talked about your report and some
15  materials that were produced back at the time of your
16  report such as a CV and a testimony list and a fee
17  schedule.  We have those.
18     A.   Yes.
19     Q.   You also then produced some binders that
20  included a listing of items generated?
21     A.   Yes.
22        (Exhibit 289 marked.)
23     Q.   Is 289 one such inventory?
24     A.   Yes.
25     Q.   We also looked at your Section E to your

1  own materials, correct?
2     A.   Yes.
3     Q.   We marked, in fact, as exhibits everything
4  in that Section E?
5     A.   That's correct.
6     Q.   What else, if anything, do you have in
7  your book contrasting it with Mr. Kapp's book?
8     A.   I would assume that you have the points
9  that were generated by the GPS survey?
10     Q.   I do not.
11     A.   I have them in my book, and they are
12  part -- if you want to --
13     Q.   Sure.  Let me just --
14        MR. KAPP:  Let's go off the record real
15  quick.
16        (Discussion off the record.)
17        (Exhibits 290 and 291 marked.)
18     Q.   (By Mr. Brosseau) Exhibit 290, what is
19  that, Dr. Ogden?
20     A.   Exhibit 290 is our print of the GPS survey
21  points that were gathered by the Wyoming Highway Patrol.
22     Q.   Okay.  Did you, yourself, or your company
23  also measure the scene?
24     A.   Yes.
25     Q.   And did you use a scanner?

1     A.   Yes.
2     Q.   Was it a FARO?
3     A.   Yes.
4     Q.   Do you have those data?
5     A.   Yes.
6     Q.   Are they here?
7     A.   Yes.
8     Q.   And, obviously, they're here
9  electronically?
10     A.   Yes.
11     Q.   Is it on a disc that's in one of these
12  folders?
13     A.   Yes.
14     Q.   You have -- I say you.  Are you the one or
15  was it the Wyoming Highway Patrol that provided the
16  descriptions for many of those survey points?
17     A.   Wyoming Highway Patrol.
18     Q.   And you notice that there are some points
19  where the Wyoming Highway Patrol described in those data
20  fluid, correct?
21     A.   Yes.
22     Q.   Did you find any fluid in any location
23  other than the eastbound lanes?
24     A.   No.
25     Q.   Exhibit 291 is the CV with attached

1    testimony list that you gave me this morning?
2       A.    Yes.
3       Q.    And I understand that since we received
4    the last version that, among other changes, you are now a
5    P.E. in Wyoming?
6       A.    Correct.
7       Q.    When did you get your P.E. license in
8    Wyoming?
9       A.    Oh, in Wyoming?  It came within days after
10   I wrote this report.  I actually submitted for my P.E.,
11   gosh, I want to say back in August.  They only meet once
12   or twice a year.  And I just missed their date, so it
13   might have been back in July when I submitted it.
14      Q.    Did you pursue the P.E. for the purpose of
15   this case?
16      A.    No.  I do a lot of work in Wyoming, a lot
17   of work.  Most of the work that I do is as an accident
18   reconstructionist.  And in reality most of the
19   testimonies that are within the realms of an
20   accident reconstructionist that has specialties in
21   vehicle dynamics.  But there was a -- I believe there was
22   a ruling a few years back where Wyoming said, You've got
23   to have a P.E.
24            Now that, of course, violates separation
25   of powers and probably come up to an issue where the

1    state Supreme Court will say, No, you can't tell me what
2    happens in my courts.  But with that said, most other
3    states have dealt with that, so I just went ahead and got
4    my P.E. in Wyoming.
5       Q.    Did you face any challenge to your ability
6    to testify on the grounds of a practicing engineer?
7       A.    Never.
8       Q.    But to avoid such challenge, you decided
9    it was a good time to get the P.E.
10      A.    Yeah, go ahead and by comedy get my P.E.
11   on my own, correct.
12      MR. KAPP:  Off the record.
13            (Discussion off the record.)
14      Q.    (By Mr. Brosseau)  We have now, as far as
15   you know, covered everything in your book; is that right?
16      A.    Yes.
17      Q.    Okay.  Then we have another binder which
18   is in Mr. Kapp's books as we broke them down earlier?
19      A.    As the information provided to me.
20      Q.    And there are 10 different sections to
21   this book?
22      A.    The first notebook, yes.
23      Q.    Okay.  I'm sorry.  Of these two notebooks
24   combined?
25      A.    You are looking currently at Number 2.

1    Number 1 is -- there you go.  That's Number 1.
2       Q.    Number 1 has Sections 1 through 8 and 2
3    has Sections 9 through --
4       A.    14, it should be, or 16.
5       Q.    14, maybe?
6       A.    14, yes.
7       Q.    And is there material in every section?
8       A.    Yes.
9       Q.    Was anything removed?
10      A.    No.
11      Q.    And everything -- is everything in these
12   two binders hard copy of something?  In other words, we
13   don't have anything that's stuck in here like a flash
14   drive or CD or DVD?
15      A.    Correct.
16      Q.    You identified in Exhibit 258, your
17   initial report, all of the materials that you reviewed,
18   including those provided to you as of the time of that
19   report, correct?
20      A.    Yes.
21      Q.    And since then, you added some materials
22   that were in Section E that became some deposition
23   exhibits today.  You've also received the deposition of
24   John Smith with exhibits, and you've received the
25   deposition of Lew Grill with exhibits.  And you've

1    received a supplemental report from John Scott.
2       A.    Also I received the disclosures because I
3    believe we had a simultaneous disclosure in this case.
4    So those I did not have at the time of my report either.
5       Q.    So you received both FedEx and
6    Bridgestone's expert disclosures with reports attached;
7    is that right?
8            If you want to look at your materials,
9    please do so.
10      A.    Please.  Some of it I don't care to spend
11   much time on because it's not my area.  You had included
12   FedEx's discovery?
13      Q.    Yes, the disclosures.
14      A.    I don't have that.
15      Q.    Okay.  So do you have a disclosure from a
16   FedEx retained expert named Dennis Ritchie?
17      A.    No.
18      Q.    Do you have -- is it correct you have
19   spoken with lawyers with three different law firms which
20   represented FedEx in this case?
21      MR. KAPP:  You can answer yes or no.
22      A.    Yes.
23      Q.    (By Mr. Brosseau)  Have you spoken with
24   lawyers from each of those three firms?
25      A.    Yes.

1     Q.     In addition to lawyers, you've also had

2 communications regarding this case with Mat Martonovich,

3 correct?

4     A.     Yes.

5     Q.     Have you had any communications with

6 others associated with OEC?

7     A.     Yes.

8     Q.     Who?

9     A.     Courtney Engle.

10     Q.     Anybody else?

11     A.     Carson Ogden.

12     Q.     Anybody else?

13     A.     And Sherie Ogden.

14     Q.     Is that it?

15     A.     Yes.

16     Q.     Who's Bill Mill?

17     A.     Bill Mill is an investigator out of Fort

18 Collins.

19     Q.     Have you had any communications with Bill

20 in this case?

21     A.     I haven't, no.

22     Q.     Other than the people we've just mentioned

23 or the entities being the law firms we just listed, prior

24 to today, with whom have you, first of all, spoken, if

25 anybody, regarding this case?

1     A.     I think that's it.

2     Q.     Did you ever have conversations with Bill

3 Woehrle regarding this case?

4     A.     I may have very early on.

5     Q.     What do you recall of that may have had

6 conversation?

7     A.     Nothing. I recall nothing. I think I may

8 have, though.

9     Q.     Other than perhaps Mr. Woehrle, any other

10 people that I've mentioned? Are there others with whom

11 you've spoken in connection with this case?

12     A.     Yes.

13     Q.     Who?

14     A.     The tow truck driver that towed the FedEx

15 vehicle to the location in Cheyenne where it was

16 originally stored.

17     Q.     Anybody else?

18     A.     Not that I can recall.

19     Q.     Have you had any conversations with any of

20 the Wyoming Highway Patrol troopers regarding this case?

21     A.     I may have, and I may have called them

22 regarding information as far as vehicle locations, et

23 cetera. However, I usually have my associates, either

24 Mr. Martonovich or Ms. Engle, do that, so I do not know

25 in this case whether I did or they did.

1     Q.     When you say "locations," you're talking

2 about this then present locations that the vehicle would

3 be stored?

4     A.     No. At the time of -- at the time of our

5 initial investigation the day after the collision

6 occurred, one of the vehicles which I recall to be a

7 Chevrolet Venture -- now that I think about it might have

8 been the Chrysler -- was still present at the scene but

9 had been pulled by a tow truck up to the offramp from

10 I-80 onto College.

11       We requested information and called the

12 police officer, and we may have done this through Amanda

13 Good to find the location of the vehicles.

14     Q.     When you say "find the location of the

15 vehicles," what do you mean by find their location?

16     A.     All three vehicles, where they had been

17 towed to.

18     Q.     Okay. So where they were located, not at

19 the time they came to rest, so that you could go see

20 them?

21     A.     I knew where they came to rest because I

22 was there to see the marks, so that was not an issue. It

23 was more wanting to see where they were physically

24 located for inspection.

25     Q.     Okay. So that's what I think I was trying

1 to get at when I said so you were trying to find where

2 they were stored. It was where they were on November 9

3 or some later date, not where they had came to rest on

4 November 8; true?

5     A.     Yes.

6     Q.     Okay. Any other conversations that you

7 recall?

8     A.     Not that I recall.

9     Q.     Other than your work in this case, have

10 you done other work for Hirst Applegate?

11     A.     Yes.

12     Q.     Other than in this case, have you ever

13 done work for Mr. Kapp or his firm?

14     A.     One time.

15     Q.     Tell me, what was the nature, generally,

16 of the case?

17     A.     I don't know the nature, but I know it was

18 when I was still with Alcorn & Associates, so that would

19 be the '90s.

