# EXHIBIT 3

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF WYOMING
 2
     ALODIE GOODEN, AS              )
 3   WRONGFUL DEATH                 )
     REPRESENTATIVE OF THE          ) CIVIL ACTION
 4   ESTATE OF TANYA GOODEN         ) NO. 15-CV-45
     AND CAMERON GOODEN,            )
 5                                  )
              PLAINTIFF,            )
 6                                  )
     V.                             )
 7                                  ) (TRANSCRIPT
     BRIDGESTONE AMERICAS           ) CONTAINS
 8   TIRE OPERATIONS LLC; FED       ) CONFIDENTIAL
     EX GROUND PACKAGE              ) PORTIONS
 9   SYSTEM, INC., AND JOHN         ) PURSUANT TO
     DOE                            ) PROTECTIVE
10   CORPORATIONS/ENTITIES          ) ORDER)
     1-3,                           )
11                                  )
              DEFENDANTS.           )
12                                  )
     GINA CUBILLOS, AS              )
13   WRONGFUL DEATH                 )
     REPRESENTATIVE OF THE          )
14   ESTATE OF JAMES EDNIE,         )
                                    ) CIVIL ACTION
15            PLAINTIFF,            ) NO. 15-CV-50
                                    )
16   V.                             )
                                    )
17   BRIDGESTONE AMERICAS           )
     TIRE OPERATIONS LLC; FED       )
18   EX GROUND PACKAGE              )
     SYSTEM, INC., AND JOHN         )
19   DOE                            )
     CORPORATIONS/ENTITIES          )
20   1-3.                           )
                                    )
21            DEFENDANTS.           )
     _____
22   VIDEOTAPED DEPOSITION OF: JAMES KIRIAZES
     TAKEN ON BEHALF OF THE DEFENDANT FED EX GROUND
23   MARCH 28, 2016   NASHVILLE, TENNESSEE
     ATKINSON-BAKER, INC.
24   COURT REPORTERS
     ABI JOB NO. AA02784
25   800-288-3376 JENNIFER HAYNIE, LCR NO. 403
```

CONFIDENTIAL

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff's Gooden/Cubillos:
 3       MICHAEL J. FITZGERALD, ESQ.
         The Fitzgerald Law Firm
 4       2108 Warren Avenue
         Cheyenne, Wyoming  82001
 5       615.634.4000
         James@fitzgeraldlaw.com
 6       Michael@fitzgeraldlaw.com
 7       STEPHEN H. KLINE, ESQ.
         Kline, McCorkle & Pilger
 8       P.O. Box 1938
         Cheyenne, Wyoming  82003
 9
10   For the Defendant Fed Ex Ground:
11       PAUL KAPP, ESQ.
         STEPHANIE L. SOLOMON, ESQ.
12       Sundahl, Powers, Kapp & Martin, LLC
         1725 Carey Avenue
13       Cheyenne, Wyoming  82003
         307.632.6421
14       Pkapp@spkm.org
         Ssolomon@spkm.org
15   For the Defendant Bridgestone Americas Tire
     Operations:
16
17       COLIN P. SMITH, ESQ.
         Holland & Knight
18       131 South Dearborn Street
         Chicago, Illinois  60603
19       312.578.6552
         Colin.smith@hklaw.com
20
21   COURT REPORTER:
22       JENNIFER HAYNIE (License No. 403)
         Cell:  615.429.6588
23       E-mail:  jennifercourtreporter@gmail.com
24
25
```

## Page 3

```
 1             I N D E X
 2   Examinations                      Page
 3   BY MR. KAPP                          5
     BY MR. SMITH                       289
 4   BY MR. KAPP                        292
 5
 6             E X H I B I T S
 7   Number      Description          Page
 8    351   E-mail, R283 Field Information    34
      352   Ryder Fleet Report              62
 9    353   2/3/15 Voice Call               64
      354   Page 4179 of York e-mail        95
10    355   Bates Stamp 9022                99
      356   Field performance document     110
11    357   August 13, 2015 e-mail         152
      358   Awareness campaign draft       163
12    359   Field performance review       164
      360   Warren County performance      193
13          review
      361   Meeting collaboration document 195
14    362   E-mail, R283 Information        214
            Request
15    363   Tire detail report             215
      364   Field performance investigation 240
16    365   Technical Analysis             240
      366   2/3/15 Voice Call              247
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              Videotaped deposition of JAMES
 2   KIRIAZES, taken on behalf of Defendant Fed Ex
 3   Ground, on the 28th day of March, 2016,
 4   commencing at 9:13 a.m., in the offices of Regus
 5   Business Center, 424 Church Street, Suite 2000,
 6   Nashville, Tennessee, for all purposes under the
 7   Wyoming Rules of Civil Procedure.
 8              The formalities as to notice,
 9   caption, certificate, et cetera, are waived.
10   All objections, except as to the form of the
11   questions, are reserved to the hearing.
12              It is agreed that Jennifer Haynie,
13   being a Notary Public and Court Reporter for the
14   State of Tennessee, may swear the witness, and
15   that the reading and signing of the completed
16   deposition by the witness are reserved.
17
18                     * * *
19
20
21
22
23
24
25
```

## Page 5

```
 1        THE VIDEOGRAPHER:  This is the           09:13
 2   beginning of Disc 1 of the deposition of James  09:13
 3   Kiriazes.                                        09:13
 4        THE WITNESS:  Yes, sir.                     09:13
 5        THE VIDEOGRAPHER:  Today's date is         09:13
 6   March 28th, 2016.  The time indicated on the     09:14
 7   video screen is 9:14.  The standard introduction 09:14
 8   has been waived by agreement.  The court          09:14
 9   reporter will now swear in the witness.           09:14
10        JAMES KIRIAZES,                              09:14
11   was called as a witness on March 28, 2016        09:14
12   and after having been duly sworn, testified as   09:14
13   follows under oath:                               09:14
14              EXAMINATION                            09:14
15   BY MR. KAPP:                                      09:14
16   Q.   Good morning, sir.                           09:14
17   A.   Good morning.                                09:14
18   Q.   We have been talking and chatting before     09:14
19   we got on the record, but I'm going to do it      09:14
20   formally.  Again, my name is Paul Kapp and I'm    09:14
21   here with Stephanie Solomon on behalf of FedEx    09:14
22   Ground Package Services.  We're here to take      09:14
23   your deposition.  I figure by now, you probably   09:14
24   got that message; is that right?                  09:14
25   A.   Yes, sir.                                     09:14
```

2 (Pages 2 to 5)

CONFIDENTIAL

**Page 26**

```
1   Ecopia, either the 14 or the 16 ply?                  09:37
2   A.   Do I know who designed the line of tires?        09:37
3   Q.   Yeah.                                            09:37
4   A.   The name that I have associated with it          09:37
5   is Paul Bernstorf. I don't know where in the          09:37
6   ownership chain he is, but he's who I think of.       09:37
7   Q.   Do I understand that perhaps no one              09:38
8   person at a tire company actually designs a           09:38
9   tire. It's a team effort.                             09:38
10  A.   It's been called that, yes.                      09:38
11  Q.   But he's the head of that team?                  09:38
12  A.   I don't know that he's the head of that          09:38
13  team, no. I don't know that there's a team,           09:38
14  per se. I just know I associate him with that         09:38
15  line of tires being responsible.                      09:38
16  Q.   How closely, if at all, have you worked          09:38
17  with Paul Bernstorf since coming to the company?      09:38
18  A.   We're had occasion to meet in person and         09:38
19  we've had occasion to talk on various topics.         09:38
20  There's a lot of -- a lot of different projects       09:38
21  we've interfaced with.                                09:38
22  Q.   As a part of your occupation, your role          09:38
23  with BATO, would you -- well, strike that.            09:38
24       As a part of BATO, you would be                  09:38
25  responsible for supervising, say, the folks that      09:38
```

**Page 27**

```
1   might do field investigations if issues came up       09:38
2   with a tire; is that correct?                          09:39
3        MR. SMITH: Objection to the form of               09:39
4   the question. You can answer.                          09:39
5        THE WITNESS: I'm not directly                     09:39
6   responsible as their supervisor for our field          09:39
7   engineers who would do those types of                  09:39
8   investigations. I'm only responsible for my            09:39
9   team in Nashville.                                      09:39
10  BY MR. KAPP:                                            09:39
11  Q.   Okay. Do the field engineers report to            09:39
12  your team in Nashville?                                 09:39
13  A.   They do not.                                       09:39
14  Q.   Do you know who designed the inner                 09:39
15  liner -- inner liner of this tire?                      09:39
16  A.   No, sir.                                           09:39
17  Q.   Do you know who designed or specced out            09:39
18  any of the components of this tire?                     09:39
19  A.   No, sir.                                           09:39
20       MR. SMITH: I assume, Paul, by "this                09:39
21  tire," you've been referring to the subject             09:39
22  14 ply R283.                                            09:40
23       MR. KAPP: Yeah. And actually, it's                 09:40
24  broader than that. Right now, it's the R283,            09:40
25  both 14 and the 16 ply.                                 09:40
```

