# EXHIBIT C

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Alodie Gooden, as Wrongful     )
Death Representative of the    ) Videotaped
Estate of Tanya Gooden and     ) Deposition of:
Cameron Gooden,                )
                               ) BRIAN KEHLER
     Plaintiff,                )
                               )
vs.                            )
                               ) Civil Action No.
Bridgestone Americas Tire      ) 15-cv-45
Operations LLC; Fed Ex Ground  )
Package System, Inc.; and      )
John Doe Corporations/         )
Entities 1-3,                  )
                               )
     Defendants.               )


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

Gina Cubillos, as Wrongful     )
Death Representative of the    )
Estate of James Ednie,         )
                               )
     Plaintiff,                )
                               )
vs.                            ) Civil Action No.
                               ) 15-cv-50
Bridgestone Americas Tire      )
Operations LLC; Fed Ex Ground  )
Package System, Inc.; and      )
John Doe Corporations/         )
Entities 1-3,                  )
                               )
     Defendants.               )

**Page 2**

VIDEOTAPED DEPOSITION OF

BRIAN KEHLER

August 18, 2015 - 9:13 a.m.

Location:  Offices of CitiCourt
           236 South 300 East
           Salt Lake City, Utah


Reporter:  VICKY McDANIEL, CSR, RMR

**Page 3**

APPEARANCES

FOR PLAINTIFF GINA CUBILLOS:

   STEPHEN H. KLINE, ESQ.
   KLINE, McCORKLE & PILGER
   P.O. Box 1938
   Cheyenne, Wyoming 82003-1938
   Tel: (307) 778-7056
   Fax: (307) 635-8106
   steve@kmplaw.net

FOR PLAINTIFF ALODIE GOODEN:
   JAMES E. FITZGERALD, ESQ.
   THE FITZGERALD LAW FIRM
   2108 Warren Avenue
   Cheyenne, Wyoming 82001
   Tel: (307) 634-4000
   Fax: (307) 635-2391

FOR DEFENDANT BRIDGESTONE AMERICAS
TIRE OPERATIONS LLC:

   CHAD LIEBERMAN, ESQ.
   Brosseau Bartlett Seserman, LLC
   6455 South Yosemite Street, Suite 750
   Greenwood Village, Colorado 80111

FOR FED EX GROUND PACKAGE SYSTEM, INC., THE WITNESS,
and CLR TRANSPORTATION:
   LOYD E. SMITH
   MURANE & BOSTWICK, LLP
   508 West 27th Street
   Cheyenne, Wyoming 82001
   Tel: (307) 634-7500
   Fax: (307) 638-7882
   les@murane.com

**Page 4**

FOR THE WITNESS:
   SEAN J. GAMBLE, ESQ.
   FRIEDMAN RUBIN
   51 University Street, Suite 201
   Seattle, Washington 98101
   Tel: (206) 501-4446
   Fax: (206) 782-4358

   DIANA RHODES, ESQ.
   RHODES LAW FIRM, LLC
   2015 Warren Avenue
   Cheyenne, Wyoming 82001
   Tel: (307) 222-0025
   Fax: (307) 222-0280

VIDEOGRAPHER:  Ryan Reverman, CLVS

## 5

### INDEX

| BRIAN KEHLER | PAGE |
|---|---|
| Examination by Mr. Kline | 8 |
| Examination by Mr. Lieberman | 132 |
| Examination by Mr. Fitzgerald | 237 |
| Examination by Mr. Smith | 288 |
| Further Examination by Mr. Kline | 292 |
| Further Examination by Mr. Fitzgerald | 294 |

### EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 32 | Photo of truck cab with items circled | 132 |
| 33 | Photo of truck cab with a device circled | 142 |
| 34 | Invoice from Redbone Diesel dated 5/27/14 | 147 |
| 35 | Commercial Tire invoices dated 8/26/14 | 148 |
| 36 | Sapp Bros. Invoice dated 8/27/14 | 155 |
| 37 | Sapp Bros. Invoice dated 8/30/14 | 158 |
| 38 | FleetNet invoice dated 10/1/14 | 162 |
| 39 | Invoice from Sapp Bros. dated 10/28/14 | 171 |
| 40 | Invoice from Redbone Diesel dated 11/5/14 | 179 |
| 41 | Documentation for trip to Salt Lake leaving 11/7/14 | 184 |
| 42 | Driver's Log for Steven Marks, 11/7/14 | 190 |

## 6

### EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 43 | Google map | 221 |
| 44 | Portion of a police report | 226 |
| 45 | Supplemental Report by Kristin Wetherbee dated 11/12/14 | 227 |
| 46 | Driver Vehicle Inspection Reports | 233 |
| 47 | Photographs of truck at the accident scene | 251 |
| 48 | Driver's Logs for Brian Kehler 10/29/14-11/08/14 | 257 |
| 49 | Driver's Logs for Brian Kehler, 10/8/14-10/28/14 | 259 |
| 50 | Driver's Logs for Brian Kehler, 10/29/14-11/08/14 | 260 |
| 51 | On the Road Reference Guide | 287 |
| 52 | Testing materials | 287 |
| 53 | Driver's Logs for Steven Marks, 10/29/14-11/08/14 | 289 |

\* \* \*

## 7

### PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. The time is approximately 9:13 a.m. This is the videotaped deposition of Brian Kehler in the matter of Gooden versus Bridgestone Americas Tire Operations, LLC, et al., being held at the offices of CitiCourt, LLC, in Salt Lake City, Utah, on August 18th, 2015.

My name is Ryan Reverman, certified legal videographer with the firm of CitiCourt. The court reporter is Vicky McDaniel, also with the firm of CitiCourt.

Counsel will now state their appearances for the record, and the witness will be sworn.

MR. KLINE: Steve Kline on behalf of the Ednie family and Gina Cubillos.

MR. FITZGERALD: Jim Fitzgerald on behalf of the Gooden family.

MR. LIEBERMAN: Chad Lieberman for Bridgestone Americas Tire Operations.

MR. SMITH: Loyd Smith for FedEx Ground and non-parties Brian Kehler and CLR Transportation.

MR. GAMBLE: Sean Gamble for Brian Kehler.

MS. RHODES: Diana Rhodes for Brian Kehler.

## 8

BRIAN KEHLER, called as a witness, being first duly sworn, was examined and testified as follows:

### EXAMINATION

BY MR. KLINE:

Q. Can you please give us your name and address.

A. My name is Brian Douglas Kehler. I live at 581 Grove Drive, Alpine, Utah 84004.

Q. And Mr. Kehler, I introduced myself off the record. We all did. Now that I'm the sole person asking questions to start with, I'll reintroduce myself again. I'm Steve Kline. I'm an attorney out of Cheyenne.

And there are two combined lawsuits that we're here regarding. Obviously you're familiar with those. I represent Gina Cubillos, who is the personal -- wrongful death personal representative of the -- for the Ednie family, which is one half of those claims. Okay?

I'll ask you when we start here, have you ever had a deposition taken before?

A. No, I haven't.

Q. Have you ever testified in a court proceeding?

**Page 121**

1  Q. The number that you had from back in
2  November?
3  A. Correct.
4  Q. Have we covered all of the training you
5  received from either FedEx or any of the independent
6  contractors who you worked for who were involved with
7  FedEx? Have we covered all the training that any of
8  them did with you?
9  A. Pretty much, yeah. I agree.
10 Q. And since hiring on for FedEx, tell me
11 your schedule as far as runs, how frequently you
12 would make runs, how much rest you would have
13 between. I'm just trying to get an idea of what you
14 do every year as far as work.
15 A. Okay. I would start out on Tuesday. I
16 leave Tuesday and I would run to Willington,
17 Connecticut.
18 Q. What's the name of that town in
19 Connecticut?
20 A. Willington.
21 Q. I'm assuming that's near Hartford
22 somewhere?
23 A. No. That's near the Massachusetts line.
24 Q. Okay.
25 A. It's 20 miles northeast of Hartford. We