20     Q.     Other than whatever work you've done in

21 this case, have you done other work for Murane &

22 Bostwick?

23     A.     Yes.

24     Q.     On how many occasions?

25     A.     Best I can do is estimate. 20, 30 times,

1  maybe, over 25 years.
2      Q.    Have you ever been directly engaged by
3  FedEx or any of its companies?
4      A.    Yes.
5      Q.    Have you ever been engaged directly by
6  FedEx Ground?
7      A.    Yes.
8      Q.    To do what?
9      A.    To investigate a collision.
10     Q.    On how many occasions?
11     A.    Very few because usually it's through
12 counsel, but very few.
13     Q.    How many times have you been engaged
14 directly by FedEx or by counsel representing FedEx?
15     A.    Can I estimate?
16     Q.    Please do.
17     A.    Maybe a dozen times.
18     Q.    And how many of those retentions have been
19 such that they required work from you over the last five
20 or six years?
21     A.    Maybe half.
22     Q.    Do you have other current cases for FedEx
23 or counsel representing FedEx?
24     A.    I have one.
25     Q.    To your knowledge, have you been disclosed

1  as an expert in that case?
2      A.    Yes.
3      Q.    What is the case?
4      A.    It is a case on I-76 where a group of
5  individuals intoxicated ran off the roadway and hit a
6  section of guardrail, and that guardrail came out and
7  blocked the entire width of I-76 in one direction as it
8  careened off into a deep ravine and rolled down to the
9  bottom of the ravine.
10         The FedEx driver observed a funny motion
11 to his front. He slowed down. And as he got to an
12 overpass structure where I believe it's E-470 crosses
13 over I-76, he noticed there's a problem here. So he put
14 on his hazard lights and stopped his vehicle in the lane
15 in advance of the guardrail section that was protruding
16 out into the roadway, got onto the cell phone to call 911
17 and was struck in the rear by someone who drove into the
18 back of an eight and a half foot by 13 foot fully
19 illuminated flashing hazard lights truck and incurred
20 some serious injuries as they struck the back of that
21 truck.
22     Q.    Are you reconstructing that accident?
23     A.    It's already been done.
24     Q.    Have you testified?
25     A.    No.

1      Q.    Is the file closed?
2      A.    No.
3      Q.    So it's a currently pending lawsuit?
4      A.    As far as I know, yes.
5      Q.    Do you know who is representing FedEx?
6      A.    It was Mike Sullivan before he passed, and
7  then that was given to Ed Smalley, I think. I think it
8  was Ed Smalley.
9      Q.    Have you ever been retained, or to your
10 knowledge, have any of your firms, Alcorn or current firm
11 or any other, been retained by Woodhouse Roden
12 Nethercott?
13     A.    I don't know.
14     Q.    By The Fitzgerald Law Firm?
15     A.    I don't know.
16     Q.    By Kline, McCorkle & Pilger?
17     A.    I don't know.
18     Q.    By my law firm?
19     A.    I don't know.
20     Q.    To your best recollection, have you and I
21 ever met?
22     A.    This is the first time you and I have met.
23     Q.    Have you ever been retained by Holland &
24 Knight?
25     A.    I don't know.

1      Q.    Have you ever been retained by Lathrop &
2  Rutledge?
3      A.    Yes, I have.
4      Q.    What kind of matter or matters?
5      A.    Mostly trucking matters, by both Cory and
6  John, in cases -- trucking matters mostly.
7      Q.    I'm sorry. I don't know who John is.
8      A.    Maybe it's not John. I thought it was --
9          MR. KAPP: Kent.
10     A.    Kent, yes, Kent.
11     Q.    (By Mr. Brosseau) Do you have any current
12 matters for any of them?
13     A.    No.
14     Q.    When was the last time you had an active
15 matter for Lathrop & Rutledge?
16     A.    On a case that was actually against FedEx,
17 and that was the one that occurred up on top of Telegraph
18 Hill that had 168 vehicles, the big fire, and multiple
19 fatalities. That was about six years ago, I believe.
20         MR. KAPP: 10 years ago. Actually, it was
21 longer than that, but --
22     Q.    (By Mr. Brosseau) We were in the process
23 of inventorying your file. I'd like to continue that if
24 we could so we can finish that process.
25         Have we now discussed all of the materials

1  which you believe you received subsequent to the issuance
2  of your expert report?
3      A.   I believe so.
4      Q.   And have we now covered all of the
5  documents that are contained within the two binders that
6  we've described as Mr. Kapp's binders?
7      A.   Actually, I don't know where he -- here's
8  the -- Mr. Kapp is actually leaning on the other one.
9      Q.   What is this third binder?
10     A.   This is actually Book 1, which we reviewed
11 through.  And Book 2 is the one that's in here.
12     Q.   So we have covered both of the Kapp
13 binders?
14     A.   Yes.
15     Q.   We've covered the one binder that is your
16 work product?
17     A.   Yes.
18     Q.   And then there is a blue folder that we've
19 talked about some and we have covered everything in the
20 blue folder?
21     A.   I believe we have, yes.
22     Q.   And then there is a file that had some
23 electronically stored data, correct, among other things?
24     A.   Yes.
25     Q.   Okay.  Within here are a couple of flash

1  drives.  Can you describe those contents?
2      A.   Yes.  One contains the raw scan files.
3      Q.   Meaning the FARO data?
4      A.   As processed by scene.  The other contains
5  photos.
6      Q.   Okay.
7      A.   And I have also duplicated all of the
8  photos for today that -- I did this yesterday and
9  downloaded not only our photos but any photo and video I
10 was ever provided.
11     Q.   Is that something that is something we can
12 have, or is that something that you would like to keep
13 and then we can maybe get a copy of it if we were even
14 interested?
15     A.   I would like to keep this because that way
16 I have it with me in my file, but you can certainly copy
17 it, if you would like.
18     Q.   Okay.
19         MR. BROSSEAU:  Mr. Kapp, in the event we
20 have an interest in getting copies of these materials, do
21 you have any problem with anything we should know at this
22 point?
23         MR. KAPP:  No.
24         MR. BROSSEAU:  Okay.  I just want to say
25 if I -- to make it simple, if I want a copy of this stuff

1  that Jerry has talked about, if I call you, assuming that
2  I give you adequate amount of time, can I get it?
3         MR. KAPP:  Yeah.
4         MR. BROSSEAU:  Thank you.
5      Q.   (By Mr. Brosseau)  Tell me what else you
6  have here in the way of electronically stored data.
7      A.   These are file materials that were
8  provided to us from Hirst Applegate and from Murane &
9  Bostwick.
10     Q.   All of which then would be identified in
11 Exhibit 258, your expert report?
12     A.   I think so.  The reason why I pause is
13 because I don't know that there may not be something from
14 Murane & Bostwick that came after.  But I believe that
15 everything contained in Murane & Bostwick, all of these
16 are actually contained in Notebooks 1, 2 and 3.
17     Q.   Which we have already inventoried?
18     A.   Yes.
19     Q.   There is a green folder with some prints
20 or laser copies of prints of photographs?
21     A.   Correct.
22     Q.   Are these also among the other materials
23 that you have?
24     A.   Yes.  These are the photographs taken by
25 the Wyoming Highway Patrol.

1      Q.   And then there is a second blue folder
2  that has more photographs, prints, or proofs or laser
3  prints -- not proofs -- laser prints or copies of
4  photographs, all of which we've also talked about
5  previously?
6      A.   Yes.
7      Q.   All of which you produced previously, as
8  far as you know?
9      A.   Correct.
10     Q.   Okay.  Have we now described the entirety
11 of your file?
12     A.   Yes.
13     Q.   You testified regarding some braking that
14 was done, in your opinion, by Mr. Kehler at some point
15 after he departed the westbound lanes, most likely
16 commencing in the median, correct?
17     A.   Yes.
18     Q.   In your opinion, did that braking commence
19 before impact with the cable barrier?  If you want to
20 break it down into application of brake pedal versus
21 effective deceleration of the vehicle, that's fine too,
22 however you would like to do it.
23     A.   It's possible there's -- I think that it's
24 almost commensurate with striking the median cable
25 barrier or shortly after.

1      Q.      And when you say "it," the application of
2  the service brake or the effective commencement of the
3  braking that likely commenced at or after the cable
4  barrier?
5      A.      The application.
6      Q.      Okay.  So effective braking of this
7  tractor did not initiate, in your opinion, until
8  three-tenths or so of a second after the cable barrier
9  was struck, at the earliest?
10     A.      Two-tenths to three-tenths, yes.
11     Q.      At the earliest?
12     A.      That's correct.
13     Q.      Once the brakes were applied, did
14 Mr. Kehler stay on the brakes to the point of the vehicle
15 coming to rest?
16     A.      Doubtful.
17     Q.      Bases?
18     A.      Well, our record shows that he's on it for
19 about 7 seconds, but it actually takes about 10 seconds
20 for the vehicle to come to rest after it strikes the
21 Chevrolet.  So sometime between impact and the Chevrolet
22 and the impact with the Chrysler, he's going to come off
23 the brake.  And that's going to be due to the forces of
24 the impact.  He's not going to stay on the brake lightly.
25     Q.      I either have been misunderstanding your

1  testimony or misunderstood you here.  My understanding is
2  the total event from first documented tire mark to the
3  final rest took between 10 and 11 seconds.  Is that true?
4      A.      Say that again.
5      Q.      The total event from first documented tire
6  mark to final rest took between 10 and 11 seconds; is
7  that true?
8      A.      That is correct.
9      Q.      So it didn't take 7 or 8 or 10 seconds
10 from impact with either minivan to rest?
11     A.      Well, the impact with the Chrysler or --
12 pardon me -- with the Chevrolet occurs at 4.56 to 4.7
13 seconds into the entire event.  So the entire event is
14 acting 10 to 11.  So it's 5 to 6 seconds of time period
15 between the impact of the Chevrolet and the rest.  So
16 that's what I'm trying to get at.
17     Q.      Gotcha.
18     A.      Okay.  Good.
19     Q.      So the speed at impact into the Chevrolet
20 and, in fact, into the Chrysler, you can't give us any
21 definitive answer to except to say that if you apply a
22 straight line acceleration, you can tell us what it is?
23     A.      I can give you minimums, correct.
24     Q.      Minimums would be based on the
25 straight-line recognizing, in your opinion, you have two

1  significant deceleration events being those two impacts?
2      A.      Correct.
3      Q.      Did the power interruption that is
4  inferred from the -- at least inferred, maybe even
5  expressed, from the ECM data for the tractor have any
6  effect, in your opinion, on the recorded -- the obtaining
7  or the recording of any of the historical data within the
8  ECM?
9      A.      Probably not.
10     Q.      So if we look, for example, at historical
11 data reporting speeds, peak speeds, or anything like that
12 or RPM, any power interruptions that occur in the last
13 few seconds of our crash didn't affect those data?
14     A.      Probably not.
15     Q.      Okay.  Now, do you have a concern that you
16 believe has a basis and probability for the
17 reliability -- about the reliability of any of that
18 historically recorded data?
19     A.      I have a few, yes.
20     Q.      Tell me what your concerns are.
21     A.      Those peaks speeds can be very deceptive
22 because wheel spin can create -- you have to remember.
23 It's going off a tone ring and the wheel spin.  If you're
24 looking at issues with, say, for instance, the fault of
25 an ABS sensor, it is actually reading from the ABS sensor

1  on that wheel, which could be spinning at a different
2  rate than other wheels on the vehicle are spinning.
3          If you're looking at the rates that are
4  being determined in your historical data, wheel spin can
5  create very, very momentary spikes that are different
6  from the actual center of mass travel of the vehicle.  It
7  may not be representative.
8          We recognize this because a lot of times
9  we receive historical data and one of the first elements
10 you see is the vehicle traveling at 95 miles per hour.
11 That's actually a wheel spin test that they do at the
12 factory.  Sometimes it's recorded, and you have no idea
13 where that's coming from, so they can be somewhat
14 deceptive.
15     Q.      Do you have an opinion that any the peak
16 speeds were reported in this instance involving this
17 tractor to the extent the data was captured and reported,
18 in fact, should not be believed?
19     A.      I think they are what they are.  I don't
20 know what they're actually telling me.  They tell me that
21 is the peak speed, and I don't know what those are due
22 to.
23     Q.      Let me go to something else related to
24 this topic, and that is hard brake event.  Is it correct
25 that a hard brake event can be recorded without regard to

1  whether a service brake was ever applied?