**Page 28**

```
1        MR. SMITH: Well, there's four              09:40
2   different sizes, also, Paul. Are you referring  09:40
3   to all the sizes or are you referring just to   09:40
4   the 295/75 R22.5?                                09:40
5        MR. KAPP: 295/75 22.5 load range G,         09:40
6   that's what I'm talking about.                   09:40
7   BY MR. KAPP:                                      09:40
8   Q.   The 14 and the 16 ply R283 in the 295       09:40
9   size.                                            09:40
10  A.   I'm sorry. I lost the question in that.      09:40
11  Q.   We got a little bit -- the R283 295/75       09:40
12  22.5 in the 14 -- in the load range G for the     09:40
13  14 ply and the load range H for the 16.          09:40
14  A.   Okay. The question again was -- I think      09:40
15  I have the size now.                              09:41
16  Q.   Yeah. You got the size now.                  09:41
17       MR. KAPP: Go back up to -- because           09:41
18  I allowed myself to get a little --               09:41
19       MR. SMITH: The question, Paul, was           09:41
20  do you know who designed any of the components.   09:41
21  BY MR. KAPP:                                      09:41
22  Q.   Right. Do you know -- do you know who        09:41
23  designed any of those components?                 09:41
24  A.   Yeah. No, sir.                                09:41
25  Q.   Okay. What kind of testing has your          09:41
```

**Page 29**

```
1   group performed on the R283s, the 14s or the      09:42
2   16s, as we've been discussing?                     09:42
3   A.   The testing my group would have performed     09:42
4   would be to place those tires on fleets and then   09:42
5   monitor those performance over time.               09:42
6   Q.   Okay. Now, since -- since these tires         09:42
7   went into the market, there have been some         09:42
8   issues that have come up that have caused BATO     09:42
9   to conduct subsequent testing, correct?            09:42
10  A.   I'm not sure I understand.                     09:42
11  Q.   Well, I mean, has -- has BATO conducted       09:42
12  any testing on this tire line since it -- since    09:42
13  it went into market beyond fleet testing?          09:42
14  A.   I believe there's been -- there are lots      09:42
15  of routine tests that continue even on products    09:42
16  that are introduced in the market.                 09:42
17  Q.   Okay. Have there been -- there have been      09:43
18  non-routine testing -- strike that.                09:43
19       There has been non-routine testing of the     09:43
20  R283 line of tires since it entered the market,    09:43
21  though. Don't you agree?                            09:43
22  A.   I believe that's accurate, yes, sir.          09:43
23  Q.   And there have been non-routine field         09:43
24  investigations related to this R283 line of        09:43
25  tires since it has come onto -- into the market.   09:43
```

8 (Pages 26 to 29)

CONFIDENTIAL

**Page 30**

```
1    Don't you agree?                           09:43
2    A.   No.  I wouldn't call any of the field  09:43
3    work we do non-routine.  That's what we do, is  09:43
4    field work.                                09:43
5        MR. KAPP:  We can go off the record     09:44
6    real quick while I try to find the record. 09:44
7        THE VIDEOGRAPHER:  We're going off      09:44
8    record.  The time is 9:44.                 09:44
9        (Brief break was observed.)            09:44
10       THE VIDEOGRAPHER:  We're back on the    09:51
11   record.  The time is 9:52.                 09:52
12   BY MR. KAPP:                               09:52
13   Q.   All right, sir.  We're back on the    09:52
14   record.  I had asked you if there were any 09:52
15   non-routine field investigations conducted into  09:52
16   the R283 and you had said no, there were none.  09:52
17   I'm handing you Exhibit 351.               09:52
18       MR. KLINE:  Can I take a look at        09:52
19   that when you have a chance, Colin?        09:52
20       MR. SMITH:  Sure.                      09:52
21       MR. KAPP:  I would have brought -- I    09:52
22   would have brought everybody copies, but getting  09:52
23   3,000 documents to Nashville, Tennessee is not  09:52
24   an easy undertaking.                       09:52
25       MR. KLINE:  Okay.                      09:53
```

**Page 31**

```
1        MS. SOLOMON:  Do you want to read       09:53
2    the Bates number, Paul?                    09:53
3        MR. KAPP:  And that Bates              09:53
4    1570035786.                                09:53
5    BY MR. KAPP:                               09:53
6    Q.   If you would, who -- who generated that  09:53
7    e-mail, sir?                               09:53
8        MR. SMITH:  Just let me first object   09:53
9    to the predicate of the question.         09:53
10       MR. KAPP:  I'm sorry?                  09:53
11       MR. SMITH:  I'm objecting to the       09:53
12   statement you made at the beginning of the 09:53
13   question.                                  09:53
14       THE WITNESS:  I'm still reading it     09:53
15   here.                                      09:53
16       MR. KAPP:  All right.                  09:53
17       MR. KLINE:  That ends with 786, did    09:53
18   you say, Paul?                             09:53
19       MR. KAPP:  5786.                       09:53
20       THE WITNESS:  Okay.                    09:53
21   BY MR. KAPP:                               09:53
22   Q.   Who -- who generated that e-mail?     09:53
23   A.   I did.  This is from me.              09:53
24   Q.   Okay.  And when did you generate it?  09:53
25   A.   It looks like October 13th, 2014.     09:53
```

**Page 32**

```
1    Q.   And what was the purpose of generating  09:53
2    that e-mail?                               09:54
3    A.   This e-mail is addressed to our regional  09:54
4    field engineering team and it is specifically  09:54
5    looking at getting some ideas from them about  09:54
6    what field information we can get together  09:54
7    relatively quickly.                        09:54
8    Q.   Okay.  Will you read into the record,  09:54
9    sir, what you said to your field engineers in  09:54
10   this e-mail of 10/13/2014.                 09:54
11   A.   Sure.  I'll read the text here.       09:54
12   "RFEMs" -- which is regional field engineering  09:54
13   managers -- "Our investigation into the R283  09:54
14   continues and let me express that it continues  09:54
15   in an increasingly urgent timeline.  We're in  09:54
16   need of field support.  I would like to    09:54
17   brainstorm with the team to understand how we  09:54
18   can best utilize our field team to gather  09:54
19   information relevant to the investigation.  09:54
20   Examples of what kind of data we are looking to  09:55
21   understand:  What is the real difference between  09:55
22   those fleets who have experienced issues with  09:55
23   the R283 and those who have not?  Is it really  09:55
24   equipment?  Is it really geography?  Is it  09:55
25   really speed?  Is it really time at speed?  Why  09:55
```

**Page 33**

```
1    is the incident rate of claims so high compared  09:55
2    to adjustments?  What are the real differences  09:55
3    between the application today and that of two to  09:55
4    three years ago?                           09:55
5        I am looking for input into field      09:55
6    activities that you can all suggest and then  09:55
7    support to gather relevant data quickly.  I am  09:55
8    looking to discuss how we can put in place an  09:55
9    expedited process to investigate field     09:55
10   complaints on this tire as we become aware of  09:55
11   the complete.                              09:55
12       In short, I'm looking for your experience  09:55
13   and expertise to help with this phase of the  09:55
14   investigation.  Thanks for your support and I  09:55
15   look forward to this dialogue.  James."    09:55
16   Q.   Okay.  A couple of follow-up questions.  09:56
17   Now, the R283 that you are discussing in this  09:56
18   e-mail includes both the R283 Ecopia 14 ply, the  09:56
19   type -- the type of tire that was involved in  09:56
20   this accident.  Do you agree?              09:56
21       MR. SMITH:  Objection to the form.     09:56
22       THE WITNESS:  No.  This was for the    09:56
23   16 ply investigation that we were doing.   09:56
24   BY MR. KAPP:                               09:56
25   Q.   So is it your testimony under oath, sir,  09:56
```

9 (Pages 30 to 33)