**Page 122**

1  would go there and pick up the next set of trailers
2  and head back, get back on Friday night and then get
3  up Saturday and go to Des Moines, Iowa and return on
4  Sunday night.
5        And then the following week would leave on
6  Wednesday --
7  Q. Let me stop you there for a second. You
8  would leave Des Moines on Sunday, or you actually
9  returned to Salt Lake on Sunday?
10 A. Both.
11 Q. Both. Okay.
12 A. Right.
13 Q. And then would you rest from Sunday till
14 Wednesday morning?
15 A. No.
16 Q. No.
17 A. We would come back Sunday.
18 Q. Okay. So let me rephrase it. You would
19 rest from Monday until Wednesday?
20 A. Correct.
21 Q. Okay. And you'd go pick up a load on
22 Wednesday?
23 A. Correct.
24 Q. And start over again as far as driving to
25 Hartford?

**Page 123**

1  A. Correct.
2  Q. And during the two years plus that you
3  worked for Mr. Rodwick, did you take vacations?
4  A. Yes.
5  Q. So I'm trying to figure out how much --
6  how many of these runs you would make, typically.
7  And you can break it down any way you want -- in a
8  month, six months, a year.
9  A. Before vacation?
10 Q. Yeah. And we'll throw vacations in there
11 whenever you want to talk about those.
12 A. Well, I would just have my normal time
13 off, you know, the two days in between the runs. And
14 then probably -- it would be around 4th of July that
15 I would start requesting a week off and to go on a
16 vacation, you know, get away from the monotony.
17 Q. And how many days off did you take a year?
18 Other than obviously there's the two-day downtime --
19 A. Uh-huh.
20 Q. -- between the Des Moines trip and the
21 next Hartford trip --
22 A. Uh-huh.
23 Q. -- correct?
24 A. Right.
25 Q. Other than that --

**Page 124**

1  A. Yeah.
2  Q. -- I'm trying to understand, you know,
3  when you would take time off, how much time you would
4  take.
5  A. I would take a week off, a full week.
6  Q. So you're working 51 weeks a year?
7  A. That would be pretty accurate.
8  Q. And you did that for two and a half years.
9  Did I get that right?
10 A. That's pretty accurate.
11 Q. And during that period of time you had the
12 very same schedule once you picked up Mr. Marks of
13 going and doing a Hartford and back run, and then a
14 Des Moines and back run, and then starting over again
15 after two days rest?
16 A. Correct.
17 Q. And did you ever have a partner other than
18 Mr. Marks on this -- once you picked up Mr. Marks?
19 A. No.
20 Q. And did anyone else drive that tractor --
21 the tractors that you were driving other than you and
22 Mr. Marks?
23 A. I want to back up a little bit, if I
24 could.
25 Q. Sure.

125

1  A.  One -- one time I had another driver
2  because he was sick, and I had a fill-in that I had.
3  Otherwise it's Steve.
4  Q.  So you only had a fill-in for Mr. Marks on
5  one occasion that you recall in that period of time?
6  A.  That I can recall.
7  Q.  And so each of the trips to outside of
8  Hartford and Des Moines started here in North Salt --
9  North Salt Lake, correct?
10  A.  Correct.
11  Q.  And tell me physically what you did to get
12  your next assignment. You know what -- do you
13  understand what I'm asking?
14  A.  What would I do physically to get my next
15  assignment?
16  Q.  Right. I get -- I take it every Wednesday
17  you knew to show up to get a haul to Hartford?
18  A.  Correct.
19  Q.  And what would you -- walk me through what
20  you did to get that assignment.
21  A.  Well, I would -- on -- for the Des Moines
22  run?
23  Q.  And the Hartford run, both of them.
24  A.  Okay. I would park my car in the parking
25  lot, and I would go through the gate, swipe my card