2     A.    Yes.

3     Q.    It's simply the deceleration of the

4  vehicle; it doesn't matter how it was decelerated?

5     A.    That's correct.

6     Q.    So, for example, you had a wheel spin that

7  reported a spike in a speed, if it dropped off rapidly,

8  that could reported as a hard brake event?

9     A.    Not necessarily.

10    Q.    But it could?

11    A.    It's possible, but there are instances

12  where it's not, and I can explain that.

13    Q.    Does it have any reference to RPM?

14    A.    It has some reference to RPM, but it has

15  more reference to do with the fact that this is a 1-hertz

16  system.  And so if it's not -- if it doesn't catch the

17  actual drop, then it won't fire off something that's

18  instantaneous like that.  If it instantly peaks and comes

19  back down, it's not going to catch that.

20    Q.    You have to have an adequate segment in

21  time?

22    A.    That's correct.

23    Q.    Is there any other reason that you might

24  have questions about those historically recorded data

25  other than what we've already talked about?

1     A.    I don't think so, no.

2     Q.    Okay.

3           MR. BROSSEAU:  If I don't draw an

4  objection -- if I pass the witness for now, Paul, can I

5  come back as I check my notes, or would you like me to

6  take a break now?

7           MR. KAPP:  You can pass.

8           MR. BROSSEAU:  And then return?

9           MR. KAPP:  I don't think I can -- I don't

10  know that we, as lawyers, have ever really been

11  successful in stopping.

12          MR. BROSSEAU:  I just want to make sure

13  it's okay.

14          MR. KAPP:  Go ahead.

15          MR. BROSSEAU:  And for that, I will for

16  the moment at least pass the witness.

17          EXAMINATION

18  BY MR. J. FITZGERALD:

19    Q.    All right.  So you went to the scene on

20  November 9; we know that?

21    A.    Yes.

22    Q.    About 16 hours after the wreck?

23    A.    I believe that's correct, yes.

24    Q.    Who went with you?

25    A.    Mathew Martonovich.

1     Q.    Was it only the two of you?

2     A.    Yes.

3     Q.    I'm going to hand you what we'll mark as

4  the next exhibit, although I'm sure somewhere in this

5  record it's already been marked.

6           (Exhibit 292 marked.)

7     Q.    Is Mr. Martonovich in that photograph?

8     A.    Yes.  He's dressed like an orange covered

9  eskimo.

10    Q.    He's across the highway, correct?

11    A.    He is.

12    Q.    He's on the eastbound lane -- excuse me --

13  the westbound lane, right?

14    A.    No.  He's actually off of the shoulder on

15  the eastbound side.

16    Q.    He's on the north side of the interstate?

17    A.    He's on the south side.

18    Q.    Well, which way are these marks going?

19  Are they going from the westbound lane to the eastbound

20  lane or vice versa?

21    A.    They're going from the westbound to the

22  eastbound which means they're oriented towards the

23  southwest.

24    Q.    All right.  You see the tire pieces in

25  that exhibit?

1     A.    I see one, yes, and I see another one down

2  here at the left.

3     Q.    What's the number?

4     A.    292.

5     Q.    Did you and Mr. Martonovich pick up those

6  pieces of tire tread?

7     A.    No.

8     Q.    Did you pick up any pieces of tire tread?

9     A.    No.

10    Q.    Why not?  Why didn't you pick up the

11  pieces of tire?

12    A.    That is a no-no.  If there is evidence

13  that is on a roadway, you leave it for others to look at.

14  And I will not touch or move any evidence.

15    Q.    Did you tell anybody that they're going to

16  need to look at that evidence?

17    A.    No.

18    Q.    Did you talk to the highway patrol about

19  preserving that evidence?

20    A.    No.

21    Q.    You were, to your knowledge, one of the

22  first people, if not the first -- let me strike that.

23          Do you know if any FedEx representative

24  had been to the scene before you were there?

25    A.    I have no knowledge.  I don't know.

1      Q.      Would it be important for somebody to
2  preserve those pieces of tire for this case?
3            MR. KAPP: Object to form; calls for
4  speculation.
5      A.      It's actually outside my scope.  I'm not a
6  tire guy, so you would have to ask a tire guy when a tire
7  guy went out there, but I'm not a tire guy.
8      Q.      (By Mr. J. Fitzgerald) Did you undertake
9  any effort with FedEx to tell them, Hey, there's pieces
10 of tire out here, you probably want to get them
11 preserved?
12     A.      No.
13     Q.      Why not?
14     A.      Because I need to leave it at the scene
15 for others to come by and to see, and I will not do that.
16 I will not remove evidence off a roadway that could be
17 important for someone else to see.  I feel that that is a
18 violation of my practice.
19     Q.      And maybe I've asked this, but let me say
20 it again.  I just want to make sure I understand
21 correctly.  Even though you saw pieces of tire out there,
22 you didn't make any effort to tell FedEx you probably
23 better preserve these tire pieces.  Am I right?
24     A.      Yeah.  That's not my job, no.
25     Q.      Please turn to Exhibit 263.  You should

1  have it in there in front of you.  It's the one where you
2  the drew the circles around the little gouge marks made
3  by the rim.
4      A.      Yes.
5      Q.      Now that you have that before you, am I
6  correct that you intended to draw these circles around
7  the gouge marks created by the rim?
8      A.      Yes.
9      Q.      Okay.  I'm going to come over and I'm
10 going to use this home-made model here and make sure I'm
11 correct.  Please show us using this to represent the rim.
12 This is a circular object, roughly, very roughly, the
13 shape of a tire rim.  All right.  A rim, a wheel, and
14 you have now put it on the Exhibit 263, correct?
15     A.      Yes.
16     Q.      Okay.  Let me line this one up right on
17 top of the mark.  Have I done that right?
18     A.      I have no idea.
19     Q.      Well, you want to line it up right under
20 the mark?
21     A.      Which mark are you talking about?
22     Q.      I just pointed it out.  Well, that's your
23 circle.  Do the edge, please.  I'm probably not making
24 myself clear.
25     A.      May I have my glasses here?

1      Q.      This is what we're trying to do.  Let me
2  show you.  We're trying to get it right to the edge of
3  this device, this little model we've created right on
4  top.
5            Okay.  Now, I realize -- you're an old
6  artillery man.  We won't use mills, but in terms of
7  degrees, what is the degree, counting this is zero -- you
8  got a protractor with you, don't you?
9      A.      I do.
10     Q.      Yeah.  Let's see -- so the exercise here
11 is to try to determine -- let's do this.  Use this -- let
12 me move this piece of paper.  So we have a reference
13 point, let's call the top of this paper zero.  Okay?
14     A.      Okay.
15     Q.      So your protractor would pretty much have
16 to go like that, wouldn't it?
17     A.      Well, if you want to orient that way, but
18 that's not how the road is oriented.  The road is
19 oriented like this.  This line, as I'm showing you here,
20 should be one of your axes, if you really want to know
21 what's going on with that mark.
22     Q.      Well, in relative terms, you could use the
23 top of the paper, right?
24     A.      Well, I can, but here's an issue that you
25 deal with.  Notice something here.  If I draw a line in

1  my photograph where I look at the right side and I'm
2  right along that center line, you can see -- and the left
3  side -- it's wider on the left side of the photograph
4  than it is on the right.  That is parallax issue.  So you
5  can't really line those up in that manner because this is
6  not taken orthogonal to the photo, but it's taken across
7  from the photo.
8      Q.      All right.  Let me just come straight to
9  the point.  Even using your rough circle here, it looks
10 like this line and this line would intersect as opposed
11 it being parallel to one another.  Wouldn't you agree?
12     A.      Well, I think they are crossing because
13 they're asynchronous.  They were not occurring at the
14 same time.
15     Q.      Fine.  And how many seconds or portions of
16 seconds are they apart, speaking of asynchronicity?
17     A.      Milliseconds probably.  And so you're
18 looking at a wheel that's gouging in and maybe rotating
19 but still gouging in one direction while the other side
20 comes down and gouges this way.
21     Q.      And how much time -- how much distance are
22 we talking about?  How far do they travel as they're
23 being in different angles?
24     A.      I don't know, and I can't tell from this
25 photo.

1    Q.    Is it a matter of inches?
2    A.    No.  I would say it's probably a matter of
3  several inches.  If I'm looking at it here, you'll see
4  one gouges in and the other one starts.  They're not
5  actually necessarily side by side when going through.
6    Q.    Right.  So I just want to make sure I'm
7  clear.  You're saying in whatever time it took, this rim
8  would have been oriented parallel one of the marks and
9  within inches and milliseconds, it would be oriented in a
10  somewhat different direction.  Is that what you're
11  saying?
12    A.    Well, the contact points are.  Remember,
13  one contact point is different than the other.  So one
14  contact point hits, and it changes its shape while the
15  other one hits and begins to change its shape.
16    Q.    What's the shape?
17    A.    The shape is changed due to the friction
18  and the grinding of the material, meaning the aluminum
19  rim and the roadway.  And that can happen very quickly.
20    Q.    Did you find any aluminum shavings in
21  either of these marks?
22    A.    No.
23    Q.    Did you look for them?
24    A.    They're usually gone; they usually don't
25  stick around very long.