CONFIDENTIAL

1   that you, through BATO -- strike that -- that                     09:56
2   BATO through you and your field engineers were                    09:56
3   only investigating the 16 ply tire, not the                       09:56
4   14 ply tire?  Is that your testimony, sir?                        09:56
5       A.    My testimony is this letter referring to                09:56
6   the R283 investigation was at the time we were                    09:56
7   looking at the 16 ply.  That's what it refers to                  09:56
8   in terms of the rates of claims and so it was                     09:56
9   specific to 16 ply.                                               09:57
10          MR. KAPP:  In Jim Fitzgerald's                            09:57
11  words, "mark that."                                               09:57
12          THE WITNESS:  Do I mark it?                                09:57
13          MR. KLINE:  No.                                           09:57
14          MR. SMITH:  He's talking to the                           09:57
15  reporter.                                                         09:57
16          MR. KAPP:  You don't -- you don't                         09:57
17  mark anything.                                                    09:57
18          MR. KLINE:  I think I heard it from                       09:57
19  you before I heard it from Jim.                                   09:57
20          (Exhibit Number 351 was marked.)                          09:57
21  BY MR. KAPP:                                                      09:57
22      Q.    There's nothing on this e-mail -- strike                09:57
23  that.                                                             09:57
24          There's nothing in this e-mail that                      09:57
25  conveys to your field team that the R283 -- your                  09:57

Page 34

1   investigation into the R283 was limited to the                   09:57
2   16 ply version of this tire.  Don't you agree?                    09:57
3       A.    That's correct.  There's nothing in this               09:57
4   e-mail that says that.                                            09:57
5       Q.    And, in fact, your field people were                   09:57
6   looking at both the 14 and the 16s.  Don't you                    09:58
7   agree?                                                            09:58
8       A.    Well, the field team looks at all the                  09:58
9   tires.  This e-mail was specific to the 16 ply.                   09:58
10  I can't tell you whether they, you know, went                     09:58
11  out and took this and looked at things other                     09:58
12  than the 16 ply, if that's what you're asking                     09:58
13  me.                                                               09:58
14      Q.    And you're saying that this e-mail only                 09:58
15  pertained to the 16 ply, even though you didn't                   09:58
16  call out the 16 ply, because there was nothing                    09:58
17  on BATO's radar to indicate that there was any                    09:58
18  sort of flagging concerns with the 14; is that                    09:58
19  correct?                                                          09:58
20      A.    So this was written in October of 2014 --              09:58
21      Q.    Right.                                                  09:58
22      A.    -- and the incident rate it's                          09:58
23  specifically talking about would have been the                   09:59
24  16 ply.  That would have been my intent.                         09:59
25      Q.    Okay.  But you didn't tell that to your                09:58

Page 35

1   field people.  That's true?                                      09:58
2       A.    Not explicitly in this letter.                         09:58
3       Q.    Now, let's just -- obviously, sir, I                   09:59
4   don't agree with your statement that this is                     09:59
5   directed towards the 16 and we'll just agree to                  09:59
6   disagree on that.  But let's just take your                      09:59
7   statement for face value that it is as to the                    09:59
8   16 ply.  Would you agree that that would -- that                 09:59
9   what you were engaging in was non-routine field                  09:59
10  investigation of the 16?                                         09:59
11          MR. SMITH:  Objection to the form of                     09:59
12  the question.  Move to strike counsel's                          09:59
13  comments.                                                        09:59
14          MR. KLINE:  I have to agree with                         09:59
15  that.                                                            09:59
16          MR. KAPP:  I'll ask it a different                       09:59
17  way.                                                             09:59
18  BY MR. KAPP:                                                     09:59
19      Q.    Would you agree -- would you agree that               09:59
20  the tasks that you were asking of your people on                 09:59
21  October 13th, 2014 in this e-mail, they were --                  09:59
22  they were non-routine?                                           09:59
23      A.    No.  I would not agree with that.                      09:59
24      Q.    Okay.  Why was the -- why was the                      09:59
25  investigation continuing in increasingly urgent                  09:59

Page 36

1   timeline?                                                        10:00
2       A.    What I mean by that specifically is at               10:00
3   this time, this was very early.  The time frame                  10:00
4   I remember for the 16 ply was kind of that                       10:00
5   September '14 to kind of the spring, summer of                   10:00
6   '15.  That's kind of that window.  And so since                  10:00
7   we were early in it, the more information we                     10:00
8   could get, the more quickly we could get it                      10:00
9   helped us focus where we were going.                             10:00
10      Q.    Okay.  Why were you only interested in                10:00
11  the 16 ply?                                                      10:00
12      A.    That's the one that had the increased                 10:00
13  rate that was described in the e-mail.                           10:00
14      Q.    How would they know that if you didn't               10:00
15  call out the 16 versus the 14 ply?                               10:00
16      A.    Well, I mentioned the -- I believe the              10:00
17  time frame we're really talking about was                        10:00
18  September and this is in October, so there --                    10:00
19  there was some conversation going on about what                  10:01
20  we were looking at and why.  Again, it's not                     10:01
21  explicit in here that it was 16 ply, but that                    10:01
22  was what I was relying on.                                       10:01
23      Q.    Okay.  Well, we've been talking about                10:01
24  routine investigations.  What would your                         10:01
25  definition be of a non-routine investigation?                    10:01

Page 37

10 (Pages 34 to 37)

CONFIDENTIAL

Page 38

```
1    A.   Specific to the field team or for who?    10:01
2    Q.   As to the field team.                     10:01
3    A.   So the -- the reason I'm calling it       10:01
4  non-routine is that's the field team's          10:01
5  responsibility, is when they hear of a          10:01
6  complaint, they go out and they look into it.   10:01
7  They investigate it. So that is a routine       10:01
8  activity of theirs. Getting -- gathering data   10:01
9  on fleets, gathering data in this way, to me, is 10:01
10 routine. That's why I refer to it as routine.   10:01
11   Q.   Well, if it was routine, wouldn't it --   10:01
12 wouldn't you be gathering information as to both 10:01
13 the 14 and the 16 ply?                           10:01
14   A.   The field team responds to questions.     10:02
15 I've got a question of this. Can you go find     10:02
16 it? I've got a question of that. Can you go      10:02
17 find it? So specifically, if I ask them about    10:02
18 the 14 ply, they would have looked about the 14. 10:02
19 If I asked them 16, they would have gone and     10:02
20 looked at the 16.                                10:02
21   Q.   Okay. And it's your testimony under oath  10:02
22 that this e-mail -- what is it, exhibit what?    10:02
23   A.   Hang on. I should keep these on.          10:02
24   Q.   You probably should.                      10:02
25   A.   This is -- this is marked Exhibit 351.    10:02
```

Page 39

```
1    Q.   Okay. And it's your testimony that, hey, 10:02
2  this is all about the 16, not about the 14; is  10:02
3  that correct?                                    10:02
4       MR. SMITH:  Objection to the form of       10:02
5  the question. Asked and answered. It's further  10:02
6  argumentative. You can answer.                   10:02
7       THE WITNESS:  My intent when this          10:02
8  was written would have been on the 16 ply.      10:02
9  BY MR. KAPP:                                     10:02
10   Q.   Okay. What kind of documents does your   10:02
11 office -- strike that.                           10:03
12       What -- what kind of documents does your  10:03
13 department, or do they, generate?                10:03
14   A.   My department or my team specifically?   10:03
15   Q.   Let's just take it -- let's talk about   10:03
16 the -- the teams. And those teams would be your 10:03
17 field engineers; is that right?                  10:03
18   A.   Well, my -- my teams are the people who  10:03
19 arrange and deal with the fleet testing         10:03
20 logistics and then the team that deals with then 10:03
21 analytics of the warranty and adjustment data.  10:03
22 So if we're speaking of my teams, there's       10:03
23 various documents that we would create to share 10:03
24 information throughout the company.              10:03
25   Q.   The fleet team -- the fleet testing      10:03
```

Page 40

```
1  folks, what kind of documents do they generate? 10:03
2    A.   So our fleet testing documentation,      10:03
3  there's a set of documents that are generated   10:04
4  around the logistics of the testing, what tests 10:04
5  are going in on schedule, when they're ending,  10:04
6  whether the inspections are complete on time.   10:04
7  There's also a series of documents that the     10:04
8  field engineers generate that we track, which   10:04
9  are reports for when tests conclude, what their 10:04
10 belief is we've learned from the test, that type 10:04
11 of thing in the field testing.                   10:04
12   Q.   Okay. What does the -- your other team,  10:04
13 the ones that deals with warranty issues,       10:04
14 adjustments, claims, what kind of documents do  10:04
15 they generate?                                   10:04
16   A.   So they generate -- and, again, I'll use 10:04
17 routine and non-routine to describe their work. 10:04
18 Routinely, they will generate documents that    10:04
19 look at trends over time and statistics. And    10:04
20 early -- earlier we talked about statistics and 10:04
21 the engineers -- a large part of engineering is 10:04
22 statistics. It's analysis.                       10:05
23       So they would generate those routine      10:05
24 documents that we would share with the          10:05
25 organization, the plant's quality team, the     10:05
```