126

1  to be allowed to come in. And then --
2  Q.  And that's your FedEx I.D.?
3  A.  Exactly.
4  Q.  Okay.
5  A.  Then I would go to Linehaul and tell them
6  my truck number, and they would pull up the paperwork
7  for the truck number, what's assigned, and give me
8  the load and the trailer numbers. And then I would
9  go out and fetch them and then bring back the
10  paperwork --
11  Q.  I'm sorry. I missed that. You would go
12  out and what?
13  A.  Fetch them.
14  Q.  Fetch them, okay. So FedEx assigned you
15  the routes?
16  A.  Correct.
17  Q.  And they assigned you the trailers you
18  were to haul?
19  A.  Correct.
20  Q.  Did you know in each instance what you
21  were hauling?
22  A.  Never.
23  Q.  Okay. How were you dressed?
24  A.  I usually wore -- depends on the season.
25  On nice days I'd wear probably shorts and FedEx

127

1  shirt. Always wore a FedEx shirt.
2  Q.  Did you have a FedEx -- anything else? A
3  ball cap? A jacket? A --
4  A.  Jacket, rain jacket. The cold months I'd
5  wear jeans and, you know, long-sleeve shirts.
6  Q.  And FedEx allowed you to wear shorts?
7  A.  Yes.
8  Q.  Did they regulate your appearance? I
9  mean, what did they require of you appearance-wise,
10  FedEx?
11  A.  Well, it's not a requirement to wear FedEx
12  clothes. The contractors supplied the uniform for
13  the drivers. I can tell you that other contractors
14  automatically get them for you, where like Chris, I
15  asked for it.
16  Q.  Have you ever seen a FedEx driver driving
17  down the road in a FedEx truck for an independent
18  contractor who didn't have any identification
19  clothing, anything that said FedEx on it?
20  A.  Just like this shirt?
21  Q.  Yes.
22  A.  Absolutely.
23  Q.  How frequently do you see that?
24  A.  Pretty frequently.
25  Q.  Do you know what the contract between

128

1  Mr. Rodwick and FedEx says about clothing?
2  A.  No, I don't.
3  Q.  Did you ever -- did FedEx ever front you
4  any money for business expenses or --
5  A.  No.
6  Q.  Okay. You look shocked by that question.
7  A.  I am.
8  Q.  Did they ever -- did you ever pay for
9  anything that was invoiced to FedEx that you had to
10  pay back?
11  A.  Pay back? Can you rephrase that?
12  Q.  I'm just -- did you ever pay for anything
13  that FedEx paid you back for?
14  A.  I have paid for items out of my own pocket
15  that I got reimbursed from Chris and from other
16  contractors out of my own pocket.
17  Q.  But not FedEx?
18  A.  Not for me personally. Maybe by Steve. I
19  mean, we had an incident that -- for the trailer that
20  had a broken -- it's a plastic -- where the plug goes
21  in -- where the electric line goes in and this
22  housing is busted. So we had to purchase that at a
23  truck stop in Laramie. So therefore, that's FedEx.
24  But we had to pay for it -- or he did, and then he
25  got reimbursed.

**245**

1  A. Correct.
2  Q. And I won't go through every month,
3  obviously, but those go back -- your personal logs go
4  back for a couple of years. Do we understand that
5  correctly?
6  A. Correct.
7  Q. Okay. So we know about the skinny little
8  book. We know about logs. We know you have FedEx
9  clothing at home. What else do you have at home that
10 relates to the work you did for FedEx?
11 A. That's surely it.
12 Q. I want to make sure that we're clear on
13 getting the maintenance done on the truck. Earlier
14 in the deposition I believe I heard you say that --
15 and you can correct me on any of my questions, but I
16 believe I heard you say that when you take a truck, a
17 FedEx truck, in at the end of your work, it goes to
18 the FedEx yard and it stays there until you get back?
19 A. That's correct.
20 Q. Okay. And we also understand that at some
21 point it sounded like you were saying that Redbone
22 could have gone over, gotten your truck, and taken it
23 to their shop?
24 A. That's correct.
25 Q. Okay.