1    Q.    You didn't even look, though, right?
2    A.    Yes, I did.  I took photographs, but I
3  didn't see any.
4    Q.    What's the closest photograph you took?
5    A.    I have some back in here.  When you have
6  aluminum shavings, they stand out.  I've done numerous
7  accidents with that.  And, typically, those are gone with
8  traffic because the aluminum shavings -- aluminum is very
9  light.  It does not molecularly bond with the asphalt.
10  It is basically a flake.  And along comes a wind, and off
11  it's gone.  And they usually don't last but maybe an hour
12  or so.
13    Q.    Are you speaking of ambient wind or wind
14  caused by traffic?
15    A.    Yes, both.
16    Q.    Just so we're clear, your testimony is
17  that although this mark and this mark would intersect,
18  that's because in this very short period of time, very
19  short distance, the rim is moving around, right, in terms
20  of the axis?
21    A.    There's more to it than that.  Remember
22  what I showed you before.  Take the center line.  And I
23  go along the center line.  In reality, we know that the
24  center line is spaced evenly from the yellow edge line,
25  yet when I place another edge on it, I can see these two

1  lines intersect.  That is -- the horizon effect when you
2  used to do art when you were a kid, that's a part of
3  what's happening here.  These are not as crossed as they
4  appear to be.  They are actually more in line, but they
5  are asynchronous.
6    Q.    Actually, they would have to extend a ways
7  to be crossed, wouldn't they?  They're not crossing in
8  this photograph, are they?
9    A.    No.  But I'm saying part of what you're
10  seeing is the parallax effect.  So you're assuming that
11  looking at this photograph that the orientation of these
12  are more severely crossed than what they actually are,
13  and that's due to the depth and the parallax of the
14  photo.  This is taken at the side, not straight on.
15    Q.    You mean if they were crossed because they
16  aren't crossed?
17    A.    No.  You said draw a line between these
18  marks.
19    Q.    I want to make sure we're clear.  On what
20  you've circled here, those lines aren't crossed with each
21  other, are they?
22    A.    Not here.
23    Q.    Okay.
24    A.    And that's because when we look at them,
25  they're asynchronous and they're being produced as the

1  vehicle tire or that wheel is rotating already to the
2  left.
3    Q.    Why are they so short?
4    A.    I don't know because they came down and
5  made contact with the road.  And they went back up
6  without contact with the road, and that can happen.
7    Q.    Okay.  Did you examine any of the pieces
8  of the tire at the scene -- I mean remnants of the tire?
9    A.    I did, but they were just shredded pieces
10  of cord and they mean nothing to me.  There's nothing I
11  can see from it.
12    Q.    You picked them up and put them back down?
13    A.    I did not pick them up.  I looked at them
14  on the ground.  I do have photographs of them.
15    Q.    Was the highway patrol officer present at
16  the scene when you were there?
17    A.    No.
18    Q.    When did you first see the subject left
19  tire?
20    A.    I saw it that day.
21    Q.    When?
22    A.    It's in the properties of my photos.  So
23  it will tell us --
24    Q.    Give me a general idea.  Did you go to the
25  scene first and then go to the tractor?

1    A.    Yes.
2    Q.    You examined the tractor on November 9,
3  right?
4    A.    Yes.
5    Q.    December 19 of 2014, correct?
6    A.    I didn't; Mat did.
7    Q.    Somebody from OEC did, correct?
8    A.    Yes, Mr. Martonovich.
9    Q.    And January 20, somebody from OEC again
10  examined the tractor?
11    A.    Yes.
12    Q.    And April 7, 2015?
13    A.    I believe that's correct.
14    Q.    Was any physical evidence ever collected
15  on any of those dates?
16    A.    Photographs were taken, yes.
17    Q.    No, I'm sorry.  Anything physically, not a
18  photograph?
19    A.    Yes.
20    Q.    A device?
21    A.    Yes.
22    Q.    What did you collect?
23    A.    We, at the request of Ms. Good, obtained
24  the GPS unit, and that was on, I believe, November 9, and
25  obtained the GPS unit from the vehicle.  And I also -- I

1  personally downloaded the ECM.
2    Q.    Did you draw any physical evidence at any
3  time from the tractor?
4    A.    No.  That's it.  I believe that Ms. Good
5  may have removed the driver's log, but I don't know that
6  for sure.
7    Q.    Did anybody else on behalf of FedEx remove
8  anything while you were or Mr. Martonovich was present?
9    A.    No.
10    Q.    Who removed the left front steer tire?
11    A.    We did.  We removed that, and I don't know
12  where that was done at.
13    Q.    Who's you?  You and Mr. Martonovich?
14    A.    No, I did not.  OEC Forensics was present
15  for it, and I think it was done through -- because we
16  don't have capabilities of lifting the tire.  But it
17  was done in conjunction with some mechanical shop.  And I
18  don't know personally which one it is because I did not
19  prepare for that to know what that was today.
20    Q.    Did you check the inflation -- did you
21  check the inflation of the right front steer tire on
22  November 9?
23    A.    After it was raised -- on November 9?
24    Q.    Correct.
25    A.    I believe that we inspected and documented

1  all of those inflations.  And I asked Mat where those
2  notes were, and he couldn't remember where the notes
3  were.  But he remembered doing the same thing.  But I
4  have no notes.
5        So without notes, the answer is, no,
6  because I have no evidence.  But I recall doing it, and I
7  don't know where those notes are.
8    Q.    Do you recall what the inflation was that
9  you found on the right front tire?
10    A.    If I recall right, there were no inflation
11  issues on any of the tires.  They were all within about
12  105 PSI to 110 PSI, but I don't have my notes.  And so I
13  can't tell you.
14    Q.    Why do you take notes?
15    A.    I take notes to be able to keep notes.
16  And so the only thing I can think of is in the process of
17  putting all of our notes together, that that note somehow
18  did not get put in my file.  But I recall very clearly
19  doing that because we have a sheet that we record all of
20  the brake measurements on.  And sometimes we'll record
21  tire information there too.
22        But we have another sheet that we use to
23  report tire information on as well, and I recall using
24  that sheet.  But I don't have it and I don't know what
25  happened to it.  I don't know whether we did that

1  electronically, meaning on an iPad, filling out the form
2  and it never got downloaded or whether we did that with
3  an actual physical sheet and it didn't get put into the
4  folder.
5    Q.    You sent the tire to Mr. Woehrle, the left
6  front tire?
7    A.    I don't know for sure whether we did that
8  and arranged that or whether that was done by Hirst
9  Applegate or Lloyd Smith.
10    Q.    Do you know that it was sent to
11  Mr. Woehrle?
12    A.    I believe it was, but I don't know for
13  sure.
14    Q.    When is the first you ever heard of
15  Mr. Woehrle in relation to this case?
16    A.    I believe that was when Lloyd Smith was
17  handling the case.
18    Q.    So you hadn't even heard of Woehrle at the
19  time -- within a couple of days of the wreck; is that
20  right?
21    A.    Well, no.  I've heard of Mr. Woehrle
22  before.  You mean in conjunction with this case?
23    Q.    Yeah.  Let me be more direct.  Within a
24  couple of days of this wreck, the tire is on its way to
25  Mr. Woehrle, okay?  You didn't know that?

1     A.    No, I didn't know that, so that must have
2 been handled by Hirst Applegate.
3         Q.    Did you see the radar detector mount in
4 the cab when you were there on November 9?
5     A.    I don't remember, specifically.
6         Q.    I'm only talking about this mount.
7     A.    I don't remember, specifically.
8         Q.    You didn't see a radar detector then, did
9 you?
10    A.    I don't remember, specifically.
11        Q.    Did you take any photographs of the cab as
12 it was?
13    A.    Yes.
14        Q.    When you were there?
15    A.    Yes.  And they are contained in my file.
16        Q.    Can you see a radar detector mount in any
17 of those?
18    A.    I don't know.  We could look at it, if you
19 want.
20        Q.    Well, let me just ask you this.  If there
21 is a radar detector mount, you would be able to tell that
22 from a photograph, right?  I mean, a radar detector mount
23 is not a really hard thing to see, is it?
24    A.    Well, it depends on the brand of radar
25 detector.  They are different.  And the GPS can have the

1 same mount as a radar detector, as a phone mount, so the
2 distinction between them is not something I would
3 necessarily know.
4         Q.    Are you interested in figuring out whether
5 these drivers have been using a radar detector?
6     A.    Quite honestly, I could care less whether
7 they do or not.  It has nothing to do with the physical
8 evidence or analysis of an accident.
9         (Exhibit 293 marked.)
10        Q.    Whose hand is that?
11    A.    Mat Martonovich.
12        Q.    Did you look at this document?
13    A.    No.
14        Q.    Only Mr. Martonovich?
15    A.    Well, he photographed it, yes.
16        Q.    Is it clear enough for you to read down
17 there where it says DOT required pretrip inspection?
18    A.    Yes.
19        Q.    Nothing is marked, is it?
20    A.    Not on this form.
21        Q.    Do you see where it says at the top,
22 Destination is 0841/Salt?
23    A.    Yes.
24        Q.    And this is the subject tractor, right,
25 125417?

1     A.    It is.
2         Q.    Is it any concern to you that the pretrip
3 inspection was not marked?
4         MR. KAPP:  Object to the form.  This
5 witness isn't being offered in that area and the area of
6 compliance with any sort of practices or regulations
7 regarding commercial truck.
8     A.    No.
9         Q.    (By Mr. J. Fitzgerald)  It doesn't concern
10 you that it's not marked?
11    A.    Not in the least.
12        Q.    Well, let me show you the next exhibit.
13        (Exhibit 294 marked.)
14        Q.    You can see a readout there where it says,
15 IS Fleet Services, correct?
16    A.    I do.
17        Q.    And let me just make sure I'm clear.  I
18 take it it means nothing to you that the 6:54 a.m.
19 inspection was skipped?
20        MR. KAPP:  Same objections.
21    A.    It doesn't.  This is Steve Marks' record
22 long before Mr. Kehler took over.
23        Q.    (By Mr. J. Fitzgerald)  Do you know
24 anything about the requirement for pretrip inspections?
25        MR. KAPP:  Same objections.

1     A.    In general, I do, if I need to look at it
2 specifically, but I did not review that because I'm not
3 retained as an expert in that area.
4         Q.    (By Mr. J. Fitzgerald)  And you're not
5 retained as an expert in airbags either, right?
6     A.    Well, I don't know about that.
7         Q.    So are you going to offer opinions about
8 the airbags in this case?
9     A.    I will regarding the fact that a command
10 was sent and the airbags did not deploy, certainly, yes.
11        Q.    You have no explanation precisely as to
12 why, right?
13    A.    Yeah.  We don't, and I --
14        Q.    You would have to speculate?
15    A.    Well, no.  I'm not going to speculate.
16 There are reasons why it can, and one of the reasons why
17 we know it didn't.  That isn't a reason is the fact that
18 there was not enough energy.  We know there was because
19 the capacitors were charged, and it indicates the
20 capacitors were charged.  So we have an interruption
21 somewhere.  That can be investigated, but that is -- that
22 portion is not part of my analysis.
23        Q.    Right.
24    A.    I wasn't asked to do that portion.
25        Q.    Right.  And you haven't investigated, have

1  you?
2       A.   I have not; I haven't been asked to.
3       Q.   Were you even shown the records from
4  Cowboy Dodge showing the ORC manual went into the shop in
5  March of 2014?  Have you seen Cowboy Dodge records of
6  that?
7       A.   No.
8       Q.   Nobody has shown you those?
9       A.   I have no records of it, no.
10      Q.   So let me just make sure we're real clear.
11  Other than saying that, in your opinion, there was an
12  interruption of electricity from the capacitor to the
13  module, you have no further information for us in terms
14  of an opinion held to a reasonable degree of probability
15  in your field as to why the airbags did not deploy; is
16  that right?
17      A.   That's correct.
18      Q.   Okay.  Let me show you 295.
19           (Exhibit 295 marked.)
20      Q.   Do you recognize that as a tire gauge?
21      A.   I do.
22      Q.   Do you recognize that's showing inflation
23  of about 94 pounds?
24      A.   I do.
25      Q.   Is that something you did?