Page 41

```
1  marketing team. And then non-routine documents 10:05
2  where if we were looking at a specific product  10:05
3  or a specific event in time, they would generate 10:05
4  similar documents, but non-routine in that they 10:05
5  were focused on one product at that time.       10:05
6    Q.   Did your team generate non-routine       10:05
7  documents as a part of doing their work for BATO 10:05
8  in relationship to any of the R283 line?        10:05
9    A.   Yes.                                      10:05
10   Q.   Okay. What kind of non-routine documents 10:05
11 were generated?                                  10:05
12   A.   We would -- we would look, for instance, 10:05
13 at various snapshots in time, at the return      10:05
14 rates, the analysis of the return rates against 10:05
15 the baseline. We would be generating documents  10:06
16 that look at -- we actually created a new way to 10:06
17 look at the documents instead of what we call an 10:06
18 exposure chart. We found another way to look at 10:06
19 counts in production that was just a different   10:06
20 visualization that would be non-routine.         10:06
21   Q.   Is that -- and I interrupt you and I     10:06
22 apologize, but I'll forget if we -- if I don't  10:06
23 stop you. Was that the first time you'd used    10:06
24 this process of -- to look at the data?         10:06
25   A.   The visualization I'm talking about,     10:06
```

11 (Pages 38 to 41)

CONFIDENTIAL

1   yeah, it was the first time.  We -- we have a          10:06
2   new tool called Tableau, which is a different          10:06
3   software tool we use to visualize.                     10:06
4       Q.     Spell?                                      10:06
5       A.     T-A-B-L-E-A-U.                              10:06
6       Q.     And did you purchase that or did you        10:06
7   create it?                                             10:06
8       A.     Oh, no.  It's a purchased software.         10:06
9       Q.     And you purchased it for your analysis of   10:06
10  the R283?                                              10:06
11      A.     No.  We purchased it for general            10:06
12  analysis.  Much like Excel, which is another           10:06
13  version, this has a little more functionality          10:06
14  and produces documents that have a little more         10:07
15  visual appeal.                                         10:07
16      Q.     You used it for the first time in your      10:07
17  analysis of the R283?                                  10:07
18      A.     No.  We used Tableau prior to 283.          10:07
19      Q.     Okay.  All right.  What other non-routine   10:07
20  documents were generated?                              10:07
21      A.     Well, those are the ones I recall.          10:07
22      Q.     Okay.  Now, we've got a -- we had an        10:07
23  Excel spreadsheet provided to us in many, many,        10:07
24  many different versions or dates.  And it -- the       10:07
25  most recent one that we have, the last entry is        10:07

Page 42

1   A.     When -- when we're -- when you're looking       10:09
2   at information and doing investigations,               10:09
3   spreadsheets are a very big part of that.              10:09
4       Q.     When did you first start inputting into     10:09
5   the Excel spreadsheet that we're discussing, the       10:09
6   4020 spreadsheet?                                      10:09
7       A.     I don't remember when we -- when I          10:09
8   specifically -- I'm the one who created that           10:09
9   document -- when I specifically created that for       10:09
10  me to keep track of the information.  I don't          10:10
11  specifically recall the date.                          10:10
12      Q.     Why did you create it?                      10:10
13      A.     I created it to -- in one place, trying     10:10
14  to put as much information as I knew of about          10:10
15  the particular investigation.  And then that           10:10
16  document become a feeder for lots of other             10:10
17  documents that would be the report outs from it,       10:10
18  so it was really a -- an internal way just to          10:10
19  keep everything in one place.                          10:10
20      Q.     Okay.  So it was the first document         10:10
21  generated in the process?                              10:10
22      A.     I don't know that it was the first          10:10
23  document generated in the process, but I know it       10:10
24  was -- that spreadsheet is what I -- what I            10:10
25  created to keep track of the information that          10:10

Page 44

1   in June of 2015.  In any case, I -- here's a --        10:08
2   here is an expanded version of the Excel               10:08
3   spreadsheet.  Does this look at all familiar to        10:08
4   you at all?                                            10:08
5       A.     Yes, sir.                                   10:08
6       Q.     Okay.  And what do you -- what -- what is   10:08
7   this document that I'm referring to that I have        10:08
8   in my hand?  It's been made an exhibit, but what       10:08
9   is it?                                                 10:08
10      A.     So that document is a spreadsheet that I    10:08
11  was maintaining to gather information on this          10:08
12  particular event, this particular investigation.       10:08
13      Q.     Okay.  Does BATO routinely maintain         10:08
14  documents of this type?  And just for the              10:08
15  record, when I say "documents of this type," I'm       10:08
16  referring to of the type that -- of the style          10:08
17  set forth in Document 1570004020.                      10:08
18      A.     I don't know what that document is.  Is     10:09
19  that the document you're referring to?                 10:09
20      Q.     It is.  It's the -- the 4020 number is      10:09
21  the most recent version of this spreadsheet that       10:09
22  we have been provided.  And what I'm asking you        10:09
23  is, do you routinely maintain this kind of             10:09
24  spreadsheet for a line of tires that you're --         10:09
25  that you're dealing with?                              10:09

Page 43

1   was moving around.                                     10:10
2       Q.     Right.  And you -- did you pick an          10:10
3   investigation team?                                    10:10
4       A.     Did I pick?  No.  There was no team,        10:10
5   per se.                                                10:10
6       Q.     You're going to have to forgive me.         10:10
7   There's -- this is a document intensive case for       10:11
8   us and so it takes me a while to find it.              10:11
9   Well -- and you're going to have to use mine.          10:11
10  I'm sorry, sir.                                        10:11
11      But in the 4020 document that we have              10:11
12  been provided, at the bottom of it, it says            10:11
13  "Investigation details incomplete."  Did you          10:11
14  write that language in?                                10:11
15      A.     Yes, I did.                                 10:11
16      Q.     And the first entry is 1/1 of '14.          10:12
17      A.     New Year's Day of '14.                      10:12
18      Q.     All right.  And you're the one who          10:12
19  inputted all this information; is that correct?        10:12
20      A.     Yes.  Myself primarily.  I had a couple     10:12
21  of people who might have reviewed it with me,          10:12
22  but I'm the owner of the document and the              10:12
23  primary inputter to the document.                      10:12
24      Q.     Okay.  And you start talking about          10:12
25  discussion and southeast manager meeting of           10:12

Page 45

12 (Pages 42 to 45)

CONFIDENTIAL

| | |
|---|---|
| 1 anything generated as part and parcel of that | 10:20 |
| 2 meeting? | 10:20 |
| 3 A.   I honestly don't know if we generated any | 10:20 |
| 4 as part of that meeting. | 10:20 |
| 5 Q.   9/29, you had another meeting of this | 10:20 |
| 6 team and as reported in your investigation | 10:20 |
| 7 details, you had an update with Kozy, Bernstorf, | 10:20 |
| 8 Johnson, Palmer and yourself; is that correct? | 10:20 |
| 9 A.   Yes, sir. | 10:21 |
| 10 Q.   Kozy's a new name.  Who is he or she? | 10:21 |
| 11       MR. SMITH:  Objection to the form of | 10:21 |
| 12 the question.  By the way, that's K-O-Z-Y. | 10:21 |
| 13       THE WITNESS:  Jim Kozy is part of | 10:21 |
| 14 the ATC staff. | 10:21 |
| 15 BY MR. KAPP: | 10:21 |
| 16 Q.   Okay.  And Johnson is your boss? | 10:21 |
| 17 A.   At the time, Dave Johnson is who that | 10:21 |
| 18 refers to.  He was my boss. | 10:21 |
| 19 Q.   Okay.  Is he -- he's obviously not your | 10:21 |
| 20 boss anymore. | 10:21 |
| 21 A.   That's correct, sir. | 10:21 |
| 22 Q.   Okay.  What is he to you now? | 10:21 |
| 23 A.   Besides my past boss, we don't have a | 10:21 |
| 24 reporting relationship right now. | 10:21 |
| 25 Q.   Okay.  9/30/2014, what happened then? | 10:21 |