**246**

1  A. I've used them a couple times.
2  Q. All right. So we need to understand,
3  under what circumstances can Redbone just go get your
4  truck?
5  A. Under the circumstance that I allow --
6  allow them.
7  Q. So you would be talking to Redbone and --
8  or who would initiate the conversation, for example?
9  A. I would. I would go over there and tell
10 them that if they would do an oil change on it.
11 Q. And would -- is Redbone authorized to come
12 and take your truck without you knowing about it?
13 A. No.
14 Q. How do you get your truck back?
15 A. They drive it back over.
16 Q. Okay. Do you have to leave your keys
17 there at the FedEx building?
18 A. No. You leave them in the truck.
19 Q. Okay. And the truck is inside a gated
20 facility, correct?
21 A. Correct.
22 Q. Chain link fence all around?
23 A. Correct.
24 Q. So you have no hesitation to leave your
25 keys there?

**247**

1  A. Correct.
2  Q. All right.
3  Tell us about the Linehaul facility. When
4  you -- when you show up to go drive freight for
5  FedEx, what building do you go to?
6  A. It's the main building that -- it's
7  connected. The building's all connected. It's on
8  the north end of the warehouse, and that's where I
9  would go, on the north end of the building.
10 Q. What is it connected to?
11 A. It's connected to the packaging -- not --
12 transferring warehouse with the conveyor belts where
13 they back up the trailers and local trucks that they
14 would sort, and they would be dispersed into said
15 vehicles and trailers.
16 Q. Okay. When you go into the Linehaul
17 building, what do you see?
18 A. I see -- when I walk in, off to my right
19 is a sitting area. You want to have lunch, there's
20 soda machines, vendors. Off to my -- then there's
21 bathrooms, and off to my immediate left is the
22 dispatch area. If you go down the hall a little bit
23 and take a left, there's the computers and the door
24 that goes into dispatch area.
25 Q. In the building that -- that encloses what

**248**

1  you just described, is there more? I mean, is there
2  something beside Linehaul, or is that all there is in
3  that building?
4  A. There's a administration building that's
5  on the west side of the building. And off to the
6  northwest side of the building, not connected, is a
7  repair shop.
8  Q. How many people are working in the
9  Linehaul area, typically?
10 A. I don't know.
11 Q. I mean, is it like six or eight, or 50 or
12 more?
13 A. Putting boxes in the --
14 Q. No, no. I mean, when you --
15 A. Oh. Oh, okay.
16 Q. -- when you walk in --
17 A. Okay.
18 Q. -- and dispatch is on one side and there's
19 a break area on the other.
20 A. There's usually two dispatchers. The
21 manager's in the back in his office, and there's
22 another couple offices with another couple people and
23 some clerks and the log girl who does the logs.
24 That's about it.
25 Q. Okay. And in the administration part of

### Page 265

1  Q. You're the first one to move the truck?
2  A. I am.
3  Q. All right. When you took the truck to
4  Warner, for example, for maintenance, what did you do
5  while they were maintaining it? Did you wait there,
6  or did you drop the truck off and come back later?
7  A. I didn't take the truck to Warner --
8  Q. Okay.
9  A. -- for maintenance.
10 Q. All right. Did the truck ever go to
11 Warner -- the tractor, pardon me, did it ever go to
12 Warner for maintenance?
13 A. No. I -- I would have gone to Sapp Bros.
14 Q. Would anybody besides you have taken the
15 truck to Warner for maintenance?
16 A. Not that I know of.
17 Q. Okay. When it -- when it went to Sapp
18 Bros., what was your routine? Did you say, you know,
19 "Here I am; I'm going to go over to the cafe and have
20 a bite to eat and I'll be back in an hour?" What did
21 you do?
22 A. Right. I'd go in there and line up the
23 oil change, or if I had any repairs or to get some
24 tires, and then I would go over to the restaurant and
25 I'd wait there. Then I'd come back right before