1       A.   No.  This is Mat Martonovich after the
2  front end of the vehicle had been lifted off the ground
3  before the removal of the right front tire.
4       Q.   So that was done on November 9, correct?
5       A.   No.  This was done whenever we removed the
6  right front tire which was, I believe, in January.  I'm
7  not sure.
8       Q.   Okay.  Is that Mr. Martonovich's hand in
9  the -- folding the gauge?
10      A.   His hand and his feet, yes.
11           (Exhibit 296 marked.)
12      Q.   Does that photograph refresh your
13  recollection what the inside of the cab looked like when
14  you were there on November 9?
15      A.   Yes.
16      Q.   Do you know what those two mounts are that
17  we see there?
18      A.   No.
19      Q.   I'm going to show you what's marked for
20  identification as 297.
21           (Exhibit 297 marked.)
22      Q.   Do you recognize that blue more or less
23  square shaped object on the lower left-hand corner of the
24  photograph that appears to be plugged into something
25  inside the cab?

1       A.   I do.
2       Q.   Is that yours?
3       A.   It is.
4       Q.   What is it?
5       A.   It's a Nexiq link that allows you to be
6  able to communicate through CAN bus with the ECM.  And
7  that's Mat taking a photograph that shows my connection
8  to the Deutsch cable or the Deutsch connection in the
9  inside of the cab as I'm doing that download.
10      Q.   Did you use any other devices than that to
11  do the download?
12      A.   Yes.
13      Q.   What else did you use?
14      A.   My computer.
15      Q.   And does that computer still have that
16  original data on it?
17      A.   Probably not.  It was transferred over and
18  that is contained within the electronic copy of our file
19  of the prints.
20           (Exhibit 298 marked.)
21      Q.   Is that Mr. Martonovich's thumb.
22      A.   I don't know.
23      Q.   You don't know?
24      A.   I don't.  I don't know whether that's his
25  or mine.  I can't tell.

1       Q.   Can you tell whoever it is is holding?
2       A.   Looks like the Garmin GPS.
3       Q.   Does it look like the front or the back of
4  the Garmin GPS?
5       A.   That's the back.
6       Q.   That would be facing the road, correct?
7       A.   I have no idea what you're talking about.
8       Q.   Well, the object has -- at least it has
9  width and depth, a right side and a left side and so
10  forth, right, GPS?
11      A.   Sure.
12      Q.   And if you have it turned one direction,
13  you can see information like where you are, correct?
14      A.   Yes.
15      Q.   But that doesn't appear what's shown in
16  298?
17      A.   That's correct.
18      Q.   This appears to be the other side of the
19  GPS, right?
20      A.   It's the connection side, yes.
21      Q.   Is that a camera there?
22      A.   I have no idea.  I can't tell.  It looks
23  like the ball joint mount where it snaps into its mount,
24  but I really don't know.  I don't think so.
25      Q.   How about on the other piece -- I'll just

1  point to you what I'm looking at.  In the upper left to
2  the left of the thumb and the upper left of the black
3  object, is that a camera?
4       A.    That's a symbol that says G for Garmin.
5       Q.    Is there a camera on the Garmin GPS?
6       A.    I don't think so.  I think what this is is
7  the power unit, and that's where it snaps in to be able
8  to move it.  I don't think that's a camera lens.  It's
9  actually a spot where it snaps into the bracket.  The
10  bracket has a ball on the end, and it snaps in and you
11  can move it around.  I think that's what that is.
12      Q.    Did OEC inquire as to whether there was
13  any video that came from this Garmin GPS?
14      A.    We took possession by instruction of the
15  GPS, and it had no camera on it, so --
16      Q.    I thought I heard you say earlier that
17  perhaps Amanda Good took possession of it.
18      A.    No.  Mandy Good instructed us to take
19  possession.  We informed her that it was present, and she
20  didn't want somebody to rifle through the vehicle and
21  steal anything, because that can happen, unfortunately.
22  But she instructed us to take possession of that.
23      Q.    Where did you take it?
24      A.    We maintained it, and we -- I think
25  we -- no.  We provided that for download, but we had it

1  in a -- wrapped in bubble wrap and evidence -- the
2  antistatic evidence and into an envelope.
3       Q.    Who did you give it to?
4       A.    We gave that to Mandy Good.
5       Q.    When did you give it to Mandy Good?
6       A.    I don't know.  I think it was done -- it
7  was done either later that day or it was mailed to her
8  later.
9       Q.    Was she at the scene with you?
10      A.    Yes.
11      Q.    Was she already there when you got there?
12      A.    No.  She showed up after we had already
13  arrived.
14      Q.    Was anybody with her?
15      A.    Yes.
16      Q.    Who?
17      A.    Her husband and one of her children.
18      Q.    Was she there the whole time you were
19  there?
20      A.    No.
21      Q.    How long was she there?
22      A.    I can only estimate, maybe 15 minutes, 20
23  minutes, most.
24      Q.    Did you observe the -- well, when you saw
25  it, was the left front tire still on its rim?

1       A.    It appeared as it does in my photographs.
2       Q.    Was it removed from the rim?
3       A.    Partially, yes, or if not fully -- I think
4  it was resting.
5            MR. KAPP:  Are you asking, did he remove
6  it from the rim, or was it removed from the rim?
7       Q.    (By Mr. J. Fitzgerald)  Did somebody
8  remove it from the rim?
9       A.    No.  It was still associated with the
10  wheel.  You can clearly see it in the photographs.
11      Q.    You didn't do anything to change its
12  relation to being on the rim, right?
13      A.    No, nothing whatsoever.
14      Q.    Did you box it up?
15      A.    No.
16      Q.    Do you know who removed it from its rim?
17      A.    I don't recall who removed it from the
18  rim.  I know that Mat had coordinated that through Hirst
19  Applegate, and it was -- this is not on the date of
20  inspection.  This occurred after.  And then it was
21  removed by a mechanic who also had the capabilities of
22  lifting that vehicle to be able to do so.  But I don't
23  know that location.  Mr. Martonovich would know that, but
24  I don't.
25      Q.    Let me just make sure I'm clear on this.

1  Are you saying that was done at the time the truck was
2  lifted up, so it could have been the same time the
3  inflation was measured in the right wheel?
4       A.    No.  Those were removed two separate
5  times.  The left front was removed earlier.  I believe it
6  was still in Cheyenne, but I don't -- I wasn't there, so
7  I don't know when that was done.  That was coordinated
8  through Hirst Applegate.  Then the right front was
9  removed at a later date.
10      Q.    Our review of the records shows that the
11  highest speed recorded during November 2014, as printed
12  by your firm, OEC Forensics, was 86.5.
13           Do you have any reason to dispute that?
14      A.    I think that's in my report.
15      Q.    The highest speed recorded in October 2014
16  was 89.5.
17           Do you agree with that?
18      A.    Yes.
19      Q.    And then in September the highest speed
20  recorded was 89 miles per hour.
21           Do you agree with that?
22      A.    Yes.
23      Q.    As far as your opinions go in this case,
24  do those high speeds have any meaning?
25      A.    No.  As I addressed before, we don't know

1   what they are or what produced those.
2       Q.   You don't know what they are?
3       A.   No. The reason why is because if you have
4   wheel slip, that does not necessarily -- it may record a
5   wheel speed of that, but that does not necessarily mean
6   it correlates with the velocity of the vehicle.
7       Q.   Are you going to be offering any opinions
8   on how fast these drivers drove this tractor with these
9   tires on it at the time the tires were purchased at any
10  time?
11          MR. KAPP:  Object to the form to the
12  extent that there are matters contained in his report,
13  but I'll let the witness answer the question.
14          Go ahead.
15      A.   The only thing I can opine to is the data
16  I have in my report. And so that's the only thing I will
17  opine to.
18      Q.   (By Mr. J. Fitzgerald) I thought I heard
19  you just make room for an opinion that tires -- that the
20  data may overstate the speed they were actually driving.
21  Can you offer that opinion at trial?
22      A.   If you read page 29 of 46 of my report,
23  it's actually contained there. I discussed that. I
24  discuss wheel slip. And I discuss how wheel slip can
25  overreport speeds. And so we don't know what produced

1   that. We don't know who produced that.
2           And so there's -- all it tells you is a
3   glimpse in time, but it does not tell you where, who,
4   what, and why. And so that's why -- it's used oftentimes
5   as a diagnostic measure for those that are looking to see
6   if there is any indications of chronic overspeed.
7       Q.   Well, let me ask you this: Who besides
8   Kehler and Marks may have gone as fast as whatever 89
9   computes down to based upon your opinions?
10          MR. KAPP:  Object to the form; misstates
11  his testimony about whether anyone went that fast.
12          MR. J. FITZGERALD:  No, I'm making room
13  for you to lower that speed down. I want to know who
14  would have done it besides Mr. Kehler or Mr. Marks.
15          MR. KAPP:  Same objections.
16      A.   Well, let's look at, first of all, what
17  this means.
18      Q.   (By Mr. J. Fitzgerald) No. Let's go with
19  who's driving this truck besides Kehler and Marks?
20      A.   Well, we have the individuals that are
21  doing maintenance on the truck. They're driving it.
22  And, in fact, if you're driving the truck and you're
23  doing maintenance on a vehicle, you will also test-drive
24  the truck after you've done maintenance.
25      Q.   How far is it from Redbone to the FedEx

1   yard hub?
2       A.   I have no idea, but it's not the distance
3   from the Redbone to the FedEx yard. I believe they park
4   it right outside. But when you test-drive, you're not
5   going to test-drive it across the street; you're going to
6   take it somewhere and drive it.
7       Q.   Is it your testimony that this truck was
8   not parked at the FedEx hub on FedEx properties?
9       A.   No, it's not my testimony. I'm relating
10  this back to the deposition testimony that we already
11  have, so I'll state it clearly.
12          The driver, Mr. Kehler, says that he parks
13  the vehicle. And when he leaves it, when they're off
14  duty, then Redbone will come pick up that truck to do
15  maintenance.
16          As part of your maintenance, if you are
17  doing anything from a front wheel alignment or any other
18  kinds of maintenance, routine maintenance, on the truck,
19  you will test-drive it. If you're putting new brakes on
20  a vehicle, not only do you test-drive it, but you burnish
21  those. You do hard braking to be able to get those pads
22  so that they are seeded and you have proper friction.
23          So that's all done as a maintenance
24  operation. So those are potential individuals that could
25  have driven that truck aside from Mr. Marks and Mr.