Page 54

| | |
|---|---|
| 1 A.   It says here, "Update meeting with Cane, | 10:21 |
| 2 Johnson, Turk, Palmer and Kirlazes. | |
| 3 Q.   Same questions.  Do you remember what you | 10:21 |
| 4 discussed and were there any documents | 10:21 |
| 5 generated? | 10:21 |
| 6 A.   I do not specifically recall what we | 10:21 |
| 7 discussed or if we generated anything from this. | |
| 8 Q.   10/2/2014, what happened and what is | 10:21 |
| 9 reflected in your investigation detail of this | 10:22 |
| 10 Document 4020? | 10:22 |
| 11 A.   It says, update meeting with SE for sales | 10:22 |
| 12 engineering and ATC for Akron Technical Centers | 10:22 |
| 13 for investigation details.  And then it goes on | 10:22 |
| 14 to say that our next meeting is 10/13. | 10:22 |
| 15 Q.   Okay.  Question -- and we've only got the | 10:22 |
| 16 document that ends at Bates Number 4020.  Did | 10:22 |
| 17 you continue to maintain this spreadsheet? | 10:22 |
| 18 A.   That spreadsheet?  Yes. | 10:22 |
| 19 Q.   Yes.  When was the last time you added to | 10:22 |
| 20 it? | 10:22 |
| 21 A.   The last time I added to that spreadsheet | 10:22 |
| 22 was last week. | 10:22 |
| 23 Q.   4020, this spreadsheet maintains -- it's | 10:22 |
| 24 basically got all of the -- all of the returns, | 10:23 |
| 25 claims and adjustments for both the 14 ply and | 10:23 |

Page 55

| | |
|---|---|
| 1 16 ply version of the R283 in question.  Do you | 10:23 |
| 2 agree? | 10:23 |
| 3 A.   I believe it has select returns, claims, | 10:23 |
| 4 adjustments for the R283s. | 10:23 |
| 5 Q.   Both the 14 and the 16? | 10:23 |
| 6 A.   The 14 and the 16, as well as a couple | 10:23 |
| 7 other sizes around there, yes. | 10:23 |
| 8 Q.   What do you mean by "select returns"? | 10:23 |
| 9 A.   We receive returns on product that are | 10:23 |
| 10 all -- for all sorts of different reasons.  This | 10:24 |
| 11 spreadsheet doesn't capture the entire universe | 10:24 |
| 12 of returns on the R283s of all those sizes.  It | 10:24 |
| 13 only captures specific ones. | 10:24 |
| 14 Q.   What part of the universe does the 4020 | 10:24 |
| 15 spreadsheet capture? | 10:24 |
| 16 A.   On that spreadsheet, I tried to capture | 10:24 |
| 17 the ones that were specific to returns that had | 10:24 |
| 18 to deal with the shoulder or the -- the side | 10:24 |
| 19 wall, rather, or the tread of the tire. | 10:24 |
| 20 Q.   Why did you choose to capture those? | 10:24 |
| 21 A.   That was where our area of interest is. | 10:24 |
| 22 Q.   Why was your area of interest there? | 10:24 |
| 23 A.   What do you mean by why was it there? | 10:24 |
| 24 Q.   Well, you're the one who said that you | 10:24 |
| 25 tried to capture areas of interest.  My question | 10:24 |

Page 56

| | |
|---|---|
| 1 is, why did you identify those kind of returns | 10:24 |
| 2 as your area of interest? | 10:24 |
| 3 A.   Oh, okay.  The return condition that was | 10:24 |
| 4 specifically being looked at was a tread leaving | 10:25 |
| 5 tread condition, and so I tried to capture | 10:25 |
| 6 anything that might be related to a tread | 10:25 |
| 7 leaving tread condition.  So that's why the | 10:25 |
| 8 shoulder and the -- I'm sorry -- the side wall | 10:25 |
| 9 and the tread were the two areas of interest | 10:25 |
| 10 that I refined that to. | 10:25 |
| 11       MR. SMITH:  Excuse me for a minute, | 10:25 |
| 12 Paul.  Could you read back that answer for me, | 10:25 |
| 13 please? | 10:25 |
| 14       (Question was read back.) | 10:25 |
| 15       MR. SMITH:  I'm -- I'm sorry.  I | 10:25 |
| 16 misspoke.  I meant BLB, belt leaving belt, not | 10:25 |
| 17 tread leaving tread. | 10:26 |
| 18 BY MR. KAPP: | 10:26 |
| 19 Q.   This is why I'm glad we have Colin here | 10:26 |
| 20 because you said tread leaving tread and I -- I | 10:26 |
| 21 was thinking belt leaving belt.  I heard it -- I | 10:26 |
| 22 heard it just the way you said it or you meant | 10:26 |
| 23 it, even though you were using the wrong word. | 10:26 |
| 24 But okay. | 10:26 |
| 25       All right.  So we've identified why. | 10:26 |

Page 57

15 (Pages 54 to 57)

CONFIDENTIAL

**Page 58**

```
 1    Now, I do have to ask you, this 4020        10:26
 2  spreadsheet -- and I realize that now there are 10:26
 3  more versions of it, but, you know, the 4020   10:26
 4  spreadsheet that we have that ends in June 29th 10:26
 5  of 2015, I don't see that it -- that it -- it   10:26
 6  appears to relate to the R283 line of tires.    10:26
 7  Don't you agree?                                10:26
 8    A.    I think that spreadsheet captures the   10:26
 9  R283 in all the sizes, yeah.                    10:26
10    Q.    Okay. Is it your testimony under oath,  10:26
11  sir, that a -- that a tread leaving tread --    10:27
12          MS. SOLOMON: Belt leaving belt.         10:27
13          MR. KAPP: Strike that.                  10:27
14  BY MR. KAPP:                                    10:27
15    Q.    Is it your testimony under oath, sir,   10:27
16  that you, on behalf of BATO, routinely lead     10:27
17  investigations of belt leaving belt conditions? 10:27
18    A.    Well, I don't say I led the -- the      10:27
19  investigation, and I'm not -- I'm not sure I    10:27
20  understand that question.                       10:27
21    Q.    Is it your testimony under -- under oath 10:27
22  that you, as a part of your employment with BATO 10:27
23  and whether or not you led it, routinely conduct 10:28
24  investigations of belt leaving belt conditions  10:28
25  in your tires?                                  10:28
```

**Page 59**

```
 1    A.    I think the best way for me to answer   10:28
 2  that is we look into all the warranty and       10:28
 3  returns. Some that -- may come back for various 10:28
 4  reasons, so if one comes back from -- with a    10:28
 5  belt leaving belt condition, that's something   10:28
 6  that my team looks at. We don't -- we don't     10:28
 7  have an investigation quote/unquote that goes   10:28
 8  into spreadsheets like this particular one, but 10:28
 9  they're all -- they're all analyzed in terms of 10:28
10  statistics and the analysis that goes into that. 10:28
11    Q.    But this investigation was special enough 10:28
12  to create this spreadsheet to keep you on track, 10:28
13  correct?                                        10:28
14    A.    This investigation was special only in  10:28
15  that there was a lot of information that I was   10:29
16  trying to deal with, so I put it in one big     10:29
17  spreadsheet.                                    10:29
18    Q.    And the -- and the information you were 10:29
19  dealing with were returns of the R283 tire with 10:29
20  belt leaving belt separations?                  10:29
21          MR. SMITH: Objection to the form of     10:29
22  the question. Go ahead.                         10:29
23          THE WITNESS: Sure. So that was the      10:29
24  condition that I spoke to about why we were     10:29
25  limiting the tread and side wall, so that       10:29
```

**Page 60**

```
 1  condition was the focus of why we looked at     10:29
 2  this.                                           10:29
 3  BY MR. KAPP:                                    10:29
 4    Q.    So the answer to my question is yes?    10:29
 5          MR. SMITH: Objection to the form of     10:29
 6  the question. It's been asked and answered.     10:29
 7          THE WITNESS: If you could repeat        10:29
 8  the question again, I'll make sure I'm accurate 10:29
 9  in my answer.                                   10:29
10          MR. KAPP: Go ahead, Jennifer.           10:29
11          MR. SMITH: Please read the answer       10:29
12  back, too, when you read the question.          10:29
13          (Question was read back.)               10:30
14          THE WITNESS: Yeah. I don't think I      10:30
15  can add to that.                                10:30
16  BY MR. KAPP:                                    10:30
17    Q.    Okay. Has your spreadsheet, your 40 --  10:30
18  what I call the 4020 spreadsheet, for lack of a 10:30
19  better way to identify it --                    10:30
20    A.    Okay.                                   10:30
21    Q.    -- does it have additional entries under 10:30
22  the, quote, investigation details section?      10:30
23    A.    Other than what's been printed there?   10:30
24    Q.    Right.                                  10:30
25    A.    If you printed the whole document, then 10:30
```