### Page 266

1  they'd finish and --
2  Q. And wait?
3  A. Yeah.
4  Q. In the -- in their waiting area?
5  A. Yes.
6  Q. Okay. Did anybody besides you and
7  Mr. Marks ever drive this tractor during the period
8  between August 26, 2014 and the day of the wreck?
9  A. I don't know.
10 Q. Did you tell the highway patrol that this
11 truck was about to be given to another crew?
12 A. I don't remember that.
13 Q. Is it even plausible that this truck was
14 about to be given to another crew?
15 A. It's plausible.
16 Q. Okay. Tell us what that would mean. Does
17 that mean you'd be assigned to another truck for the
18 future?
19 A. Correct.
20 Q. So somebody else would take it over
21 entirely?
22 A. Correct.
23 Q. Let me be more clear. Somebody else would
24 take over this particular tractor entirely?
25 A. Correct.

### Page 267

1  Q. Another -- another crew consisting of
2  someone such as yourself and Mr. Marks, correct?
3  A. No. It would be a singular.
4  Q. Oh. A solo driver?
5  A. Correct.
6  Q. And explain that for us, please.
7  A. He has four solo drivers and one team.
8  Q. Okay. And why would a truck ever be
9  turned over from a team to a solo?
10 A. Because the road truck puts on so much
11 miles that every couple years you turn it over to the
12 next man below, whatever truck needs to be taken off
13 the road, that's the oldest, has the most mileage,
14 most wear. And the team, such as my case, would get
15 the fresh truck, the fresh used truck.
16 Q. Okay. And who is Mike Hays [sic], again?
17 You said somebody would get the fresh truck. Who --
18 A. That would be who's next in line that
19 has --
20 Q. Oh.
21 A. -- the oldest or most mileage, worn-down
22 truck. That would be pulled off line, and this would
23 replace that truck.
24 Q. At the time of this incident that brings
25 us all together here, was this the oldest, most worn

### Page 268

1  truck?
2  A. The one that I was driving?
3  Q. The 125417.
4  A. No.
5  Q. Do you know which one was more worn?
6  A. Not without looking at the numbers of the
7  trucks.
8  Q. You're just sure there was one --
9  A. Yes.
10 Q. -- that was more worn?
11 A. Yes.
12 Q. Have you ever heard of a thing called
13 Linehaul contractor orientation?
14 A. Linehaul contractor orientation?
15 Q. Yes.
16 A. That's unfamiliar to me.
17 Q. When you first started hauling freight for
18 FedEx Ground, were you given -- how -- how did you
19 learn the FedEx way?
20 A. As I described earlier, I learned like a
21 shotgun wedding. You come aboard, you take your
22 test, you file the application, you do your drug
23 test, and you do a road test. And they gave you a
24 little bit of shotgun about hooking up, and then you
25 go with a driver that has been doing it and you learn

1                    REPORTER'S CERTIFICATE

           I, Vicky McDaniel, Certified Shorthand
Reporter in and for the State of Utah, do hereby
certify:

           That prior to being examined, the witness,
BRIAN KEHLER, was by me duly sworn to tell the truth,
the whole truth, and nothing but the truth;

           That said deposition was taken down by me
in stenotype on August 18, 2015, at the place herein
named and was thereafter transcribed, and that a true
and correct transcription of said testimony is set
forth in the preceding pages.

           I further certify that, a request having
been made to review the transcript, a reading copy
was sent to Mr. Smith for the witness to read and
sign and then return to me for filing with Mr. Kline.

           I further certify that I am not of kin or
otherwise associated with any of the parties to said
cause of action and that I am not interested in the
outcome thereof.

           WITNESS MY HAND this 31st day of August,
2015.




                         _____
                         Vicky McDaniel, CSR, RMR
                         Notary Public
                         Residing in Salt Lake County