1   Kehler.
2       Q.   As a mathematician, how would you
3   calculate the odds that it was service companies on all
4   three of the high speeds they gave you, November's high
5   of 86.5, October's high of 89.5, and September's high of
6   89.5?
7           MR. KAPP:  Object to the form.
8       A.   First off, I'm not a mathematician or
9   statistician. Secondly, it's not my opinion. You asked
10  me specifically who else drives it. I gave you that
11  indication. It's not me stating that someone else is
12  driving that. But you're misinterpreting those peak
13  speeds.
14          I think you believe that that peak speed
15  correlates directly to the vehicle speed. That does not
16  necessarily correlate. Wheel slip, which can easily
17  occur, particularly on a bobtail or a lightly loaded
18  vehicle, wheel slip can have those wheels spinning much
19  faster than the actual motion of the vehicle.
20          And so what you see there I cannot tell
21  you whether that's the over-the-road speed, whether
22  that's induced by wheel slip or whether that's somebody
23  else driving, because I really can't tell you. I wasn't
24  there when these were produced.
25      Q.   (By Mr. J. Fitzgerald) Do you have some

1  opinion on what the 89 would translate to based on any or
2  all of these factors?
3      A.   I can't, and none of us can.  That's the
4  problem by relying solely on these peak speeds because
5  these peak speeds do not tell you the who, what, where,
6  when, or how.  All it is is a dummy switch that records a
7  number.
8      Q.   So I just want to make sure I'm clear.
9  We're not going to hear some opinion from you at trial
10  that, well, although the recorded speed in September at
11  its high was 89 miles an hour, it really was some other
12  number like 85?
13          MR. KAPP:  Object to form.
14      Q.   (By Mr. J. Fitzgerald)  Are you going to
15  offer that kind of an opinion?
16      A.   You're not familiar with me, I take it.
17      Q.   I just want to make sure we're not going
18  to hear a different number than 89.  It's going to be
19  something -- it might be different, but we're not
20  actually going to have a number?
21          MR. KAPP:  Object to the form, Counsel.
22  You're mischaracterizing his testimony because he's
23  testified that 89 doesn't necessarily mean 89.
24          MR. J. FITZGERALD:  That's fine.
25      Q.   (By Mr. J. Fitzgerald)  I just want to

1  know, are you going to say it means 87, 86, or any other
2  particular number?
3      A.   I can't.
4      Q.   Okay.
5      A.   I'm a square shooter.  You ask me a
6  question, I answer it.  If it's in my report or it's in
7  my testimony, that's what I'm going to tell you.  And I
8  will not play games.  I won't play games with my client.
9  I won't play games with any of you because I have a
10  reputation I uphold.  And I believe it's also imperative
11  that when I give my testimony, that I give my testimony
12  based upon reasonable degrees of probability and within
13  my education, training, and experience, and that's what
14  I'm doing here.  So I'm not going to tell you something
15  that you're not going to hear at trial.
16          If I'm stating it here and we're
17  discussing it, that's how we're going to go.  If there's
18  additional information or data that's presented at trial
19  that's outside of these settings, I may be asked to
20  address that, and that would be the exception.  I'm not
21  going to do that to you.
22      Q.   Well, what kind of further information
23  would you want to know that would add to any of your
24  opinions?
25      A.   Well, I don't know what we don't know.

1      Q.   I want to make sure that every opinion
2  that you're going to give in this case is either in that
3  report or been talked about today.
4      A.   I think I just gave you that assurance.
5  That's how I operate.  If you were to hire me, I would do
6  that same thing for you, because I don't think it's
7  fair -- I don't think it's fair to him, and I don't think
8  it's fair to any of you.  And I take my job very
9  seriously and my position.  So I don't play that game.
10          But I do understand that during the course
11  of trial that evidence does get presented -- we all know
12  this because we've been there -- that evidence is
13  presented that may not be contained in the information
14  that I have or that any of us have discussed, that a
15  judge will permit me to be able to discuss.
16          If that occurs, I will discuss that.  But
17  my opinions truly are limited to what we have contained
18  within my report and what we've been discussing here
19  today or any questions you may ask me in addition.  And I
20  will not -- I won't -- I don't play with numbers.
21      Q.   Well, what further work are you planning
22  to do besides what you just said?
23      A.   I plan on reviewing the deposition
24  testimony of the additional experts.
25      Q.   What other documents are you going to look

1  at?
2      A.   I don't know because I haven't seen them
3  yet.
4      Q.   What other documents would you like to
5  look at?
6      A.   Well, if I am presented with the
7  deposition testimony of Mr. Scott, Dr. Gillespie, any
8  other individuals within my field of expertise, I would
9  review that.  And if there's any additional information
10  that comes from there, I would request the ability to be
11  able to address that.  I would ask that through Mr. Kapp
12  first.  And if the judge says you can't do that, then
13  that's the way it is.  The rules of evidence are as they
14  are.
15      Q.   I just want to know, are there any other
16  documents that you want to look at before you render your
17  full opinions?
18      A.   I believe I have rendered my full
19  opinions.  The only difference will be if there's the
20  necessity to rebut or discuss something else.
21      Q.   Beyond the deposition, are there any other
22  documents you want to look at to put yourself in a
23  position to render your full opinions now?
24      A.   No.
25      Q.   And what opinions that you render today do

1  you not hold to a reasonable degree of probability?
2      A.   None.
3      Q.   Other than as stated in this record,
4  correct?
5      A.   Correct.
6          MR. J. FITZGERALD:  That's all I have.
7                EXAMINATION
8  BY MR. KLINE:
9      Q.   Mr. Ogden, let's start with square
10 shooting.  You've indicated that you have done no
11 investigation with respect to what caused the airbag
12 system not to deploy.  Did I get that right?
13     A.   That's correct.
14     Q.   Could you have done that if they had asked
15 you to do that?
16     A.   No.
17     Q.   Okay.
18     A.   Can I answer why?
19     Q.   Yes.
20     A.   It requires destructive testing on the
21 vehicle so you would have to -- it would also be -- it
22 would have to be permission from everybody here, but also
23 Chrysler, as well as the individuals who did the
24 modification.  But it was outside the scope of what I was
25 requested to do.

1      Q.   And if you had gotten an order that
2  allowed destructive testing, you could have done that
3  investigation?
4      A.   Yes, that's correct.
5      Q.   And, instead, what you've been charged
6  with is just throwing dispersions as to why it might be
7  that that didn't go off?
8          MR. KAPP:  Object to the form.
9      Q.   (By Mr. Kline)  Isn't that true?
10         MR. KAPP:  Argumentative.
11     A.   No.
12     Q.   (By Mr. Kline)  That's exactly what you've
13 done, isn't it?
14     A.   No.
15     Q.   You suggested one reason why it might not
16 have gone off, just to throw that out there, because
17 that's what you've been charged to do?
18     A.   No.  That is incorrect.
19     Q.   Let's go to your appearance on the scene
20 on November 9.
21         Did you say what time it was that you
22 showed up on the scene?
23     A.   I believe it was sometime before 8:00 in
24 the morning.
25     Q.   And you were the first person on the

1  scene?
2      A.   The first persons on the scene were the
3  first responders.
4      Q.   I mean on November 9.  There were other
5  people there when you showed up?
6      A.   No.  There was just myself and
7  Mr. Martonovich.
8      Q.   Okay.  When you got there at some point,
9  you took what has been marked as Exhibit 292; is that
10 correct?  That's that photograph?
11     A.   That is correct.
12     Q.   And do you remember how long after you
13 arrived at the scene that was taken?
14     A.   No.  But if we go into the properties of
15 photographs, it will show us.
16     Q.   And at that point, do you remember whether
17 there were any police officers or anyone else on the
18 scene?
19     A.   No.  I was made aware that the police
20 investigation was not complete; that they had not
21 completed all of their survey, and they would complete
22 that survey.  And I believe that was done through our
23 discussion with either Amanda Good or with the police
24 officer when we tried to find the locations of the
25 vehicles when we arrived at the scene.

1      Q.   And do you remember -- there's clearly one
2  piece of a tire there in that photo; is that correct?
3      A.   Yes.  There's a portion of a remnant.
4      Q.   Okay.  How many other portions or remnants
5  of the tire do you remember seeing at the scene on that
6  morning?
7      A.   Just what's shown in this photograph.  The
8  others had apparently been removed by Wyoming Highway
9  Patrol.
10     Q.   Have you been made aware that there are
11 two pieces of the tire that other experts believe --
12 shreds of the tire or remnants of the tire that were,
13 say, comparable in size of that one that were at the
14 scene originally that evidently weren't there when you
15 were there?
16         MR. KAPP:  Object to the form to the
17 extent it may misstate the evidence.
18         Go ahead.
19     A.   If someone claims that there were remnants
20 of this tire at this scene after I was there, I would
21 question whether the remnants were related because I went
22 back, walked through the area, and those were the
23 remnants that were present.
24     Q.   (By Mr. Kline)  But you don't remember
25 seeing those other two remnants at the scene?

1    A.    I have no idea what you're talking about
2  as far as other two remnants, so I would say they were
3  most likely not associated.
4        Q.    And if you thought they were associated,
5  you would have photographed them?
6    A.    If I would have seen them.  It wouldn't
7  have mattered whether I thought they were associated.  If
8  I would have seen them, I would have photographed them.
9        Q.    So you photographed every remnant of
10  tires, regardless whether it's related to this accident,
11  that was within the realm of the accident scene that was
12  there when you were there?
13    A.    My photographs were intended to capture
14  that, yes.
15        Q.    Okay.  You didn't see Ms. Good or any of
16  her family pick up any remnants of tires, did you?
17    A.    First of all, her family never got out of
18  the vehicle.  And Ms. Good -- the first thing we instruct
19  people when they arrive is don't touch anything or don't
20  move anything.  So the answer would be no one moved
21  anything while we were there.
22        Q.    So with respect to the monthly DDEC
23  reading of the high speed, are there things that can make
24  it underreported as far as the speed as well as
25  overreported?