**Page 61**

```
 1  that would be where that ends.                  10:30
 2    Q.    But what I want to know is, were there -- 10:30
 3  were there -- did meetings continue to take     10:30
 4  place after 10/2 of 2014 that were reported in  10:30
 5  the spreadsheet?                                10:30
 6    A.    There would have been meetings that have 10:30
 7  taken place. They're not reported on that       10:31
 8  spreadsheet.                                    10:31
 9    Q.    Is the reason why you quit making entry 10:31
10  of investigative details, is the reason you did 10:31
11  that this lawsuit or litigation?                10:31
12    A.    Oh, no. I don't think this lawsuit came 10:31
13  about, my recollection, until, what, the January 10:31
14  of '15 time frame. So it just became           10:31
15  inconvenient to try and list all the meetings in 10:31
16  one place, so I stopped. That's the only reason 10:31
17  I did that.                                     10:31
18    Q.    Okay. There's a section in here about   10:31
19  fleets that are no longer using the tire or no  10:31
20  longer taking these tires. Do you recall that?  10:32
21    A.    I'll have to see it to recall it        10:32
22  specifically, but I do remember noting some     10:32
23  comments from fleets.                           10:32
24          MS. SOLOMON: Can you read that?         10:32
25  BY MR. KAPP:                                    10:32
```

16 (Pages 58 to 61)

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | claims? | 03:15 |
| 2 | A.    So -- | 03:15 |
| 3 | MR. SMITH:  Objection to the form of | 03:15 |
| 4 | the question. | 03:15 |
| 5 | THE WITNESS:  Yeah.  The word | 03:15 |
| 6 | "uptick" there is one that I struggle with | 03:15 |
| 7 | because from this table, you can't make that | 03:15 |
| 8 | conclusion.  You have to go to the exposure | 03:15 |
| 9 | chart where the actual statistical analysis is | 03:15 |
| 10 | run and look at those confidence limits to | 03:15 |
| 11 | understand whether it is statistically different | 03:15 |
| 12 | or not. | 03:15 |
| 13 | BY MR. KAPP: | 03:15 |
| 14 | Q.    Why do you depict the data in that form | 03:15 |
| 15 | if it's of no relevance to you? | 03:15 |
| 16 | MR. SMITH:  Objection to the form. | 03:15 |
| 17 | Misstates the testimony of the witness. | 03:15 |
| 18 | BY MR. KAPP: | 03:15 |
| 19 | Q.    Well, are you saying -- let me -- I'll | 03:15 |
| 20 | retract that.  Are you saying that these -- that | 03:15 |
| 21 | the graphs on 4031 and 4032 are of no | 03:15 |
| 22 | informational value? | 03:16 |
| 23 | A.    No.  Again, they're meant to represent | 03:16 |
| 24 | the timeline and in one place, be able to | 03:16 |
| 25 | superimpose that production, be able to | 03:16 |

Page 210

| | | |
|---|---|---|
| 1 | superimpose where the individual returns were | 03:16 |
| 2 | coming from so that, you know, we could do an | 03:16 |
| 3 | investigation just understanding how all those | 03:16 |
| 4 | pieces came together.  It was a new tool we | 03:16 |
| 5 | created. | 03:16 |
| 6 | Q.    So you don't -- you really don't think | 03:16 |
| 7 | that there is an uptick in claims and returns | 03:16 |
| 8 | for tires made after -- made the week of | 03:16 |
| 9 | January 17th after a spec change to the 14 and | 03:16 |
| 10 | the 16 tire in the week before?  Is that your | 03:16 |
| 11 | testimony under oath, sir? | 03:16 |
| 12 | A.    So my testimony is these documents that | 03:16 |
| 13 | were made as a part of the 16 ply investigation | 03:16 |
| 14 | that from this chart, the 31, 32 and the other | 03:16 |
| 15 | similar charts -- you used the word "mountain." | 03:17 |
| 16 | I actually refer to them as mountain charts, as | 03:17 |
| 17 | well. | 03:17 |
| 18 | These mountain charts don't give you | 03:17 |
| 19 | enough statistical information to draw a | 03:17 |
| 20 | conclusion to whether that is relevant or not | 03:17 |
| 21 | statistically.  These exposure charts at the | 03:17 |
| 22 | back is where that statistical determination is | 03:17 |
| 23 | made, so these visualizations on the mountain | 03:17 |
| 24 | charts aren't statistical from that perspective. | 03:17 |
| 25 | Q.    Okay.  And once again, you mentioned the | 03:17 |

Page 211

| | | |
|---|---|---|
| 1 | 16 ply investigation, but you're gathering data | 03:17 |
| 2 | for the 14 and the 16? | 03:17 |
| 3 | A.    This represents all the 283 data in this | 03:17 |
| 4 | size, 295/75 R22 and a half.  I think we | 03:17 |
| 5 | established that earlier. | 03:17 |
| 6 | Q.    So what's a chart you think that I should | 03:17 |
| 7 | look at that actually tells the story? | 03:17 |
| 8 | A.    So these exposure charts in the back -- | 03:17 |
| 9 | let me give you one.  And I believe this is the | 03:17 |
| 10 | same chart we already marked before.  Okay. | 03:18 |
| 11 | These are -- so this breaks out 14, 16, 14, 16. | 03:18 |
| 12 | This is very early, 12/1/2014.  Oh, here it is. | 03:18 |
| 13 | So if you look at 4052, that's the same | 03:18 |
| 14 | chart we had marked earlier as Exhibit 354. | 03:18 |
| 15 | That is the exact same chart we colored on | 03:18 |
| 16 | previously.  This is where that statistical | 03:18 |
| 17 | significance is of the most importance. | 03:18 |
| 18 | Q.    Okay.  Explain to me why -- how it is | 03:19 |
| 19 | important, please. | 03:19 |
| 20 | A.    Well, again, in the upper right-hand | 03:19 |
| 21 | corner, this is what is really driving all of | 03:19 |
| 22 | this chart's interpretation. | 03:19 |
| 23 | Q.    You're looking at 22 -- 22 million -- | 03:19 |
| 24 | A.    Out of -- | 03:19 |
| 25 | Q.    -- 187,288 tires; is that right? | 03:19 |

Page 212

| | | |
|---|---|---|
| 1 | A.    Yes.  That's included in the baseline. | 03:19 |
| 2 | Q.    Okay. | 03:19 |
| 3 | A.    And of those tires, all of the 295/75 R | 03:19 |
| 4 | 22 and a half tire size, when we look at the | 03:19 |
| 5 | baseline, it has a total rate of 122.  The | 03:19 |
| 6 | 16 ply R283 Ecopia is the largest on that page | 03:19 |
| 7 | at 360 with a total of 91,604 produced. | 03:19 |
| 8 | The second highest is the tire it | 03:19 |
| 9 | replaced in the market, which was the R280 | 03:19 |
| 10 | 16 ply at 148.  The third highest is the R280 | 03:19 |
| 11 | 14 ply with two million tires.  It had the most | 03:20 |
| 12 | tires out of all of them at 48 incident rate. | 03:20 |
| 13 | And that was a whole decade earlier that that | 03:20 |
| 14 | tire was running.  And then the 14 ply Ecopia | 03:20 |
| 15 | R283, 540,000 produced had only 41, so it's well | 03:20 |
| 16 | below the baseline. | 03:20 |
| 17 | Q.    And you stopped gathering data in | 03:20 |
| 18 | November of 2014 on these tires; isn't that | 03:20 |
| 19 | correct? | 03:20 |
| 20 | A.    Oh, no.  We continue to gather data every | 03:20 |
| 21 | day, every tire that's ever presented back to | 03:20 |
| 22 | us.  You know, we go -- we really go out of our | 03:20 |
| 23 | way to try and make sure that tires that come | 03:20 |
| 24 | back are understood and so any -- any piece of | 03:20 |
| 25 | that data is available to us. | 03:20 |

Page 213

54 (Pages 210 to 213)