1    A.    Probably not.  Overreporting, yes;
2  underreporting, no.
3        Q.    Do you have an approximation of the time
4  that elapsed when the FedEx truck entered the median when
5  it struck the Ednie and Gooden van?
6    A.    Yes.
7        Q.    What is that?
8    A.    Do we have our exhibits?  I can use
9  Exhibit 259.  That time period is between 2.77 and 2.89
10  seconds to strike the Chevrolet.  And I didn't figure the
11  exact distance for the impact with the Chrysler, but I
12  have it here.  So it's probably around 3 seconds to three
13  and a quarter seconds.
14        Q.    From the time the FedEx truck entered the
15  median to the time it struck the Chevrolet was 2.7
16  seconds?  I'm talking about specifically entering the
17  median.
18    A.    2.77 to 2.89.
19        Q.    Okay.
20    A.    That's on Exhibit 259.
21        Q.    Would the cable barrier that the truck hit
22  have changed the angle of travel of the FedEx truck?
23    A.    Yes.
24        Q.    And do you have any estimate as to how
25  long it would have taken the FedEx truck to travel from

1  the cable barrier to the Ednie Gooden van?
2    A.    Would be less than the time frame I told
3  you because it would be less than the time entering the
4  median.
5        Q.    Do you still have the Garmin?
6    A.    No.
7        Q.    Finally, the second witness testified that
8  the maintenance -- somebody picked up the FedEx truck for
9  maintenance at the North Salt Lake Transfer Station.
10        Do you know how they access that truck at
11  the North Salt Lake Transfer Station for FedEx?
12    A.    Are you talking about Redbone?
13        Q.    Redbone or whoever you are talking about.
14    A.    I'm talking about Redbone.  I don't know
15  whether that's at the Salt Lake Transfer.
16        Q.    Do you know anyone at Redbone who has a
17  pass to enter that transfer station?
18    A.    No.  I'm going off of the testimony that
19  was provided by Mr. Kehler about when they parked the
20  vehicle and they are off duty that they will come during
21  that time to pick up the vehicle and take it for
22  maintenance.  That's what I'm discussing.  I don't know
23  whether they're inside or outside the gate.
24        Q.    Do you know if they ever parked outside
25  the gate?

1    A.    No.
2        Q.    And you don't -- I guess you've already
3  testified you don't know how far it is from Redbone to
4  the North Salt Lake Transfer Station?
5    A.    I think it's right across the street, is
6  what Mr. Kehler indicated.
7        Q.    It would be pretty hard to get it up to 89
8  miles an hour between the two places, right?
9        MR. KAPP:  Object to form.
10    A.    That actually wasn't my testimony, but,
11  yes, that's correct.
12        MR. KLINE:  All right.  That's all I have.
13        EXAMINATION
14  BY MR. BROSSEAU:
15        Q.    Peak speeds.  As I understand it, you
16  are -- you've testified that there may be reasons why
17  those peak speeds are not accurate?
18    A.    Correct.
19        Q.    There are reasons why they may be
20  reporting a speed higher than the actual road speed was?
21    A.    Correct.
22        Q.    Is it also correct that you are not
23  opining that, in fact, those peak speeds are wrong?
24    A.    Correct.
25        MR. KAPP:  Object to the form.

1          MR. BROSSEAU:  What's the basis?
2          MR. KAPP:  I object to the form.
3      **Q.     (By Mr. Brosseau)  Okay.  And do you have**
4  **any opinion that the reported GPS speed data are wrong?**
5      A.    Speed data --
6      **Q.    Yes.**
7      A.    -- I would say is not wrong.  I can
8  explain why.
9      **Q.    Go ahead.**
10     A.     When you go through a Ph.D., they make you
11 take many classes, and one of the classes I took was
12 actually on geodesy and GIS.  And we talk about GPS
13 systems and the guidance of GPS systems.
14          GPS speeds are actually a time distance
15 between different points that are on the ground.  One
16 thing that GPS satellites are really good at are giving
17 you X and Y distances, just not very good at Z
18 delineation, meaning altitude.
19          You have to dwell on the spot for a long
20 time before it can solve that equation.  However, the X
21 and Y which allows us to be able to determine between
22 each individual point that we're analyzing gives us very
23 accurate speeds because it's very accurate distances that
24 it's measuring.
25          So those speeds typically are accurate to

1  within a few -- about -- I would say 500ths of a mile per
2  hour because the resolution is in the 10ths.  So those
3  are fairly -- and it will either round up or round down.
4      **Q.     But is it also correct that the longer the**
5  **segment, the more accurate the GPS speed data is?**
6      A.    No.  That's not how GPS speed is recorded.
7  GPS speed is recorded between two close points.  So it
8  takes a random ping.  Do you know what a ping is?  A ping
9  is requesting information.  It's random.
10          Sometimes we see it real close and
11 sometimes we see it far away.  It's not taking an average
12 speed between two of those locations.  We see it's taking
13 an average between two real close pings, but only
14 reporting one.  So what you're getting in reality is the
15 average of the two points that are taken in your
16 northings and eastings that are provided for you.  But
17 you're getting a true speed between those points to
18 within about 500ths of a mile per hour.
19     **Q.     So the data that's reporting -- speed data**
20 **that's reported with GPS in this case, even one as short**
21 **of segments of six seconds, as far as you're concerned,**
22 **would be highly accurate?**
23     A.    Yes.  I think it's very accurate.
24     **Q.     Did you make any observations regarding**
25 **irregularity, if any, of tread wear on the right steer**

1  axle tire?
2      A.    I did make observations.  I did not see
3  any gross evidence of irregularity.
4      **Q.     There have been some descriptions of**
5  **irregular wear by others.  One person you may have saw,**
6  **Lew Grill, called it cupping.**
7      A.    Yes.
8      **Q.     Did you see anything that you considered**
9  **to be cupping?**
10     A.     I see evidence where the side -- outside
11 sidewall of that tire as it's rotating and doing its
12 business after we lost our caster is wearing irregularly
13 on the outside during that.  That's all part of this
14 accident.  That's not due to the wheel rolling down the
15 road.
16     **Q.     I didn't notice -- well, it doesn't appear**
17 **that you were provided with a copy of the transcript of**
18 **the deposition of John Smith?**
19     A.    Yes, I was, but that occurred after my
20 report.
21     **Q.     Okay.  Do you have John Smith's**
22 **deposition?**
23     A.    I do.
24     **Q.     Did you read it?**
25     A.    No.  He's a tire guy.  I don't care about

1  tire guys.
2      **Q.     And so you're not familiar with whatever**
3  **Mr. Smith may have said as the tire guy about tire**
4  **wear -- tread wear on the right steer axle?**
5      A.    No, I'm not concerned with it.
6      **Q.     Is it correct you didn't see anything you**
7  **characterize as a skid mark at this accident site from**
8  **the tractor or trailer?**
9      A.    That's correct.
10     **Q.     A skid is a term of art, correct?**
11     A.    Generally, yes.
12     **Q.     Certainly if you use the term "skid," it**
13 **would have meaning to you?**
14     A.    Yes, it would.
15     **Q.     And what is a skid -- skid mark?**
16     A.     In our terms, we typically use the term
17 "skid mark" to mean a locked wheel, locked tire sliding
18 dynamically on the roadway.  It's no longer static with
19 the roadway surface.  All of your experts will know
20 exactly what I just said.  I can explain for you.
21     **Q.     I'm trying to figure out how something**
22 **would be sliding statically.**
23     A.    It doesn't slide statically.
24     **Q.     You said sliding dynamically rather than**
25 **sliding statically.  I can't figure out what sliding**

1  statically could possibly mean.
2      A.   Yaw mark.  There is a -- portions of the
3  tire are static.  Portions of the tire are rotating, and
4  it will leave marks.  So that the tire is no longer
5  stationary with respect to the roadway, but it is still
6  rotating.  So that means that its contact patch, if it
7  were straight, would be static, but because it's side
8  sliding, it has become dynamic.
9          So when we look at a dynamic condition,
10 that means typically that the wheel is locked.  That's
11 when we call it the skid.  The tire surface is now
12 dynamic or moving differential to the roadway surface.
13 Is that a better explanation for you?
14     Q.   As I said, my problem was only talking
15 about something sliding statically.
16     A.   Well, that probably was a poor choice of
17 words.  I think what I was trying to indicate is what my
18 explanation was.
19     Q.   That's the reason I gave you a quizzical
20 look.  Sliding statically didn't make any sense to me.
21     A.   We've been at it a long time.
22     Q.   Okay.  Have you had any discussions
23 regarding this accident with either Diana Rhodes or Shawn
24 Gamble?
25     A.   Those names don't ring a bell with me, so

1  I would say no.
2      Q.   You provided us with a rate fee and
3  billing document back at the time of your disclosure.
4  And it does provide that there is a $325 rate per hour
5  for certain work, and $500 per hour for testimony.
6          What's the reason for the distinction?
7      A.   There's two different reasons for the
8  distinction.  One is the requirement in a deposition or
9  trial is a more stressful environment and requires more
10 effort and drains on me.  And it's typical in our field
11 that people will charge time and a half to double time
12 for deposition and trial.  That's one part.
13         The other part is that also incorporates
14 my read and signature.  So I don't charge for that
15 separately.  And in the state of Colorado, the deposing
16 attorney, under Colorado rules, unless you have an
17 agreement, pays not only for the deposition contact time,
18 they're supposed to pay for the travel, and they're also
19 supposed to pay for the review, correct, and sign of the
20 document.
21         Rather than break all of those things up
22 and have that as a bill that I provide to that deposing
23 attorney later, I incorporate it into one, and that
24 includes my travel as well.
25     MR. BROSSEAU:  I pass the witness.

1      MR. KAPP:  I do have some questions.
2      EXAMINATION
3  BY MR. KAPP:
4      Q.   This is just an order of business.  I
5  can't imagine these gentleman would do something like
6  that.  But is there anything in your file that you have
7  generated and that are part and parcel of your opinions
8  that they have not made an exhibit of, because if there
9  is, then I want you to make an exhibit of it so that
10 these guys have got everything you've generated with the
11 deposition.
12     A.   Well, Section F was not made specifically
13 in its total an exhibit, but portions of Section F of my
14 first notebook are in.  That's actually ECM download,
15 airbag control module, sensory and diagnostic ROL modules
16 downloads, our inspection forms that were all part of
17 what we provided.
18     MR. KAPP:  What's the next exhibit number?
19     MR. BROSSEAU:  299.
20     MR. KAPP:  Exhibit 299, and I don't care
21 how we get it done at the end of the day.
22     MR. BROSSEAU:  Do you want to mark the
23 entire binder 299?
24     MR. KAPP:  That works for me.  We'll mark
25 the entire binder 299.