CONFIDENTIAL

| | Page 214 |
|---|---|
| 1 | Q.   Let me see if I've got anything more to   03:20 |
| 2 | ask about that document.  Document 7428 -- it's   03:21 |
| 3 | actually 1570037428.   03:22 |
| 4 | MR. SMITH:  Can I see that, please?   03:22 |
| 5 | What exhibit number is this?   03:22 |
| 6 | MR. KAPP:  I don't know.  I'm kind   03:22 |
| 7 | of leaving it to you to keep the exhibits in   03:22 |
| 8 | order.  You do it better than me.  You're more   03:22 |
| 9 | reliable.   03:22 |
| 10 | (Discussion off the record.)   03:22 |
| 11 | (Exhibit Number 362 was marked.)   03:22 |
| 12 | BY MR. KAPP:   03:22 |
| 13 | Q.   All right.  And don't read that yet   03:23 |
| 14 | because I'm taking you back one more time.   03:23 |
| 15 | A.   Okay.   03:23 |
| 16 | Q.   Go back to 361, please.  Look at Page   03:23 |
| 17 | 4070.   03:23 |
| 18 | A.   I don't have a 4070.   03:23 |
| 19 | Q.   I think I've got a random document here.   03:24 |
| 20 | I don't know where it came from, but it came   03:24 |
| 21 | from the -- some of the 45,000 documents I've   03:24 |
| 22 | gotten from the company in the past six months.   03:24 |
| 23 | We used mine, I guess.  It is Bates Stamp   03:24 |
| 24 | 4070 -- it's Bates Stamp 1570004070 and it's   03:24 |
| 25 | Exhibit --   03:24 |

Page 214

| | Page 215 |
|---|---|
| 1 | MR. SMITH:  Must be 363.   03:24 |
| 2 | MR. KAPP:  363.   03:24 |
| 3 | (Exhibit Number 363 was marked.)   03:24 |
| 4 | BY MR. KAPP:   03:24 |
| 5 | Q.   What is that?  Do you mind me crowding   03:24 |
| 6 | you since --   03:24 |
| 7 | A.   Oh, sure.  That's fine.   03:24 |
| 8 | Q.   What is that?   03:24 |
| 9 | A.   So this is what we call a tire detail   03:25 |
| 10 | report.   03:25 |
| 11 | Q.   All right.   03:25 |
| 12 | A.   There's a lot of different information on   03:25 |
| 13 | it.  Some we've already talked about a little   03:25 |
| 14 | bit.  So I'll draw your attention to the center   03:25 |
| 15 | of the page because we talked about this before   03:25 |
| 16 | where there's a -- in this particular case, it's   03:25 |
| 17 | Warren County R283 Ecopia 14 ply.   03:25 |
| 18 | Q.   That's our tire?   03:25 |
| 19 | A.   That's the -- well, let me see.  Is this   03:25 |
| 20 | the 295/75 size?  It doesn't specifically say   03:25 |
| 21 | what size, so I cannot conclude that it is the   03:25 |
| 22 | 295/75 R22 and a half size.  I can just tell you   03:25 |
| 23 | it is 283 Ecopia 14 ply.  It might be all sizes.   03:25 |
| 24 | Q.   Do you know if the Warren plant makes   03:25 |
| 25 | anything other than the 295?   03:25 |

Page 215

| | Page 216 |
|---|---|
| 1 | A.   I do not know personally.   03:25 |
| 2 | Q.   All right.   03:25 |
| 3 | A.   Okay.  So in the center, we have account   03:25 |
| 4 | and this is -- let's see.  It doesn't say what   03:25 |
| 5 | performance group, if anything, we're looking   03:26 |
| 6 | at.  It is adjustments.  It is for looking   03:26 |
| 7 | specifically at the 283, the 280, the 287, the   03:26 |
| 8 | 591 and the 507.  And -- well, it doesn't state   03:26 |
| 9 | it.  Oh, it does.  "TBR by plant for steer   03:26 |
| 10 | select structural."   03:26 |
| 11 | So the codes it's looking at would be   03:26 |
| 12 | that side wall and tread codes, codes related to   03:26 |
| 13 | those.  And in this time frame from 2004,   03:26 |
| 14 | January to 2014, October, there were 17 such   03:26 |
| 15 | codes that were presented.   03:26 |
| 16 | Q.   Right.   03:26 |
| 17 | A.   Okay.   03:26 |
| 18 | Q.   And so if we look at the column, it's an   03:26 |
| 19 | account by period of production.   03:26 |
| 20 | A.   Yes.   03:26 |
| 21 | Q.   You're looking at incidents and you're   03:26 |
| 22 | basically grouping them in the month that the   03:26 |
| 23 | tire was built.   03:27 |
| 24 | A.   It's actually the DOT week, yes.   03:27 |
| 25 | Q.   The DOT week.   03:27 |

Page 216

| | Page 217 |
|---|---|
| 1 | A.   Well, these are production periods.   03:27 |
| 2 | Q.   Right.   03:27 |
| 3 | A.   So you'll see -- what this translates to   03:27 |
| 4 | is this would be 2014/03.  That would actually   03:27 |
| 5 | be March of 2014.   03:27 |
| 6 | Q.   Right.   03:27 |
| 7 | A.   And then if there was one next to it, you   03:27 |
| 8 | would see it would be four, which would be   03:27 |
| 9 | April, and then next to it would be May.  So one   03:27 |
| 10 | column represents the whole month here.   03:27 |
| 11 | Q.   Okay.  And that -- and that incident   03:27 |
| 12 | count includes belt edge detachments, right?   03:27 |
| 13 | A.   It includes -- if you'll move your finger.   03:27 |
| 14 | It looks like there are three belt edge   03:27 |
| 15 | detachments.  It looks like there are another   03:27 |
| 16 | three belt leaving belt conditions, and it looks   03:27 |
| 17 | like there is one BED overdeflection due to   03:27 |
| 18 | loader inflation.  And I believe that is belt   03:28 |
| 19 | edge detachment, BED.   03:28 |
| 20 | Q.   These are all -- these are all conditions   03:28 |
| 21 | which either are belt leaving belt -- belt   03:28 |
| 22 | separations like what was experienced here or   03:28 |
| 23 | which could lead to belt separations such as the   03:28 |
| 24 | type experienced here, correct?   03:28 |
| 25 | A.   Well, if you'll -- if you look   03:28 |

Page 217

55 (Pages 214 to 217)

CONFIDENTIAL

Page 218

```
1   specifically at what they are, it describes          03:28
2   them.  So this red one is a belt edge                03:28
3   detachment, but it's less than 50 percent of the     03:28
4   tread width.                                          03:28
5   Q.    Okay.                                           03:28
6   A.    The green one is a belt leaving belt with       03:28
7   greater than 50 percent of the tread width.          03:28
8   Q.    Okay.                                           03:28
9   A.    And this one here, this belt edge               03:28
10  detachment, it doesn't specify how much of the       03:28
11  tread width would be involved, whether it would      03:28
12  be a very small section or a large.                   03:28
13  Q.    So I'm going to mark with my yellow pen         03:28
14  the 03/2014.  All right?                              03:28
15  A.    Okay.                                           03:28
16  Q.    So that's data for the Warren plant?            03:29
17  A.    This appears to be data specific to            03:29
18  Warren.  That is correct.                             03:29
19  Q.    Now, I'm going to put a yellow finger           03:29
20  around that.                                          03:29
21  A.    Okay.                                           03:29
22  Q.    Does that appear to you to be                   03:29
23  statistically significant as evidence of the        03:29
24  Warren plant having something either going on at     03:29
25  the plant or quality control, manufacturing,         03:29
```

Page 219

```
1   such that you have a spike in these various          03:29
2   conditions for that month?                            03:29
3   A.    So you keep referring to that as a             03:29
4   spike --                                              03:29
5   Q.    Yeah.                                           03:29
6   A.    -- but let's go down to this chart here.       03:29
7   It superimposes our production.                       03:29
8   Q.    Right.                                          03:29
9   A.    So again, in that same period, it appears      03:29
10  that we had just shy of 30,000 tires produced        03:29
11  that month and of those 30,000 tires, six            03:30
12  individual came back.  The previous -- let's go      03:30
13  here into what appears to be February.  You'll        03:30
14  see that production was just under 20,000, so,       03:30
15  you know -- and then if you look at the months        03:30
16  even before that, it obviously trails down to        03:30
17  when the tire started.                                03:30
18  Q.    Okay.                                           03:30
19  A.    So statistically, when we want to talk         03:30
20  statistical and spikes, we have to go back to        03:30
21  that exposure chart that actually looks at the       03:30
22  confidence intervals.                                 03:30
23  Q.    But if we look at this, there are whole        03:30
24  periods from March of 2012 to the end of 2012       03:30
25  where there are no belt edge detachments, belt      03:30
```