1      THE DEPONENT:  Okay.  As long as I can
2  maintain -- or we make copies here.  That's fine.
3      MR. BROSSEAU:  Let's deal with that off
4  the record when we finish.
5      (Exhibit 299 marked.)
6      A.   I think we covered everything that was in
7  this blue folder.  But there's other materials I see that
8  are in here.  So I think if we put all of the items I had
9  into that blue folder and made this, this most likely
10 would be duplicative, but at least we'll know for sure we
11 have all that.
12     Q.   (By Mr. Kapp)  Is there anything else to
13 your file that they have not made an exhibit of that you
14 have generated?
15     A.   Yes.  Our HDS scan, our high definition
16 scan, using the FARO X330 which I have that thumb drive
17 in here was not made an exhibit.  I'm not quite sure how
18 to handle that.  We could mark it as an exhibit, but
19 that's one we have as well.
20     Q.   Why don't we do that.
21     MR. BROSSEAU:  While he's pulling that
22 out, we also did not mark as an exhibit the large
23 majority of his photos or his video of the demount
24 process.  And we did not mark his decel calculations.
25 That's a separate document.  We did not mark his GPS

1  overlay analysis, all of which in this latter category
2  were on the flash drive produced to us in December of
3  2015.
4          MR. KAPP:  So long as all counsel agree
5  that they received all those documents.
6          MR. BROSSEAU:  I don't know if they did or
7  not.  I know that in our case, we made a specific request
8  to you in December.  And in response to that, you sent a
9  letter to us containing that flash drive.  It was not
10  cc'd to anybody else, so I don't know if it was provided
11  to anybody else other than us who asked for it.
12          MR. KLINE:  I don't know that we have it.
13  I don't know.
14          MR. M. FITZGERALD:  We only have the
15  photos.
16          MR. KAPP:  Well, then I guess somehow,
17  someway, in the world of electronics, we'll have to
18  duplicate those and make them all a part of the
19  deposition.
20          THE DEPONENT:  Okay.  If you can remind me
21  of that, that would be great because I'll forget it.
22          MR. BROSSEAU:  So if you want to go ahead
23  and do something, we can make an exhibit a 300 as a place
24  marker, place saver, and then you can provide materials
25  Mr. Kapp has requested to Mr. Kapp, and he can distribute

1  them to all counsel as the Exhibit 300.
2          MR. KAPP:  And all I'm doing, guys, is I
3  just don't want anybody in July standing up and going,
4  I've never seen that before and you never gave it to me.
5  I'm giving everybody full opportunity to have the things
6  he's generated.  And if you comfortable with not marking
7  these as exhibits, we won't.  But if we need to, we
8  will.
9          MR. BROSSEAU:  Paul, I marked what I felt
10  I needed to.  So it's up to you or other counsel if you
11  want other things marked.
12          MR. KAPP:  We'll mark --
13          MR. BROSSEAU:  If you start down the path
14  and you want to mark everything, then what I suggest is a
15  placeholder 300 of Dr. Ogden to supply to you whatever
16  hasn't been marked here is probably the best way to go,
17  in my humble opinion.
18          MR. KAPP:  I like that idea.  And unless
19  there is objection, that's what we're going to do.
20          Is there any objection?
21          MR. KLINE:  To be honest with you, Jim had
22  diverted my attention when Mark made his suggestion,
23  so --
24          MR. BROSSEAU:  So let me state it for the
25  record and see if this works for you guys.  And that is,

1  we're going to have the reporter mark as Exhibit 300,
2  mark a blank piece of paper.  It will be a placeholder.
3  That placeholder will be part of this record until such
4  time as -- or Dr. Ogden supplies to Mr. Kapp all of the
5  remaining file materials which Dr. Ogden and Mr. Kapp
6  believe have not been marked in this deposition thus far.
7          Mr. Kapp will then provide those as the
8  new Exhibit 300 to this deposition.
9          MR. KLINE:  That works for me.
10          MR. J. FITZGERALD:  That's fine.
11          MR. KAPP:  Okay.
12          (Exhibit 300 marked.)
13      Q.    (By Mr. Kapp)  Counsel has asked you
14  several questions about this right front tire.
15          Did you ever do any analysis of the right
16  front tire size, anything like that?
17      A.    Yes.
18      Q.    What did you do?
19      A.    Well, I looked at the aspect ratio and the
20  tread width size and compared that to what the door panel
21  says is the appropriate size or what is the suggested
22  size, if you will, of this vehicle, and looked at the
23  height difference between those two tires, the one the
24  size suggested from the door panel by the manufacturer as
25  well as the size that was actually put on the steer axle.

1      Q.    Okay.  Was there a difference in size?
2      A.    Slightly, yes.
3      Q.    What is slightly?
4      A.    Three millimeters in height.
5      Q.    In terms of -- there's been testimony in
6  this case that the tire on the right side was the wrong
7  tire --
8          MR. KLINE:  Object to the form of the
9  question already.
10          MR. BROSSEAU:  It's only going to get
11  worse from here.
12          MR. KAPP:  All right.  Let's quit
13  laughing.
14      Q.    (By Mr. Kapp)  There's been testimony that
15  the tire on the right side was incorrect in some respect.
16          My question to you is, do you have an
17  opinion as to whether or not the tire that was on the
18  right-hand side had any effect on the handling of the
19  truck?
20          MR. BROSSEAU:  Objection, form and
21  foundation.
22          MR. KLINE:  Join.
23          MR. J. FITZGERALD:  Join.
24      A.    It wouldn't.  I mean, I have an opinion it
25  wouldn't.  It's not a very big difference, so --

1   Q.   (By Mr. Kapp) Okay. This morning, Mark
2   was referring to it as the first mark on the road.
3   A.   Yes.
4   Q.   The first -- the highway patrol had
5   painted the first mark on the road by the time that you
6   got there?
7   A.   That's correct.
8   Q.   Do you know when they painted it?
9   A.   I believe it's visible in their scene
10  photographs the afternoon of the impact, so it would be
11  right after the impact sometime.
12  Q.   Okay. This discussion about the airbag on
13  the Dodge Chrysler van, who owns that?
14  A.   That was owned by the plaintiffs in this
15  case.
16  Q.   Do you know whether Plaintiff's counsel
17  have asked their experts to analyze why the airbag did
18  not deploy?
19  MR. KLINE:  For the record, Plaintiff
20  Ednie family claimants do not derive their claim from
21  somebody who owned that vehicle.
22  MR. KAPP:  Okay.
23  MR. KLINE:  In other words, it wasn't
24  titled to us.
25  Q.   (By Mr. Kapp) Who was it titled in, if

1   you know?
2   A.   I have no idea. I have -- it's not my
3   vehicle. I have no possession. I have no authority.
4   Q.   Do you know if the attorneys that
5   represented the interest that owned the van ever asked
6   any of their experts to determine why the airbag did not
7   deploy?
8   A.   Since I have not been informed of an
9   inspection, which should be a group inspection by every
10  one of the engineers involved, to include Chrysler as
11  well as those that did the modifications, I have never
12  been informed of ever such inspection or intent to do an
13  inspection to test it.
14  Q.   Okay. But let me make sure I understand.
15  From your analysis, you have concluded that there was a
16  command to deploy the airbag?
17  A.   That's correct.
18  Q.   When the command was sent, what happened?
19  A.   Nothing.
20  Q.   You just don't know why the command didn't
21  deploy the airbag; is that what you're saying?
22  A.   That's correct.
23  Q.   Okay.
24  A.   Let's just pretend that counsel don't
25  agree with your opinion that the shaft broke while the

1   truck was still westbound. Is there any other
2   corroborating field evidence that you can look to to
3   support your conclusion?
4   MR. BROSSEAU:  Object to form.
5   MR. KLINE:  And I object to the form
6   because the truck had some westbound component the whole
7   time, didn't it?
8   MR. KAPP:  Let's try it this way.
9   Q.   (By Mr. Brosseau) Let's pretend that
10  counsel didn't agree that the steering shaft broke while
11  the truck was westbound in the westbound lane of I-80.
12  Is there any corroborating evidence that
13  you can look to to support your opinion that it did?
14  A.   Yes.
15  Q.   What is it?
16  A.   That's the roadway evidence.
17  Q.   What about the roadway evidence
18  corroborates your opinion?
19  A.   The loss of caster in those wheels going
20  back and forth and oscillating back and forth is
21  indicating there is no steering control. It means those
22  front wheels are not connected. And if a driver has his
23  hands on the steering wheel and there's still integrity,
24  he will feel that as a vibration that he can damp out by
25  power steering and actually move the vehicle over.

1   And so then we wouldn't see the
2   oscillation. But the oscillation is telling us that
3   there is no steering control.
4   Q.   Is there any significance to the fact that
5   the truck left the westbound lane in 110 -- was it 110
6   feet?
7   A.   189, I believe. Want me to check that to
8   be certain? Yeah, it's 188.5, so approximately 189 feet.
9   Q.   Is there any significant -- is that
10  corroboration in any manner or in any fashion significant
11  to you?
12  A.   Yes.
13  Q.   How?
14  A.   That's a pretty quick hard steer to the
15  left directing that vehicle off the roadway. It wouldn't
16  be the same as a simple lane change. But in excess of
17  that, it's occurring between Lines A and B that we had
18  addressed previously which are probably no more than 10
19  to 15 feet apart, and so it's happening quite quickly.
20  MR. KAPP:  That's all I've got for now. I
21  suspect that I will have other questions of the witness
22  in July.
23  MR. BROSSEAU:  I have nothing further.
24  (Discussion off the record.)
25  MR. BROSSEAU:  The record should reflect

Page 265

1  that with the agreement of all counsel, the deponent is
2  withdrawing Exhibit 299, will arrange to get copies made,
3  and will then provide copies, including one that will be
4  furnished to the reporter so it will be with the record
5  as the original 299.
6          MR. KAPP:  Yes.  Just so long as I don't
7  personally have to do anything to make that happen.
8          MR. BROSSEAU:  Is that okay with
9  Plaintiff's counsel?
10         MR. KLINE:  Yes.
11         * * * * * * *
12         (WHEREUPON, the foregoing deposition was
13  concluded at the hour of 5:06 p.m. on March 11, 2016.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 267

1
                    REPORTER'S CERTIFICATE
2
3          I, Claudia R. Booton, a Registered
4  Professional Reporter and Notary Public within and for
5  the State of Colorado, commissioned to administer oaths,
6  do hereby certify that previous to the commencement of
7  the examination, the witness was duly sworn by me to
8  testify the truth in relation to matters in controversy
9  between the said parties; that the said deposition was
10 taken in stenotype by me at the time and place aforesaid
11 and was thereafter reduced to typewritten form by me; and
12 that the foregoing is a true and correct transcript of my
13 stenotype notes thereof.
14         That I am not an attorney nor counsel nor in
15 any way connected with any attorney or counsel for any of
16 the parties to said action nor otherwise interested in
17 the outcome of this action.
18         My commission expires:  November 22, 2016.
19
20
21         _____
22         Claudia R. Booton
           Registered Professional Reporter
           Notary Public, State of Colorado
23
24
25

Page 266

1          I, JERRY S. OGDEN, Ph.D., P.E., the
2  deponent in the above deposition, do acknowledge that I
3  have read the foregoing tra nscript of my testimony, and
4  state under oath that it, together with any attached
5  Statement of Change pages, constitutes my sworn
6  statement.
7
8
   _____  I have made changes to my deposition
9
   _____  I have NOT made any changes to my deposition
10
11
12         _____
                    JERRY S. OGDEN, Ph.D., P.E.
13
14
15
16 Subscribed and sworn to before me this _____ day
17 of _____.
18
19         My commission expires: _____
20
21         _____
                    Notary Public
22
23
24
25