Page 220

```
1   leaving belt, tread leaving belt or BED              03:30
2   overdeflections, correct?  You have zero, none.      03:30
3   A.    Yeah.  And if you look at the production,      03:31
4   we were producing well less than -- what does       03:31
5   that look like -- two, 3,000 tires a month.  So     03:31
6   if I keep that the same percentage, I would         03:31
7   expect to see none.                                   03:31
8   Q.    Okay.  If we go to the highest point of       03:31
9   production, why don't you take and draw a line      03:31
10  on the production versus incident rate, PPM,         03:31
11  from the highest point of production down.          03:31
12  A.    Okay.  So it looks like the highest            03:31
13  production here would have been -- appears to be    03:31
14  September 2014.  Do you want me to use this one     03:31
15  or that one?                                          03:31
16  Q.    Use my yellow one.                             03:31
17  A.    So if I -- if I do it this way,                03:31
18  September 2014 -- I don't know.  It looks like       03:31
19  maybe --                                             03:31
20  Q.    It looks like you went off a little bit.       03:31
21  A.    I did go off a little at September like       03:31
22  right there.                                          03:31
23  Q.    Yeah.  Would you agree that at your           03:31
24  highest point of production, you didn't have        03:31
25  any?                                                 03:31
```

Page 221

```
1   A.    My highest point of production, which was     03:31
2   September, is -- this chart was run in October.     03:31
3   I wouldn't have had my exposure in the market       03:32
4   yet to see any signal coming back.                   03:32
5   Q.    Okay.  All right.  Well, in May of --         03:32
6   what was -- what was your production in March of   03:32
7   2014?                                                03:32
8   A.    It looks like, like we said earlier,          03:32
9   something shy of 30,000, but something north of    03:32
10  25,000 per month.                                    03:32
11  Q.    Okay.  And you had --                          03:32
12  A.    March you said.  I'm sorry.  Right?           03:32
13  Q.    Right.  And your incident rate for March      03:32
14  of 2014 at how many thousand?                        03:32
15  A.    That is -- let's just call it 28,000.         03:32
16  Q.    28,000.  Your incident rate in March of       03:32
17  2014 at 28,000 units is 40,000 parts per            03:32
18  million, correct?                                    03:33
19  A.    No.  That's production billing.  The          03:33
20  incident rate over here is less than 250.          03:33
21  Q.    250 parts per million.                         03:33
22  A.    It's less than --                              03:33
23  Q.    All right.                                     03:33
24  A.    -- that.  It looks like it's 240.             03:33
25  Q.    Okay.  Well, let's go over to the next        03:33
```

56 (Pages 218 to 221)

CONFIDENTIAL

1    **Q.   Right.**                                           05:13
2    A.   The word "rapidly" I might not have used           05:13
3    myself, but otherwise, I agree with that                05:13
4    statement.                                              05:14
5    **Q.   Did this come out of your department?**          05:14
6    A.   Yes.  I'm sure this came out of my group.          05:14
7    **Q.   Would have been something you would have**       05:14
8    **read and had to have approved?**                      05:14
9    A.   It would have been something that more             05:14
10   than likely, I'd at least reviewed.  Approval --        05:14
11   I wouldn't use the word "approved," but I would         05:14
12   have at least reviewed it.                              05:14
13   **Q.   The statement, "You have reason to**             05:14
14   **believe that market conditions may have**             05:14
15   **changed -- may have rapidly changed from those**      05:14
16   **that which the tire was originally developed,"**      05:14
17   **that's the same thing as saying that the**            05:14
18   **designer of the there missed the market**            05:14
19   **expectation for performance of the tire in the**      05:14
20   **real world.  Don't you agree?**                       05:14
21        MR. SMITH:  Objection to the form.                 05:14
22        THE WITNESS:  No.  I -- I don't                    05:14
23   think those state the same thing.                       05:14
24   BY MR. KAPP:                                            05:14
25   **Q.   Okay.  Let's go to 0684.  It's in the**          05:15

Page 286

1    **same document and it's under "Summary of current**   05:15
2    **status."  Do you agree?**                             05:15
3    A.   It is in the same document and it is               05:15
4    titled "Summary of current of status," yes.            05:15
5    **Q.   Okay.  And there are three bullet points**       05:15
6    **that summarize the current status of the**            05:15
7    **situation when this -- when this document was**       05:15
8    **created, which apparently was sometime in 2014,**     05:15
9    **correct?**                                            05:15
10   A.   Yeah.  I think we've agreed this document          05:15
11   was likely created in 2014.                             05:15
12   **Q.   Okay.  One of the -- one of the summaries**      05:16
13   **or current status summaries was that Bridgestone**    05:16
14   **observed that customers were using the tire as**      05:16
15   **intended in experiencing belt leaving belt**          05:16
16   **issues.  Did I read that -- did I paraphrase**        05:16
17   **that correctly?**                                     05:16
18   A.   Well, you read it correctly.                       05:16
19   **Q.   Okay.  Do you agree with that finding --**       05:16
20   A.   I think --                                         05:16
21   **Q.   -- that summary?**                               05:16
22   A.   I think this observation at the time is            05:16
23   accurate.  And like I said, I think we found            05:16
24   some additional information from some of our            05:16
25   customers that the -- that what we originally           05:16

Page 287

1    heard from them might not have been so accurate,        05:16
2    specifically on speed and weights.                      05:16
3    **Q.   So you're telling me that this is not**          05:16
4    **accurate to the extent that you have since found**    05:16
5    **that, oh, your customers were abusing the**           05:16
6    **product; is that correct?**                           05:16
7    A.   I think what I said was when this was              05:16
8    created, which we believe again is in sometime          05:16
9    of 2014 in an ongoing investigation, we were           05:16
10   stating our observation.  And the observation at        05:17
11   the time was what was being reported to us was          05:17
12   exactly what's listed on this page.  I do know          05:17
13   of circumstance where what was reported to us           05:17
14   turned out to not be factual, so that's what I'm        05:17
15   saying.                                                 05:17
16   **Q.   So is it your testimony that the reason**        05:17
17   **that these 16s, at least -- if not the 14s, but**     05:17
18   **the 16s, are failing or did fail, is good, old**      05:17
19   **customer abuse, misuse?**                             05:17
20        MR. SMITH:  Objection to the form of              05:17
21   the question.                                           05:17
22        THE WITNESS:  I think you're using               05:17
23   the term pretty broadly about all of the                05:17
24   individual tires, but I do not know personally          05:17
25   of any tire that we could attribute to something        05:17

Page 288

1    other than that on the 16 ply, which was -- you         05:17
2    were talking specifically about.                        05:17
3    BY MR. KAPP:                                            05:17
4    **Q.   Did you just -- did you just tell me that**      05:17
5    **every failure in the 16 is a result of customer**     05:17
6    **use or abuse?**                                       05:18
7    A.   I said the ones I personally know about            05:18
8    and the ones that are chronicled all have               05:18
9    something related to that in their life or some         05:18
10   of their life, more specifically.                       05:18
11        MR. KAPP:  All right.  Thank you.                 05:18
12        MR. SMITH:  Anything else?                        05:18
13        MR. KAPP:  I'm done.                              05:18
14        MR. KLINE:  I have no questions.                  05:18
15        EXAMINATION                                        05:18
16   BY MR. SMITH:                                           05:18
17   **Q.   I have just a couple for you,**                  05:18
18   **Mr. Kiriazes.**                                       05:18
19        MR. KLINE:  Michael, you're good,                05:18
20   too?                                                    05:18
21        MR. MICHAEL FITZGERALD:  I don't                  05:18
22   have any questions.                                      05:18
23   BY MR. SMITH:                                           05:18
24   **Q.   I have just a couple for you,**                  05:18
25   **Mr. Kiriazes.  There were on your spreadsheet**       05:18

Page 289

73 (Pages 286 to 289)

CONFIDENTIAL

```
 1          REPORTER'S CERTIFICATE
 2          I certify that the witness in the
 3   foregoing deposition JAMES KIRIAZES, was by me
 4   duly sworn to testify in the within-entitled
 5   cause; that the said deposition was taken at the
 6   time and place therein named; that the testimony
 7   of said witness was reported by me, a Shorthand
 8   Reporter and Notary Public of the State of
 9   Tennessee authorized to administer oaths and
10   affirmations, and said testimony, pages 6
11   through 293 was thereafter transcribed into
12   typewriting.
13          I further certify that I am not counsel
14   or attorney for either or any of the parties to
15   said deposition, nor in any way interested in
16   the outcome of the cause named in said
17   deposition. (SIGNATURE RESERVED)
18          IN WITNESS WHEREOF, I have hereunto
19   set my hand the 5th Day of April, 2016.
20
21
22
23
24
             JENNIFER HAYNIE (License No. 403)
25           My Commission Expires:  11/06/2017
```

Page 294

75 (Page 294)